UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | |
|---|---|
| LUCILLE BUTLER, individually, and as Special Administrator of the Estate of KEVIN LUCAS, deceased, <br><br> Plaintiffs, <br><br> v. <br><br> VERMILLION COUNTY SHERIFF W. PATRICK HARTSHORN, KENNETH O'BRIEN, SERGEANT FRANK SPORICH, COUNTY CORRECTIONAL OFFICERS SERGEANT MARC REYNOLDS, OFFICER MICHAEL SCHULL, OFFICER RICHARD LONG, AND LT. RAY LLEWWELLYN, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) 04 CV 2048 ) ) ) ) The Honorable Michael P. McCuskey ) Magistrate Judge David G. Bernthal ) ) ) ) ) ) ) |

**INDEX OF EXHIBITS IN SUPPORT OF**
**DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS**

1. Lucille Butler's Deposition Transcript

2. Elisha Stanford's Deposition Transcript

3. David E. Decker's Deposition Transcript

4. Kenneth O'Brien's Deposition Transcript

5. Marc Reynolds' Deposition Transcript

6. Michael Schull's Deposition Transcript

7. Frank Sporcich's Deposition Transcript

8. Richard Long's Deposition Transcript

9. Raymond Lewellyn's Deposition Transcript

i

10. Vermilion County's Cell Check Book-In Sheet for First Shift, dated May 10, 2003

11. Toxicology Report, dated May 21, 2003, regarding the contents of the bag found in Kevin Lucas' padded cell

12. Vermilion County Investigative Report written by Rod Kaag

13. Medix Emergency Medical Services Report, dated May 10, 2003

14. Cole Elder's Deposition Transcript

15. Ryan Allison's Deposition Transcript

16. Dr. Scott Denton's Deposition Transcript

17. Dr. Scott Denton's Autopsy Report, dated June 19, 2003

18. Toxicology Report, dated May 30, 2003, regarding Kevin Lucas' blood alcohol and cocaine levels

19. IDOC Specialist Michael Talkington's letter to Sheriff Pat Hartshorn, dated October 10, 2003, and Talkington's memorandum, dated May 20, 2003, regarding his investigation into Kevin Lucas' death

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| LUCILLE BUTLER, individually, and as Special Administrator of the Estate of KEVIN LUCAS, deceased, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 04 CV 2048 |
| VERMILLION COUNTY SHERIFF W. PATRICK HARTSHORN, KENNETH O'BRIEN, SERGEANT FRANK SPORICH, COUNTY CORRECTIONAL OFFICERS SERGEANT MARC REYNOLDS, OFFICER MICHAEL SCHULL, OFFICER RICHARD LONG, AND LT. RAY LLEWWELLYN, | ) ) ) ) ) ) ) ) ) | The Honorable Michael P. McCuskey Magistrate Judge David G. Bernthal |
| Defendants. | ) | |

**DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS FILED IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 7.1(D), Defendants state that the following material facts are undisputed and that Defendants are entitled to summary judgment based on the following undisputed facts:

**THE PARTIES**

1. Plaintiff Lucille Butler was the mother of Kevin Lucas (D.O.B. 9/6/77) and has brought this action as the special administrator of her son's estate (Am. Comp. ¶ 2; Ex. 1–Butler Dep., p. 8).

2. W. Patrick Hartshorn is the duly elected Sheriff of Vermilion County and is sued only in his official capacity (Am. Comp. ¶ 3).

3. Vermilion County Deputy Sheriff Ken O'Brien and Sergeant Frank Sporcich were, at the time of all relevant events, Vermilion County Deputy Sheriffs. Lieutenant Ray Lewellyn, Sergeant Marc Reynolds, Officer Michael Schull and Officer Richard Long were, at the time of all relevant events, Vermilion County Correctional Officers (Am. Comp. ¶¶ 4-5).

**THE UNDISPUTED FACTS OCCURRING BEFORE
PLAINTIFF'S ARREST IN THE MORNING OF MAY 10, 2003**

4. In the early morning of May 10, 2003, Kevin Lucas ("Kevin") had been at a bar drinking with friends and subsequently went to someone's trailer home with two friends, Donnie Finch, and an admitted drug dealer and convicted felon by the name of Elisha Stanford (Ex. 2–Stanford Dep., pp. 7-8, 17-18).

