IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
STATE OF ILLINOIS

LUCILLE BUTLER, individually, and)
as Special Administrator of the )
Estate of KEVIN LUCAS, deceased, )
                             )

COPY

      Plaintiff,        )
                             )
-vs-                  )No. 04 CV 2048
                             )
VERMILION COUNTY SHERIFF W. PATRICK)
HARTSHORN, et al.,       )
                             )
      Defendants.      )

DEPOSITION

   The deposition of DAVID E. DECKER, a citizen of
the State of Illinois, a witness of lawful age;
produced, sworn, and examined upon his corporeal
oath, at the Vermilion County Courthouse, 7 North
Vermilion, Danville, Illinois, on the 26th day of
August, 2005, before Amy L. Prillaman, CSR, License
No. 084-003275, in and for the County of Vermilion
and State of Illinois; as a witness in a certain suit
and matter now pending and undetermined in the United
States District Court for the Central District of
Illinois.

     APPEARANCES:

              Mr. Dennis De Caro
              KUPETS & DE CARO, P.C.
              30 North LaSalle, Suite 4020
              Chicago, Illinois  60602
              Appearing for the Plaintiff

              Mr. Jason W. Rose
              HERVAS, SOTOS, CONDON & BERSANI
              333 Pierce Road, #195
              Itasca, Illinois  60143
              Appearing for the Defendants

          ALSO PRESENT:  Lucille Butler

EXHIBIT 3

Page 2

1                    I N D E X

2  Examinations                        Page

3
    EXAMINATION,                        3
4  BY: MR. DENNIS DE CARO:
    EXAMINATION CONDUCTED:              30
5    BY: MR. JASON W. ROSE:
    RE-EXAMINATION,                     35
6    BY: MR. DENNIS DE CARO:
    RE-EXAMINATION,                     36
7    BY: MR. JASON W. ROSE:
    RE-EXAMINATION,                     38
8  BY: MR. DENNIS DE CARO:

9

10              E X H I B I T S

11
    No.                                 Page
12
    Decker 1                            21
13

Page 3

1        (Commencing at 1:45 PM)

2              DAVID E. DECKER,

3  the deponent herein, called as a witness after having

4  been first duly sworn, was examined and testified as

5  follows:

6  EXAMINATION,

7  BY: MR. DENNIS DE CARO:

8      Q. Please state your full name and spell your

9  last name for the court reporter.

10     A. David Eugene Decker.

11     Q. Mr. Decker, have you ever given a

12  deposition before?

13     A. Yes, I have.

14     Q. So same rules, it's just quickly you need

15  to answer everything verbally so if you nod or

16  something the court reporter can take it down but

17  when we read it we don't know whether you nodded yes

18  or no and typically one of us will ask you either

19  way. Then we should try not to speak over one

20  another.

21       My name is Dennis De Caro, I represent

22  Lucille Butler and the estate of her deceased son,

23  Kevin Lucas. I'm going to be asking you a series of

24  questions about an incident that occurred by your

Page 4

1  house on May 10th, 2003. How I want to start out,

2  though, is I'm going to show you a photograph and I'm

3  going to ask you, this is one of the photographs out

4  of O'Brien Exhibit 4 and ask you if that is the

5  individual that was running around your trailer the

6  morning of May 10th --

7      A. Honestly I couldn't tell you.

8      Q. Okay. What I have tendered the witness,

9  one of the photographs from O'Brien Exhibit 4.

10       Let me do a little background and we will

11  get out of here. What is your current address?

12     A. 701 South Griffin, lot one.

13     Q. Same place?

14     A. (Witness nods head).

15     Q. What is your date of birth?

16     A. 10-8-63.

17     Q. How about your Social Security number?

18     A. 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.

19     Q. Before we get too far off, there was a

20  nurse in one of the ambulance reports, a Jamie

21  Decker. Are you related to her?

22     A. Jamie?

23     Q. I'm not 100 percent sure if he said Jamie.

24  Is there another J. Decker who worked at Provena?

Page 5

1      A. I've got a sister that works at Provena,

2  Tammy Decker. I don't know what she did with this.

3      Q. He said Jamie. Do you know a Jamie Decker?

4      A. No. Not that I know of anyway.

5      Q. These are just some background we ask

6  everybody. Highest level of education?

7      A. Tenth grade.

8      Q. Where did you go to --

9      A. Danville High.

10     Q. Are you currently employed?

11     A. Self-employed.

12     Q. What do you do?

13     A. Construction.

14     Q. How long have you done that?

15     A. Two years.

16     Q. Were you employed in May of '03?

17     A. Yes, I was.

18     Q. What were you doing then?

19     A. Construction. I worked for Reifsteck

20  Construction.

21     Q. Reifsteck?

22     A. Reifsteck, R E I F S T E C K.

23     Q. You had an opportunity to review your

24  statement that you gave on May 10th of '03?

