KENNETH O'BRIEN E-FILED
Wednesday, 15 March, 2006 03:22:27 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF ILLINOIS

URBANA DIVISION


Lucille Butler, Individually, and as
Special Administrator of the Estate
of Kevin Lucas, Deceased,
          Plaintiff,

          vs                          No. 04-CV-2048

Vermilion County Sheriff Kenneth
O'Brien, et. al.,
          Defendants.


DISCOVERY DEPOSITION


        The discovery deposition of KENNETH O'BRIEN
was taken on behalf of the Plaintiff at the Vermilion
County Courthouse, Danville, Illinois, on June 28,
2005, before Susan M. Randolph, Certified Shorthand
Reporter of the State of Illinois.

                CSR #084-003240

        APPEARANCES:

        KUPETS & DE CARO, P.C.
        30 N. LaSalle Street, Suite 4020
        Chicago, Illinois  60602
        BY:  Mr. Dennis J. DeCaro
        Appearing for Plaintiff

        HERVAS, SOTOS, CONDON & BERSANI, P.C.
        333 Pierce Road
        Itasca, Illinois  60143
        BY:  Mr. Michael W. Condon
        Appearing for Defendants


COPY

EXHIBIT
4

Page 2

1                    INDEX
2 Examination conducted by:
3      Mr. DeCaro. . . . .Page 3
4
5 Also present: Lucille Butler
6
7
                   EXHIBITS
8 No.     Description        Page
     1    Complaint Form              100
9  2      Statement                   107
     3    Answers to Interrogatories  114
10 4      Group of Photographs        116
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 3

1              KENNETH O'BRIEN
2 having been first duly sworn upon his oath testified
3 as follows:
4        EXAMINATION CONDUCTED
5        BY MR. DECARO:
6    Q. Would you please state your full name for
7 the court reporter.
8    A. Sure. It's Kenneth, K-e-n-n-e-t-h M.
9 O'Brien, O-'-B-r-i-e-n.
10    Q. All right. Good. Officer O'Brien, my
11 name is Dennis DeCaro. I represent Lucille Butler who
12 is here today and the estate of her deceased son,
13 Kevin Lucas.
14       I'm going to be asking you a series of
15 questions about May 10th, 2003, which you probably
16 already know. Just a few things, I'm sure Mike has
17 told you you have to answer everything verbally. If
18 you nod, when we read it we will see nod but we won't
19 know whether you nodded yes or no. The other thing is
20 we will try not to speak over one another because it's
21 also, it's difficult for the court reporter to take
22 that down and it's also confusing as to if you are
23 answering the question I'm trying to ask and things
24 like that. If you have any questions, let me know.

Page 4

1 Let me just get a little background information.
2 What's your date of birth?
3    A. It's 9/9/76.
4    Q. Okay. What town do you reside in?
5    A. St. Joseph.
6    Q. Have you ever given a prior deposition in
7 a civil case like this?
8    A. No.
9    Q. Okay. Have you, when you were a county
10 sheriff, did you ever testify at trial on a case?
11    A. No.
12    Q. Prior to the deposition today, and I don't
13 want to limit this to today because I know we were
14 going to have your deposition on another day and we
15 continued, or that was Sporcich?
16       MR. CONDON: That was Sporcich.
17       MR. DECARO: Okay. Have you reviewed
18 anything for your deposition today like your
19 interrogatory answers, your statement, your written
20 statement or the statement you gave to your captain?
21       THE WITNESS: Yes.
22    Q. Okay. Anything, did you look at anything
23 else?
24    A. Pictures.

Page 5

1    Q. Okay. Were those the pictures of Kevin in
2 the cell?
3    A. Yes.
4    Q. Okay. When you reviewed your complaint
5 form, did you have any things you wanted to amend or
6 correct on there or was your recollection in that
7 complaint form the same as it is today?
8       MR. CONDON: You mean the interrogatories?
9       MR. DECARO: Well, no, he wrote a
10 complaint --
11       MR. CONDON: Oh okay.
12       MR. DECARO: -- afterwards.
13       MR. CONDON: His report.
14       MR. DECARO: Yeah, your report.
15       THE WITNESS: No.
16    Q. How about, and you gave a statement, you
17 gave a statement to, I don't know if it was your
18 captain or an investigator shortly after this event?
19    A. Yeah.
20    Q. Did you review that today?
21    A. Yes.
22    Q. Okay. Anything in there that you wanted
23 to change or amend or thought was inaccurate?
24    A. No.

Page 6

1    Q. Okay. Did you look at your
2 interrogatories also today?
3    A. Yes.
4    Q. Anything in there that needs updating or
5 changing?
6    A. No.
7    Q. And we will look at those and I will give
8 you a copy of them as we go through them. I just want
9 to get that out of the way. What is your highest
10 level of education?
11    A. Bachelors degree.
12    Q. From where?
13    A. Southern Illinois University.
14    Q. When did you get that?
15    A. 1998.
16    Q. And I cut you off, is that Carbondale?
17    A. Yeah.
18    Q. In what area, was there a major?
19    A. Yes, it was criminal justice.
20    Q. After that, prior to becoming a county
21 sheriff, did you have any, did you take any classes
22 after college?
23    A. No.
24    Q. Okay. And I will ask you about training

Page 7

1 separately.
2    A. Okay.
3    Q. When did you become a county sheriff?
4    A. September 2001.
5    Q. Prior to becoming the county sheriff, a
6 county sheriff in September of 2001, -- strike that.
7 While you were in college, did you hold any type of
8 employment?
9    A. Yes.
10    Q. Okay. Was it anything other than, you
11 know, part-time or was it -- strike that. Bad
12 question. Why don't you just tell me generally during
13 college what kind of jobs you had?
14    A. Okay. Worked at a gas station, worked at
15 Disneyworld and worked at one of the dorms.
16    Q. Okay. After college, after 1998 and prior
17 to September of '01, what type of jobs did you have?
18    A. After college?
19    Q. Yeah.
20    A. Okay. I was an adult probation officer
21 for two years and then I was an investigator for the
22 public defender's office in McHenry County.
23    Q. Let's talk about those a little more.
24 Where were you an adult probation officer?

Page 8

1    A. McHenry County.
2    Q. And what years or months were you an adult
3 probation officer?
4    A. July '98 to October of 2000.
5    Q. Okay. And generally what were your duties
6 as an adult probation officer?
7    A. Just make sure they followed their
8 probation, any court orders, things like that.
9    Q. Okay. Would you do any type of drug
10 testing on the probationary people?
11    A. Yeah. We did urinalysis.
12    Q. Okay. Would you, how were those
13 conducted? Would they come to your office and you
14 would do it? Would you go to their home or was it
15 done another way?
16    A. They came to the office. They were
17 supervised.
18    Q. Okay. Were you involved in that in any
19 way? I mean would you collect samples? Were you
20 involved in the chain of custody of that?
21    A. Yeah, I collected them. I went in with
22 them to the bathroom and then took the cup and then
23 just put it back into the refrigerator for testing.
24    Q. Okay. And somebody else would take it and

Page 9

1 send it to a lab?
2    A. Yes.
3    Q. Okay. Prior to becoming an adult
4 probation officer, was there any training involved?
5    A. Prior, no. While I was there, I did.
6    Q. Okay. Let's talk about that. What type
7 of training did you have while you were there?
8    A. It was adult probation basic training.
9    Q. Okay. Was it, can you tell me generally
10 what type of areas? I'm assuming it was what you need
11 to do as an adult probation person but was it also
12 awareness of whether this person is violating their
13 probation, you know, a history of drug use, are they
14 alcoholics, how do you notice those things, things
15 like that or --
16    A. I don't remember. It was only a 40 hour
17 class.
18    Q. Okay.
19    A. Just five days.
20    Q. Where was that conducted at?
21    A. Springfield at UIS.
22    Q. Okay. And then as an investigator for
23 McHenry what types of things would you investigate?
24    A. Just anything that the attorneys wanted me

Page 6 - Page 9

Page 10

1 to like talk to witnesses or talk to victims.
2    Q. Okay. So you were an investigator for the
3 state's attorney's office?
4    A. For the public defender's office.
5    Q. For the public defender's office, okay.
6 Did they, was there any training involved prior to you
7 accepting that position?
8    A. No.
9    Q. Okay. Was there any on-the-job training?
10    A. Yeah.
11    Q. Were those courses or was it going out
12 with an older investigator?
13    A. Yes. It was just basically following the
14 public defender and he just showed me what I was
15 supposed to do in that capacity.
16    Q. Okay. Let me just go back to the adult
17 probation. Was there a name for the training, the 40
18 hour training you received? Was there a class name or
19 anything like that?
20    A. I think it was just adult probation basic
21 training.
22    Q. Did you do that on your own or was it with
23 a group of adult probation personnel from McHenry who
24 went to UIS?

Page 11

1    A. It was just whoever just got hired from
2 all the counties around the state that went there.
3    Q. And was that in one week or was that over
4 a period of time?
5    A. Just one week.
6    Q. Okay. When you were an investigator for
7 McHenry County, were you deputized?
8    A. No.
9    Q. Okay. You had no power to arrest anyone?
10    A. No.
11    Q. It was purely investigation?
12    A. Right.
13    Q. Okay. And your training on how to
14 investigate and what types of questions to ask and
15 things like that was basically on-the-job training
16 from a more experienced investigator?
17    A. Right.
18    Q. Okay. Was there any independent training
19 classes?
20    A. I went to one. It was just a death
21 investigation class.
22    Q. Okay. And what years were you an
23 investigator for McHenry?
24    A. From October of 2000 to September of '01.

Page 12

1    Q. And then you became a county sheriff?
2    A. Right.
3    Q. Okay. And there was some training prior
4 to becoming a county sheriff?
5    A. Right.
6    Q. Where was that conducted at?
7    A. At the Police Training Institute at the
8 University of Illinois.
9    Q. And how long of a program is that?
10    A. I believe it's 480 hours.
11    Q. Okay. And that's done all at once?
12    A. Yes.
13    Q. Was there one general instructor or was it
14 more of a college situation where you had different
15 instructors for different classes?
16    A. College situation. There was several
17 instructors.
18    Q. Okay. What, what months did you attend
19 PTI?
20    A. September of '01 to December of '01.
21    Q. Okay. And when you leave there you, did
22 you take an exam to see whether you passed the course?
23    A. Yes. You take a test in order to get
24 certified to be a police officer.

Page 13

1    Q. Okay. And then once you became a county
2 sheriff is there on-the-job training or continuing
3 training as a sheriff?
4    A. Yes. There's a field training program for
5 three months.
6    Q. And who was the trainer for that? Or
7 again were there multiple trainers?
8    A. Multiple trainers.
9    Q. And where is that conducted at?
10    A. It's on-the-job training. I mean it's
11 riding around in the cars.
12    Q. Okay. So you were with a partner for the
13 first three months?
14    A. Yes.
15    Q. And then after that are you on your own in
16 the vehicle?
17    A. Yes.
18    Q. At PTI is the training limited to police
19 type training or do you have any training as far as
20 procedures at the jail as far as what the rules are
21 that govern detaining arrestees and arrestees who have
22 been put into cells and things like that?
23    A. I don't remember.
24    Q. On-the-job training was your, with the

Page 14

1 county, was it strictly related to police matters or
2 was any of it broken up into jail activities or what
3 to do with people once they are in the Public Safety
4 Building?
5    A. It's mostly patrol. Not a lot of it was
6 on the correction side.
7    Q. Okay. Did you have any training on the
8 correction side as a county sheriff?
9    A. No.
10    Q. Was there training at all or instruction
11 or regulations or rules or manuals on at what point
12 your responsibility ends when the person is turned
13 over to a jailer?
14    A. Okay. As far as -- what I was told is
15 that once you drop the person off, basically once you
16 bring him into the correctional facility it's, they
17 basically, I mean they are in the custody of the
18 correctional officers that are working or the
19 facility.
20    Q. Okay. Now you said you were told that.
21 Is that also in some sheriff's manual or is that
22 something you've just been told?
23    A. I believe it's just been told through the
24 field training program.

Page 15

1    Q. Okay. When you became a sheriff, did they
2 give you a manual or a book of rules and regulations
3 that governed your conduct as a sheriff?
4    A. Yes.
5    Q. Okay. What is that called if you recall?
6    A. I don't remember.
7    Q. Okay. Is it a, is it a manual or is it a
8 rule book? Is it a statute book?
9    A. I think it's just a policy and procedure
10 manual.
11    Q. Is that something you -- what were those
12 guidelines as far as you know or were those the rules
13 you had to follow?
14    A. You had to follow them.
15    Q. Were those the rules -- you were given
16 that some time about the time you started in '01?
17    A. Correct.
18    Q. Okay. Were those rules still in effect in
19 May of '03 or I'm assuming some of them had been added
20 and amended but there was substantially the same set
21 of rules?
22    A. Yes.
23    Q. Is that something you would take home with
24 you and keep or is that something that they said, you

Page 16

1 know, is in a room over there if you want to review
2 it?
3    A. No, they gave it to us.
4    Q. Do you still have that?
5    A. No.
6    Q. In any of your training, I guess in any of
7 your training were you ever trained on recognizing
8 whether someone was intoxicated by liquor or
9 narcotics?
10    A. Yeah, there was a DUI training class.
11    Q. Where was that at? At PTI?
12    A. No. That was at, it's a Holiday Inn in
13 Urbana.
14    Q. Was that conducted as an ongoing training
15 seminar while you were a sheriff?
16    A. Yes.
17    Q. Was that something you could volunteer to
18 take or, to get a certificate, or were you required to
19 take it?
20    A. You volunteer.
21    Q. Okay. Other than that, any other training
22 regarding that?
23    A. I believe there was some at PTI but
24 basically it was just to show impairment.

