THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
STATE OF ILLINOIS

LUCILLE BUTLER, Individually and )
as Special Administrator of the )
Estate of Kevin Lucas, Deceased, )
                                 )
            Plaintiff,           )
                                 )
    vs.                          )   No. 04-CV-2048
                                 )
VERMILION COUNTY SHERIFF         )
KENNETH O'BRIEN, et al.,         )
                                 )
            Defendants.          )

COPY

DEPOSITION

The Deposition of MARC REYNOLDS, a citizen of the State of Illinois, a witness of lawful age; produced, sworn, and examined upon his corporeal oath, at the Vermilion County Courthouse, Danville, Illinois on August 9, 2005, before Becky Jessup, CSR, RPR, Notary Public in and for the County of Vermilion and State of Illinois, as a witness in a certain suit and matter now pending and undetermined in the United States District Court for the Central District of Illinois.
CSR License No. 84-004343


APPEARANCES:

    KUPETS & DE CARO, P.C.
    30 N. LaSalle Street, Suite 4020
    Chicago, Illinois  60602
    By:  Mr. Dennis De Caro, Attorney
    Appearing for the Plaintiff


    LAW OFFICES OF MR. MICHAEL CONDON
    Attorney at Law
    333 Pierce Road
    Itasca, Illinois  60123

EXHIBIT 5

**Page 2**

```
1        INDEX OF EXAMINATION
2                                         Page
3   EXAMINATION, by Mr. De Caro              3
4   EXAMINATION, by Mr. Condon              61
5
6
7
8              EXHIBITS
9   No.               Page
10  1   .........................           51
11  2   .........................           54
12  3   .........................           55
```

**Page 3**

1  MARC REYNOLDS, the witness herein, having
2  been first duly sworn to tell the truth, the whole
3  truth and nothing but the truth, was examined and
4  testified as follows:
5
6  EXAMINATION,
7     QUESTIONS BY MR. DE CARO:
8     Q. Would you please state your full name and
9  spell your last name for the court reporter?
10    A. My name is Marc Alan Reynolds,
11 r-e-y-n-o-l-d-s.
12    Q. And you are currently a sergeant with the
13 Vermilion County sheriff?
14    A. Yes.
15    Q. Sergeant Reynolds, my name is Dennis De
16 Caro. I represent Lucille Butler and the estate of
17 Kevin Lucas.
18       I am going to ask you some questions
19 about your background and we will talk about May 10
20 of '03. Have you ever given a deposition before?
21    A. No.
22    Q. A couple of rules. One, you need to
23 answer everything verbally. We are going to write
24 this up.

**Page 4**

1  When you nod we don't know whether you
2  meant yes or no and we will ask you if you meant
3  yes or no.
4       The other is let me get my full question
5  out. If you start answering it is hard for the
6  court reporter to take us down speaking at the same
7  time. Other than that it will be fine. If you
8  need to take a break, let us know.
9       Prior to your deposition today, have you
10 reviewed any documents, interrogatories, your
11 statement? Things like that?
12    A. Yes.
13    Q. What have you reviewed?
14    A. My recorded statement.
15    Q. Did you review your interrogatories?
16 Those are the questions I asked. There is like 25
17 or 30 of them?
18    A. Yes, I did.
19    Q. Did you review anyone else's statements?
20    A. No. Just my own.
21    Q. Have you read any deposition testimony?
22    A. No.
23    Q. So would it be fair to say you looked at
24 your interrogatories and your recorded statement

**Page 5**

1  and that was it?
2     A. That was it.
3     Q. What is your date of birth?
4     A. March 21, 1970.
5     Q. What is your highest level of education?
6     A. 13.
7     Q. Where did you go to high school? Here in
8  Danville?
9     A. Westville High School.
10    Q. So 13 is -- did you go to --
11    A. I went to community college for about a
12 year and a half but.
13    Q. Which one is that?
14    A. Danville Area Community College.
15    Q. And did not receive your associates from
16 there?
17    A. No.
18    Q. Other than the initial training that you
19 received when you became a correctional officer,
20 have you received any other training subsequent to
21 that prior to that type of training?
22       Have you received any other training
23 regarding police or correctional officer policies
24 and procedures?

Page 6

1  A. I am not understanding your question.
2  Q. Okay. When did you first become a
3  correctional officer?
4  A. February 5, 1991.
5  Q. So you were 21 at the time?
6  A. I was actually 20.
7  Q. Let's talk a little bit about your
8  employment between high school and becoming a
9  correctional officer.
10    And we will do it quickly because I have
11 it from your personnel file. In May to August of
12 1988 you worked at Trio's restaurant?
13  A. Yes.
14  Q. What did you do there?
15  A. Make pizzas.
16  Q. From May of '89 to February of '90 you
17 worked at Target?
18  A. Um-hum. I was in loss prevention there.
19  Q. And what is loss prevention?
20  A. Just basically trying to catch
21 shoplifters.
22  Q. Any training or Target train you at all
23 before you did that?
24  A. No.

Page 7

1  Q. Did they tell you what to look for?
2  A. Yeah. They did some on-the-job training
3 but nothing specialized.
4  Q. Then August of '90 until you worked at
5 Quick Lube?
6  A. Yes.
7  Q. And did you work there until February of
8 '91?
9  A. Yes.
10  Q. What did you do at Quick Lube?
11  A. It was an oil change place here in town.
12  Q. So prior to February 5 of '91 had you had
13 any formal or informal training in security or
14 police procedures?
15  A. No.
16  Q. Prior to February 5 of 1991 did you have
17 any training in emergency medical response?
18  A. No.
19  Q. And then you went to PTI training to
20 become a correctional officer?
21  A. Yes.
22  Q. And when was that if you recall?
23  A. I believe it was June of '91 I went.
24  Q. What did you do for the county between

Page 8

1 February 5 and June of '91? Were you a
2 correctional officer?
3  A. Yes, I was.
4  Q. Did you have full duties at that time?
5  A. Yes.
6  Q. Prior to June of '91 did you receive any
7 training from the county sheriff regarding how to
8 be a correctional officer? Prior to PTI?
9  A. Yes.
10  Q. And was that formal? Were you going to
11 classroom or it was sort of on-the-job training?
12  A. It was on-the-job training.
13  Q. Who provided you with that training or
14 did it vary from shift supervisor to shift
15 supervisor?
16  A. I had a shift supervisor but usually I
17 was just with another correctional officer that had
18 been there.
19  Q. Did that vary or were you with one person
20 most of the time?
21  A. It varied most of the time.
22  Q. Then you went to your PTI training?
23 After your PTI training did you have any -- have
24 you had any additional training through the county

Page 9

1 as a correctional officer? So this is after PTI.
2 Have you had any other training classes subsequent
3 to PTI?
4  A. Yeah. I have had classes since then.
5  Q. At the public safety building?
6  A. I have had some there and I have had some
7 -- I would probably have to look in my file to see
8 exactly which ones I have had. I know I have had
9 more than one.
10  Q. Do you remember the subject that the
11 training classes were on?
12  A. I can remember one right now that was my
13 Breathalyzer training that I received.
14  Q. And then do you need to become certified
15 with the state or county to administer
16 Breathalyzers?
17  A. You would have to be certified through
18 the state.
19  Q. And how long does that certification last
20 for or is it a year or is it indefinite?
21  A. Initially it was every year but now it is
22 every two years.
23  Q. Are you currently certified?
24  A. Yes.