5. The three men arrived at the friend's trailer at around 4:00 a.m. and Lucas "didn't seem too drunk" at the time, according to Stanford (Ex. 2, pp. 21-22). After staying at the friend's trailer for awhile, Stanford agreed to take Kevin home and the two began the five minute drive to Kevin's home. Shortly after leaving, however, Kevin advised Stanford that he wanted to get out of the car and walk the remaining way home. Accordingly, Kevin got out of Stanford's vehicle on Griffin Street in Danville (Ex. 2, pp. 26-27).

6. According to Stanford, Kevin was not incoherent and was not slurring his words when Stanford last saw him (Ex. 2, pp. 26-27).

7. At around 6:30 a.m., Kevin was acting erratically at or near trailers located at 701 S. Griffin, Lot 1, Danville, Illinois (Am. Comp. ¶ 6). Kevin knocked on the door of a resident living in the trailer park, David Decker, and asked Decker to call the police because someone was trying to kidnap him. Decker called 911 and asked that a police officer be dispatched (Ex. 3–Decker Dep., pp. 7-10, 28-29).

2

8.  Kevin did not ask Decker for a doctor or medical attention and did not complain that he was hurt or indicate that he was in pain (Ex. 3, p. 32).

9.  If Decker had believed that Kevin was having a medical emergency, he would have told 911 that Kevin needed medical attention (Ex. 3, pp. 32-33).

10. Kevin was coherent when he spoke with Decker (Ex. 3, p. 33).

### THE ARRIVAL AT THE TRAILER PARK OF DEFENDANTS O'BRIEN & SPORCICH AND THE TRANSPORT OF PLAINTIFF TO THE COUNTY'S PUBLIC SAFETY BUILDING

11. Shortly after 6:30 a.m., Defendant Deputy Ken O'Brien arrived on the scene in his squad car. Kevin attempted to enter O'Brien's car when he arrived but the doors were locked (Am. Comp. ¶ 8; Ex. 3, p. 12).

12. O'Brien met Kevin at the back of his vehicle and the two had a short conversation, during which time Lucas indicated that he was "blown" (Ex. 3, p. 12; Ex. 4-O'Brien Dep., pp. 25-26).

13. O'Brien assumed that Lucas had taken a narcotic of some sort (Ex. 4, pp. 25-26).

14. O'Brien also smelled alcohol on Kevin and Kevin said something to O'Brien about being "drunk" (Ex. 4, pp. 25, 29).

15. O'Brien decided to handcuff Kevin for his own safety as well as Kevin's safety and advised Kevin of his intentions (Ex. 4, pp. 25, 28-30). O'Brien then attempted to place the handcuffs on Kevin but Kevin started to pull away and walk away from O'Brien (Ex. 4, pp. 32, 39-41). O'Brien was ultimately able to handcuff Kevin; by this time, O'Brien had decided that he was going to take Kevin to the Vermilion County Public Safety Building ("PSB") and that Kevin was under arrest because of his resistance/obstruction of O'Brien (Am. Comp. ¶ 13; Ex. 4, pp. 28-33, 40, 46-47).

3

16. Sergeant Frank Sporcich arrived on the scene while O'Brien was attempting to put Kevin into his police car (Ex. 4, pp. 43-44).

17. O'Brien wanted to "pat down" Kevin at the scene of the arrest but was unable to because Kevin was uncooperative and O'Brien was finding it difficult to maintain control of Kevin (Ex. 4, pp. 39-40, 86-88).

18. Kevin resisted O'Brien's actions. Kevin pulled away from O'Brien and was lifting his feet up in the air after O'Brien handcuffed him (Ex. 4, pp. 40-41).

19. At no time during the arrest did Kevin exhibit any problems breathing (Ex. 4, pp. 42-43).

### EVENTS AT THE COUNTY'S PUBLIC SAFETY BUILDING

20. Kevin was driven to the Vermilion County Public Safety Building ("PSB") by Deputy O'Brien (Am. Comp. ¶ 18; Ex. 4, pp. 56-58). While on the way to the PSB, O'Brien asked Kevin if he had a job and Kevin said that he did. Kevin also talked about how Danville was going downhill because it was turning into more of a city (Ex. 4, p. 53).

21. Kevin was assisted into the PSB by O'Brien, Sporcich and the on duty supervisor working at the time, Sgt. Marc Reynolds (Ex. 5–Reynolds Dep., pp. 12-14). When Kevin saw Sgt. Reynolds, Kevin called out to him and used Reynolds' correct name (Ex. 5, p. 15).

22. When Kevin walked by him at the PSB, Sgt. Reynolds assumed that Kevin was either drunk or high since Kevin was agitated, his speech was slurred and his eyes were bloodshot (Ex. 5, p. 21).