## Page 6

1  A. Yes.

2  Q. Does that refresh your recollection of what

3  happened that morning?

4  A. Yeah. I kind of still remember.

5  Q. Is there anything in that statement that

6  you think is a little inaccurate that you might want

7  to change?

8  A. I don't know about inaccurate, but I don't

9  remember the part where I said that the gentleman's

10  shorts went to his knees or his ankles. I don't

11  remember that part.

12  Q. When you gave -- do you remember when you

13  gave this statement where was it at? Was it at your

14  house?

15  A. In the vehicle in front of my house.

16  Q. A police vehicle?

17  A. Uh-huh.

18  Q. Was the person you were giving it to, did

19  he tape record it?

20  A. Yes.

21  Q. Did you ever hear the tape back?

22  A. No.

23  Q. Have you ever seen this statement prior to

24  me giving it to you today?

## Page 7

1  A. No.

2  Q. Why don't we just go through, why don't you

3  just tell me what you recall happening that morning.

4  A. Okay. I was asleep on the couch, there was

5  a knock on the door. I answered the door and it was

6  a black guy standing at the door and asked me to call

7  911, that someone was trying to kidnap him.

8  Q. Had you ever seen this person before?

9  A. No.

10  Q. How did he appear when he asked you that?

11  Was he -- did he --

12  A. He was jogging in place, real hyper.

13  Q. And you were able to observe him from time

14  to time before the police got there?

15  A. Yes.

16  Q. At any time during the time you were

17  watching him did you ever see him drinking anything?

18  A. No.

19  Q. Did you ever see him ingesting any kind of

20  narcotic?

21  A. No.

22  Q. When he opened the door was there a screen

23  door between you and he?

24  A. Yes. Storm door.

## Page 8

1  Q. Okay. Did you open your --

2  A. Storm door, yes.

3  Q. Okay. How close were you from the person?

4  A. Oh, probably four foot, three foot,

5  something like that.

6  Q. You didn't fear that he was going to attack

7  you or anything, you readily opened the door?

8  A. No, I didn't open it all the way, I just

9  opened it a little bit, just so I could hear what

10  was --

11  Q. Okay. Did you smell any alcohol on his

12  breath?

13  A. I don't recall smelling alcohol.

14  Q. Other than jogging in place and someone

15  saying call the police, somebody is going to kidnap

16  me, physically did he -- anything else appear

17  different to you about the person?

18  A. I don't know what you mean. The guy was

19  just jogging in place.

20  Q. Did you call the police?

21  A. Yes.

22  Q. And after you called the police did you

23  keep looking out the window or the door to see what

24  he was doing?

## Page 9

1  A. Yeah. But see, the way my trailer is,

2  where my front door is I couldn't see him from the

3  time when he left the porch and once he got behind my

4  trailer or I guess I should say the front of my

5  trailer, I couldn't see him until he was like at the

6  end of my drive and the road because I could look out

7  the window. There was no window, some bedrooms and

8  stuff in that area.

9  Q. Did you see while you were waiting for the

10  police to arrive, did you ever see a vehicle that he

11  might have gotten out of or was getting into?

12  A. No. Huh-uh. Nope.

13  Q. So he was there by himself as far as you

14  know?

15  A. As far as I know.

16  Q. Can you describe the individual for me?

17  A. Colored gentleman. I think he had a head

18  band on.

19  Q. Okay. Any idea how old he was?

20  A. No.

21  Q. Do you recall anything he was wearing?

22  A. That head band. I think it was red, white

23  and blue I think.

24  Q. About how long did it take before the

Page 10

1 police got there?
2   A. Oh, shoot. Probably say a good 10 minutes.
3   Q. And during that period did he ever come
4 back to the door?
5   A. Yeah, five different times.
6   Q. Okay. And what did he do when he came back
7 to the door?
8   A. He knocked on the door. I didn't answer it
9 though. I just watched him. And he would do the
10 same thing, like I said, like the first time after I
11 went and called the police when he asked me to, he
12 would run to the road and go left on Griffin and run
13 to the end of my yard, stop, kind of jog in place, he
14 would run back the same pattern, come back up on my
15 porch, knock. Nothing loud. He didn't beat on it
16 real hard or nothing. And he done that like five
17 different times.
18   Q. Did you form any opinion what was going on?
19 I mean did you --
20   A. The only thing I could think is he was on
21 something. You know, I --
22   Q. Did you ever --
23   A. Because he was really -- I mean he was real
24 hyper, I mean not one time did I see him stop and