Page 17

1    Q. Okay. Have you ever been trained in
2 recognizing if a detainee or arrestee has an altered
3 mental state?
4    A. I have now but not before that date.
5    Q. Okay. And now you've got new employment?
6    A. Correct.
7    Q. At the University of Illinois?
8    A. Right.
9    Q. There they trained you on altered mental
10 states?
11    A. I went through a, it's a class called
12 Crisis Intervention Training.
13    Q. And that was through U of I?
14    A. That was through the training board.
15    Q. That was a bad question. It was training
16 for your new job?
17    A. Correct.
18    Q. Okay. Prior, well prior to becoming --
19 strike that. Prior to May of '03, were you ever
20 trained in providing medical attention or assistance
21 to a detainee or arrestee?
22    A. No.
23    Q. What would happen if you had someone in
24 your vehicle, you were going to bring them to the jail

Page 14 - Page 17

## Page 18

1 and they needed medical attention? What was the
2 protocol for that?
3     **A. If they needed medical attention, I would**
4 **take them to the hospital.**
5     Q. And was there any, did you have any
6 training on recognizing whether somebody needed
7 medical attention or not? Or it was left up to you to
8 decide?
9     **A. It was left up to us.**
10     Q. So you are currently at the University of
11 Illinois. What is your title there?
12     **A. Police officer.**
13     Q. Okay. Have we talked about all your
14 employment after leaving college up till today? Have
15 we missed anything?
16     **A. No.**
17     Q. And we ask this of everyone, and I've gone
18 through your personnel file so I pretty much know the
19 answer to this. Have you ever been convicted of a
20 felony or a misdemeanor involving dishonesty?
21     **A. No.**
22     Q. I do know from your personnel file you
23 have a history of asthma?
24     **A. Correct.**

## Page 19

1     Q. Okay. When did you first find out you had
2 asthma?
3     **A. My parents said I was two.**
4     Q. Okay. I know very little about asthma but
5 I'm sure I will learn much more about it. Are there
6 various types of asthma or is it just, you know, mild,
7 severe, I can live with that type of asthma?
8     **A. I don't know. I'm sure there is varying**
9 **degrees.**
10     Q. Right. I'm saying your type of asthma is
11 there a name for it or you've just got asthma?
12     **A. Just got asthma.**
13     Q. Okay. Is your asthma, how do you control
14 your asthma?
15     **A. Take medication.**
16     Q. And I don't need to get into that but do
17 you take prescription or do you take an inhaler?
18     **A. Both.**
19     Q. Okay. Do you do that on a daily basis or
20 just when you need it?
21     **A. Daily.**
22     Q. Okay. Is there anything, do you also have
23 allergies?
24     **A. Yes.**

## Page 20

1     Q. Does that aggravate your asthma?
2     **A. Yes.**
3     Q. Okay. Does anything else aggravate your
4 asthma?
5     **A. Other than allergies, no.**
6     Q. Okay. Does, I mean if you are outside
7 cutting the lawn or exerting yourself, does that
8 aggravate it?
9     **A. Well that's my allergies, grass.**
10     Q. Mowing the grass. All right. Let's go to
11 another scenario. How about working out. I mean when
12 you exert yourself and your heart rate is raising does
13 that have any correlation to your asthma?
14     **A. Are you asking if it's sports, like sports**
15 **related?**
16     Q. Yeah. Yeah.
17     **A. It can be but it just depends on what the**
18 **weather is like and what's, what's in the air.**
19     Q. Okay. And the pill, the medication you
20 take, is that, if you would have an asthma attack, say
21 this hypothetical, if you had an asthma attack sports
22 related playing basketball inside a gymnasium, would
23 you take a pill or would you use your inhaler for
24 immediate relief?

## Page 21

1     **A. Inhaler.**
2     Q. Okay. Let's just go through the sequence
3 of events on May 10th, 2003. I want to do it a couple
4 of times. One, I just want you to tell me what
5 happened off the top of your head; two, we will look
6 at your report; and, three, we will look at your
7 statement. You were working the third shift that
8 night?
9     **A. Yes.**
10     Q. Okay. And that would be from 11 p.m. to 7
11 a.m.?
12     **A. Right.**
13     Q. Okay. So that was, my recollection is it
14 was a Friday night to a Saturday morning?
15     **A. Correct.**
16     Q. Okay. And from reading the reports you
17 received a call from a person, there was a disturbance
18 at a trailer lot at 701 Griffin, lot 1 or 2?
19     **A. Right, they called communications.**
20     Q. Okay. And you received a call from
21 dispatch?
22     **A. Correct.**
23     Q. Okay. On your car radio or did you have
24 radios that attached to your body?

Page 22

1    A. We have both but it's the car radio.
2    Q. Okay. And how does that work? Once you
3 are out of the car, -- strike that. Do those radios
4 work simultaneously or once you get out of the car do
5 you put the radio that's on your body on?
6    A. Yes. You turn the radio on once you get
7 out of the car.
8    Q. Okay. And then when you go back in you
9 shut it back off so you don't have stereo --
10    A. Correct.
11    Q. -- calls? You received the call,
12 ultimately you get to the location where you see a
13 black male fitting the description of the person who
14 called in?
15    A. Right.
16    Q. Okay. And when you first see --
17    MR. CONDON: Just for the record I don't
18 know if the question was clear. You said fitting the
19 description of the person who called in.
20    MR. DECARO: That was called in. The
21 dispatcher gave you a description, correct?
22    THE WITNESS: Correct.
23    Q. Okay. And when you arrive on the scene
24 you find a person fitting that description?

Page 23

1    A. Correct.
2    Q. In what location did you find him?
3    A. In the front drive I believe.
4    Q. Okay. Basically around 701 Griffin?
5    A. Yes.
6    Q. And that's a trailer park or there is a
7 few trailers there?
8    A. Yeah. I believe there is like four
9 trailers there or five.
10    Q. All right. And those are, are those
11 trailer homes that are semi-permanent or are they
12 trailers on wheels that -- if you recall?
13    A. I don't know.
14    Q. Okay. And when you first get there what
15 is the person wearing that you see?
16    A. All I remember is they had blue jeans on,
17 blue jean shorts.
18    Q. Did he have a shirt on?
19    A. I don't remember.
20    Q. Okay. Did he have a bandana on?
21    A. I don't remember.
22    Q. Or a headband?
23    A. I don't remember.
24    Q. Okay. About what time of the morning is

Page 24

1 this?
2    A. I think it was about 6:30 I believe.
3    Q. And this happens May 5th -- strike that --
4 May 10th, 2003 so you had been on the job a little
5 less than two years at that point?
6    A. Right.
7    Q. Okay. And at what point, do you know what
8 month you began riding alone in your own vehicle?
9    A. It would have been March of '02.
10    Q. So you are in your own vehicle for about
11 15 months at this time, 14 months?
12    A. Yeah.
13    Q. And let's just assume for these questions
14 that the person you come along wearing these blue
15 jeans shorts is Kevin Lucas. So I will refer to him
16 as Kevin throughout the deposition as opposed to that
17 guy. When you first see Kevin, what is he doing?
18    A. When I first see Kevin, he goes to my
19 passenger side door and tries to unlock the door, or
20 actually tries to open the door.
21    Q. Okay. And what do you, what happens next?
22    A. I then tell him to step away from the car
23 and then I get out of the vehicle.
24    Q. Okay. Do you recall what dispatch had

Page 25

1 told you about this call prior to responding or being
2 there?
3    A. Dispatch said that the subject stated he
4 was, someone was trying to kidnap him.
5    Q. Okay. Did that seem reasonable to you at
6 the time that somebody was out there saying they were
7 trying to be kidnapped or did it not, you didn't form
8 an opinion about that at that point?
9    MR. CONDON: I will just object to the
10 form of the question.
11    MR. DECARO: I will withdraw the question.
12 We will talk about it later. Okay. So Kevin tries to
13 get in the front passenger door of your car?
14    THE WITNESS: Correct.
15    Q. Okay. And that was locked?
16    A. Correct.
17    Q. Okay. Then what does he do?
18    A. I told him to step away from the car. I
19 got out of the car. I tried to start talking to him.
20 I just asked him what was going on.
21    Q. And what did he say?
22    A. I believe he said he was, he was blown. I
23 didn't know what that meant. I believe I smelled
24 alcohol on him at that time.

## Page 26

1 Q. Okay. When you are talking to him, are
2 you on your side of the vehicle? Are you close to
3 him? I guess what I'm trying to find out is did you
4 fear for your safety from his behavior or did you go
5 right up to him and talk to him?
6 A. No. We talked at the front of the car but
7 I was still probably, I was whatever distance you
8 usually are. I don't just go right up, you know, and
9 stand like nose to nose with someone. I'm still a
10 good distance from them in case, you know, someone
11 wants to fight.
12 Q. Okay. So you are both on the same side of
13 the car?
14 A. Correct.
15 Q. Okay. And he said he was blown. Did you,
16 when he said that, did you have any idea what he was
17 talking about? Did you form any opinion in your mind
18 what he meant by that?
19 A. I just thought he was on drugs.
20 Q. I'm assuming that when someone, if you
21 think that, you are thinking they have done cocaine?
22 A. I didn't know what he did.
23 Q. Okay. So you thought he was on drugs
24 because he said that?

## Page 27

1 A. Yes.
2 Q. Okay. What does that, what does that
3 jargon mean? I mean cause then I don't know if it's
4 -- strike that. If somebody says "I'm blown," I'm
5 just trying to figure out your reasoning, how you
6 transfer that into they are on drugs.
7 A. Just because I could smell alcohol and he
8 said he was blown so I assumed he was on something
9 else other than alcohol.
10 Q. Okay. So at that point you assumed he was
11 on some kind of narcotic and had been drinking?
12 A. Correct.
13 Q. And you really, and I don't want to
14 belabor the point but I'm just having a little
15 difficult time, maybe I don't deal with enough people
16 is how you, how you get to he is on drugs from him
17 saying I'm blown?
18 A. Cause also the way he was acting.
19 Q. And how was he acting?
20 A. He was just jittery and agitated and
21 walking around and not standing still.
22 Q. Okay. Did you -- strike that. Okay. So
23 he tells you that. You are on the same side of the
24 car. What happens next?

## Page 28

1 A. I keep trying to talk to him. I just tell
2 him to relax. And at that point I think I'm still
3 just trying to get his name.
4 Q. Okay. Were you, was he able to give you
5 his name?
6 A. I don't recall.
7 Q. When you, you said he was walking around.
8 Was he walking around in circles? Was he walking
9 around your car? Was he walking away from you and
10 then back towards you? Or was he just like walking in
11 space, or walking in place? I'm sorry.
12 A. He was walking, I was standing in front of
13 the car and he was just basically just making a circle
14 around the front of me.
15 Q. Okay. Other than walking around in
16 circles around you, were there any other things he was
17 doing for you to conclude he was, and I want to make
18 sure I say the right words that you used, did you say
19 fidgety, irritable, agitated?
20 A. Just agitated.
21 Q. Okay. What was he doing other than
22 walking around that made you think he was agitated?
23 A. From what I remember he was just, kept
24 walking around. I believe he said he was drunk. Just

## Page 29

1 really wasn't listening to anything I was saying. He
2 just wasn't being very cooperative.
3 Q. Okay. So at that point when you say he
4 wasn't listening to what you were saying were you
5 asking him questions about himself and he wasn't
6 responding or were you giving him commands to do
7 things and he wasn't following them?
8 A. I believe at that point I was asking him
9 what his name was, who was trying to kidnap him and
10 what was going on.
11 Q. And how would he respond to those?
12 A. I don't think he answered me.
13 Q. He would just continue to walk around?
14 A. Yes.
15 Q. Okay. Up to this point, had you seen him
16 commit any type of crime?
17 A. No.
18 Q. Okay. What happens next?
19 A. After the amount of time that he was
20 walking around after I told him to relax, after he
21 didn't do that, I just told him I was going to place
22 him in handcuffs for his safety and mine and --
23 Q. Okay. Go ahead. I'm sorry.
24 A. That's all right.

Page 30

1    Q. How much time transpires from when you
2 first get out of the car until you tell him that?
3    A. I don't know. Maybe 30 seconds.
4    Q. Okay. Okay. All right. And let's talk
5 about the placing of handcuffs. And you said you were
6 going to do that for his safety and yours?
7    A. Right.
8    Q. Okay. Let's talk about his safety. What
9 had he done prior to that point that you felt that he
10 might endanger himself?
11    A. Well because the way he was acting by not
12 listening to me, kept walking around, wasn't basically
13 following any of what I was -- at one point I started
14 asking him like personal information and then I was
15 just telling him to sit against the car and he wasn't
16 doing that. So at that point I decided to place him
17 in the handcuffs for his safety and mine basically. I
18 don't feel like fighting somebody at 6:30 in the
19 morning when I'm about to go home.
20    Q. Right. And I can -- strike that. But
21 what did you think he was going to do to himself that
22 he might harm himself?
23    A. Well I don't know what he was going to do.
24    Q. Okay. Let's talk about your safety.

Page 31

1 Based upon the fact that you just said you didn't know
2 what he was going to do, --
3    A. Uh-huh.
4    Q. -- were you more, a little more concerned
5 about your safety because you didn't know what he was
6 going to do when you placed him in handcuffs?
7    A. Yeah, by the way he was acting.
8    Q. Okay. And I'm assuming, like you said at
9 6:30 in the morning you come upon this guy that won't
10 answer your questions walking around the car, you
11 didn't know what he was going to do next?
12    A. Correct.
13    Q. Okay. And then at that point after you
14 tell him I'm going to place you in handcuffs, are
15 those the words you used or what did you say?
16    A. I don't recall.
17    Q. Something to that effect?
18    A. Correct.
19    Q. Okay. Did you then immediately try to
20 handcuff him?
21    A. I told him I was going to handcuff him.
22    Q. Okay. When you tell him that, are you
23 facing each other or had you gone behind him at that
24 point?

Page 32

1    A. I don't remember.
2    Q. Okay. Was there any response from Kevin
3 when you told him that? Did he say no or did he move
4 away or --
5    A. When I told him?
6    Q. Yes.
7    A. No.
8    Q. Did he resist in any way when you told him
9 that?
10    A. No.
11    Q. Okay. Then what did you do next?
12    A. I then grabbed one of his hands, attempted
13 to place the handcuffs on him. As I tried to grab his
14 other hand, he started pulling away and then I think
15 at some point I got him handcuffed.
16    Q. Okay. Were you going to, was it your
17 intent to handcuff him behind his back or in front of
18 him?
19    A. Behind his back.
20    Q. Okay. Is that where you handcuff
21 somebody? Is that something you are trained on? Or
22 is that something you just independently decide I'm
23 going to handcuff him in front or behind?
24    A. That's policy.