Page 10

1  Q. And how is it that the correctional
2 officers come to administer Breathalyzers? I mean
3 you don't go out and pull over people on the
4 highway, correct?
5  A. No. We are inside the jail.
6  Q. So the officer who does pull the person
7 over on the highway will bring them to the jail and
8 then do they ask you to administer a Breathalyzer?
9  A. Yes.
10  Q. Do the officers, do the sheriffs that
11 actually arrest the person in the field do they
12 ever administer the Breathalyzers themselves?
13  A. No.
14  Q. How many Breathalyzers would you say you
15 have administered since becoming certified until
16 today? I mean is it a common thing or is it a
17 fairly uncommon?
18  A. It is pretty common especially with me
19 being on third shift.
20  Q. So how many would you say you have
21 administered so far?
22  A. Since I have been certified?
23  Q. Yes.
24  A. I would say hundreds.

Page 11

1  Q. Do you know when you were certified?
2 Just the year if you know the year?
3  A. I believe it was in 1993.
4  Q. Do you ever administer Breathalyzers for
5 individuals who aren't charged with a DUI?
6  A. No.
7  Q. And I know there is a provision in one of
8 these policy manuals regarding someone who has
9 blown over a .30 that they need to get medical
10 attention. Are you familiar with that?
11  A. Yes.
12  Q. Is that limited to individuals who have
13 been or who are about to be arrested for a DUI you
14 would administer the Breathalyzer, they blow over
15 .30 and then you call a doctor? I guess my
16 question is: Is that procedure limited to DUIs?
17  A. Yes because that is the only thing we use
18 a Breathalyzer machine for is the DUI.
19  Q. Has there ever been an occasion where
20 that you are aware of where a person might be so
21 intoxicated by alcohol that they are passing out at
22 the jail?
23  A. No. Because if anybody is that
24 intoxicated we will refuse them.

Page 12

1  Q. And do you send them to the hospital?
2  A. Yeah. With the officer that brought them
3 in, yeah.
4  Q. Let's go to the morning of May 10, 2003.
5 When is the first time you saw Kevin Lucas that
6 morning?
7  A. When he was brought to the front steps of
8 the PSB.
9  Q. You were working third shift that night?
10  A. Yes.
11  Q. So you would have worked from 11 p.m. to
12 7 a.m.?
13  A. Yes.
14  Q. And do you know about what time he was
15 brought to the front steps of the PSB?
16  A. I would say approximately 6:30.
17  Q. How was it that you found out he was
18 coming to the public safety building?
19  A. The 911 operator called the fourth floor
20 and requested help for the deputies that were
21 bringing him in.
22  Q. And you were the shift supervisor that
23 night?
24  A. Yes.

Page 13

1  Q. And so you went down there and what did
2 you first see, the officers pulled up in their
3 vehicles I am assuming?
4  A. Yes.
5  Q. And they pulled up near the front steps
6 or as close as you can get to the front steps?
7  A. Yes.
8  Q. Why is it they went to the front steps
9 that day?
10  A. The jail, the new addition to the jail
11 was being built and they couldn't get through back
12 there so everybody with an arrest had to come
13 through the front of the jail and walk through the
14 lobby.
15  Q. I see. Now when you walk through the
16 lobby, there is a monitor there? A video camera?
17  A. Yeah.
18  Q. Is that videotaped or is that just a
19 monitor so somebody in a control room or office can
20 see who is coming in?
21  A. I really don't know because that is the
22 city's and I don't know if it is recorded or where
23 it goes to.
24  Q. So why don't you -- you are standing on

Page 14

1 the front steps of the public safety building.
2 What do you see?
3    A. I see the officers get out of the car and
4 open the back door to Officer O'Brien's squad car.
5 They get Kevin out of the vehicle and, you know,
6 get him -- he is standing up.
7        And when he gets out, his pants are
8 around his ankles. They attempted to pull them up
9 but they were so big and baggy they wouldn't stay
10 up.
11       So Sergeant Sporcich was on one side of
12 him and O'Brian was on the other side. And there
13 was a minor struggle, not just -- minor so they
14 were just carrying him up the steps. And I just
15 opened the doors for them.
16    Q. Were they, you know, as they -- strike
17 that. From what you testified it sounds like one
18 hand of the officers had Kevin under the arm and
19 was sort of assisting him in?
20    A. That is correct.
21    Q. Was he walking with them or was his feet
22 off the ground or were they dragging him or how did
23 they get to the front door?
24    A. It wasn't exactly dragging. He was

Page 15

1 taking some steps but others, you know, they were
2 kind of picking him up and bringing him in.
3    Q. Did you ever see was Kevin handcuffed at
4 the time?
5    A. Yes, he was.
6    Q. So did you ever see Kevin strike either
7 of the officers while they were walking him in?
8    A. No.
9    Q. When 911 called you and asked for
10 assistance, did they identify that it was for Kevin
11 Lucas?
12    A. No.
13    Q. When you saw the officers with this
14 individual, did you recognize him as Kevin Lucas?
15    A. At first I didn't. But he did call me by
16 name.
17    Q. Did you know Kevin?
18    A. Yes.
19    Q. And prior to May 10, 2003, how many times
20 had you seen Kevin in the public safety building?
21    A. I couldn't give you an exact number how
22 many times he had been arrested but any time he was
23 ever remanded back and came upstairs I generally
24 saw him.

Page 16

1    Q. The cells in the public safety building
2 if Kevin was arrested by the city police would they
3 be -- would the inmates be in the same cells?
4    A. Yes.
5    Q. So he said I think you said he said hello
6 to you?
7    A. Yes.
8    Q. Had he not said that, would you have
9 known who he was?
10    A. No.
11    Q. So you didn't recognize him by sight you
12 only knew him by name would that be fair? Or once
13 you knew it was Kevin Lucas did you recognize him
14 by sight?
15    A. Yes.
16    Q. As the shift -- strike that. When did
17 you become shift supervisor?
18    A. I was promoted in '93.
19    Q. So you had been shift supervisor for 10
20 years approximately by May 10?
21    A. Um-hum.
22    Q. Yes?
23    A. Yes.
24    Q. As shift supervisor do you do cell

Page 17

1 checks?
2    A. At times, yes.
3    Q. And is that only when there might be, you
4 might be light a correctional officer or is that
5 something you rotate doing as a shift supervisor?
6    A. Just occasionally. I mean we --
7 sometimes we are a little short shifted and I will
8 pitch in and help, yes.
9    Q. Do shift supervisors typically observe
10 the inmates in the cells or is that something that
11 is left to the person who is doing the cell checks?
12    A. It is the person who is making the cell
13 checks is the one who does it.
14    Q. I am not that familiar with how the
15 county building is set up and what exactly your
16 duties are.
17       But I mean if Kevin were in jail in 2002,
18 if you weren't doing the cell checks, would you
19 know Kevin was in the county jail?
20    A. Yes.
21    Q. So you actually during the course of your
22 day as a shift supervisor you will walk past the
23 holding cells and in the cells on the third and
24 fourth floor?