23. Lucas was brought to the book-in area and was placed at a bench in the book-in area (Ex. 5, pp. 31-33).

4

24. Upon being placed at the bench in the book-in area, Lucas repeatedly got up off the bench and was ignoring Deputy O'Brien's instructions to remain seated (Ex. 5, pp. 31-33; Ex. 6-Schull Dep., pp. 25-26).

25. The book-in officer working at the time was Defendant Correctional Officer Mike Schull. Schull assumed that Kevin was intoxicated or on something because of Lucas' fidgitiness and his repeated standing up and sitting down (Ex. 6, pp. 9, 27).

26. Officer Schull neither spoke with Kevin nor did he conduct a physical assessment of Kevin, although he did have a chance to observe Kevin at the PSB (Ex. 6, pp. 30-31, 48, 91-92). Officer Schull did not believe that Kevin needed medical treatment and Kevin never asked for medical treatment at the PSB (Ex. 6, p. 91).

27. Seeing that Lucas was not following O'Brien's directives to remain seated, Sgt. Reynolds ordered that Kevin be placed in the padded cell at the PSB for Kevin's safety (since the regular cells at the PSB had steel bunk beds with sharp corners) (Ex. 5, pp. 33-35).

28. Kevin was brought to the padded cell and placed inside by Officer O'Brien and Sgt. Sporcich at approximately 6:45 a.m. (Am. Comp. ¶¶ 19, 25; Ex. 4, pp. 63-68; Ex. 7–Sporcich Dep., pp. 30-34).

29. Sgt. Sporcich assumed that Kevin was under the influence of alcohol because of Kevin's slurred speech, his excitability and his refusal to cooperate with officers (Ex. 7, pp. 39-40, 48).

30. Kevin was breathing normally when he was brought to the padded cell (Ex. 4, p. 70; Ex. 7, pp. 66-67).

31. Kevin was placed in the padded cell, and four officers, including O'Brien, Sporcich, Schull, and Reynolds, laid Kevin on his chest and removed his handcuffs (Ex. 4, pp. 72-80; Ex. 7, p. 41). The officers then took off Kevin's clothes and shoes, leaving Kevin in just his underwear and socks (Ex. 4, p. 77; Ex. 7, p. 71).

32. After removing Kevin's handcuffs and clothes, the four officers quickly exited the cell (Ex. 4, pp. 78-80).

33. At the time and immediately after the officers exited the padded cell, Kevin was yelling and was clearly conscious (Ex. 4, pp. 80-81).

34. At no time did Kevin ever complain of any injuries or request medical assistance (Ex. 4, p. 95; Ex. 7, pp. 66-67).

35. Officer O'Brien and Sgt. Sporcich never believed that Kevin needed medical attention (Ex. 4, p.124; Ex. 7, pp. 41, 66-67).

36. While Vermilion County Jail regulations provide that inmates who are "injured or seriously ill or unconscious" are not to be admitted into the Jail, Kevin did not meet any of these criteria since he was conscious and did not appear to be injured or seriously ill (Ex. 6, pp. 98-101).

**EVENTS AFTER KEVIN WAS PLACED IN THE PADDED CELL AT 6:45 A.M.**

37. At 6:55 a.m, Officer Schull returned to Kevin's cell to check on his condition (Ex. 6, pp. 44-45). Kevin was looking through the open food slot in the cell and asked Schull to get him out of there. Id. Schull did not respond but observed that Kevin did not appear to be in any physical distress nor did he have any apparent injuries or illnesses. Id. at pp. 106, 119-120.

6

38. At the end of his shift at 7:00 a.m., Officer Schull advised the correctional officer coming on duty, Richard Long, that Kevin was in the padded cell, that he was intoxicated, and that he had not yet been processed (Ex. 6, pp. 44-45).

39. Defendants Deputy O'Brien, Sgt. Sporcich, Corrections Sgt. Reynolds and book-in Officer Schull all ended their shifts at 7:00 a.m., which was just after Kevin was placed in the padded cell. None of these four officers had any further contact with Kevin after 7:00 a.m. (Ex. 6, p. 41; Ex. 5, p. 44; Ex. 4, pp. 82-83; Ex. 7, p. 30). Additionally, none of these four Defendants, except Schull, had any contact with oncoming Correctional Officer Richard Long (Ex. 8, Long Dep., p. 46).