Page 11

1 stand still, he just constantly ran and I mean not
2 full speed, but it would be the whole time.
3   Q. On something like a narcotic?
4   A. I couldn't say, I don't know.
5   Q. How about did you ever think this guy is
6 just nuts?
7   A. Honestly I thought he was on something. I
8 mean, you know.
9   Q. And that was -- you came to that conclusion
10 based upon his behavior?
11   A. Yeah, just his behavior, running back and
12 forth and -- because I found it odd that he said
13 someone was trying to kidnap him but he would run out
14 there by the road, you know.
15   Q. So his behavior wasn't really consistent
16 with what he was telling you?
17   A. Yeah.
18   Q. Do you have any police training or anything
19 like that?
20   A. No. I believe I even called the 911 back
21 and asked them to hurry up and get someone there
22 because I didn't know what the guy was doing.
23   Q. Okay. When the police arrived, what did
24 you see him do, the individual?

Page 12

1   A. He was -- apparently he was at the trailer
2 next to me because I seen him run back to the police
3 car and of course I'm on other side of my trailer
4 inside, looking out the window, and I see him. He
5 ran right to the passenger side of the police car,
6 sheriff's car, and tried to get in and it was locked.
7 He ran back around to the other side at that time.
8 That sheriff was out of his car, but still had the
9 door open, he was like behind the door.
10   Q. Okay.
11   A. And he ran on around past the police
12 officer into the back of the car and of course the
13 police officer watched him and he ran, like, to the
14 other side of the car to the back door.
15   Q. Tried to get in or just --
16   A. I don't think he tried to get in. And then
17 he went to go back around the car, that's when the
18 police officer met him at the back of the vehicle.
19   Q. So he banged on your door several -- not
20 banged, he knocked and he asked you at least once to
21 call the police?
22   A. Yes.
23   Q. And you did. And then when the police got
24 there you saw him initially trying to get in the

Page 13

1 police car?
2   A. Right.
3   Q. Okay. And then once he and the police
4 officer got in the same vicinity, what did you see?
5   A. It looked like to me they was talking and
6 then to me it looked like that he was going to
7 handcuff the gentleman.
8   Q. When they were talking initially was the
9 person still jogging or was he standing still?
10   A. He was standing still.
11   Q. Okay. And when they're talking how far
12 would you say they were?
13   A. They were right together.
14   Q. I mean there wasn't anything or was there,
15 was it like a yelling or combative, or they're having
16 a conversation?
17   A. I would say a conversation because I was
18 inside, I couldn't hear it.
19   Q. But how did it appear to you? Did it seem
20 like it was adversarial?
21   A. It was just conversation.
22   Q. And then what's the next thing that
23 happened?
24   A. If I remember correctly he went to put a

### Page 14

1  handcuff on the gentleman and then he started
2  getting -- kind of struggling with the police officer
3  and at that time I called 911 again and told them
4  that he probably needed a backup and at this time I
5  could still see out the window, I was on the phone,
6  and that police officer put him down on the ground
7  and started putting his hand behind his back to
8  handcuff him and at that time the other police
9  officer had arrived and got out and helped him
10  handcuff the guy.
11     Q. Okay.
12     A. I mean there wasn't a lot of struggling as
13  far as fighting or anything that.
14     MR. ROSE: There was or was not a lot of
15  struggling?
16     A. Was not.
17     Q. You say in your report, your statement, he
18  handcuffed on the one arm and then that's when the
19  colored gentleman started struggling with the
20  officer, the officer got him down on the grass and
21  had his knee on his back trying to get the other arm
22  around, is that accurate?
23     A. That's correct.
24     Q. Where on his back did the first officer

### Page 15

1  have his knee? Up by the shoulders or by his butt?
2     A. I believe it was up this way, closer to his
3  shoulders.
4     Q. So you never saw that first officer get
5  both handcuffs on the person?
6     A. No.
7     Q. He had to wait for the other officer to
8  come, correct?
9     A. Well, yeah. I believe so.
10     Q. Let me ask you this. From when he first
11  put the black person down on the ground, on the
12  grass, how long was it before the second officer --
13     A. The police officer was already out of his
14  car, heading towards him.
15     Q. Okay. So --
16     A. I mean it was just like --
17     Q. -- it was quick?
18     A. Yeah, three or four steps away because he
19  pulled in and then he was just right there.
20     Q. So he didn't put him down on the ground
21  until shortly before the other officer was there?
22     A. Yeah. Shortly before.
23     Q. Then you talk about the first officer had
24  his knee on the person's back. Did the second