Page 33

1    Q. Okay. And what is the policy on
2 handcuffing regarding that? Is it always handcuff
3 people behind their back when you are going to
4 transport them to the jail or --
5    A. It's handcuffed behind the back unless
6 they have some sort of like shoulder problems or
7 ailment and then you cuff them up in front.
8    Q. Okay. Up to this point, you hadn't seen
9 Kevin commit any crime?
10    A. No.
11    Q. So you grab the, and I'm sorry if you just
12 said this, do you know which hand of his that you got
13 a cuff on?
14    A. I don't recall.
15    Q. Okay. So you got it on one hand and you
16 were attempting to grab the other hand and put it
17 behind his back or how did it go?
18    A. I had him cuffed on one hand and, or one
19 wrist, and I tried to grab his other wrist and he kept
20 pulling away and then I somehow finally got it cuffed.
21    Q. Okay. When you got both wrists cuffed,
22 were you both, when both wrists were cuffed, were you
23 both standing upright?
24    A. Yes.

Page 34

1    Q. Any time before getting both wrists cuffed
2  had you or he fallen to the ground?
3    A. I don't remember.
4    Q. Okay. And I saw in some report you saw
5  that Kevin had an inhaler in his hand at some point?
6    A. Yes. I believe it was on the ground.
7    Q. The inhaler was on the ground or he was on
8  the ground when you saw that?
9    A. The inhaler was on the ground.
10   Q. Okay. So when did you see the inhaler?
11 When you first got there before handcuffing him?
12   A. No. I believe it was after. Actually I
13 don't remember.
14   Q. Okay. When you did handcuff Kevin, were
15 you able to see both of his hands clearly? And I'm
16 leading up to did you see if he had anything in his
17 hands when you handcuffed him?
18   A. No, he didn't have anything in his hands.
19   Q. Okay. So you saw the inhaler on the
20 ground some time prior to leaving the area?
21   A. Correct.
22   Q. Okay. You don't know whether it was prior
23 to cuffing him or not?
24   A. No, I don't.

Page 35

1    Q. Would that be fair?
2    A. Right.
3    Q. Okay. So at some point you get Eric
4  handcuffed behind his back. Is he able to go into
5  his, when someone is handcuffed behind their back, are
6  they able to go into their back pockets of their
7  pants?
8        MR. CONDON: I will just object, it calls
9  for speculation.
10       MR. DECARO: Let me withdraw that. After
11 you handcuffed Kevin, were you able to observe whether
12 he could go into his back pockets of his pants or
13 would his arms not reach there because they were
14 cuffed?
15       THE WITNESS: I believe his pants were on
16 the ground at that time.
17   Q. Okay. Is there a policy or procedure --
18 strike that. Prior to this point, had you used your
19 radio in any, from getting to the scene to handcuffing
20 Kevin, had you used your radio in any way to call for
21 backup or call dispatch and tell them you've got a
22 person in sight or anything like that?
23   A. I don't believe so cause I knew Sergeant
24 Sporcich was on his way.

Page 36

1    Q. And I'm assuming you knew that. Did he
2  call you on your radio or did you call dispatch and
3  dispatch told you?
4    A. You don't have to call dispatch. Whenever
5  you get on the air, everybody can hear you.
6    Q. Okay. Is there any policy or procedure on
7  waiting for backup before attempting to handcuff
8  somebody or can you go ahead and do that if you are on
9  your own and it's one person?
10   A. You can handcuff on your own.
11   Q. Okay. So at any time prior to handcuffing
12 Kevin were you ever on, was Kevin ever on the ground
13 with you on top of him?
14   A. Prior to me handcuffing him?
15   Q. Yes.
16   A. No.
17   Q. All right. So now he is handcuffed, his
18 pants are down to his ankles?
19   A. Uh-huh.
20   Q. Yes?
21   A. Right.
22   Q. And he has on checkered underwear if you
23 recall --
24   A. I guess.

Page 37

1    Q. -- from the photographs?
2    A. Yes.
3    Q. Do you remember at this point whether he
4  has got a shirt on or not? Do you see any tattoos on
5  him?
6    A. If I remember right, I think he might have
7  had a white T-shirt on but that's all I --
8    Q. Okay.
9        MR. CONDON: Don't guess. If you don't
10 know, don't guess. He doesn't want you to guess.
11       THE WITNESS: I honestly don't remember.
12       MR. DECARO: Okay. No problem. Okay.
13 What happens next? You get him handcuffed, what
14 happens next?
15       THE WITNESS: I get him handcuffed. I've
16 got him, I'm holding him up against the trunk of the
17 car cause he keeps like lifting his feet up like he is
18 trying to, I don't know, like be heavy or, you know,
19 not wanting me to hold onto him and then, that's what
20 he does.
21   Q. Okay. Now how are you holding -- strike
22 that. Is he, is he, is the front of Kevin facing the
23 trunk of the car --
24   A. Yes.

Page 38

1    Q. -- or is his back to the trunk?
2    A. His chest is touching the trunk.
3    Q. Okay. Is he bent over onto the trunk?
4    A. I believe he is standing leaning over the
5    trunk.
6    Q. Okay. And are you sort of just holding
7    him waiting for Sergeant Sporcich or are you actually
8    trying to hold him up?
9    A. Both.
10    Q. Okay. So he would be standing facing the
11    trunk and then would he put his chest on the trunk and
12    lift his legs up or would he just be standing and lift
13    his legs up and all his weight would go on you?
14    A. I don't remember. Both really.
15    Q. Okay. Were there any times where he would
16    lift his legs up and you would let him fall to the
17    ground?
18    A. No.
19    Q. So how long are you standing at the back
20    of the trunk -- strike that. How long are you
21    standing at the trunk of your car prior to Sporcich
22    arriving?
23    A. I think he said he was 150, Route 150 and
24    Avenue G so it probably took him maybe two minutes, so

Page 39

1    I might have been there 45 seconds about.
2    Q. Okay. And after you handcuffed -- well
3    strike that. What was your, when you made the
4    decision to handcuff Kevin, what was your plan, what
5    were you going to do with him?
6    A. I was going to search him for any weapons
7    or anything like that.
8    Q. Okay. And then once you handcuffed him
9    did you search him?
10    A. I couldn't.
11    Q. And why is that?
12    A. Because I couldn't keep control of him.
13    Q. Okay. Did you ever search him that night?
14    A. No.
15    Q. And let's do it a couple of ways. So if
16    you had searched him and he hadn't had any weapons or
17    anything on him were you going to let him go or was it
18    your plan to bring him to the county jail the whole
19    time?
20    A. Well, my initial plan was I wasn't
21    planning on arresting him because he hadn't done
22    anything. He was just walking around --
23    Q. Right.
24    A. -- banging on doors. I mean there is

Page 40

1    nothing illegal about that. So I was just going to
2    find out, you know, what he was doing and try to give
3    him a ride home or something.
4    Q. Okay. And that plan, what changed that
5    plan? The fact that you couldn't search him?
6    A. No. The fact that he was resisting me
7    when I was telling him to do things.
8    Q. Okay. So in the, so by the time you had
9    him handcuffed you were going to take him to the
10    county jail at that point?
11    A. Correct.
12    Q. Okay. What is the -- strike that. So
13    you are standing at the back of the vehicle and
14    eventually Sergeant Sporcich arrives?
15    A. Correct.
16    Q. Okay. Is there anything, other than Kevin
17    lifting his feet up and, lifting his feet up while you
18    guys are waiting there that occurs during the period
19    from after handcuffing him until Sporcich arrives?
20    A. He tries to walk away from me, pull away
21    from me.
22    Q. Okay. How do you physically have ahold of
23    him? I'm assuming his back is to you?
24    A. Correct.

Page 41

1    Q. Okay. Where is your left hand and your
2    right hand on him?
3    A. I don't recall but I think I had, I
4    probably just had one hand on his back and the other
5    hand just holding his wrists.
6    Q. Okay. So when you are holding his wrists
7    are you holding the cuffs between his wrists or are
8    you holding one or the other wrists?
9    A. I'm holding his wrists.
10    Q. Okay. And you have one hand on his back.
11    And he is attempting to move to the left or to the
12    right to get away from you?
13    A. He is just trying to get away.
14    Q. Is it, is it, is he forcefully trying to
15    do that or is that part of the jitteriness, agitation
16    type of trying to get away from you?
17    MR. CONDON: I will object to the form of
18    the question, it's vague.
19    MR. DECARO: I will withdraw it. Did you
20    form an opinion while you are holding him there and
21    you say he is trying to get away, did you form an
22    opinion this guy is trying to flee from my control of
23    him or he is still jittery?
24    THE WITNESS: He is pulling away from me

## Page 42

1 so he is trying to get away from me.
2 Q. Okay. Did he ever get away from you?
3 A. I don't believe so.
4 Q. Okay. And this whole time his pants are
5 down on the ground, not on the ground but they are on
6 his legs but down?
7 A. I believe so.
8 Q. Okay. Okay. Other than that, was there
9 any conversation between you and Kevin while you were
10 waiting for Sporcich after you handcuff him?
11 A. I don't believe so. I think if anything I
12 just told him to relax.
13 Q. Okay. Was he saying anything to you?
14 A. I don't remember.
15 Q. Was he making any sounds?
16 A. No.
17 Q. Okay. In your, either your, I think your
18 statement you said a couple of times you told him to
19 take deep breaths. Do you remember that?
20 A. Yes.
21 Q. Was he having any type of difficulty
22 breathing?
23 A. No.
24 Q. Was he breathing quickly?

## Page 43

1 A. No.
2 Q. Did you think that would help him relax?
3 A. Yeah.
4 Q. Okay. Have we covered everything that
5 occurred after you handcuffed him and before Sporcich
6 got there? Anything else take place?
7 A. I don't think so.
8 Q. Okay. Sergeant Sporcich gets there.
9 What's the first thing that happens after Sporcich
10 gets there?
11 A. He gets out of his car and comes over to
12 me and we put Kevin on the ground so I can unlock the
13 car doors and then get him in the car.
14 Q. Okay. You have to manually, do you have
15 to go open the car door and hit a button to unlock the
16 doors?
17 A. Yeah. I had to unlock the car and then I
18 had to hit a button to unlock the back passenger door.
19 Q. Okay. Why did you have to put Kevin on
20 the ground to do that?
21 A. Because I couldn't hold him. I don't know
22 if it was Sergeant Sporcich or my idea. We placed him
23 on the ground on his stomach.
24 Q. Okay. And I don't mean to be, you know,

## Page 44

1 unreasonable but you had said you had been holding him
2 at the back of the car for about two minutes before
3 Sporcich got there, and then Sporcich got there, who
4 my understanding at that point he was about an 18 year
5 veteran on the force. Did Sporcich attempt to hold
6 him at the back end of the car while you went and
7 opened the doors or did you immediately decide let's
8 put him on the ground while I do this?
9 A. I don't remember. I was only there for 45
10 seconds, not two minutes, and when we got, when Frank
11 got there he was still, basically started fighting,
12 pulling away, things like that, so then we put him on
13 the ground so we could get him in the car.
14 Q. I may have misunderstood. Let's clarify
15 it. From the point of where you handcuffed Kevin to
16 the point when Sporcich got there was 45 seconds?
17 A. Approximately.
18 Q. Okay. I thought you said two minutes.
19 I'm sorry. Okay. When, and how long did it take you
20 to open the car doors?
21 A. Probably five seconds.
22 Q. Okay. And then did you immediately pick
23 Kevin up off the ground?
24 A. Yes.

## Page 45

1 Q. At any point -- was that the only time
2 Kevin was on the ground?
3 A. Yes.
4 Q. At any point while he was on the ground
5 did you have your knee on his back?
6 A. I don't remember.
7 Q. Okay. Did you see Sergeant Sporcich with
8 his knee on Kevin's back at any time?
9 A. He might have. I don't know.
10 Q. Okay. Is that a, is there a training on
11 how to restrain someone when they are on the ground?
12 A. Yes.
13 Q. Was Kevin's stomach on the ground or was
14 his back on the ground?
15 A. Stomach.
16 Q. In your training, are you trained to keep
17 someone down, face down, handcuffed behind their back
18 by using your knee or a foot or something to keep them
19 down?
20 A. Yes. You can use your knee.
21 Q. Okay. And I'm assuming that's so they
22 don't get up and take off?
23 A. Right.
24 Q. Okay. And I know you said you don't

Page 46

1  remember whether your knee was on him but just
2  logically it would occur Sergeant Sporcich got there,
3  you put Kevin on the ground, then you left to go open
4  the car door, correct?
5      A. Yes.
6      Q. So your knee wouldn't have been on him
7  then. And then you come back and you said you guys
8  immediately picked him up so you wouldn't have put
9  your knee on him then, correct?
10     A. Right.
11     Q. Okay. So most likely -- well strike that.
12 There really wasn't a period where you would have put
13 your knee on Kevin?
14     A. Correct.
15     Q. Okay. And if there was a period when
16 anyone would have it would have been Sergeant Sporcich
17 while you went to open the car?
18        MR. CONDON: I will just object to the
19 form of the question, calls for speculation.
20        MR. DECARO: I will withdraw that. You
21 never saw, did you ever see Sporcich with his knee on
22 Kevin?
23        THE WITNESS: I don't remember.
24     Q. Okay. So you get back from opening the

Page 47

1  car doors, at any point did you ever tell Kevin he was
2  under arrest?
3      A. I don't think so.
4      Q. But he was under arrest, right? He wasn't
5  free to leave?
6      A. Correct.
7      Q. And what would the charge have been at
8  that point?
9      A. Resisting a peace officer.
10     Q. Now is that an independent charge? I mean
11 can you have resisting a police officer without some
12 underlying charge?
13     A. Yeah.
14     Q. Okay. All right. So you get back from
15 opening the car door, how do you guys pick Kevin up?
16 Do you each take an arm?
17     A. I believe we each grab underneath like his
18 armpit area by his bicep and just lift him up that
19 way.
20     Q. Okay. And then what happens?
21     A. We place him in the car.
22     Q. Okay. Is there any problem putting him in
23 the car?
24     A. No.

Page 48

1      Q. Okay. Is he having, are you having any
2  conversation with him or giving him commands at that
3  point from off of the ground into the car?
4      A. I just more than likely told him that we
5  were going to take him into the car.
6      Q. Okay. And he goes into the car. Does he
7  go, he goes into your back seat I'm assuming?
8      A. Correct.
9      Q. Okay. Does he go in feet first, head
10 first?
11     A. I think he just went in sideways, so he
12 probably sat down first and we got his feet in.
13     Q. Okay. So as --
14     A. Because his pants were around his ankles.
15     Q. So as a person would normally get into a
16 car?
17     A. Correct.
18     Q. Was he followed, I mean was he giving you
19 any resistance at that time as you put him into the
20 car?
21     A. He was just doing what he was doing
22 previously.
23     Q. Trying to get away?
24     A. He was just fidgeting, somewhat combative.