### Page 18

1  A. Occasionally, yes.
2  Q. Were you aware that Kevin had asthma?
3  A. Yes.
4  Q. How did you become aware of this?
5  A. Just with him being in jail and the years
6  that I have been there and having to deal with he
7  did have asthma.
8     There had been times where I had taken
9  him to the third floor myself and we have a
10 Nebulizer machine there where he has had to have
11 Nebulizer treatments. And he always had an inhaler
12 with him when he was in jail.
13    Q. Would you say if you could classify his
14 asthma, would you say it was mild or severe?
15    MR. CONDON: I will object. Lack of
16 foundation. That asks for a medical opinion.
17    A. I would say it was controlled but
18 sometimes it was, you know, he had bad days and he
19 had good days.
20 BY MR. DE CARO:
21    Q. Do you have asthma?
22    A. No.
23    Q. Anyone in your family have asthma?
24    A. No.

### Page 19

1  Q. Do you know anyone else who carries an
2  inhaler around for asthma?
3  A. Just inmates that come to jail. That is
4  it.
5  Q. What is the difference between the
6  nebulizer and the inhaler or do they serve the same
7  purpose?
8  A. I think if somebody is having an asthma
9  attack just from the experience I have had with
10 Kevin and other inmates they seem to use the
11 nebulizer better because the inhaler is not working
12 so I don't think it is as good as the nebulizer
13 treatment is.
14    Q. The nebulizer goes right into the cell?
15    A. No. What happens is that is left in the
16 nurse's office and we have to take them down there
17 to do it.
18    Q. Had you ever done that in the past with
19 Kevin? Have you actually taken him to the nurse's
20 office?
21    A. Yes.
22    Q. How was it in the past? How many times
23 have you done that that you recall?
24    A. Just with him or other inmates.

### Page 20

1  Q. Just with him?
2  A. If I had to make a guess I would say just
3  myself probably three or four times.
4  Q. And what type of behavior was Kevin
5  exhibiting when he needed the nebulizer? I mean
6  was he short of breath? Was he telling you he
7  needed it by sign language? I mean how did he
8  appear to you?
9  A. Any time he has ever needed it he would
10 say that his inhaler wasn't working and he needed a
11 treatment. And he would wheeze, really short of
12 breath and we would take him down and get it done.
13    Q. I am assuming some time would pass by the
14 time he would tell you he needed it until the time
15 you got him to the nurse's office? Did you notice
16 that his breathing got worse as more time went on?
17    A. It usually just stayed the same because
18 wherever he was, he would walk under his own power
19 and get on the elevator. It is a pretty short
20 time. It was always the same.
21    Q. Are you aware prior to May 10 what type
22 of charges Kevin was arrested for in the past?
23    A. No.
24    Q. Had you ever seen Kevin prior to May 10

### Page 21

1  come in to the jail where you thought he was high
2  on alcohol or narcotics or both?
3  A. I don't recall, no.
4  Q. When you saw him on May 10 as he passed
5  you coming in, was he acting as you had seen him
6  act in the past or did you form an opinion as they
7  walked past you that he was high or drunk or both?
8  A. When he walked past me I thought either
9  he was drunk or high. I didn't know which one.
10    Q. Why did you think that? What was he
11 doing?
12    A. He was extremely agitated. His eyes were
13 really bloodshot. I didn't smell alcohol because I
14 never got that close initially but just the slurred
15 speech.
16    Q. What did he say to you in a slurred
17 manner?
18    A. I know he said my name but I don't recall
19 exactly what phrase he said before my name.
20    Q. When he said -- did he say Sergeant
21 Reynolds?
22    A. He said Marc.
23    Q. When he said that, was it slurred?
24    A. No. He said my name clear but I don't

Page 22

1 recall what he said prior to saying my name at the
2 end of it.
3    Q. So he said something incoherent or
4 mumbled it?
5    A. I couldn't understand what he said.
6    Q. And you said he was agitated. Are we
7 still talking about as he approached you while
8 you're on the steps?
9    A. Yes.
10   Q. What behaviors are you saying caused you
11 to believe he was agitated?
12   A. Well, he wasn't walking and they were
13 having to carry him because he wasn't walking. He
14 was kind of wrestling back and forth with them
15 while they were on each side of him.
16   Q. Had you ever seen Kevin brought in to the
17 public safety building by an arresting officer
18 before May 10?
19   A. I really don't recall ever seeing him
20 being brought in, no.
21   Q. He gets in the front doors. Do you
22 follow them after they pass you? You say you are
23 holding the door. They go in. Do you follow them?
24   A. Yes.

Page 23

1    Q. Where did they go next?
2    A. Straight through the door. There is two
3 doors. There is a door that you have to open or
4 actually have to be buzzed in by the records,
5 Danville City of Records that takes you to the
6 elevator door. We went right through that door,
7 the first door.
8    Q. And were you buzzed in quickly?
9    A. Yes.
10   Q. And then did you go to the elevator?
11   A. Straight to the elevator.
12   Q. And there are four of you waiting at the
13 elevator?
14   A. I know there is myself, Sergeant Sporcich
15 and Officer O'Brien. And I don't recall if Mike
16 Schull was there but he may have been there too.
17   Q. And Kevin?
18   A. Yes.
19   Q. And I didn't ask you this: As they are
20 bringing Kevin up the walkway, what is he wearing?
21   A. He has got I believe a T-shirt on and I
22 think they were blue jeans. I am pretty sure. I
23 am not 100 percent sure but they were around his
24 ankles and he had tennis shoes on.

Page 24

1    Q. So the pants were all the way down to his
2 ankles? Were they dragging on the ground?
3    A. Yes.
4    Q. Was that inhibiting him from walking in
5 any way because his pants were down at his ankles?
6    A. I believe the only reason they were there
7 is because they were so big and they weren't -- one
8 of the officers that was either O'Brien or Sporcich
9 tried to pull them up when he was taken from the
10 car. They wouldn't stay up.
11   Q. His pants were falling down not because
12 he was pushing them down? They were too big for
13 his body?
14   A. Yes.
15   Q. You get to the elevator. Eventually the
16 elevator comes, correct?
17   A. Yes.
18   Q. Does anyone get off the elevator before
19 the four of you get on?
20   A. I don't recall anybody getting off.
21   Q. Did the four of you all get on the
22 elevator?
23   A. Yes.
24   Q. Was anyone on the elevator when you got

Page 25

1 on?
2    A. Yes.
3    Q. Who was that?
4    A. Officer Lisa Hawkins.
5    Q. And is she a correctional officer?
6    A. Yes.
7    Q. And what happened next? Where did you
8 go? Did you go immediately into the book-in area?
9    A. No.
10   Q. Where did you go?
11   A. The elevator went up. Somebody must have
12 keyed it from the third floor. It went up and
13 actually went, once it got to third floor I believe
14 Officer Watkins got off and then we went straight
15 to book-in.
16   Q. So you get in the elevator at -- is that
17 the ground floor? Is that the first floor where
18 you got on?
19   A. It is the first floor.
20   Q. So you went up to 3. Officer Watkins got
21 off?
22   A. Yes.
23   Q. Did anyone get on?
24   A. No.