40. Vermilion County Lieutenant Ray Lewellyn arrived for his shift ("first shift") on May 10, 2003 at approximately 6:30 a.m. and went up to his office on the third floor at the PSB (Ex. 9–Lewellyn Dep., pp. 21-22). At approximately 7:00 a.m., the third shift supervisor, Defendant Sgt. Marc Reynolds, walked up to the third floor of the PSB and notified Lt. Lewellyn that Kevin was in the padded cell, that Kevin appeared to be under the influence of something and that Kevin was placed inside the padded cell because of his agitated state (Am. Comp. ¶ 23; Ex. 9, pp. 22-28; Ex. 5, pp. 44-46). Sgt. Reynolds then left the PSB since his shift was over (Ex. 5, p. 44).

41. Lt. Lewellyn did not have any contact or interaction with Kevin until after 11:05 a.m., when Correctional Officer Long called him regarding Kevin's condition (Ex. 9, pp. 21-22).

42. Correctional Officer Long conducted visual checks of Kevin inside the padded cell every 30 minutes between 7:00 a.m.-11:05 a.m. (Ex. 8, p. 15). Specifically, Long checked on Kevin in his cell at 7:03, 7:33, 8:05, 8:36, 9:07, 9:40, 10:10, 10:40 and finally at 11:05 a.m. (Ex. 8, pp. 15-16, 21-22; Ex. 10–Cell Check–Shift 1 for May 10, 2003).

43. During the cell checks, Long looked through the open food slot at the front of the cell to make sure that Kevin was accounted for and was not doing any bodily harm to himself. Ex. 8, pp. 21-22, 31-32.

44. At 7:03 a.m., Long observed Kevin on his knees leaning against the left wall of the cell. Kevin was facing the door of the cell and was conscious but mumbling incoherently (Ex. 8, pp. 26-28).

45. At 7:33 a.m., Long observed Kevin in the same position that he was in 30 minutes earlier (Ex. 8, p. 31).

46. During the 8:36 a.m. check, Long observed Lucas in a slightly different position. Although Kevin was still in the same general area in the padded cell, Kevin was now laying on his right side. Id. at pp. 32-33.

47. At 10:40 a.m., Long observed Kevin lying on his stomach, in the same location that he had been at all prior times (the left side of the padded cell). Id. at pp. 33-34.

48. Long did not speak with Kevin during any of his cell checks (Ex. 8, p. 21).

49. Long believed that Kevin was okay and assumed that Kevin was sleeping off his intoxication (Ex. 8, pp. 22, 53, 77).

50. At 11:05 a.m., Long decided that he would attempt to wake up Kevin before lunch and process him (Ex. 8, pp. 14-15, 34). Long opened the door of the padded cell and patted Kevin on the back. Not receiving any response, Long grabbed Kevin's arm and unsuccessfully checked for a pulse. Id.

8

51. Long called Lieutenant Lewellyn on his radio and indicated that he needed Lewellyn to come to booking. Id. at pp. 39-40. Long also called Correctional Officer Karla Young and asked her to bring ammonia tablets to the cell. Id. Correctional Officers Young and Long then unsuccessfully attempted to awake Kevin with the ammonia tablets. Id. at pp. 43-46.

52. Upon entering the cell, Long also observed a small tied bag a foot or so away from Kevin's feet (Ex. 8, pp. 46-47). The contents of this bag, which had been tied in a knot at the end, were later tested and it was determined that the substance in the bag included cocaine (Ex. 11–Toxicology report regarding cocaine; Ex. 12-Report of County Investigator Rod Kaag).

53. Long never observed Kevin snort any cocaine inside the cell (Long Dep., p. 47).

54. Upon being advised of Kevin's unresponsive condition shortly after 11:05 a.m., Lt. Lewellyn took the elevator down to the first floor and went to the padded cell to check on Kevin (Ex. 9, pp. 29-32). After checking unsuccessfully for a pulse and noting Lucas' cold body, Lt. Lewellyn advised Officer Long to call 911 and request that a rescue squad come to the PSB (Ex. 9, pp. 37-38, 44).

55. Lt. Lewellyn concluded at that time that Kevin was already dead because of the lack of any pulse and the cold, still state of Kevin's body (Ex. 9, pp. 43-44, 60).