### Page 16

1  officer ever put -- did -- was there ever a time
2  where both had their knees --
3     A. No, I don't think so. I might be wrong,
4  but I don't remember the other officer having his
5  knee or anything on him.
6     Q. Well, yeah, I mean I got that from your
7  statement, on page three, going to page four, the
8  question on the bottom of three is "Okay. Did you
9  see the officers or -- strike the guy or anything? "
10  And your answer is "No, huh-uh. All they done was
11  basically had him down on the ground and had their
12  knees in his back and they must -- and they kept --
13  must have been pretty strong because they were --
14  because they both was trying to get that one arm back
15  around so they could handcuff him."
16     A. I must have misunderstood or something
17  because I don't remember the other gentleman having
18  his knee in the guy's back.
19     Q. Just one officer?
20     A. Just the first officer. But they both
21  was -- they both had to get his one arm to get it
22  behind his back. That's what I seen, both of them
23  grabbed his arm or whatever.
24     Q. How long did it take for them to do that?

### Page 17

1     A. Not very long at all.
2     Q. Less than 30 seconds?
3     A. About 30 seconds probably.
4     Q. Okay.
5     A. Once the other officer was over there.
6     Q. Okay. And then once that happened, once
7  they had him handcuffed with both hands, what
8  happened?
9     A. They picked the gentleman up and I believe
10  it was the first officer escorted him to his police
11  car and put him in there.
12     Q. And then they left?
13     A. Then they left.
14     Q. Okay. And then this statement is given at
15  4:32 on May 10th. Is that the first time you talked
16  to another officer?
17     A. Oh, there was -- I think -- for some reason
18  I keep thinking it's the same day.
19     Q. Right. It was the same day.
20     A. That that happened.
21     Q. It was the same day, but later in the day.
22     A. Yeah, in the evening. I wasn't home during
23  the day and when I come home they said some officer
24  was wanting to talk to me. But he did show up, it's

Page 18

1 been so dang long.
2  Q. It was one officer?
3  A. Yeah.
4  Q. And my understanding is that, and I don't
5 know who and you can tell me who found this stuff,
6 the -- you found in the area where the struggle was
7 with the man on the grass, you found a watch?
8  A. I never found a watch. My stepson did.
9  Q. Okay. About what time did he find the
10 watch?
11  A. I have no idea.
12  Q. Sometime during the day?
13  A. Yeah, I guess. He brought it to my
14 attention when I first got home that he found a watch
15 and then that was -- I wasn't home probably 10
16 minutes and the police officer had showed up.
17  Q. Where they had the person down on the
18 ground trying to handcuff them, where was that in
19 relationship to your trailer? Is it by your
20 driveway, is it by the street?
21  A. By the street. The street runs north and
22 south.
23  Q. What side of the street is your trailer on,
24 east or west?

Page 19

1  A. It's on the east side of Griffin Street.
2  Q. Okay.
3  A. And then the driveway, when you come in
4 there's a bush on the corner and it was right on the
5 other side of that bush, so I would say -- I would
6 say eight to ten feet from the road.
7  Q. Okay.
8  A. Of Griffin Street. But right -- right
9 where the road goes into the trailer.
10  Q. Sure. Where did they have him down on the
11 ground, by that bush?
12  A. Yeah, probably about two or three feet away
13 from the bush.
14  Q. Is that -- did your son ever tell you where
15 he found the watch?
16  A. Yes, he told me that's where he found it.
17  Q. By the bush?
18  A. Yeah, by the bush. And remember, my son
19 never -- never knew that this went on, he was still
20 in bed at this time.
21  Q. Right. Okay. Then at some point somebody
22 found an inhaler?
23  A. The police officer did that came and talked
24 to me that evening. He was -- he asked me a couple

Page 20

1 questions as far as the gentleman coming to my house
2 that morning and asked me to show him where it
3 happened, where the police officers handcuffed him
4 and I walked over and showed him and at that time he
5 found the inhaler right in that area.
6  Q. Had you ever -- prior to showing the
7 officer that day, had you gone over there to inspect
8 the area?
9  A. No, I had to work that day. But apparently
10 my son was because that's where he found the watch.
11  Q. Right.
12  A. I don't know why he didn't find the
13 inhaler.
14  Q. Now is that an area your son would go by so
15 if it was there the day before he probably would have
16 found it the day before?
17  A. Yeah, they definitely would have because if
18 I ain't mistaken I think they cut the grass the day
19 before.
20  Q. Okay.
21  A. If I ain't mistaken.
22  Q. And we talked and you said the one thing
23 about this statement that you didn't recall was that
24 the person who they put in the police car, that his