Page 49

1      Q. Now when you say fidgeting and combative,
2  can you just tell me what he is doing?
3      A. Well he is pulling away and he is just, he
4  is not basically doing what we were telling him to do.
5      Q. Okay. Is that, is that -- strike that.
6  During those first 14 months of your -- strike that.
7  After becoming a county sheriff in '01, up to this
8  point in '03, how many arrests had you made if you
9  know?
10     A. I couldn't tell you.
11     Q. I mean would it be more than 100?
12     A. Possibly.
13     Q. Okay. Was Kevin acting like other
14 arrestees acted or was this out of the ordinary how he
15 was acting?
16     A. No, others had acted like him.
17     Q. Okay. Were they also, did you also think
18 those people were drinking or high on narcotics?
19        MR. CONDON: I'm just going to object to
20 the form of the question, lack of foundation, calls
21 for speculation. You can answer if you can.
22        THE WITNESS: I don't remember.
23        MR. DECARO: Did you think when he was
24 acting fidgety and combative that that was a result of

## Page 50

1 him being drunk or high?

2　　　THE WITNESS: I don't know.

3　　Q. You didn't form an opinion one way or the

4 other?

5　　A. No.

6　　Q. Okay. Had Kevin answered any of your

7 questions up to this point?

8　　A. I don't recall.

9　　Q. Did you know his name at this point?

10　　A. From listening to the 911 tape today, at

11 some point we maybe got his wallet or he might have

12 told us. I don't remember how we got it.

13　　Q. Do you know where in the 911 tape that

14 comes up? Is it after he is in your vehicle and you

15 are going to the jail or is it before then?

16　　A. I don't remember.

17　　Q. Okay. Do you remember, you say you got

18 his wallet at some point. Do you remember getting his

19 wallet?

20　　A. No.

21　　Q. Is it possible you didn't get his wallet?

22　　A. Like I said, I don't remember how I got

23 his name but at some point I got it.

24　　Q. Okay. Is it possible that you didn't get

## Page 51

1 it until you were at the Public Safety Building where

2 another officer recognized him?

3　　A. No. I remember from the tape I called and

4 checked a local check, local check warrant on him

5 prior to going to the jail.

6　　Q. Okay. And in your procedure in your

7 history of doing that is that typically something you

8 would do after the person is in your vehicle?

9　　A. Usually do it before even, before you

10 arrest somebody. As soon as you talk to somebody on

11 whatever call you are on usually, --

12　　Q. Okay.

13　　A. -- you usually check for warrants.

14　　Q. But in this case you didn't do that

15 because prior to handcuffing him you hadn't used your

16 radio I think you said?

17　　A. I just didn't know his name.

18　　Q. Okay. And you don't know when he gave you

19 his name, if he gave you his name; would that be fair?

20　　A. Correct.

21　　Q. Okay. And I think you also said you never

22 searched him so that's what led me to the conclusion

23 that you probably didn't grab his wallet. Do you

24 recall ever going into his pants to either get

## Page 52

1 identification or look for contraband?

2　　A. No.

3　　Q. No you don't remember that or no you

4 didn't do it?

5　　A. I don't recall.

6　　Q. Okay. Did you ever see Sporcich do it?

7　　A. No.

8　　Q. When Kevin is in the back of your car, are

9 his pants still down by his ankles?

10　　A. I don't know.

11　　Q. Okay. At the trailer park -- strike

12 that. At the trailer lot did you ever speak to any

13 person who would have called 911 regarding Kevin?

14　　A. No, I didn't.

15　　Q. Did you see Sporcich speak to anyone?

16　　A. No.

17　　Q. Did you overhear Sporcich have any type of

18 conversation with Kevin while you guys were at the

19 trailer lot?

20　　A. No.

21　　Q. Did you overhear Sporcich have any

22 conversation with Kevin at any time prior to leaving

23 the Public Safety Building that morning?

24　　A. No.

## Page 53

1　　Q. So you get Kevin into the car and what

2 happens next?

3　　A. I take him to the Public Safety Building.

4　　Q. And Officer Sporcich follows you?

5　　A. Correct.

6　　Q. Okay. While you are in the car, do you

7 have conversation with Kevin?

8　　A. Yes.

9　　Q. Okay. Tell me about all the

10 conversations. What do you say to him and what does

11 he say to you?

12　　A. If I remember, I think I asked him if he

13 had a job, and he said he did. I asked, at some point

14 we started talking about Danville and he said it was

15 going to crap because it was turning into a city and I

16 don't know, we just had a conversation.

17　　Q. Okay. Did he seem more lucid in the car?

18　　A. He just relaxed.

19　　Q. Okay. Was he fidgety in the back at all?

20 Was he moving around in the back seat or was he sort

21 of sitting still?

22　　A. No, he was just sitting there.

23　　Q. Okay. You said that you saw at some point

24 an inhaler on the ground, correct?

Page 54

1    A. Correct.
2    Q. Did you think it was Kevins or did you not
3 relate the two?
4    A. I don't remember.
5    Q. Okay. Did you ever ask him in the car
6 whether that was his inhaler?
7    A. I don't recall.
8    Q. During this whole time, did he ever
9 indicate to you that he had asthma or needed an
10 inhaler?
11    A. At some point he did.
12    Q. Do you know when that was?
13    A. I don't remember.
14    Q. What did he say to you about that?
15    A. I think he said he had, I think he just
16 told me he had asthma.
17    Q. Did he ever say that he needed his inhaler
18 or I lost my inhaler or anything like that?
19    A. No, he didn't say anything.
20    Q. All right. Let's go back to the
21 conversations in the car. Talked about he had a job.
22 Talked about how Danville was going downhill.
23 Anything else?
24    A. Not that I can remember.

Page 55

1    Q. Okay. While you were in the car did you,
2 from the 911 tape, can you tell whether you were in
3 the car when you called dispatch to find out about
4 warrants?
5    A. I believe I did it before I left.
6    Q. Okay. Before you left the trailer lot?
7    A. Yeah.
8    Q. Okay. And for that you need to know his
9 name?
10    A. Correct.
11    Q. Do you know any other information?
12    A. No.
13    Q. Okay. Do you know whether it came back
14 with warrants or no warrants?
15    A. No warrants.
16    Q. Okay. Did you also on the tape tell them,
17 you know, I'm bringing him in? I've arrested him for
18 resisting arrest, I'm bringing him in? Or what else
19 did you tell dispatch?
20    A. I just told dispatch that I was code 18,
21 which means one in custody, and I was en route to the
22 PSB or the building and that I was going to the front
23 door.
24    Q. Okay. I listened to the tape and a lot of

Page 56

1 that I don't know what you guys are talking about but
2 I did hear county 13 and county 4. Were you county 13
3 or --
4    A. I was county 13.
5    Q. Okay. And Sporcich is county 4?
6    A. Right.
7    Q. So, and also from somewhere is that
8 typically how you would go to the Public Safety
9 Building, up to the front door?
10    A. No. The problem was it was being, the
11 sallyport was being renovated so most of the time we
12 took people on the east side but if we had a
13 problem with somebody we went through the front door.
14    Q. Okay. Why would you go through the front
15 door if you had a problem?
16    A. Because it's closer.
17    Q. Closer to book-in?
18    A. Closer to getting them into the building
19 and to the elevator.
20    Q. Okay. Is there a way to bring a person
21 directly into book-in?
22    A. There is now.
23    Q. There wasn't then?
24    A. No.

Page 57

1    Q. Was that what they were constructing or --
2    A. Correct.
3    Q. Okay. So how many floors does the Public
4 Safety Building have?
5    A. I think four.
6    Q. Okay. When you walk into the main floor,
7 are you on floor one?
8    A. Correct.
9    Q. And you have to -- where is book-in?
10    A. Basement.
11    Q. Okay. So do you take, do you walk a
12 person downstairs or do you take the elevator?
13    A. Normally you take them downstairs. When
14 it was being fixed, you took them down I think it was
15 a flight of stairs.
16    Q. Okay. And from reading the statements you
17 guys used the elevator that day. Why is that?
18    A. Because that's the only way down to the
19 book-in from the front door.
20    Q. Okay. So there was no stairs near the
21 front door to get you down to book-in back then?
22    A. No.
23    Q. Okay. How did you get Kevin from your car
24 into the Public Safety Building?

Page 54 - Page 57

Page 58

1    A. Sporcich and I carried him in.
2    Q. Did Sergeant Reynolds help at all?
3    A. No.
4    Q. Did Officer Schull I think it is?
5    A. Schull.
6    Q. Schull. Did he help?
7    A. No.
8    Q. And how did you carry him?
9    A. Well, I tried to lift up his pants and
10   then we carried him the same way we brought him in,
11   just underneath the bicep, or armpit area, and then he
12   would alternately stand, walk, and then lift his feet
13   up again.
14   Q. Okay. So I'm assuming -- strike that.
15   When you first opened the door, do you tell him get
16   out of the car or do you take him out of the car?
17   A. I probably asked him if he would get out
18   of the car.
19   Q. Do you recall? Or you said I probably
20   asked him, do you recall one or the other?
21   A. I don't recall.
22      MR. CONDON: Don't guess if you don't
23   know.
24      MR. DECARO: Yeah. Cause I will hold it

Page 59

1    to you. I will hold it against you later on.
2       THE WITNESS: I don't remember.
3    Q. Only tell me what you recall. And if not
4    just say I don't recall. So you and Officer Sporcich
5    have him under the arm and at some point you are
6    walking with him and at other points he is lifting his
7    feet so you have to actually carry him; --
8    A. Correct.
9    Q. -- would that be accurate? Okay. How far
10   of a distance, can you pull up right to the front door
11   or is there a driveway? How far of a distance are we
12   talking about from where your car is to the front
13   door?
14   A. It's up a flight of stairs so it's maybe
15   10, 15 feet.
16   Q. Okay. Was he able to walk up the stairs?
17   A. I don't believe he did.
18   Q. Okay. Is he, are you saying put your feet
19   down and walk or are you just, you know, resolved to
20   get this guy into the building?
21   A. We just carry him in.
22   Q. Are you having any conversation with him
23   or do you overhear-- strike that. Are you having any
24   conversation with him while you are getting him from

Page 60

1    the car into the building?
2    A. I don't remember.
3    Q. Okay. Do you overhear Sporcich having any
4    conversation with him?
5    A. No.
6    Q. Was Kevin saying anything as he was
7    walking and being carried into the building?
8    A. No.
9    Q. Okay. You get into the building. Is
10   there an elevator close to the front door?
11   A. Yes.
12   Q. Okay. You hit the elevator for down or
13   somebody does?
14   A. Somebody does.
15   Q. Okay. You get in the elevator?
16   A. Correct.
17   Q. And at that point who was in the elevator?
18   A. Kevin, me, Sergeant Sporcich, Reynolds, I
19   believe. Somebody else might have been there. I
20   don't remember.
21   Q. Does Reynolds just happen to be there or
22   do you guys call ahead and say we need help with this
23   guy?
24   A. Called ahead and told dispatch to have

Page 61

1    corrections meet me out front.
2    Q. And why did you do that?
3    A. Because he was combative.
4    Q. Okay. Now when you say that were you
5    relying upon how he was acting at the lot or what he
6    was doing in the car?
7    A. Acting at the lot.
8    Q. Okay. When do you make that call? While
9    you are driving there?
10   A. Before we leave.
11   Q. Okay. Okay. But he wasn't combative in
12   the car really?
13   A. No.
14   Q. Okay. And where do you meet Reynolds?
15   A. I don't remember.
16   Q. Okay. And now how is, is the elevator--
17   strike that. How do you have Kevin positioned in the
18   elevator? Is he facing the wall? Is he facing the
19   door?
20   A. I don't know.
21   Q. Is there any problem in the elevator? Is
22   he being combative in the elevator?
23   A. No.
24   Q. Okay. So do you go directly down to the

Page 62

1 book-in?

2    A. Yes.

3    Q. The elevator didn't go up to the third or

4 fourth floor first and then down?

5    A. No. No.

6    Q. So you get to book-in and what happens?

7 Walk him out, in book-in I don't know, can you just

8 describe book-in for me? Is it -- well go ahead.

9    A. You just get off the elevator and right

10 when you look out there is a big glass wall and that's

11 where the correction guards sit who book people in,

12 just take a left and go back around and there is a

13 long counter and then there is a bench that faces that

14 counter and most people sit on that bench once you

15 bring them in.

16    Q. Okay. At that point in May of '03 were

17 there any video cameras in the book-in area?

18    A. I don't know.

19    Q. Okay. Is there a, are you familiar with

20 the Public Safety Building? As an officer, do they

21 give you a tour of the building?

22    A. I hadn't had one.

23    Q. Okay. Do you know if there was a command

24 center that had video screens so the other jailers

Page 63

1 could watch the movement within the jail?

2    A. I don't know.

3    Q. Who would know that?

4    A. People that work at the jail. I don't

5 know.

6    Q. Okay. You get Kevin into the book-in

7 area. Is he bleeding at this point --

8    A. No.

9    Q. -- from anywhere? Any visible injury to

10 him at this point?

11    A. No.

12    Q. You are in the book-in area and what

13 occurs there?

14    A. I sit him down on the bench and attempt to

15 take the handcuffs off of him.

16    Q. And what happened then?

17    A. Then he started pulling away and then

18 someone said take him into the padded cell.

19    Q. Okay. So the bench you put him on is

20 directly across from a desk where someone books you

21 in?

22    A. It's like a counter.

23    Q. Okay. And what occurs at the counter?

24 You get fingerprinted?

Page 64

1    A. No. Basically there is a sheet you fill

2 out, basically it's their biographical information and

3 then what charge and then you just fill it out and

4 that's basically what it is there for.

5    Q. Okay. Did anyone attempt to get

6 information from Kevin to fill out that sheet at that

7 time in the book-in area?

8    A. I don't remember.

9    Q. Okay. And from what you said it sounded

10 like Kevin would not let you unlock his handcuffs?

11    A. Correct.

12    Q. Did you say hey, you know, I'm trying to

13 unlock your handcuffs?

14    A. Yes.

15    Q. Okay. And did he respond?

16    A. No, I don't remember.

17    Q. Okay. And how long of a time elapsed

18 while you were trying to unlock his handcuffs?

19    A. Oh, I don't know.

20    Q. I mean did you try multiple times or did

21 you just try once and he pulled away and you said, you

22 know, the hell with you I will leave your handcuffs

23 on?