Page 26

1  Q. Where then -- from 3 you went down to
2  book-in on the elevator?
3  A. Yes.
4  Q. Nonstop?
5  A. Nonstop.
6  Q. Did the elevator --
7    MR. CONDON: Just for the record book-in
8  is in the basement?
9  A. Yes.
10 BY MR. DE CARO:
11 Q. When Officer Watkins got off on the third
12 floor -- strike that.
13    When Officer Watkins got off on the third
14 floor how were you all standing in the elevator?
15 Where were you positioned, where was Sporcich,
16 where was O'Brien, where was Kevin?
17 A. Sporcich, one was on one side of his arm
18 and one was on the other side. I don't recall
19 which was on which side.
20    And myself and Officer Watkins were
21 standing in front of them. They were towards the
22 back of the elevator and we were at the front of
23 the elevator at the door.
24 Q. When they got on the elevator with Kevin,

Page 27

1  did they turn him around once he got on the
2  elevator or was Kevin facing the back of the
3  elevator?
4  A. He was turned around facing the door of
5  the elevator.
6  Q. And he remained that way the whole trip?
7  A. Yes.
8  Q. What floor do the work release men and
9  women -- strike that. You are familiar with work
10 release when people come in and they have to do,
11 they check in and then go out to wherever they are
12 working?
13 A. As they are leaving or?
14 Q. Yes. As they are leaving -- strike that.
15 Are you familiar with the work release program at
16 all at the Vermilion County jail?
17 A. Yes.
18 Q. Why don't you tell me how it works. I am
19 assuming that people come to the PSB and check in
20 and then go to wherever they have to work.
21    Or are these prisoners who are already
22 there being released to go to work?
23 A. They are prisoners that are already there
24 and then we release them, whatever time their job

Page 28

1  needs them there.
2  Q. And these prisoners on the third and
3  fourth floor of the public safety building, do
4  those floors house the prisoners who are in prison
5  there?
6  A. Yes.
7  Q. So if you are in work release, do you
8  have to go down to -- do you go to third floor and
9  check out and leave or do you check out from
10 whatever floor you are being housed on?
11 A. All work release are on the third floor.
12 Q. When Officer Watkins got off the elevator
13 on the third floor, did you notice anybody, any
14 prisoner or correctional officer or anyone else
15 waiting to get on the elevator on the third floor?
16 A. No. I don't recall anybody being there,
17 no.
18 Q. This all occurred on the elevator
19 approximately 7:00, a few minutes before 7?
20 A. If I had to guess I would say between
21 6:30 and 6:45.
22 Q. Is there a time when work release inmates
23 are released to go to work?
24 A. There is no set time for any of them.

Page 29

1  They all have different schedules, different jobs
2  and they are all released at different times.
3  Q. Okay. Officer Watkins gets off the
4  elevator and you go directly down to the book-in
5  area.
6    Were Officer Sporcich and O'Brien as far
7  as you know having any problems with Kevin on the
8  elevator while Officer Watkins was on the elevator?
9  A. I don't recall if they were having
10 problems when she was on the elevator.
11 Q. Let's talk about after she got off going
12 from 3 to the basement do the officers or yourself
13 have any problems with Kevin on the elevator?
14 A. Sergeant Sporcich and O'Brien were like
15 holding him under his armpit and he was struggling
16 back and forth with him.
17 Q. So he was moving, sort of swaying back
18 and forth?
19 A. Yes.
20 Q. And was that the extent of the trouble?
21 A. Yes.
22 Q. And how did Sporcich and O'Brien control
23 Kevin when he would do that?
24 A. They just tried to brace themselves and

Page 30

1 keep them in one spot.
2   Q. At any time did Kevin's body hit any part
3 of the elevator?
4   A. No.
5   Q. So what they did was they tightened their
6 grip on him when he would move?
7   A. Yes.
8   Q. So that is the extent of the trouble on
9 the elevator?
10   A. Yes.
11   Q. And we talked about all the trouble, the
12 extent of the trouble walking Kevin from the police
13 vehicle into the PSB building, correct?
14   A. Yes.
15   Q. We get down to the book-in area.
16 Everyone gets off of the elevator I am assuming or
17 did anyone stay on the elevator?
18   A. Everyone gets off.
19   Q. And where do you go when you get off the
20 elevator?
21   A. Straight to the book-in area.
22   Q. By the table there?
23   A. Yes.
24   Q. And where does Sporcich, O'Brien and

Page 31

1 Kevin go?
2   A. They bring him over. There is a bench by
3 the counter and they set him down there. Still
4 handcuffed.
5   Q. Do they handcuff him to the bench?
6   A. No.
7   Q. I have been there with your counsel and I
8 saw that there are handcuff rings on that bench. I
9 am assuming some officers come in and handcuff
10 their prisoners to the bench?
11   A. At times, yes.
12   Q. Is there in your experience a reason why
13 some people are handcuffed to the bench and some
14 are not?
15   A. In some cases the reason we do it is our
16 processing area is in the next room. If we have
17 maybe one or two inmates that are already down
18 there if the book-in officer has to go over to the
19 other side and book a prisoner, sometimes they will
20 handcuff them to the bench so they don't go into
21 where the control room is at or wander around or
22 get into someone's property.
23   Q. All four of you go over to the book-in
24 area? Are there any other correctional officers

Page 32

1 down in the book-in area?
2   A. I know Officer Schull is down there.
3   Q. Where is he when you first arrive?
4   A. He is in the -- I believe he was in the
5 book-in control room.
6   Q. Do you know if he was working with a
7 partner that day?
8   A. He would have been down there by himself
9 I believe.
10   Q. You go over to the book-in area with
11 Kevin. What is the next thing that happens?
12   A. He sat down on the bench. They asked him
13 to stay there and sit and he keeps popping up,
14 standing up on his own.
15      Like I said, I don't recall what he was
16 saying but nothing was really making a whole bunch
17 of sense.
18   Q. Were they having, was Kevin attempting to
19 leave the area at that time when you said he was
20 sitting down and standing up?
21      Was he attempting to flee the book-in
22 area or was he just staying in the same position
23 sitting down and standing up?
24   A. He was just more or less standing up and