9

56. Medix Emergency Services was called at 11:18 a.m. and paramedics Cole Elder and Ryan Allison arrived at the PSB at 11:22 a.m. (Ex. 13–Medix Report, dated May 10, 2003). After entering the PSB and going into the padded cell, paramedic Elder touched Kevin's right arm and checked for a pulse (Ex. 14–Elder Dep., pp. 9-10). Elder then tried to roll Kevin over, at which time Elder noted that rigor mortis had already set in over "most of" Kevin's body, including his arms and legs. Id. at pp. 9-10, 23-24. Paramedic Allison also noted that Kevin had "very observable" rigor mortis (Ex. 15–Allison Dep., p. 68).

57. At 11:27 a.m., paramedics confirmed that there was no electrical activity in Kevin's heart and Kevin was formally pronounced dead (via a phone call with physicians at Provena Hospital) at 11:33 a.m. (Ex. 14, pp. 11-13; Ex. 15, pp. 50-53).

**RELEVANT EVENTS AFTER LUCAS WAS PRONOUNCED DEAD**

58. On May 11, 2003, Medical Examiner J. Scott Denton conducted an autopsy on Kevin (Ex. 16–Denton dep., p. 10). After conducting the autopsy and reviewing Kevin's toxicology reports, Denton concluded that Kevin died as a result of "cocaine and alcohol intoxication" which caused Kevin's heart to beat irregularly ("cardiac arrhythmia") (Ex. 16, pp. 56-57, 85-86; Ex. 17–Denton's Autopsy Report, dated June 19, 2003; Ex. 18–ISP toxicology report, dated May 30, 2003).

59. Denton considered but specifically ruled out excessive force by the police or Kevin's asthmatic condition as causes or contributing factors in Kevin's death (Ex. 16, pp. 42-53, 57-62, 73-74, 133).

60. The toxicology report indicates that Kevin had a blood alcohol level of .097 g/DL and a vitreous humor alcohol level of .131 g/DL at the time of his death.

10

61. Kevin had a cocaine level of 285 ug/L in his blood and a cocaine metabolite level of 890 ug/L at the time of his death (Ex. 18).

62. Rigor mortis is a tell tale sign of death (Ex. 16, p. 126).

63. Given the presence of rigor mortis in Kevin's arms and legs at approximately 11:22 a.m., Kevin probably died in the padded cell sometime before 10:22 a.m. since rigor mortis typically takes an hour to two hours to manifest itself after a person dies (Ex. 16, pp. 105-106, 149-158).

64. On May 20, 2003, Illinois Department of Correcions Specialist Michael Talkington investigated the events surrounding Kevin's death. Talkington found no violations of the Illinois County Jail Standards (20 Illinois Administrative Code 701) (Ex. 19–Talkington's letter to Sheriff Hartshorn).

65. The Illinois County Jail Standards state *inter alia* that "any seriously injured, seriously ill, or unconscious person must not be admitted to the jail until a medical examination has been conducted by a licensed physician..." Id. at ch. 701.40(e).

66. The Illinois County Jail Standards state *inter alia* that "detainees shall be given an immediate frisk search." Id. at ch. 701.40(b).

67. The Illinois County Jail Standards state *inter alia* that "a jail officer shall provide personal observation, not including observation by a monitoring device, at least once every 30 minutes." Id. at ch. 701.130.

68. The Illinois County Jail Standards state *inter alia* that "jail sections housing persons who are escape risks, suicidal, mentally disturbed or impaired, or who present special security concerns shall be given special care and supervision and checked more frequently than the standard 30-minute check." Id. at ch. 701.140.  (Note: the Illinois County Jail Standards do not define the phrase "mentally disturbed or impaired").

> s/JASON W. ROSE
> Jason W. Rose, Attorney No. 06208130
> Michael W. Condon, Attorney No. 06192071
> Attorneys for Defendants
> HERVAS, CONDON & BERSANI, P.C.
> 333 Pierce Road, Suite 195
> Itasca, IL 60243-3156
> Ph: 630-773-4774
> Fax: 630-773-4851
> jrose@hcbattorneys.com

| | |
|---|---|
| STATE OF ILLINOIS | ) |
| | )SS. |
| COUNTY OF DUPAGE | ) |

## CERTIFICATE OF SERVICE

I hereby certify that on Wednesday, March 15, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following CM/ECF participant: Dennis J. DeCaro.

s/JASON W. ROSE
Jason W. Rose, Attorney No. 06208130
Michael W. Condon, Attorney No. 06192071
Attorneys for Defendants
HERVAS, CONDON & BERSANI, P.C.
333 Pierce Road, Suite 195
Itasca, IL 60243-3156
Ph: 630-773-4774
Fax: 630-773-4851
jrose@hcbattorneys.com

13