Page 21

1 pants were down around his ankle.
2  A. Yeah, I don't recall --
3  Q. Saying that?
4  A. Yeah. That doesn't jog my memory.
5  Q. So you wouldn't know what color the
6 individual's underwear are or anything like that?
7  A. No. I really don't remember that part.
8 But if I said it, maybe...
9  Q. Well, this was the day of and we are
10 several years later so you may have remembered it
11 then.
12  A. But you think that would be something I'd
13 remember.
14   MR. ROSE: Have we marked that as an
15 exhibit?
16   MR. DE CARO: No, we will mark that as
17 Decker Exhibit 1, the statement.
18   (Whereupon Exhibit No. Decker 1 was marked
19 for identification.)
20  Q. Other than speaking with that officer on
21 the day that this all occurred, have you spoken to
22 any officers since then?
23  A. Yeah, but I couldn't tell you who or when
24 or...

## Page 22

1  Q. On how many occasions would you say?
2  A. I think I talked to two different officers,
3  I believe.
4  Q. Do you have -- do you have any family
5  members that work for the Vermilion County Sheriff?
6  A. No.
7  Q. Vermilion county police?
8  A. I got a nephew that works as the chief in
9  Alvin.
10  Q. Where?
11  A. Alvin, Illinois.
12  Q. So other than the officers -- subsequent to
13  this officer that took your statement, do you know
14  what the other officers who came by at later dates,
15  what they wanted?
16  A. Well, one that come the same day, he told
17  me, I believe, that he was trying to find out if the
18  police had harmed the gentleman, I believe.
19  Q. Was that the same person you gave the
20  statement to?
21  A. Yeah.
22  Q. Okay.
23  A. I believe so.
24  Q. Okay. And then subsequent -- after that

## Page 23

1  day did you talk to other officers that came out
2  there?
3  A. I know I talked to another --
4  Q. We had an investigator, you may have spoken
5  to him.
6  A. It could have been, but for some reason I
7  only think it was a while after that.
8  Q. Yeah.
9  A. I talked to him and not too long ago I
10  think, I want to say maybe a year ago, maybe not even
11  a year ago.
12  Q. Who came out about that time?
13  A. I couldn't tell you that.
14  Q. Was it --
15  A. An investigator.
16  Q. And did he want to go over your statement
17  or --
18  A. Yeah, he went over my statement.
19  Q. Did he bring it with him and show it to
20  you?
21  A. No. He might not even -- he just wanted to
22  hear what I seen and heard and all that.
23  Q. Are those all the people now, we have
24  covered everybody who has come out to talk to you?

## Page 24

1  A. I believe so. It's been so long.
2  Recently, just that one gentleman. But then I think
3  the police officer that come the same day, back in
4  2003, then another one after him, but I couldn't tell
5  you.
6  Q. Have you ever spoken to anyone who said
7  they saw the person that was arrested at your house
8  in the county jail that day?
9  A. Did I ever see somebody that said he seen
10  him?
11  Q. Yeah. Did you ever speak to anybody who
12  said they were in the county jail with him that day?
13  A. Well, I don't know if he was in the county
14  jail with him. You mean a police officer or --
15  Q. Anybody. Anybody.
16  A. Oh, I don't think so. But now when the
17  first gentleman come that same night he started
18  asking me questions and I refused to answer any
19  questions until I found out what was going on.
20  Q. What did he tell you?
21  A. He told me that the gentleman had died. He
22  told me, I think he said they was taking him his
23  lunch and they found him.
24  Q. Did he tell you what caused his death?

## Page 25

1  A. No.
2  Q. Did he tell you what kind of cell he was in
3  or anything like that?
4  A. No. He just wanted to know what happened
5  that day.
6  Q. Okay.
7  MR. ROSE: I'm sorry, was this the same
8  officer that you went -- walked around and you found
9  the inhaler with?
10  A. Yes.
11  MR. ROSE: Okay.
12  A. Yeah, the same one I gave my statement to,
13  yeah. Because I refused to answer any more questions
14  until he told me what was going on. The gentleman
15  was there that morning at my house, was arrested and
16  they had found him in his jail cell when they was
17  taking his lunch to him, he died.
18  Q. Before they took the gentleman away in the
19  police car that morning, did any of the officers ever
20  come up to you and talk to you?
21  A. No.
22  Q. How far is it from your trailer to the area
23  by the bush?
24  A. What do you mean, just the --