24    MR. CONDON: I object to the form of the

Page 65

1 question.

2    MR. DECARO: Well you know what I mean,

3 that kind of state of mind.

4    THE WITNESS: I attempted to take his

5 handcuffs off of him and I think whoever was watching

6 me take them off just decided to take him to the

7 padded cell.

8    Q. And I think you said in your statement

9 that was Sergeant Sporcich who decided that?

10    A. My statement, yeah.

11    Q. Is that your recollection today?

12    A. From what I've learned lately, or since

13 then it was actually Reynolds.

14    Q. Okay. Well your statements were given

15 that day?

16    A. Right.

17    Q. A couple of hours after the incident,

18 correct?

19    A. Right.

20    Q. I'm assuming the person who said that was

21 standing near you and you heard, or you thought you

22 heard Sporcich say it on that day, correct?

23    A. I didn't see who said it. I just thought

24 it might have been Sergeant Sporcich.

Page 66

1    Q. Okay. How did you learn it was somebody
2 else?
3    **A. Through, through this.**
4    Q. Okay. Through reading these documents or
5 through talking to the other officers?
6    **A. Documents.**
7    Q. Okay. And they say it was somebody else?
8    MR. CONDON: Object to the form of the
9 question.
10    MR. DECARO: The documents indicated it
11 was someone else?
12    THE WITNESS: Correct.
13    Q. Okay. Who was that?
14    **A. Sergeant Reynolds.**
15    Q. Because Sporcich wouldn't have, it wasn't
16 his domain really to say where to put prisoners?
17    **A. Correct.**
18    Q. Okay. In the book-in area, did you have
19 any conversation with Kevin other than telling him I'm
20 trying to get your handcuffs off?
21    **A. I don't believe so.**
22    Q. Okay. Did you overhear anyone have any
23 conversation with him?
24    **A. I think Sergeant, or not Sergeant, but**

Page 67

1 **Officer Schull, I think he said he knew him or**
2 **something like that.**
3    Q. Okay.
4    **A. And then I think Kevin told him that he**
5 **was drunk or something like that.**
6    Q. Did anyone else say, you know, let him
7 take the handcuffs off you?
8    **A. No.**
9    Q. Okay. In the book-in area, are there
10 holding cells?
11    **A. Yeah, but you got to go around, I mean**
12 **it's kind of a separate room.**
13    Q. Okay. And do you have an understanding of
14 why some people are put in holding cells, some people
15 are put in padded cells?
16    **A. Usually if you go in a padded cell, it's**
17 **just because you are being combative; and then holding**
18 **cells is just waiting for people to get processed.**
19    Q. And the combativeness that Kevin showed at
20 this point was he moved his hands when you were trying
21 to unlock his handcuffs?
22    **A. Right. He was pulling away from me.**
23    Q. Okay. Was he still seated on the bench
24 when he was pulling away? I'm just trying to figure

Page 68

1 out when you say pulling away was he getting up and
2 trying to walk away or was he just moving his hands
3 around?
4    **A. He was sitting on the bench and he kept,**
5 **you know, moving his body away and sliding down on the**
6 **bench.**
7    Q. Okay. Sliding down to the ground or
8 moving --
9    **A. No, just moving laterally.**
10    Q. Okay. At this point could you smell
11 alcohol on him?
12    **A. Yes.**
13    Q. Okay. Where was Officer Reynolds at this
14 point?
15    **A. I don't know.**
16    Q. Okay. Officer Reynolds was in the
17 elevator with you though?
18    **A. Correct.**
19    Q. Okay. How close was he to Eric, or Kevin?
20    MR. CONDON: When he was in the elevator
21 you mean?
22    MR. DECARO: Yes.
23    THE WITNESS: I think he was in front of
24 us.

Page 69

1    Q. Okay. Was his back to you?
2    **A. I think he was -- I don't know.**
3    Q. Okay. How does Kevin get to the padded
4 cells?
5    **A. Officer Sporcich, or Sergeant Sporcich and**
6 **I carry him over there.**
7    Q. Okay. Same manner --
8    **A. Correct.**
9    Q. -- as how you brought him in?
10    **A. Yeah.**
11    Q. Okay. Does Officer Reynolds or Schull
12 help carry him?
13    **A. No.**
14    Q. Okay. How far is it from where he was
15 seated to the padded cell?
16    **A. It was down the hallway maybe 20 feet.**
17    Q. Okay. While you were in the booking area,
18 book-in area, other than you, Sporcich, Reynolds,
19 Schull and Kevin, was there anyone else there?
20    **A. I don't recall seeing anyone.**
21    Q. Okay. Can you, can persons in the holding
22 cells see what's happening in the booking area?
23    **A. I don't know.**
24    Q. Can you see the holding cells from the

## Page 70

1 book-in area?
2     A. Yes but not, no one, I don't believe
3 anybody was in any of them because the cells that most
4 of the inmates were in there is doors blocking them so
5 you can't see into the book-in area. But there is an
6 area, like I said where that other room is that's on
7 the other side of the counter where there is people,
8 people could see in but I don't remember if there was
9 anyone in there or not.
10     Q. What is that room called?
11     A. Just a holding cell I guess.
12     Q. Okay. There is a cell and then is there
13 like a glass wall or there is just an open area?
14     A. You got the, if you are standing by the
15 counter you can turn around, there is a glass wall or
16 a glass window and you can see into where they do the
17 fingerprints, basically it's the processing room, and
18 basically if you are looking at it from the counter
19 you take a look, you look right and there's two cells
20 over there.
21     Q. Okay. Were there any work release people
22 in the book-in area, booking in area?
23     A. No, I don't remember.
24     Q. Okay. While you were on the elevator, did

## Page 71

1 any other inmates get on?
2     A. No.
3     Q. While you were taking it, when you got
4 down to the book-in area, were any inmates there
5 waiting to get on the elevator when you guys got off
6 with Kevin?
7     A. No, I don't think so.
8     Q. Okay. So as you are walking -- strike
9 that. Was Kevin able to walk to the padded cell?
10     A. I believe we carried him.
11     Q. Okay. Was he saying anything or moaning
12 or yelling or anything on the way?
13     A. No, I don't recall.
14     Q. Was he having any difficulty breathing
15 that you could tell on the way?
16     A. No.
17     Q. Was he breathing normally?
18     A. Yeah.
19     Q. What happens when you get him into the
20 padded cell? First, at some point you get him into
21 the padded cell, correct?
22     A. Correct.
23     Q. Do you happen to know the size of the
24 padded cell?

## Page 72

1     A. No.
2     Q. When you get him into the padded cell, who
3 is all in the padded cell with Kevin?
4     A. Once we got him in?
5     Q. Yes.
6     A. It's me, Sergeant Sporcich and then I
7 believe Officer Schull and then Sergeant Reynolds.
8     Q. Okay. And what was, were Reynolds and
9 Schull asked by either you or Sporcich to follow them
10 or, you know, was there some reason why all four of
11 you went? Did you anticipate there was going to be a
12 problem?
13     MR. CONDON: Just object to the form of
14 the question.
15     MR. DECARO: Let me rephrase it. Did you
16 ask Reynolds and Sporcich, you know, follow us into
17 the padded cell with this guy?
18     THE WITNESS: Me and Sergeant Sporcich
19 were already carrying him in so Reynolds and Schull
20 probably followed us in because they have got to do
21 whatever they got to do when you bring someone in to
22 the padded room.
23     Q. Okay. Do you know what they have to do?
24     A. No.

## Page 73

1     Q. All right. So what do you do once you get
2 Kevin into the padded cell?
3     A. I know we placed him on his chest to try
4 to get the handcuffs off of him.
5     Q. Does the padded cell have a padded floor?
6     A. I don't remember.
7     Q. Okay. You place him on his chest. Is he
8 fidgeting or being combative at that point?
9     A. Yeah, he starts to kick.
10     Q. Okay. Is he saying anything?
11     A. He is yelling something. I know he is
12 yelling. I don't remember what he is saying though.
13     Q. Is anybody giving him commands to relax or
14 just calm down, we are trying to take the cuffs off?
15 Is anyone, that you can hear, giving him commands
16 including yourself?
17     A. Yeah, I am. I am just telling him we are
18 taking the cuffs off of him.
19     Q. Okay. Is he responding to you?
20     A. I don't think so.
21     Q. But he is just yelling something that you
22 don't recall or it was incoherent?
23     A. I don't remember.
24     Q. Okay. So he is face down on the floor.

**Page 74**

1 You are trying to get the cuffs off. How was he
2 taking the cuffs -- is he being held on the floor?
3 I'm talking initially now. We will go step by step.
4 But when you first get him there, you put him on the
5 floor, does someone hold him so he doesn't get up
6 initially?
7    A. I've got my, I've got a knee placed
8 against his arm so it's up against his body so he
9 can't, once I get the cuffs off of him he can't go out
10 and hit me.
11    Q. And you are indicating your left arm. Is
12 that what your recollection is?
13    A. Yeah, it would have been his left arm.
14    Q. Okay. So you were on his left side with
15 your, which knee up against his arm?
16    A. I don't recall.
17    Q. Okay. So you had a knee up against his
18 arm so if you got the cuff off he couldn't swing?
19    A. Correct.
20    Q. Okay. Any, do you have any body part on
21 his body as weight to hold him down on the ground?
22    A. No.
23    Q. Okay. Do you see where Sporcich is at
24 this point?

**Page 75**

1    A. Yes.
2    Q. Where is he?
3    A. He is on his right side.
4    Q. Okay. Does he, where are his knees?
5    A. I believe it was on his right arm
6 somewhere.
7    Q. Okay. And I don't know what these cells
8 look like, only from the pictures. Is Sporcich right
9 side up against a wall or is your left side up against
10 the wall?
11    A. I wasn't up against the wall.
12    Q. Okay. Were you guys in the middle of the
13 cell so nobody was up against the wall?
14    A. I don't know.
15    Q. Okay. So you and Officer Sporcich are
16 towards the front of Kevin; would that be fair?
17    A. Correct.
18    Q. Okay. And you said, does he immediately
19 start to kick when you get him in there?
20    A. I don't remember.
21    Q. Okay. Where is Reynolds?
22    A. Probably standing outside. I don't know.
23    Q. All right. Well then just tell me, you
24 are trying to get the cuffs off, what happens?

**Page 76**

1    A. He starts to kick and then I just tell him
2 to relax, we are just taking the cuffs off of him.
3 And then at the time he starts kicking I tell someone
4 to come in, whoever was standing out there, Reynolds
5 or Schull, come in and hold his feet so he doesn't, I
6 don't get kicked.
7    Q. Okay. So you were up near Kevin's left
8 shoulder area?
9    A. Yeah.
10    Q. Or were you by his elbow? I don't really
11 know.
12    A. Just between his shoulder and elbow.
13    Q. Okay. And Kevin's hands are handcuffed
14 behind his back?
15    A. Correct.
16    Q. And he is kicking, I'm assuming from his
17 knees down to his feet he is --
18    A. Correct.
19    Q. -- flailing them back and forth?
20    A. He is moving them.
21    Q. Okay. So you asked one of the other
22 officers come in here and hold his feet?
23    A. Correct.
24    Q. Do you know who did that?

**Page 77**

1    A. I don't remember.
2    Q. Okay. And an officer does do that?
3    A. Correct.
4    Q. Okay. And how much time are we talking
5 about up to this point where an officer, from when you
6 get Kevin in initially to when he, when an officer
7 comes in and holds his feet? Is it 10 seconds? 30
8 seconds? A minute?
9    A. Probably 10, 15 seconds.
10    Q. Okay. So now we've got, you are trying to
11 undo the cuffs, we have Sporcich in the same position
12 and someone holding his feet?
13    A. I think it was Schull cause I remember him
14 taking off his shoes and his jean shorts.
15    Q. Okay. Does Schull do that before he grabs
16 his feet or after you get the cuffs off or when?
17    A. I don't remember.
18    Q. Okay. So Schull grabs, let's assume
19 Schull grabs his feet, then what happens?
20    A. He grabs his feet and holds him down and,
21 as soon as he quits flailing, then I just keep trying
22 to take the cuffs off of him.
23    Q. Okay. And you got the cuffs off at some
24 point?

Page 78

1    A. I got one cuff off of one wrist. I think
2 it was his left hand. And then at some point I
3 couldn't get the cuff off of his right hand so I had,
4 I think I had Sergeant Reynolds try and unlock the
5 cuff.
6    Q. Okay. And at some point does Reynolds get
7 that other cuff off?
8    A. Correct.
9    Q. Okay. How long of a process was that from
10 when you initially put him on the ground till both
11 cuffs are off?
12    A. Maybe 20 seconds, 30 seconds.
13    Q. So it happens relatively quickly?
14    A. Right.
15    Q. Okay. At any point is anyone sitting on
16 his back or, you know, where his, you know, above his
17 buttocks area?
18    A. No.
19    Q. Okay. After Reynolds gets the second cuff
20 off, what happens?
21    A. I threw the cuff out into the hallway area
22 and then everybody just got off, just Schull got off
23 and then I just stepped away from him. I think I just
24 had my hand on his back so he wouldn't get up too

Page 79

1 quickly and then I just got out of the cell.
2    Q. Okay. Did the other officers also then
3 get out of the cell?
4    A. Yes.
5    Q. And did you see them shut the door?
6    A. I don't remember.
7    Q. Okay. After getting the cuffs off and
8 getting out of the, while you were getting out of the
9 cell what was Kevin doing? Was he still in the same
10 position or had he sat up, stood up?
11    A. I don't remember.
12    Q. Okay. Do you recall all four officers out
13 of the cell at some point and the door shut?
14    A. Yes.
15    Q. Okay. And I sort of jumped ahead but I
16 mean did you, you said that Reynolds and Schull came
17 to do whatever they had to do to Kevin. After you
18 guys got the cuffs off and you left, did you see
19 Reynolds or Schull do anything to Kevin in the cell?
20    A. No, I didn't.
21    Q. Okay. Would it be fair to say once you
22 guys got the cuffs off of him that all four of you
23 then quickly left the cell and left only Kevin in the
24 cell?