Page 33

1 walking around. He wasn't trying to flee.
2   Q. Now how many times would you say before
3 the decision was made to take him to the padded
4 cell did Kevin stand up and sit down in the book-in
5 bench?
6   A. If I had to make a guess possibly four or
7 five.
8   Q. Did you hear anyone instructing him to
9 remain seated on the bench?
10   A. Yes.
11   Q. Who was that?
12   A. Deputy O'Brien.
13   Q. How many times did you hear him tell him
14 to stay on the bench?
15   A. Probably three or four times.
16   Q. Now you said Kevin was speaking and he
17 wasn't making any sense.
18      Was it that he was talking, you know,
19 gibberish the aliens are coming or something like
20 that or was it that he was mumbling talking
21 incoherent that you couldn't understand what he was
22 saying?
23   A. I couldn't understand what he was saying.
24   Q. So he wasn't forming words that you

Page 34

1 understood?
2  A. No.
3     MR. CONDON: At that point?
4 BY MR. DE CARO:
5  Q. Would that be correct he was not forming
6 words?
7  A. He was not forming words that I could
8 understand.
9  Q. And after he stood up I think you said
10 four or five times stood up, sat down, was that
11 when it was determined to put him in a padded cell?
12  A. Yes.
13  Q. And who made that determination?
14  A. I did.
15  Q. And what was the basis? What was your
16 reason? Why did you decide to do that?
17  A. I thought he was intoxicated or under the
18 influence of some type of drug. You never know.
19 But I thought for his safety that would be the best
20 place for him to be.
21  Q. And for his safety in what way? Why is
22 it safer in the padded cell?
23  A. It is safer because in the individual's
24 cells that we have there, there is bunks. They are

Page 35

1 made of steel. The corners on them are sharp.
2     I thought if he had maybe got up or woke
3 up and had to use the restroom and lost his balance
4 he would possibly hit his head or, you know, he
5 would probably have to go to the hospital, if you
6 hit any part of your body on that where we don't
7 have that problem in the padded cell.
8  Q. At any time while you guys are standing
9 by the book-in area and Kevin is sitting up and
10 standing down, where is Officer Schull?
11    Does he come over there or does he remain
12 in the control room?
13  A. I don't recall.
14  Q. Do you ever see Officer Sporcich go to
15 the control room during that period when you guys,
16 when Kevin is sitting and standing?
17  A. I don't remember.
18  Q. How about Officer O'Brien go to the
19 control room?
20  A. Here again, no, I don't recall.
21  Q. How much time elapsed while you all were
22 by the book-in bench with Kevin before you get
23 there?
24    Kevin is standing and sitting and then

Page 36

1 you decide to take him to the padded cell. How
2 much time elapses from when you first get to the
3 bench until the decision to take him to the cell is
4 made?
5  A. Probably 2, 3 minutes.
6  Q. And what are you guys doing during those
7 2, 3 minutes? Are you just standing around Kevin
8 waiting to see what he was going to do? Are you
9 behind the book-in bench, the book-in table?
10  A. Actually myself I just remember where I
11 was. I was observing him. I was outside of the
12 control room just standing right outside.
13  Q. And so you are several feet away from
14 Kevin at that point?
15  A. I am probably 3 to 4 foot away from him,
16 yes.
17  Q. Who is by Kevin if anyone?
18  A. I know O'Brien stayed by him and I don't
19 recall if Sporcich went into the control room or if
20 he stayed by him the whole time too.
21  Q. Would it be fair to say the whole time
22 Kevin was by the book-in bench you were observing
23 him?
24  A. Yes.

Page 37

1  Q. Did you ever search Kevin in the book-in
2 area?
3  A. No, I did not.
4  Q. Did you search him in the padded cell
5 area?
6  A. No, I did not.
7  Q. Did you search him at all that day prior
8 to his death?
9  A. No.
10  Q. Did you observe Officer Sporcich search
11 him at all that day in your presence?
12  A. No.
13  Q. Did you observe Officer O'Brien search
14 him in your presence that day?
15  A. No.
16  Q. Did you observe Officer Schull search him
17 that day?
18  A. No.
19  Q. Did you observe anyone search him that
20 day?
21  A. No.
22  Q. Other than standing and sitting and
23 talking incoherently -- strike that.
24    The standing and sitting and the talking

Page 38

1 incoherently, were those the basis for putting him
2 in the padded cell or was there other behaviors?
3   A. That would have been the only behaviors,
4 yes, sir.
5   Q. Did you prior to deciding to put him in
6 the padded cell, did you ever observe Kevin fall
7 down?
8   A. No.
9   Q. How does Kevin get from the book-in area
10 to the padded cell?
11   A. O'Brien and Sporcich I believe it was the
12 same way as bringing him up the steps where, you
13 know, was on each arm and he was walking and they
14 were, they had a hold underneath his underarms.
15   Q. Was Kevin resisting them in any way as
16 they walked from the book-in area to the padded
17 cell?
18   A. Yes.
19   Q. In what way?
20   A. The same way when he was on the elevator
21 just trying to wrestle out of their grip.
22   Q. Was he saying anything?
23   A. I don't recall what he was saying, no.
24   Q. And Sporcich and O'Brien had Kevin under

Page 39

1 their control? Would that be fair to say?
2   A. Yes.
3   Q. And while you went into the padded cell
4 with them?
5   A. Yes.
6   Q. Have we talked about everything that
7 occurred over in the book-in area?
8   A. Yes.
9   Q. So there was O'Brien, Sporcich, Officer
10 Schull and yourself were the officers down in the
11 immediate area of Kevin Lucas?
12   A. Yes.
13   Q. Why did you go into the padded cell with
14 the other three officers?
15   A. They were having trouble with him all the
16 way into the padded cell.
17   Q. As far as him moving?
18   A. Yes.
19   Q. So once you get into the padded cell,
20 what happens?
21   A. They, Kevin goes to his knees and they
22 attempt to lay him down on his stomach so the cuffs
23 can be taken off from him.
24   Q. Okay. And then what happens?

Page 40

1   A. During the whole time he is struggling.
2 He is kicking his legs and just not complying. So
3 once he was on his stomach, Officer O'Brien started
4 to take the cuffs off. One cuff came off real easy
5 and the other one he couldn't get off.
6   Q. So once Kevin is on his stomach are you
7 touching Kevin anywhere on his body?
8   A. Yes, I am.
9   Q. Where are you touching him?
10   A. I was holding his legs.
11   Q. Are his legs flat on the ground and you
12 are holding his ankles or his knees and you are
13 holding his calves? Are you holding his legs?
14   A. I was more like on his, the back of his
15 knees, thigh area.
16   Q. Were you sitting on them? Pushing down
17 on them?
18   A. No. I was over them but none of my
19 weight was on them. I was holding them with my
20 arms.
21   Q. Was your body over his feet just like you
22 were kneeling?
23   A. Yeah. It would have been over more of
24 his calves not his feet.