Page 26

1    Q. Feet, length of car?
2    A. To the corner of my trailer or talking
3    about my front door?
4    Q. Well, your front door.
5    A. Well, I would say 30, 40 feet.
6    Q. Okay. When the police arrived were you
7    still inside or had you stepped out?
8    A. I was still inside.
9    Q. Was your door closed?
10   A. Yeah.
11   Q. Is your trailer angled some way or it's
12   just one portion of the trailer is closer to the bush
13   than your front door?
14   A. Yeah, on the other side. My front porch is
15   on the east side of the trailer, this happened on the
16   west side of my trailer.
17   Q. Okay.
18   A. But in the front, if you know what I mean.
19   So if my trailer is sitting like this, this is
20   Griffin, this is the road here, my front porch is
21   here. It happened over here.
22   Q. So how could you see that from your front
23   porch?
24   A. Because I was in my trailer looking out my

Page 27

1    window on this side. That's what I was telling you,
2    I couldn't see him from the time he got in this area,
3    I couldn't see because this is all bedroom and
4    bathrooms back there.
5    Q. What is on the side of your trailer that is
6    closest to Griffin, are those bedrooms or --
7    A. No, front room and kitchen. They're --
8    it's all open together.
9    Q. Just so when we're reading this and it's
10   clear, your front porch is actually on the other side
11   of the trailer that is closest to Griffin?
12   A. That's correct.
13   Q. Okay. So you had to go to look out which
14   window to see what was going on by the bush?
15   A. The front room window.
16   Q. Okay.
17   A. But I could also see it if I was in the
18   kitchen.
19   Q. Is the front room window a large window
20   where if the police looked at your trailer they could
21   see you were standing there looking out?
22   A. Yeah, if I didn't have my -- if I had my
23   blinds up they probably could.
24   Q. Were they up or down that morning?

Page 28

1    A. Halfway up. That's where they always was.
2    But that's why I say that's why I couldn't see him
3    when I tell you he was doing the same pattern, I
4    couldn't see him once he got -- once he come off my
5    porch and out my drive and in the trailer park, I
6    couldn't see him from that point. But, you know,
7    there's a window right by my front door, so I could
8    see him out this window when he come up and on to my
9    front porch and then just go to the other side and I
10   could see him going from here and back down Griffin
11   Street to the edge of my --
12       MR. ROSE: When the man was arrested,
13   though, you were looking through the front room
14   window?
15   A. That's correct, on the west side.
16   Q. Right. By front room that doesn't
17·  necessarily mean it's by your front door, it's
18   actually on the opposite side of your trailer?
19   A. Right. I was looking out the window on the
20   west side of my trailer.
21   Q. Other than the gentleman coming to your
22   door and asking you to call 911, was there any other
23   conversation with him?
24   A. Yeah, he told me that -- to watch my dog.

Page 29

1    Q. Why was that -- did he say why?
2    A. My dog was right there raising hell with
3    him.
4    Q. Watch the dog so it didn't get out and get
5    him?
6    A. I told him he needs to watch my dog.
7    Q. He also told you that someone is trying to
8    kidnap him?
9    A. Yeah, as soon as I opened the door he said
10   "Call 911, someone is trying to kidnap me."
11   Q. Okay.
12   A. And then -- and he goes "Watch your dog."
13   I said, "No, you watch my dog", and I shut my doors
14   and called 911. And when I'm on the phone, it's
15   cordless so I've got the phone in my hand while I'm
16   watching him out the window because I didn't know
17   what in the world was -- you know.
18   Q. So have we covered all the conversations
19   you've had regarding this incident other than with
20   your friends and family and things like that?
21   A. Yeah, as far as I know.
22   Q. Did I get -- what is your telephone number?
23   A. (217) 442-3310.
24   Q. Any plans on moving in the next couple of

Page 30

1 years?
2   A. Not that I know of.
3   Q. Who do you live there with?
4   A. My fiancee.
5   MR. DE CARO: That's all I have.
6 EXAMINATION CONDUCTED:
7   BY: MR. JASON W. ROSE:
8   Q. Mr. Decker, I just have a few follow-up
9 questions. My name is Jason Rose, I represent
10 Vermilion county, okay?
11   First thing --
12   A. Are you one of the gentlemen that came out
13 to my place?
14   Q. That's correct.
15   A. I was going to say, I thought so.
16   Q. I'm showing you what the court reporter has
17 marked as Decker Exhibit No. 1. It is in fact your
18 statement, the tape recorded statement as given on
19 May 10th to Sergeant Rod Kaag of the Vermilion County
20 Sheriff's Department. Before the deposition you were
21 asked to review your statement and you did review
22 your statement, correct?
23   A. Uh-huh.
24   Q. And is it correct that your statement --

Page 31

1 your statement was given on the day of the events
2 that you witnessed, correct?
3   A. That's correct.
4   Q. And your statement is -- was true and
5 accurate to the best of your knowledge with the one
6 or two minor exceptions that you've already mentioned
7 during the course of the deposition?
8   A. Yes.
9   Q. Okay. So do you have an estimate as to how
10 far you would have been from the officers and the man
11 when they were handcuffing the man? You were inside
12 the trailer and you were looking through a window,
13 correct?
14   A. That's correct.
15   Q. And how far would the other men have been
16 from where you were?
17   A. I'd say 12 feet.
18   Q. You testified that when the investigating
19 officer came out on the day of the events to speak
20 with you, he wanted to know if the police had harmed
21 the individual, correct?
22   A. Yes.
23   Q. And what was your response? In your
24 opinion had the officers harmed the individual?