Page 80

1    A. Correct. Once we got him uncuffed, we
2 were all out of the cell.
3    Q. Okay. And then somebody shut the door?
4    A. Correct.
5    Q. Okay. Do you have to turn a key or does
6 the door shut automatically?
7    A. I don't know.
8    Q. Okay. Was Kevin yelling anything or
9 saying anything as you guys were leaving the cell?
10    A. I believe I heard him yell something but I
11 don't know what he was yelling.
12    Q. Was that immediately after you left the
13 cell or was it while you were walking out of booking?
14    A. It was when I was just writing up the
15 paperwork for him.
16    Q. And where did you do that?
17    A. In the book-in area.
18    Q. Is there only one padded cell?
19    A. I don't know.
20    Q. Okay. Are there other cells in the area
21 where Kevin was?
22    A. I don't think there are.
23    Q. Where is that cell in relationship to
24 where you were doing your work?

Page 81

1    A. It's, like I said you are in the book-in
2 area and then you've got that other room, which is the
3 processing room, and then on the other side of the
4 processing room is the padded cell.
5    Q. Okay. And I think you also said there is
6 a holding cell in there somewhere?
7    A. That's in the processing room.
8    Q. When you say you heard him yelling
9 something while you were doing your paperwork, did you
10 recognize his voice or you just heard somebody yelling
11 and you assumed it was Kevin?
12    A. I just assumed it was Kevin because it was
13 coming from that area.
14    Q. Okay. While you were doing your
15 paperwork, did Officer Sporcich stay in the area with
16 you or did he leave?
17    A. He left.
18    Q. Okay. While you were doing your
19 paperwork, where was Officer Reynolds?
20    A. I don't recall.
21    Q. Do you know where Officer Schull was?
22    A. No, I don't.
23    Q. Was there an officer in the booking area
24 that works there and stays in that area?

Page 82

1    A. Just in the area itself?
2    Q. Yeah.
3    A. I mean they go all over, I mean whatever
4 they have to do in order for processing. They go
5 wherever they have to go.
6    Q. Okay.
7    A. There is no one that is just stationed
8 there.
9    Q. Right. I mean they don't do that high
10 volume of inmates --
11    A. Right.
12    Q. -- that they need somebody there?
13    A. Yeah, there is somebody always there.
14    Q. Okay. And who was, who was the person, I
15 guess my question is who was the person designated to
16 be there that morning if you know?
17    A. Schull.
18    Q. Okay. Do you know when you were done with
19 your paperwork about what time that was?
20    A. No.
21    Q. Do you know, you were scheduled to be off
22 at 7 that morning?
23    A. Correct.
24    Q. Did you work late?

Page 83

1    A. I think so. I believe I went upstairs and
2 did my report.
3    Q. Okay. So what were you doing in the
4 booking area?
5    A. All I was doing was like I said that sheet
6 with the biographical information. That's all I did.
7 That only took like 30 seconds.
8    Q. All right. I misunderstood. So you
9 filled that sheet out?
10    A. Correct.
11    Q. And then you went upstairs --
12    MR. CONDON: I don't know, were you
13 finished with your answer?
14    MR. DECARO: I'm sorry.
15    THE WITNESS: I was just going to say that
16 book-in sheets, that's just, all the arresting
17 officers fill that out. That's all I was going to
18 say.
19    Q. Okay. And then you went upstairs and did
20 your complaint form?
21    A. Correct.
22    Q. Okay. Is that where your office typically
23 is is upstairs?
24    A. There is just a report writing room up

Page 84

1 there.
2    Q. Okay. I mean when you would report to
3 work is that the building you would report to?
4    A. The Public Safety Building?
5    Q. Yeah.
6    A. Yeah.
7    Q. Do you guys punch in and out or how --
8    A. No.
9    Q. How do they know you are there for your
10 shift?
11    A. Cause you call on the radio.
12    Q. Okay. Do you also call when you are
13 leaving?
14    A. Correct. You call when you are done with
15 your shift.
16    Q. Is there any notation as far as, you know,
17 what time you called and would have been done with
18 your shift that day?
19    A. I believe there is a record of it through
20 communications.
21    Q. Okay. All right.
22    A. Can I use the restroom?
23        (At this point a short recess was
24        taken after which the following

Page 85

1        proceedings were conducted:)
2    MR. DECARO: So from what you've told me
3 from taking Kevin from your car until the point where
4 you placed him into the padded cell, you and Officer
5 Sporcich had control of him; --
6    THE WITNESS: Yes.
7    Q. -- would that be fair? And then after you
8 unhandcuffed him, Officer Schull released his legs I'm
9 assuming?
10    A. Yes.
11    Q. Okay. And then all the officers left the
12 room and the door was shut?
13    A. Yes.
14    Q. Okay. So then you did the, for lack of a
15 better, the intake paperwork for the prisoner in the
16 booking area?
17    A. Yes.
18    Q. Okay. And then you left that area and
19 went and did your paperwork at another location?
20    A. Correct.
21    Q. Okay. At any time prior to you leaving
22 the booking area did you ever see any officer, any
23 officer frisk or search Kevin?
24    A. No.

Page 86

1    Q. Okay. Is there, when I say frisk or
2 search, in your mind, and with your training, is there
3 a difference between frisking someone and searching
4 someone?
5    A. Frisking is usually just a pat-down for
6 weapons and search is after arrest.
7    Q. Okay. Let's talk about, you are trained
8 in how to properly search someone?
9    A. Yes.
10    Q. Okay. Can you just tell me what you were,
11 how you were trained how you are supposed to search
12 someone? And I just mean what areas you are trained
13 to touch or is it every area of the body or --
14    A. It's the whole body.
15    Q. Okay. So if somebody were properly
16 searched their whole body would have been gone over?
17    MR. CONDON: Just object to the form of
18 the question. You can answer if you can.
19    THE WITNESS: Just search whatever
20 articles of clothing they have on.
21    MR. DECARO: Okay. And that would include
22 socks? Would you feel around their feet around their
23 socks?
24    THE WITNESS: You can.

Page 87

1    Q. Okay. Have you ever made a drug arrest
2 where an offender put any type of drug in their shoe
3 or their sock?
4    A. Not that I recall.
5    Q. Okay. Are you trained that that is a
6 possible location for contraband?
7    A. Yes.
8    Q. I mean would it be fair to say that you
9 are trained that any location that is covered by
10 clothing could be an area where somebody could be
11 concealing contraband?
12    A. Correct.
13    Q. Okay. And we talked a little bit about
14 why you didn't search Kevin in this particular
15 situation. Are you trained that if a person is
16 combative, and I will ask you several different ways,
17 if a person is combative that there is no need to
18 search them?
19    A. Can you repeat the question?
20    Q. Sure. In your training on searching
21 individuals, are there exceptions to times when you
22 don't have to search somebody? I mean like you said
23 he was combative and his pants fell down so you didn't
24 search him; is that accurate? Or why didn't you

Page 88

1 search him in this case? Let me ask you that.
2    A. Okay. Why didn't I search him when?
3    Q. You didn't search him at all, did you?
4    A. No.
5    Q. Okay. Why not?
6    A. Because I didn't have the opportunity to.
7    Q. Okay. Is there a, is there a rule that
8 every time you arrest somebody, is there a rule at
9 Vermilion County as a Vermilion County sheriff that
10 each arrestee must be searched?
11    A. I don't know.
12    Q. Okay. Were you trained that each arrestee
13 must be searched?
14    A. Yes.
15    Q. Okay. When you had him in the booking
16 area and there was you, Sporcich, Reynolds and Schull
17 or Schull, could you have searched him then?
18    A. Possibly.
19    Q. Okay. Did Officer Reynolds or Officer
20 Schull tell you that they were going to search him?
21    A. No.
22    Q. Okay. At any time prior to handcuffing
23 Kevin did he ever take a swing at you or a punch?
24    A. No.

Page 89

1    Q. Okay. Did he ever do anything other than
2 attempt to -- strike that. Did he ever do anything
3 other than continually walk around your squad car--
4 strike that. Prior to handcuffing him, did he, did he
5 perform any action directed towards you that made you
6 fear for your safety?
7    A. Directed towards me?
8    Q. Yes.
9    A. No.
10    Q. In the booking area, did Kevin say
11 anything to anyone? Did you hear Kevin say anything
12 either to you, Sporcich, Reynolds or Schull or anyone
13 else from when you got him into the book-in area until
14 you got him into the padded cell?
15    A. No, I don't recall.
16    Q. Did you ever learn whether Kevin was drunk
17 or high on narcotics subsequent to this?
18    MR. CONDON: I assume when you ask him
19 that you are not asking him did he learn it from his
20 attorney?
21    MR. DECARO: Right. Right.
22    MR. CONDON: Okay.
23    THE WITNESS: No.
24    MR. DECARO: Okay.

Page 90

1    THE WITNESS: Well, yeah, I heard the
2  radio report, or not the radio report but the TV
3  report from the coroner.
4       Q. Okay. Is it illegal in Illinois to be
5  drunk in public?
6       A. I mean in certain situations.
7       Q. Okay. We all know in DUI people are given
8  Breathalyzers and things like that to see if they are
9  driving under the influence. Are you trained at all
10 to give a person who is not driving any type of blood
11 or a breath test to determine whether they are
12 intoxicated?
13      A. No.
14      Q. Is that something you could have done in
15 this situation to see if he was drunk?
16      A. No.
17      Q. That's something you don't do or that
18 would be impossible to do?
19      A. What was the question?
20      MR. DECARO: The question was -- let's
21 have her read it back cause I don't even remember.
22      (At this point the court reporter
23      read aloud the aforesaid question
24      after which the following

Page 91

1      proceedings were conducted:)
2      MR. DECARO: Could you have given him a
3  Breathalyzer test to see whether he was even drunk or
4  rule out whether he was drunk?
5      THE WITNESS: Could have.
6      Q. Did you have a chance to read Sergeant
7  Reynolds' statement?
8      A. No.
9      Q. Have we talked about all of the
10 conversations that you had with Kevin that day?
11      A. I believe so.
12      Q. Thinking back, did Kevin respond to any of
13 your commands that morning?
14      A. No. He didn't do anything that I told him
15 to do.
16      Q. Okay. In your experience -- strike that.
17 Had you in your experience, prior to May 10th of '03,
18 had you made any DUI arrests?
19      A. Yes.
20      Q. Did you find that people who were
21 intoxicated by alcohol would not follow your commands?
22      A. Can you repeat it?
23      Q. Sure. You've made DUI arrests so you have
24 dealt with people who were intoxicated in the past,

Page 92

1  correct?
2      A. Correct.
3      Q. Prior to May 10th of '03?
4      A. Right.
5      Q. And you said that Kevin did not follow any
6  of your commands. I'm just asking you if that was
7  your experience with other intoxicated people who were
8  intoxicated by alcohol. Did you find other drunk
9  people they would not follow your commands?
10      A. Some would and some wouldn't.
11      Q. Okay. Had you made any arrests of people
12 who were, who had ingested narcotics, that you
13 subsequently learned they were high on cocaine or
14 heroin or PCB or something like that?
15      A. I don't recall.
16      Q. Did you ever go back to the padded cell
17 after you left there initially?
18      A. No.
19      Q. How did you find out of Kevin's death?
20      A. I was called by communications.
21      Q. Do you know when that was?
22      A. That day.
23      Q. Okay. And what did they tell you?
24      A. Come to the building.

Page 93

1      Q. And when you got to the building what
2  happened?
3      A. I believe Investigator Domilano told me
4  that Kevin had died.
5      Q. Okay. And then you gave a statement?
6      A. Correct.
7      Q. And who was that given to?
8      A. Captain Miller.
9      Q. Is he your direct supervisor -- strike
10 that. Is he one of your supervisors?
11      A. He is the captain of investigations, or
12 was.
13      Q. Okay. Who was your direct supervisor?
14      A. It would have been Frank or Sergeant
15 Sporcich.
16      Q. And who was his supervisor?
17      A. Captain Howard.
18      Q. And, I'm sorry, you may have answered this
19 question, how long was Kevin in booking before you
20 guys -- strike that -- before someone decided to put
21 him into a padded cell?
22      A. I don't know. Maybe 20 seconds.
23      Q. Okay. In those 20 seconds did, in those
24 20 seconds, did you hear Officer Reynolds or Officer

Page 94

1 Schull direct any questions to Kevin?
2    A. I believe Officer Schull asked Kevin what
3 he was doing here. Kevin said he was drunk.
4    Q. And you, would it be fair-- strike that.
5 Were you standing next to Kevin or sitting next to
6 Kevin the entire time he was in booking?
7    A. Yes.
8    Q. Okay. So if anyone had directed questions
9 towards him you would have heard them?
10    A. Correct.
11    Q. Is that all of the conversation you heard?
12    A. Yes.
13    Q. Okay. Had you ever made an arrest prior
14 to May 10th, 2003 where the detainee was put directly
15 into a padded cell?
16    A. I don't remember.
17    Q. Okay. When did you leave the employ of
18 the Vermilion County?
19    A. August of '04.
20    Q. Okay. After May of '03 to August '04, did
21 you ever arrest somebody who was put directly into a
22 padded cell?
23    A. At some point.
24    Q. Do you remember the facts of that case?

Page 95

1    A. No, I don't.
2    Q. Okay. So other than Kevin would it be
3 just one other person you believe?
4    A. I think so.
5    Q. Okay. Was that person, if you recall,
6 were they intoxicated or were they being combative or
7 were they, did they have an altered mental state or do
8 you know why they were put into the padded cell?
9    A. No.
10    Q. Did the scenario on that occasion go down
11 basically the same way or was that scenario you turned
12 them over to the jailers and they decided, without
13 your assistance, to put the person into the padded
14 cell?
15    A. I don't remember.
16    Q. Did Kevin, did Kevin, did he vomit at any
17 time while he was in your custody?
18    A. Not that I know of.
19    Q. Did he ever ask for medical assistance
20 while he was in your custody?
21    A. No.
22    Q. Prior to seeing the inhaler on the ground
23 at the trailer lot, did you ever see Kevin use an
24 inhaler at any point on May 10th?

Page 96

1    A. No.
2    Q. Did you have an opinion on May 10th
3 whether, we talked about blown, but I mean did you
4 ever have an opinion whether Kevin had ingested any
5 narcotics in addition to drinking alcohol based upon
6 his behavior?
7    A. As far as what?
8    Q. I mean based upon his behavior, how he was
9 acting that day, did you believe that he was drunk?
10    A. I could smell alcohol on him.
11    Q. Okay. Did you form an opinion that he may
12 have drank alcohol but also ingested narcotics?
13    A. Other than what he told me when he said he
14 was blown.
15    Q. Okay. And based on that you, just to
16 rehash blown a little bit, when somebody said that you
17 believed that that meant they did do some form of
18 narcotic?
19    A. When Kevin said that.
20    Q. Okay. But because he said that you
21 thought he may have done some drugs also?
22    A. Correct.
23    Q. Okay. But you don't know what type of
24 drug?