Page 41

1   Q. So you were sort of kneeling over him
2 applying pressure to the back of his thighs?
3   A. Yes.
4   Q. Where was Officer Schull at this point?
5   A. He was at his feet.
6   Q. So he was behind you?
7   A. Yeah.
8   Q. Was your back to Officer Schull?
9   A. Yes.
10   Q. And he was doing what if you know?
11   A. His pants were still around his ankles
12 and he was taking them from his ankles.
13   Q. Did Kevin still have his shirt on at this
14 time?
15   A. Yes.
16   Q. When you left the padded cell area, did
17 Kevin have his shirt on?
18   A. Yes.
19   Q. Where was Officer O'Brien during this
20 period when you are holding down the thighs?
21   A. He was taking the cuffs off.
22   Q. Is he applying pressure to Kevin
23 anywhere?
24   A. He just has him by his wrist attempting

Page 42

1 to take his -- and I can't remember which cuff gave
2 him problems.
3  Q. And what about Officer Sporcich?
4  A. He is on the one side of him. The right
5 or left side by his shoulders.
6  Q. And is he -- how is he holding him down?
7  A. Just with his hand.
8  Q. On his shoulder?
9  A. Yes.
10  Q. How about Kevin's head? Free to move
11 about?
12  A. Yes.
13  Q. How long does it take Officer O'Brien to
14 get the cuffs off?
15  A. 30 seconds or so.
16  Q. Is Kevin saying anything during this
17 period?
18  A. I am sure he was but I don't recall what
19 he was saying, no.
20  Q. Were you aware at this point what Kevin
21 had been arrested for?
22  A. No. Not at that point, no.
23  Q. But even without being told I am assuming
24 that you assumed he was under arrest because they

Page 43

1 were bringing him to jail?
2  A. Yes.
3  Q. So you didn't know whether it was a
4 misdemeanor or felony?
5  A. Correct.
6  Q. After you get the cuffs off, what happens
7 or after O'Brien gets the cuffs off?
8  A. We all four of us just exit the padded
9 cell quickly.
10  Q. And so when you exit, what is Kevin
11 wearing?
12  A. He has a T-shirt, boxer-like boxer shorts
13 and like footie socks I believe that just go to
14 like his ankles.
15  Q. And I think you said Schull -- did Schull
16 take his shoes off also?
17  A. Yes.
18  Q. And his pants?
19  A. Yes.
20  Q. Did anyone search his pants once they
21 were taken off to determine if he had any
22 contraband in his pants?
23  A. Yes. Somebody would have had to. I
24 don't know who did.

Page 44

1  Q. At that point you think Kevin is high on
2 some narcotic -- strike that. At that point when
3 you leave the padded cell, do you believe he is
4 drunk or high or both?
5  A. I believe he is under the influence of
6 either alcohol or drugs.
7  Q. What is the next thing you do?
8  A. Next thing I do is go straight to the
9 sink in book-in and wash my hands and dry them off.
10  Q. Then what?
11  A. I exited book-in because it was just
12 right at 7:00 at that point so it was time for me
13 to get off work. I go to third floor where the
14 lieutenant's office is and go straight to his
15 office.
16  Q. And what did you -- Lieutenant Lewellyn?
17  A. Yes.
18  Q. And he was your supervisor?
19  A. Yes, he is.
20  Q. And is he -- was he the next shift
21 supervisor?
22  A. Yes.
23  Q. And is it typical that when the shift
24 supervisor gets off his shift he will inform the

Page 45

1 next shift supervisor of what is going on?
2  A. Yes.
3  Q. And what did you inform Lieutenant
4 Lewellyn was going on regarding Kevin Lucas?
5  A. I told him Kevin was just brought in and
6 he was -- I told him that he was either under the
7 influence of drugs or alcohol but he was placed in
8 the padded cell for his own safety.
9   I told him that, you know, Kevin usually
10 has his inhaler with him and he didn't have one
11 today and if he got a minute I believe I told him
12 to check just make sure we have an inhaler for him
13 because we generally keep them in the nurse's
14 office in case somebody doesn't have one and needs
15 one and that was it.
16  Q. Whose decision was it when to try and
17 process Kevin?
18  A. I don't know.
19  Q. Who is ultimately in charge of the
20 inmates? I mean whose ultimate decision would it
21 be? Is it Sheriff Hartshorn if he wanted Kevin
22 processed at 8:00 he would be processed at 8:00?
23   MR. CONDON: Just object to the form of
24 the question. I think it is vague.

Page 46

1 A. Generally we wouldn't bother the sheriff
2 with something like that. It would be the book-in
3 officer's decision.
4 BY MR. DE CARO:
5 Q. And did you ever have a conversation with
6 the next book-in officer to tell them about Kevin's
7 condition and when you thought maybe he should be
8 processed or what he is charged with or anything
9 like that?
10 A. No, I did not.
11 Q. So have we talked about everything you
12 have told Lieutenant Lewellyn?
13 A. Yes.
14 Q. And then what did you do?
15 A. Went home.
16 Q. When is the next time you heard that
17 Kevin Lucas had died?
18 A. I was called at approximately noon.
19 Q. By whom?
20 A. By Lieutenant Lewellyn.
21 Q. What did he tell you?
22 A. He said that they needed me to come back
23 in to the jail for a tape recorded statement by one
24 of the county investigators because when the

Page 47

1 book-in officer got Kevin out to process him they
2 found he was dead.
3 Q. Now you didn't treat Kevin any
4 differently than you would have treated any other
5 inmate or person who came into the county jail that
6 morning in the condition that Kevin was in,
7 correct?
8 A. Correct.
9 Q. And what are the reasons over the years
10 that you have put people in padded cells or made
11 the decision to put someone in a padded cell?
12     In this case you said it was for Kevin's
13 own safety. Is that the only reason you would put
14 someone in a padded cell?
15 A. No.
16 Q. What are the other reasons?
17 A. I would put them in a padded cell for
18 their safety and if at times there are people that
19 come in that say they are going to kill themselves
20 and that is the only two I can think of, only two
21 reasons you would ever use the padded cell.
22 Q. Do you ever have an inmate who comes in
23 who is, you don't believe is high on narcotics or
24 alcohol but just you don't feel is in the right

Page 48

1 state of mind and could harm another inmate if you
2 put him in a cell with another inmate that you
3 would put into a padded cell?
4     MR. CONDON: Object to the incomplete
5 hypothetical and the form of the question.
6 BY MR. DE CARO:
7 Q. Let me rephrase it. In your experience
8 have you ever -- so it is not a hypothetical.
9     In your experience have you ever put a
10 person in the padded cell that you thought wasn't
11 all there mentally and was acting weird because of
12 they were mentally disturbed as opposed to acting
13 bizarre because they were under the influence of a
14 narcotic?
15 A. Yes, we have.
16 Q. How many times have you done that?
17 A. Numerous. I wouldn't have any idea how
18 many times but numerous times.
19 Q. There are occasions where you are called
20 upon to determine whether somebody is -- strike
21 that.
22     There are occasions in the past where you
23 have made a determination that somebody is acting
24 bizarre because of a mental deficiency as opposed