Page 32

1   A. No.
2   Q. And you had never met the man that you saw
3 that morning before that morning, correct?
4   A. No, never met the gentleman.
5   Q. Did the man ever ask for a doctor or
6 medical attention?
7   A. Not to my knowledge.
8   Q. You never observed any signs that the man
9 was injured or hurt, did you?
10   A. No.
11   Q. The man never cried, moaned or yelled or
12 otherwise told you that he was injured or hurt,
13 correct?
14   A. Nope.
15   Q. When you called 911, you didn't say that
16 the man needs medical attention, correct?
17   A. Nope.
18   Q. If the man had said I'm hurt, I'm injured,
19 I need medical attention, you would have told 911
20 that, correct?
21   A. Sure.
22   Q. And if you had observed that the man was in
23 immediate need of medical attention you would have
24 also told 911 that, correct?

Page 33

1   A. That's correct.
2   Q. You were able to understand the man when he
3 was speaking, correct?
4   A. Yes.
5   Q. He was coherent?
6   A. Uh-huh.
7   MR. DE CARO: Yes?
8   A. Yes.
9   Q. At some point when -- prior to the
10 handcuffing did it appear to you that the first
11 officer was trying to search or pat down the man?
12   A. It looked like to me they was just talking.
13   Q. Okay. At some point during the handcuffing
14 the man was struggling against the officer?
15   A. When he went to put the -- to put the --
16 his other arm in handcuffs, yes. When he put the
17 first one on it didn't seem like they was struggling
18 at all, but when he went to put the other one on,
19 that's when he kind of give him a hard time about it
20 and then that's when he got him down on the ground.
21   Q. You did not see any signs that the man was
22 injured when he was taken to the ground or when he
23 was handcuffed, correct?
24   A. That's correct.

Page 34

1  Q. And you're not claiming here that either
2  officer used inappropriate or excessive force that
3  you observed?
4  **A. Not that I observed.**
5  Q. Did you ever smell any alcohol on Kevin --
6  on the man's breath?
7  **A. Nope.**
8  Q. Did you ever work with Miss Butler or any
9  members of the Butler family?
10  **A. Yes, I did.**
11  Q. And when was that?
12  **A. It was at Freight Car Services, I couldn't**
13  **tell you what year it was.**
14  Q. How long did you work there?
15  **A. A year and a half.**
16  Q. And did Miss Butler work there also during
17  the entire year and a half that you were there?
18  **A. Yes.**
19  Q. What was your position there?
20  **A. I was a carpenter.**
21  Q. And what was Miss Butler's position?
22  **A. Crane operator.**
23  Q. And so did you have any occasion -- where
24  is Freight Car Services located?

Page 35

1  **A. Cannon and Oregon.**
2  Q. In Danville?
3  **A. Yes.**
4  Q. And did the two of you ever have occasion
5  to work together on the same jobs?
6  **A. No.**
7  Q. Did you have any social contact outside of
8  work?
9  **A. Nope.**
10  Q. I assume you were friendly to each other?
11  **A. Sure.**
12  Q. You knew who she was and you were --
13  **A. Right.**
14  Q. -- friendly?
15  **A. Yeah. That's correct.**
16  MR. ROSE: That's all.
17  RE-EXAMINATION,
18  BY: MR. DENNIS DE CARO:
19  Q. Mr. Decker, other than waking you up at
20  6:00 in the morning on a Saturday morning, you had
21  not witnessed the gentleman commit a crime prior to
22  the police arriving, did you?
23  **A. Nope.**
24  Q. When the police arrived did you -- while

Page 36

1  the police were there did you see the gentleman
2  commit any kind of crime? I mean you didn't see him
3  strike the officer, did you?
4  **A. No, I didn't.**
5  Q. So I think you told me the first officer
6  tries to handcuff the gentleman, puts him down, the
7  other officer comes rather quickly, they get both
8  hands handcuffed and then they put them into the car,
9  is that accurate?
10  **A. Basically, yeah.**
11  Q. Counsel asked did you see the first officer
12  pat him down or search him and you said no, correct?
13  **A. That's correct.**
14  Q. Did you ever see either officer search the
15  gentleman before putting him in the car?
16  **A. Nope.**
17  Q. Okay.
18  MR. DE CARO: That's all I have.
19  RE-EXAMINATION,
20  BY: MR. JASON W. ROSE:
21  Q. I'm just going to ask you to read this
22  paragraph of your statement out loud, okay?
23  MR. DE CARO: Which page?
24  MR. ROSE: Page three, beginning with the