Page 97

1    A. Correct.
2    Q. Okay. Did you feel that his behavior was
3 a result of ingesting alcohol and narcotics?
4    A. I don't know.
5    Q. Okay. Did you feel that his behavior
6 might have been based upon that he, for lack of a
7 better phrase, had an altered mental state? That he
8 just was wacky?
9    MR. CONDON: Objection, calls for
10 speculation. You can go ahead.
11    THE WITNESS: I don't know.
12    MR. DECARO: Okay. Did you form an
13 opinion, one way or the other -- well strike that.
14 Let me ask it this way. Did you feel Kevin was acting
15 normal? I mean did you feel there was something wrong
16 with him the way he wasn't responding to your
17 commands, was lifting his feet up, did you think there
18 was something wrong with him?
19    MR. CONDON: Let me just object to the
20 form of the question. You can answer it if you can.
21    THE WITNESS: I don't know.
22    Q. Is this typically how people, the way
23 Kevin was acting that day, is that typical for how the
24 people you had arrested prior to that would act?

Page 98

1    **A. Yes, some people have acted like that.**
2    Q. Okay. Were those people, if you know, did
3 those people ingest alcohol or narcotics or not?
4    **A. I don't know.**
5    Q. In your training, do they train you at all
6 on characteristics of people who had ingested
7 narcotics, what their behaviors might look like?
8    **A. Yes.**
9    Q. Okay. And where was that training at?
10    **A. At PTI.**
11    Q. Okay. Did Kevin exhibit any of those
12 behaviors that morning?
13    **A. I don't recall.**
14    Q. Is it you don't recall the training or you
15 don't recall whether the training is linked to his
16 behavior?
17    **A. Right, I don't recall the training.**
18    Q. Were you trained at all that ingestion of
19 narcotics may require medical assistance for someone?
20    MR. CONDON: Just object to the vague form
21 of the question but go ahead.
22    MR. DECARO: Let me withdraw that. In
23 your training at PTI, or anywhere else after becoming
24 a county sheriff, were you trained at all that someone

Page 99

1 who may have ingested a narcotic might need medical
2 assistance either because they took too much of the
3 narcotic or the narcotic was bad or it had altered
4 their mental state?
5    MR. CONDON: Same objection. Go ahead.
6    THE WITNESS: What was the question?
7    MR. DECARO: Can you read it back, please.
8        (At this point the court reporter
9        read aloud the aforesaid question
10        after which the following
11        proceedings were conducted:)
12    **A. I don't believe I had training as far as,**
13 **you know, signs of overdose or anything like that.**
14    Q. You did not have that training?
15    **A. No.**
16    Q. Okay. In your, in your personal life with
17 a history of asthma, did you ever come to find, either
18 reading articles or talking with a physician, that
19 your asthma might be aggravated or exacerbated by
20 taking a drug or smoking cigarettes?
21    **A. Well if you have asthma you are not**
22 **supposed to smoke.**
23    Q. Okay. How about is there a, did you ever
24 learn throughout your life that taking, say snorting

Page 100

1 cocaine would aggravate asthma?
2    **A. No.**
3    Q. You never heard that?
4    **A. No.**
5    MR. DECARO: We will move onto some
6 exhibits. Let me mark as O'Brien exhibit one the
7 complaint form.
8        (At this point the court reporter
9        marked O'Brien exhibit number one,
10        after which the following
11        proceedings were conducted:)
12    MR. DECARO: Okay. I've handed you what
13 we have marked as O'Brien exhibit number one. It's
14 the Vermilion County Sheriff Department Complaint
15 Form, correct?
16    THE WITNESS: Correct.
17    Q. Okay. And that is the form you completed?
18    **A. Correct.**
19    Q. Okay. And that was completed on May 10th
20 of '03?
21    **A. Correct.**
22    Q. Do you happen to know what time this would
23 have been completed?
24    **A. After the arrest.**

Page 101

1    Q. Okay. Within an hour?
2    **A. Maybe 7:30.**
3    Q. Okay. So on here, if you look at number
4 16, date and time occurred, its got May 10th, 2003 at
5 6:26 hours. Would that be the time you got the call
6 or the time you actually had first contact with Kevin?
7    **A. Time I got the call.**
8    Q. Okay. Do you have an understanding either
9 from reading this or independent recollection about
10 what time you would have left that padded cell on May
11 10th?
12    **A. What time I left?**
13    Q. Yeah. Would it have been 7, 6:40, 7:10?
14    **A. I don't know.**
15    Q. Okay. Do you have an idea how long the
16 whole thing took from first getting out of your car to
17 talk to Kevin to handcuffing him and putting him in
18 the car, drive to the building, put him in the padded
19 cell? I mean was it a 10 minute procedure or 15, a
20 half hour?
21    **A. I would say it was probably a half hour.**
22    Q. Okay. So somewhere around 7:00 Kevin
23 would have been in the padded cell?
24    **A. I guess, yes.**

Page 102

1  Q. Instead of going line by line, just let me
2  go to a few lines that I want to ask you about cause
3  you have answered some of my questions already. On
4  the second line, I mean these facts would have been --
5  well strike that. On the second line, "As I arrived,
6  I notice a male/black wearing blue jean shorts,
7  headband, walking toward my vehicle." If he had been
8  wearing a shirt, would you have put it in there do you
9  think?
10  A. I don't know. Possibly.
11  Q. Okay. Is it possible he didn't have a
12  shirt on?
13  A. I don't recall.
14  Q. If we go down to the line that starts "I
15  advised the subject to relax, put his hands on my
16  squad car and take some deep breaths to calm himself
17  down." Do you see that?
18  A. Uh-huh. Yes.
19  Q. Yes. Was that something you told him very
20  shortly after getting out of your car or did you
21  advise him of that after he had walked around your car
22  a couple of times?
23  A. I believe that was right after I got out
24  of the car and saw the way he was acting.

Page 103

1  Q. Okay. And I think we talked about him
2  being agitated because he was walking around a lot.
3  Was he fidgeting with his clothes or did he have any
4  facial ticks or was he moving his upper body a lot too
5  that made him look agitated?
6  A. Not that I recall.
7  Q. Okay. So it was basically the walking
8  that we are talking about when you say agitated?
9  A. Well he was walking and he was also, I
10  mean the movements he was doing.
11  Q. But that's what I'm trying to get. What
12  were those movements? Cause I'm trying to get a
13  picture of what he looked like.
14  A. He was walking around. I mean it's hard
15  to explain. I think he would kind of like sit down
16  and stand back up and then just kind of walk up, he
17  wasn't walking just like you are going for a walk in a
18  park, he was like walking briskly and pretty quick and
19  making, you know, quicker movements like that.
20  Q. Okay. Then you say "Subject seemed very
21  agitated, kept walking around my squad car, would not
22  stay still. I tried to get the subject's name,
23  however, he would not give it to me." So prior to
24  handcuffing him you asked him his name?

Page 104

1  A. Correct.
2  Q. Okay. And would you say he just
3  disregarded your question or do you think he heard you
4  and was refusing to give it to you or did you get an
5  impression of why he wouldn't give it to you or he
6  just didn't have the state of mind to give it to you?
7  A. I asked him and he just didn't answer.
8  Q. When you asked him that, would he turn and
9  walk away from you or would he just stare at you?
10  A. He never stared at me. He kept walking
11  around.
12  Q. Okay. "I asked him if somebody was trying
13  to kidnap him at which time he did not give me an
14  answer." The kidnapping portion of this, is that
15  something dispatch told you?
16  A. Yes.
17  Q. Okay. Did Kevin ever tell you somebody
18  was trying to kidnap him?
19  A. I don't know.
20  Q. Okay. I mean there was no, we talked
21  about the conversations with him in your car and all
22  that, and you didn't relay any conversation to me
23  about well who is trying to kidnap you and why would
24  they be trying to kidnap you. That's why I asked. It

Page 105

1  sounds as though Kevin never directly told you
2  somebody is trying to kidnap me?
3  A. I don't recall.
4  Q. Okay. Had he told you somebody was trying
5  to kidnap me would that be a line of questions that
6  you would have gone into perhaps, you know, who is
7  trying to kidnap you, why would they kidnap you, you
8  know, and what brings you to this lot and things like
9  that?
10  A. Yes.
11  Q. But you didn't have that conversation?
12  A. No.
13  MR. CONDON: You mean other than what he
14  says in his report, "I asked him if somebody was
15  trying to kidnap him."
16  MR. DECARO: Right. Right.
17  MR. CONDON: Okay.
18  MR. DECARO: Let me just ask you about the
19  last sentence. "He was turned over to correctional
20  personnel and is waiting the posting of bond." Is the
21  waiting the posting of the bond, is that just
22  something you assumed or did someone call his family
23  to come bond him out or did he say I can post a bond
24  or is that something you just normally put in there?

Page 106

1    THE WITNESS: Yes.
2    Q. So you had no independent knowledge that a
3 family member had been contacted and was coming to
4 post a bond?
5    **A. No.**
6    Q. Did you know, how is a bond amount
7 determined at that point? Is that something the
8 jailers determine or something you determine or
9 something he needs to go in front of a judge to
10 determine?
11    **A. It's a class A misdemeanor so it's**
12 **automatically $100.**
13    Q. Okay. And if somebody had come in, if
14 someone had come and given $100 Kevin could have
15 gotten out?
16    **A. Correct.**
17    Q. How typically is the arrestee allowed to
18 post, to contact someone? Are they given a phone call
19 or what happens typically?
20    MR. CONDON: Are you talking about once
21 they are in jail?
22    MR. DECARO: Yeah.
23    THE WITNESS: Yeah, usually corrections
24 let's them make a phone call.

Page 107

1    MR. DECARO: All right. Let's move on to
2 exhibit two which is going to be your statement. Mark
3 that O'Brien two.
4        (At this point the court reporter
5        marked O'Brien exhibit number two,
6        after which the following
7        proceedings were conducted:)
8    MR. DECARO: We have handed you what we
9 have marked as O'Brien exhibit two. That is a
10 statement you gave on May 10th, 2003 starting at
11 approximately 1:07 p.m., correct?
12    THE WITNESS: Correct.
13    Q. Okay. And these are all marked as, well,
14 no, your complaint form was report number V as in
15 Victor 2003 dash 05020, 05020. This statement is
16 marked V as in Victor 03 dash 05095. I'm assuming
17 from the caption that Gary Miller asked you these
18 questions?
19    **A. Yes.**
20    Q. Okay. Was there anyone else in the room
21 with you?
22    **A. No.**
23    Q. And this was tape-recorded?
24    **A. Correct.**

Page 108

1    Q. Okay. And Mike I haven't, I don't know if
2 I have asked for this but I would ask for the
3 tape-recordings of all these statements if you can get
4 them?
5    MR. CONDON: Yeah, I don't know if -- I'm
6 trying to remember.
7    MR. DECARO: I may not have asked
8 specifically for these tapes.
9    MR. CONDON: I'm just trying to remember
10 if I asked for them or whatever. But if you remember
11 just put something in writing on it.
12    MR. DECARO: Okay. Had you ever given a
13 statement like this to an investigator or your captain
14 prior to this incident?
15    THE WITNESS: No.
16    Q. Is there a certain procedure in a death
17 investigation that requires these type of statements
18 if you know?
19    **A. No, I don't know.**
20    Q. Okay. Let's go down to the first
21 question, first major question here that says okay Ken
22 basically you know we've had a discussion here and I
23 explained that the situation, I explained to you the
24 situation that a person who, whom you arrested earlier

Page 109

1 this morning was found dead in his cell, correct? And
2 you answer "right." What I would like to know is
3 prior to Captain Miller starting the tape and asking
4 you these questions what type of conversation did you
5 have with him? What did he say to you and what did
6 you say to him?
7    **A. He just basically said that Kevin had died**
8 **in the cell.**
9    Q. Okay. Did he say, did he at that point
10 have any understanding or explanation as to why he
11 died?
12    **A. I don't believe so.**
13    Q. Okay. Did he tell you what time he died?
14    **A. No.**
15    Q. Did he tell you anything about where the
16 body was or who was investigating it, anything like
17 that?
18    **A. No.**
19    Q. Okay. So it was basically Kevin Lucas
20 died this morning?
21    **A. Correct.**
22    Q. And we need a statement?
23    **A. Correct.**
24    Q. Did, outside of the statement, did Captain

Page 106 - Page 109

Page 110

1 Miller ever say that you had done anything wrong
2 during the arrest of Kevin?
3     A. No.
4     Q. Was there ever-- strike that. Let me ask
5 you, and I didn't ask you this. As the entire time
6 you were a county sheriff, had you ever been
7 reprimanded for improper conduct?
8     A. What do you mean by that?
9     Q. Well a complaint against you by a citizen
10 or a complaint by a superior saying you handled the
11 situation wrong?
12     A. No.
13     Q. Okay. Any other kind of complaints that I
14 didn't just categorize?
15     A. Just a traffic accident.
16     Q. Okay. I think I knew about that. Okay.
17 Let's look at page two, the middle of page two.
18 You're answering his question, "What was that call?"
19 In here you have, the last line there, "Was at her
20 door pounding on the door saying that someone was
21 trying to kidnap him." Is that something again that
22 dispatch told you?
23     A. Correct.
24     Q. If we go to page three, the center of page

Page 111

1 three, the first major, second large answer there,
2 last line, you say, "When I saw him, I took that" --
3 well strike that. Let's go back. "Said he, said he,
4 said he was blowin. When I saw him, I took that to
5 mean he was high on some sort of drug or something
6 like that." And we talked about this at length. The
7 only thing, you say some drug or something like that.
8 Is there something else you thought maybe he was high
9 on other than a drug?
10     A. No.
11     Q. Okay. And then the next paragraph, last
12 line you say, "I did notice he was carrying an inhaler
13 that asthmatics use to open up their bronchial tubes
14 like in an asthma attack." So at some point I know we
15 talked about you saw an inhaler on the ground. In
16 here, you say I noticed him carrying it. Did you see
17 him, did you see it in his hand or on his body
18 somewhere in his pocket?
19     A. I don't recall.
20     Q. And the last answer on page three that
21 goes onto page four-- strike that. The first answer
22 on page four, sorry, was, beginning of the first
23 sentence, "And I noticed when I got out of the car,
24 when he was talking to me, he had like a white saliva