Page 49

1 to them being under the influence of a narcotic?
2 A. Yes.
3 Q. Do you have any training in making those
4 types of determinations or is it just common sense
5 and on-the-job training?
6 A. It is from just more or less on the job
7 being there for 14 years.
8 Q. Now I know in your statement you said
9 that you did not smell any alcohol on Kevin's
10 breath that morning; is that correct?
11 A. That is correct.
12 Q. And you said Kevin was well, I don't know
13 if you said it or not. Was Kevin acting abnormal
14 that morning?
15     MR. CONDON: Just object to the form of
16 the question in terms of what abnormal.
17 BY MR. DE CARO:
18 Q. Let me withdraw it. We just talked about
19 sometimes you put somebody in a padded cell that
20 might have a mental deficiency as opposed to being
21 intoxicated and you testified that Kevin, you
22 didn't smell alcohol on his breath and you also
23 testified that you thought Kevin was under the
24 influence of alcohol or narcotics or a combination

### Page 50

1  of both.
2      In this case why did you think Kevin was
3  under the influence of a narcotic and/or alcohol as
4  opposed to having some type of mental deficiency or
5  an altered mental state that morning?
6      A. Just from the years that I have known
7  Kevin from being in jail he was not the same person
8  that he is, he was that morning.
9      Q. I understand that. But why did you
10 attribute it to him being on narcotics as opposed
11 to having a mental breakdown?
12     A. Because of the slurred speech, the
13 agitated state that he was in.
14     Q. Had you known that Kevin had been
15 arrested in the past for narcotics related crimes?
16     A. I really with the amount of inmates we
17 have, I don't pay attention to everybody's charges.
18     Q. But Kevin, did you ever know he was
19 charged with drug possession or distribution of
20 narcotics?
21     A. I know that he had been there for drug
22 related, you know, crimes before but never.
23     Q. Did you know he had been in the
24 penitentiary in Vandalia for drug related crimes?

### Page 51

1      A. Yes.
2      Q. Do you guys get a printout of what the
3  charges are for the inmates?
4      A. Yes.
5          (The court reporter marked a document as
6          Exhibit No. 1.)
7  BY MR. DE CARO:
8      Q. I am handing you what we have marked as
9  Reynolds Exhibit 1. Are those your answers to
10 interrogatories? On the last page is the signature
11 page?
12     A. Yes.
13     Q. Did you have an opportunity to review
14 these prior to your dep today?
15     A. Yes, I did.
16     Q. Are there any answers that you would like
17 to modify or tell me about might be slightly
18 different?
19     A. No.
20     Q. When you went up to tell Lieutenant
21 Lewellyn that Kevin was in the cell and he has
22 asthma and didn't have his inhaler, did you tell
23 them that -- strike that.
24         At the time you told Lieutenant Lewellyn

### Page 52

1  that Kevin was in jail and has asthma and didn't
2  have his inhaler, were you concerned that Kevin
3  might need his inhaler that day?
4      A. Yes.
5      Q. And is that because he exhibited some
6  behavior that led you to believe that or because in
7  the past he has always needed his inhaler?
8      A. It was because in the past he has always
9  needed it.
10     Q. In a response to my question No. 11
11 asking about where you have been named in prior
12 cases you have got a case Dan Fauver vs. Reynolds.
13         Does that case arise out of your
14 employment as a correctional officer?
15     A. Yes.
16     Q. What were the facts of that case that you
17 recall?
18     A. We had an inmate -- I don't remember what
19 year that was but he had fell from his bunk, hit
20 his head on the toilet and had a pretty good knot
21 on his head.
22         Our procedure is if something like that
23 happens, call the jail doctor and let them
24 determine whether they go to the hospital or not.

### Page 53

1      Q. Do you remember what allegations he had
2  in that case did he determine -- were his
3  allegations that he should have been taken to the
4  hospital and was not?
5      A. Yes.
6      Q. We talked a little bit about the slurred
7  speech that Kevin had but what I am a little
8  unclear about is when he was, when you determined
9  it was slurred speech because what we talked about
10 a lot of times he was talking incoherently, did he
11 ever speak to you in a manner that you understood
12 but his words were slurred?
13     A. The only thing I can recall is that I
14 understood that he said was my name.
15     Q. And I think you said he didn't slur when
16 he said that, did he?
17     A. No. It was clear.
18     Q. And the only other time when he spoke he
19 was speaking incoherently, correct?
20     A. I couldn't understand what he was saying.
21     Q. Is that what you are referring to as the
22 slurred speech?
23     A. Yes.
24     Q. Have you in your 14 years of employment

Page 54

1 as a correctional officer, have you ever provided
2 CPR to any inmate?
3   A. No. I have not.
4      (The court reporter marked a document as
5      Exhibit No. 2.)
6 BY MR. DE CARO:
7   Q. I am handing you what we have marked as
8 Reynolds Exhibit 2. That is a statement of
9 Sergeant Marc Reynolds, time 3:14 p.m. on May 10,
10 2003.
11       Have you had an opportunity to review
12 this statement?
13   A. Yes, I have.
14   Q. And is it your recollection that this is
15 your statement?
16   A. Yes.
17   Q. Who did you give the statement to?
18   A. Captain Gary Miller I believe.
19   Q. And where was that? Where was the
20 statement given? Was it at the public safety
21 building?
22   A. Yes.
23   Q. And on the second floor? What is on the
24 second floor? Is that Captain Miller's office?

Page 55

1   A. That and the rest of the investigators.
2   Q. After you left the padded cell area, did
3 you hear Kevin say or yell anything while you were
4 still in the book-in area?
5   A. I don't recall whether he said but he was
6 sitting up by the time we got the door shut.
7   Q. You don't recall what he said? Do you
8 recall him saying something or you don't recall him
9 saying anything?
10   A. I don't recall what he said.
11   Q. But he did say something?
12   A. He did say something but I don't recall
13 what he said.
14   Q. When you left the padded cell area, I
15 know there is two doors to the padded cell,
16 correct?
17   A. Yes.
18   Q. You shut the first padded door, correct?
19   A. Yes.
20   Q. Did you shut the second door?
21   A. I don't recall if it was shut or left
22 open.
23      (The court reporter marked a document as
24      Exhibit No. 3.)

Page 56

1 BY MR. DE CARO:
2   Q. Handing you what we have marked as
3 Exhibit No. 3, it is Basic Correctional Officer
4 Course No. 397, Performance Report. Is this the
5 performance report from your PTI training?
6   A. Yes.
7   Q. And these classes, weekly written exams,
8 human behavior, investigation, jail standards, law,
9 operations, fire arms, were those the courses you
10 took during your PTI training?
11   A. Yes.
12   Q. If you could just briefly tell me what
13 human behavior, what that course was about?
14   A. I really don't remember.
15   Q. Did any of these courses provide you with
16 any medical training at all?
17   A. Not that I recall.
18   Q. And we talked earlier about, you know,
19 distinguishing between drug induced behaviors and
20 just altered mental states or mental deficiency.
21       Did any of these courses train you in to
22 distinguish between someone's behavior that might
23 be drug induced as opposed to just being a mental
24 deficiency?