Page 37

1  question "And can you then tell me what happened
2  between he and the officer." You can just read it
3  into the record.
4  **A. It says, "Well, the colored gentleman I**
5  **think went on around the cop car to the other side,**
6  **then stopped and kind of went back around the back of**
7  **the car and that's when the sheriff apparently**
8  **grabbed his arm and wanted him to get against the**
9  **back of the car like he was going to search him or**
10  **what have you and I believe that's when he put the**
11  **handcuff on one arm and that's when the colored**
12  **gentleman started struggling with the officer. And**
13  **the other officer got him down on to the grass and**
14  **had his knee in his back trying to get his other arm**
15  **around. At this time I called 911 again to tell the**
16  **lady that they probably should send another officer,**
17  **that he was needing help, and at that time another**
18  **sheriff pulled up so I told the lady at 911 forget**
19  **it, there is another one here."**
20  Q. Thank you very much. So at least in this
21  part of the statement it was your impression that the
22  officer was trying to or had intended on searching
23  the man?
24  **A. That's what it sounds like, yeah.**

Page 38

1    Q. That's what you told the officer?

2    A. **That's apparently what I told him.**

3        MR. ROSE: That's all.

4    A. **Unless he misunderstood.**

5        MR. ROSE: Well, we have the tape. The

6    tape should be somewhere.

7    A. **Okay.**

8        MR. DE CARO: I misunderstood.

9    RE-EXAMINATION,

10   BY: MR. DENNIS DE CARO:

11   Q. He was trying to search the man?

12       MR. ROSE: There is a reference here, like,

13   quote, like he was going to search him and what have

14   you.

15   A. **Like he was going to.**

16   Q. But he never did in your presence?

17   A. **Not in my presence. I think what I was**

18   **doing was just assuming that they was going to --**

19   Q. Right. That's something you would assume

20   someone is going to do when they get arrested.

21   A. **Yeah.**

22   Q. Did you have any understanding as to --

23   strike that.

24       MR. DE CARO: I have nothing else. You

Page 39

1    have a right to reserve or waive your signature. We

2    are going to get this written up and if you reserve

3    your signature you have an opportunity to read it and

4    make any corrections but all you can do is change

5    typos or misspellings of names. You can't change

6    your testimony. And how that would occur is you

7    would have to make arrangements with us or the court

8    reporter to review it and you would make --

9    A. **For what reason?**

10       MR. DE CARO: Just for typos.

11       MR. ROSE: Some witnesses like to review

12   their transcript.

13       MR. DE CARO: That's reserving it. The

14   other one is waiving it, you trust that she took it

15   down accurately and you wouldn't see it unless you

16   asked us to send it to you. So you have to say waive

17   it or reserve.

18   A. **I'll just waive it. I have nothing to**

19   **hide.**

20   **(Concluding at 2:32 PM).**

21       (Signature Waived)

22   _____
     DAVID E. DECKER
     STATE OF ILLINOIS        )

23                            )

24   COUNTY OF VERMILION )

Page 40

1        I, Amy L. Prillaman, a Certified Shorthand

2    Reporter, in and for the County of Vermilion, State
     of Illinois, do hereby certify that DAVID E. DECKER

3    the deponent herein, was by me first duly sworn to
     tell the truth, the whole truth and nothing but the

4    truth, in the aforementioned cause of action.
         That the foregoing deposition was taken on

5    behalf of the Defendant, at the Vermilion County
     Courthouse, 7 North Vermilion, Danville, Illinois, on

6    the 26th of August, 2005;
         That said deposition is a true record of the

7    testimony given by the deponent and was taken down in
     stenograph notes and afterwards reduced to

8    typewriting under my instruction; and that it was
     agreed by and between the witness and attorneys that

9    said signature on said deposition would be waived.
         I do hereby certify that I am a disinterested

10   person in this cause of action; that I am not a
     relative of any party or any attorney of record in

11   this cause, or an attorney for any party herein, or
     otherwise interested in the event of this action, or

12   am not in the employ of the attorneys for either
     party.

13       IN WITNESS WHEREOF, I have hereunto set my hand
     this 19th day of September, 2005.

14

15   _____
         AMY L. PRILLAMAN, CSR

16

17

18

19

20

21

22

23

24