Page 112

1 film around his mouth, like a cottonmouth kind of, I
2 guess. Like he was thirsty." So when you first got
3 out of the car at the trailer lot he had a white film
4 around his entire mouth?
5     A. It looked like his lips were chapped.
6     Q. Okay. So it wasn't -- so was there like
7 a white substance on the sides of his mouth at all or
8 was it just like chapped lips?
9     A. It looked like he was just thirsty.
10     Q. Okay. Let's look at page seven. In the
11 middle of the page your answer there, the last line of
12 that larger answer Sporcich, "Sergeant Sporcich had
13 decided that we should just put him in one of the
14 cells, the padded cells that were down there in the
15 book-in." And now it's your recollection that you are
16 not sure it was Sporcich who said that?
17     A. Correct.
18     Q. Was Sergeant Sporcich-- strike that. Are
19 the county sheriffs completely separate from the
20 county correctional officers? Do you know what I'm
21 saying? Or is there some kind of hierarchy that they
22 both are combined in or are they completely separate?
23 Sergeant Sporcich would have no command capability
24 over a lower seniority correctional officer; would

Page 113

1 that be accurate?
2     A. Well, yeah, I mean he is still a Sergeant
3 but I mean you are going to listen to who, like patrol
4 is going to listen to patrol and correction is going
5 to listen to their, you know, sergeant respectively.
6     Q. Okay. And Sergeant Reynolds was an equal
7 rank as Sergeant Sporcich?
8     A. Correct.
9     Q. But if Sergeant Sporcich had told you put
10 him in the padded cell, even though you are in the
11 correctional facility, you would have listened to him
12 and done that?
13     A. Correct.
14     Q. Did you ever learn that, when they went
15 in, at the time of Kevin's death they went into the
16 padded cell and there was a baggy of cocaine also
17 found in the cell?
18     A. I learned that later.
19     Q. Okay. Do you have any idea where the
20 baggy of cocaine came from?
21     A. No.
22     Q. Do you know how big or how small it was?
23     A. No.
24     MR. DECARO: Let me just quickly look

Page 114

1 through my notes. You know what, let's just look at
2 your interrogatories real quick.
3            (At this point the court reporter
4            marked O'Brien exhibit number
5            three, after which the following
6            proceedings were conducted:)
7        MR. DECARO: I've handed you what we have
8 marked as O'Brien number three. It's your
9 interrogatory answers. You had never come across
10 Kevin Lucas prior to May 10th, 2003; would that be
11 right?
12        THE WITNESS: Correct.
13    Q. If we look at answer 16, question is, "On
14 May 10th, 2003, prior to his death, did you believe
15 that Kevin Lucas was under the influence of a narcotic
16 and/or alcohol. If so, state the basis of that
17 belief." And your answer is, "I believed that Lucas
18 was under the influence of something because he stated
19 that he "was blown." Additionally, I smelled alcohol
20 on Lucas' breath and noted that he was mumbling and
21 speaking fast. I also recall seeing white saliva
22 around his mouth." Now the mumbling and the speaking
23 fast we hadn't addressed prior to this. So when he
24 was speaking to you in the car was he mumbling and

Page 115

1 speaking fast?
2    A. No.
3    Q. Okay. When was he mumbling?
4    A. I don't recall.
5    Q. How about when he was speaking fast?
6    A. I don't remember.
7    Q. Okay. And in PTI, I'm looking at your
8 answer to 25, at PTI you did have some training as,
9 first responder training?
10    A. It was just first aid. It wasn't first
11 responder.
12    Q. Okay. Number 29 you state, I asked "State
13 why you did not provide, or request, medical treatment
14 for Kevin Lucas prior to his death on May 10th, 2003."
15 The answer is, "I never requested nor provided medical
16 treatment for Kevin Lucas because I never knew before
17 Lucas' death that Lucas was in need of medical
18 attention." Had you known that Kevin was in need of
19 medical attention prior to his death, would you have
20 sought that for him?
21    A. Yes.
22        MR. DECARO: Why don't we take a break. I
23 am going to show him some pictures. You can sit out
24 there for a minute.

Page 116

1            (Lucille Butler exiting the room)
2            (At this point the court reporter
3            marked O'Brien exhibit group
4            number four, after which the
5            following proceedings were
6            conducted:)
7        MR. DECARO: Officer, I've handed you what
8 we have marked as O'Brien group exhibit four. It is
9 18 photographs of Kevin Lucas plus two pages of a
10 compilation of the 18 photographs. Let me show you
11 the colored ones and if you take a look at those and
12 tell me if that is how Kevin Lucas -- well, first of
13 all, is that Kevin Lucas in those photographs?
14        THE WITNESS: From what I remember.
15    Q. Okay. Is that how he was dressed when you
16 exited the padded cell on May 10th, 2003? And there
17 is some photographs of his underwear and socks, when
18 he is in his underwear and socks.
19    A. I believe so.
20    Q. Okay. When you were attempting to get his
21 handcuffs off of him, were you able to see whether
22 Kevin had anything in his hands while he was, while
23 you are in the padded cell and you are trying to get
24 the handcuffs off, could you see whether he had

Page 117

1 anything in his hands?
2    A. He had nothing in his hands.
3    Q. Okay. And Kevin was handcuffed the entire
4 time from when you handcuffed him at the trailer lot
5 until you unhandcuffed him in the padded cell,
6 correct?
7    A. Correct.
8    Q. And your car that you transported Kevin
9 in, does it have a, what partitions the driver's seat
10 from the back seat? Is it a screen? Is it a
11 plexiglas?
12    A. It's a cage.
13    Q. A cage. So you can see the detainee in
14 the back seat clearly?
15    A. Yes. Correct.
16    Q. Now you see in these photographs he
17 doesn't have a shirt on but -- correct?
18    A. Correct.
19    Q. There is one photograph where there
20 appears to be some article of clothing thrown in a
21 corner. It may be the very last photo. Yeah. Do you
22 know if that is any article of clothing of Kevins?
23 Whether it's his pants or a shirt or --
24    A. I don't know.

Page 114 - Page 117

Page 118

1   Q. Okay. Is that the hallway just outside
2   the padded cell area?
3   A. Yeah.
4   Q. And just to describe this photograph we
5   are looking at a hallway with a piece of clothing in
6   the right background of the photograph.
7       MR. CONDON: Let's just go off the record
8   a minute.
9       (At this point an off the record
10      discussion was held, after which
11      the following proceedings were
12      conducted:)
13      MR. DECARO: Can I just look at those for
14  one second? Officer, I'm showing you a photograph of
15  Kevins, a close-up of his face and under his bottom
16  lip there you can see a white substance. When you are
17  talking about a white saliva around his mouth, is that
18  what you are referring to or something different?
19      THE WITNESS: No, that's something
20  different.
21      Q. Okay. And just on that was there
22  actually, you said it was chapped lips but was there,
23  did his lips appear to be white?
24      A. Yes.

Page 119

1   Q. Was there any film outside the area of his
2   lips?
3   A. It was more like spit, saliva.
4   Q. Okay. Did you attribute that to any, I
5   know you said you thought he was thirsty, but other
6   than that did you attribute that either to drug use or
7   drinking or anything else?
8   A. Alcohol.
9   Q. That that was the sugar from alcohol?
10  A. That he was dehydrated.
11  Q. Okay. Did you ever inquire from him how
12  long he had been drinking, what he had been drinking,
13  anything like that?
14  A. No.
15      MR. DECARO: Let me just ask you a few
16  more quick questions. We have been tendered during
17  the discovery of the case -- let me just, let's stop
18  for one second and I will run to the washroom and run
19  her back in. Go off the record.
20      (At this point an off the record
21      discussion was held, after which
22      the following proceedings were
23      conducted:)
24      (Lucille Butler present in room)

Page 120

1       MR. DECARO: Officer, I'm showing you some
2   documents that were tendered to us in the case. One
3   of those is entitled Book-in Procedures and the other
4   is Joint Committee on Administrative Rules
5   Administrative Code Title 20 Corrections Criminal
6   Justice and Law Enforcement Chapter One Part 701.
7   Have you ever seen either of those documents before?
8       THE WITNESS: No.
9   Q. Okay. Were you trained as a county
10  sheriff in any of the correctional department
11  procedures?
12  A. No.
13  Q. Okay. So, and I think you told us this
14  before, when you brought a prisoner to the jail, you
15  would turn them over to the correctional officer and
16  that's where your job ended?
17  A. Correct.
18  Q. Have we talked about, other than with your
19  attorney, all the conversations you had regarding this
20  case? Let me strike that. Let me withdraw that.
21  After you gave your statement to Captain Miller, did
22  you have any other conversations with any other police
23  officer regarding the case?
24  A. No.

Page 121

1   Q. Okay. Did you ever talk to Sergeant
2   Sporcich about the case?
3   A. No.
4   Q. Okay. Have you ever spoken to any of
5   Kevin's family about the case?
6   A. No.
7   Q. Have you spoken to anyone, other than your
8   family and your attorney, about the case?
9   A. No.
10  Q. Okay. Let me ask you a few questions that
11  arise from some of the documents in your personnel
12  file. And one of them, I'm not going to mark them as
13  exhibits or attach them but I will show them to you
14  just to show you what I'm talking about. This was a
15  history and physical examination.
16  A. Uh-huh.
17  Q. And there is medical history and you have,
18  you have marked wheezing asthma and shortness of
19  breath, correct?
20  A. Uh-huh. Correct.
21  Q. Okay. The shortness of breath, is that
22  associated with your asthma?
23  A. Correct.
24  Q. Okay. And would the shortness of breath

Page 122

1 continue until you take the inhaler or -- go ahead,
2 I'm sorry.
3    A. It can.
4    Q. Okay. Is there, in your asthma, can you
5 have an asthma attack that will go away without any
6 type of medication or taking an inhaler?
7    A. You can.
8    Q. And what happens to you when you have an
9 asthma attack physically? I mean are you gasping for
10 breath?
11    A. You just get shallow breaths. You start
12 wheezing. Just harder to breathe.
13    Q. Okay. And can that spontaneously resolve
14 by just relaxing or taking deeper breaths?
15    A. Sometimes at times you can do that.
16    Q. Okay. When you are having an asthma
17 attack, can you still talk?
18    A. Yes.
19    Q. Okay. And have you ever had an asthma
20 attack that wasn't resolving itself and you didn't
21 have your inhaler?
22    A. Yes.
23    Q. What did you have to do?
24    A. Either get my inhaler or go to the

Page 123

1 hospital.
2    Q. And what did the doctors do at the
3 hospital? Did they give you an inhaler?
4    A. Or you get a nebulizer treatment.
5    Q. And do you know whether the county jail
6 has nebulizers?
7    A. They do.
8    Q. Okay.
9    A. Wait. I think they do.
10    Q. Okay. And I wouldn't ask you this if I
11 wasn't somewhat certain the statute of limitations had
12 run, and that it might be relevant to this case, but
13 in your personal interview for the county sheriff on
14 number seven they asked you, "Have you ever used any
15 narcotic drug, barbituates, amphetamines, marijuana or
16 any hallucinogenic drugs?" And you've answered "yes."
17    A. Uh-huh.
18    Q. I will just show you.
19    A. Yes.
20    Q. Make sure this is your signature. Is that
21 your signature?
22    A. Yes.
23    Q. Okay. And you answered yes. And which of
24 those did you use?

Page 124

1    A. Marijuana.
2    Q. Okay. Were you ever charged with using
3 marijuana as an offense or anything like that?
4    A. No.
5    Q. Okay. That's all I have on that. On May
6 10th, 2003, was there ever a time that you thought
7 that Kevin Lucas may need medical attention?
8    A. No.
9    Q. Did you think whatever was preventing him
10 from responding to your questions and following your
11 commands would be resolved by sleeping it off in a
12 padded cell?
13    MR. CONDON: I just object, it calls for
14 speculation. You can answer if you can.
15    THE WITNESS: No, I don't know.
16    MR. DECARO: Okay. Did you think, did you
17 think he was acting as a normal person would be acting
18 that morning?
19    THE WITNESS: No.
20    Q. Okay. What did you think was causing him
21 to act not normal?
22    A. Could be him, could be a combination of
23 whatever he did, the alcohol, the drugs.
24    Q. Okay. But you didn't really know?

Page 125

1    A. No.
2    MR. DECARO: Okay. That's all I have.
3    MR. CONDON: Are you done?
4    MR. DECARO: Yeah.
5    MR. CONDON: We will reserve signature.
6       (Deponent is excused.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 126

1 STATE OF ILLINOIS )
                    )  SS
2 COUNTY OF COLES )

3        I, SUSAN M. RANDOLPH, a Notary Public in
   and for the County of Coles, State of Illinois, do
4 hereby certify that KENNETH O'BRIEN, the deponent
   herein, was by me first duly sworn to tell the truth,
5 the whole truth and nothing but the truth in the
   aforementioned cause of action.
6        That the foregoing deposition was taken on
   behalf of the Plaintiff on June 28, 2005.
7        That said deposition was taken down in
   stenograph notes and afterwards reduced to typewriting
8 under my instruction and said transcription is a true
   record of the testimony given; and that it was agreed
9 by and between the witness and attorneys that said
   signature on said deposition would be not waived.
10       I do hereby certify that I am a
   disinterested person in this cause of action; that I
11 am not a relative of any party or any attorney of
   record in this cause, or an attorney for any party
12 herein, or otherwise interested in the event of this
   action, and am not in the employ of the attorneys for
13 either party.
         In witness whereof, I have hereunto set my
14 hand and affixed my notarial seal this 4th day of
   July, 2005.
15

16

17

18        Susan M. Randolph, CSR
          NOTARY PUBLIC
19

20 "OFFICIAL SEAL"
   Susan M. Randolph
   Notary Public, State of Illinois
21 My Commission Expires 6/16/07

22

23

24

---

Page 127

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

Lucille Butler, Individually, and as
Special Administrator of the Estate
of Kevin Lucas, Deceased,
        Plaintiff,

        vs            No. 04-CV-2048

Vermilion County Sheriff Kenneth
O'Brien, et. al.,
        Defendants.

        This is to certify that I have read the
transcript of my deposition taken in the
above-entitled cause, and that the foregoing
transcript taken on June 28, 2005, accurately states
the questions asked and the answers given by me, with
the exception of the corrections noted, if any, on the
attached errata sheet(s).


        _____
              Kenneth O'Brien

Subscribed and Sworn before
me this _____ day of
_____, 2005.

_____
Notary Public