Page 57

1   A. I don't recall anything like that
2 distinguishing either or no.
3   Q. Now I see that you had American -- you
4 have at the time this was filled out you had a
5 certification in American Red Cross First Aid. Is
6 that something that was trained at PTI or did you
7 get that certification outside of PTI?
8   A. I don't remember that being a part of the
9 training there. But it may have been.
10   Q. Are you still Red Cross certified in
11 first aid?
12   A. No.
13   Q. Is that something that you need to
14 recertify on an annual or semiannual basis?
15   A. I believe to be, to stay up to date it is
16 a yearly certification.
17   Q. In May of '03 were you certified in first
18 aid?
19   A. I would say probably no. I am not for
20 sure.
21   Q. How about do you know if you were
22 certified in CPR back then in '03?
23   A. I don't remember, no.
24   Q. The Breathalyzer I see you were trained

Page 58

1 to become a Breathalyzer testing operator in '93.
2 Is that something that you need to be recertified
3 in or is that a life long certification?
4   A. You have to be recertified.
5   Q. Were you certified in '03?
6   A. Yes.
7   Q. And without -- we don't need to mark
8 these really as an exhibit. Your personnel file
9 showed that in there you had received a written
10 reprimand back in October of '03 regarding the
11 accidental discharge of a tazer. Do you remember
12 that?
13   A. Yes.
14   Q. Was that your only written reprimand that
15 you are aware of?
16   A. For that incident, yes.
17   Q. What other written reprimand do you have?
18   A. I had someone on my shift on the internet
19 at one time.
20   Q. That actually you were suspended for in
21 '04?
22   A. I didn't end up getting suspended, no.
23   Q. But beside those two events, any other
24 reprimand in your career?

Page 59

1   A. That is all that I can recall. I would
2 have to look in my file just to make sure but I
3 would say that is it.
4   Q. The tazing incident, did any lawsuit
5 arise out of that?
6   A. No.
7   Q. If an inmate needs medical attention and
8 it is a time when the nurse is not on duty, what is
9 the protocol for getting that person medical
10 attention?
11   A. I would call the -- we have two doctors
12 that are contracted through the I believe it is
13 through the health department for the jail.
14       And generally it is Dr. Ehrhart who we
15 call. He is a lot easier to get a hold of. We
16 will call him and tell him what the situation is
17 and then he will determine whether they need to go
18 to the hospital or not.
19   Q. Would you call that same doctor if it was
20 and if you thought that someone was having a mental
21 breakdown and they needed medical attention?
22       Would you call that doctor or is there a
23 psychiatric or psychological treatment center you
24 guys would call for that?

Page 60

1   A. If they are mental and needed medical
2 treatment for the mental?
3   Q. Yeah. For the mental. You thought they
4 might hurt themselves or another inmate and you had
5 determined it was because they were mentally
6 unstable, would you call these doctors or is there
7 another facility you would call?
8   A. We would call Crosspoints. We generally
9 call Crosspoints if there is any kind of threats of
10 suicide or mental patients that come in.
11   Q. And the mental patients I have just
12 thrown out a couple of examples but the mental
13 patients that you call Crosspoint for other than
14 that they might hurt themselves or hurt other
15 inmates, is there another reason why you call
16 Crosspoints? Is it for treatment or?
17   A. The only thing I will call them for is
18 for that time that they are there. The nurse
19 generally will interact with the Crosspoints to do
20 anything further with them.
21   Q. Does Crosspoint do any type -- if you
22 know do they do any type of treatment for alcohol
23 or drug addiction for your inmate?
24   A. No. I think it is strictly just for the

Page 61

1 mental.
2   Q. Other than conversations with your
3 attorney or other than conversations with your
4 family members and friends, have we covered all the
5 conversations you have had with the officers on
6 duty and the investigators regarding Kevin Lucas'
7 death?
8   A. Yes.
9   Q. Do you know any other family members of
10 Kevin Lucas?
11   A. No, I don't.
12       MR. DE CARO: That is all I have.
13       MR. CONDON: I have just a couple.
14
15 EXAMINATION,
16   QUESTIONS BY MR. CONDON:
17   Q. Sergeant Reynolds, when you observed
18 Kevin Lucas on the morning of May 10 of 2003, was
19 he having any shortness of breath that you
20 observed?
21   A. No.
22   Q. Was he wheezing at all?
23   A. No, he wasn't.
24   Q. Was he exhibiting any signs that he was

Page 62

1 having an asthma attack?
2   A. No.
3   Q. And you had observed Kevin Lucas on other
4 occasions when he was in the jail and needed
5 treatment for asthma, correct?
6   A. Yes, I have.
7     MR. CONDON: That is all.
8     MR. DE CARO: I have nothing.
9     MR. CONDON: We will reserve signature.

Page 63

2 BUTLER,
3     Plaintiff,
4   vs.
5 VERMILION COUNTY SHERIFF, et al,
6     Defendants.

7 This is to certify that I have read the transcript of my deposition taken in the above-entitled cause, and that the foregoing
8 transcript taken on August 9, 2005 accurately states the questions asked and the answers given by
9 me, with the exception of the corrections noted, if
10 any, on the attached errata sheet(s).

12         MARC REYNOLDS
13 Subscribed and Sworn before
14 me this ____ day of _____, 2005.
15 Notary Public

Page 64

1 STATE OF ILLINOIS  )
                    ) SS
2 COUNTY OF VERMILION )

3     I, BECKY L. JESSUP, CSR, RPR, a Notary Public in and for the County of Vermilion, State of
4 Illinois, do hereby certify that MARK REYNOLDS, the deponent herein, was by me first duly sworn to tell
5 the truth, the whole truth and nothing but the truth in the aforementioned cause of action.
6     That the foregoing deposition was taken on behalf of the Plaintiff, on the 9th day of August,
7 2005.
    That said deposition was taken down in
8 stenograph notes and afterwards reduced to typewriting under my instruction; and that the
9 typewritten transcript is a true and accurate record of the testimony given by said deponent; and
10 that it was agreed by and between the witness and attorneys that said signature on said deposition
11 would not be waived.
    I do hereby certify that I am a disinterested
12 person in this cause of action; that I am not a relative or attorney of any of the parties, or
13 otherwise interested in the event of this cause of action, and am not in the employ of the attorneys
14 for either party.
    IN WITNESS WHEREOF, I have hereunto set my
15 hand and affixed my notarial seal this 16th day of August, 2005.

17        *Becky L. Jessup* (signature)
18        Becky L. Jessup, CSR, RPR
          Notary Public