THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
STATE OF ILLINOIS

LUCILLE BUTLER, Individually and )
as Special Administrator of the )
Estate of Kevin Lucas, Deceased, )
                                 )
            Plaintiff,           )
                                 )
    vs.                          )    No. 04-CV-2048
                                 )
VERMILION COUNTY SHERIFF         )
KENNETH O'BRIEN, et al.,         )
                                 )
            Defendants.          )

DEPOSITION

    The Deposition of MICHAEL SCHULL, a citizen of
the State of Illinois, a witness of lawful age;
produced, sworn, and examined upon his corporeal
oath, at the Vermilion County Courthouse, Danville,
Illinois on August 5, 2005, before Becky Jessup,
CSR, RPR, Notary Public in and for the County of
Vermilion and State of Illinois, as a witness in a
certain suit and matter now pending and
undetermined in the United States District Court
for the Central District of Illinois.
    CSR License No. 84-004343

APPEARANCES:

    KUPETS & DE CARO, P.C.
    30 N. LaSalle Street, Suite 4020
    Chicago, Illinois  60602
    By:  Mr. Dennis De Caro, Attorney
    Appearing for the Plaintiff

    LAW OFFICES OF MR. MICHAEL CONDON
    Attorney at Law
    333 Pierce Road
    Itasca, Illinois  60123

COPY

EXHIBIT
6

Page 2

1    INDEX OF EXAMINATION
2                Page
3 EXAMINATION, by Mr. De Caro   3
  EXAMINATION, by Mr. Condon   78
4 EXAMINATION, by Mr. De Caro   103
  EXAMINATION, by Mr. Condon   114
5 EXAMINATION, by Mr. De Caro   117
  EXAMINATION, by Mr. Condon   118
6
7
8
9        EXHIBITS
10
  No.               Page
11
12 1 ................................. 52
  2 ................................. 54
13 3 ................................. 57
  4 ................................. 64
14 5 ................................. 65
  6 ................................. 95
15 7 ................................. 95

Page 3

1    MICHAEL SCHULL, the witness herein,
2 having been first duly sworn to tell the truth, the
3 whole truth and nothing but the truth, was examined
4 and testified as follows:
5
6 EXAMINATION,
7    QUESTIONS BY MR. DE CARO:
8   Q. Would you please state your full name and
9 spell your last name for the court reporter?
10   A. Michael Schull, S-c-h-u-l-l.
11   Q. Officer Schull, my name is Dennis De
12 Caro. I represent Lucille Butler and the estate of
13 Kevin Lucas.
14    I am going to be asking you a series of
15 questions first about your background and then
16 about an incident that occurred on May 10, 2003.
17    Have you ever given a deposition before?
18   A. Yes, I have.
19   Q. And when was the last time?
20   A. I don't know what year it was. I don't
21 recall.
22   Q. I noted in your answers to
23 interrogatories there were a few cases you were
24 involved in before this. Were those civil rights

Page 4

1 cases?
2   A. Correct.
3   Q. Was the last deposition regarding one of
4 those cases?
5   A. Yes.
6   Q. I think maybe you had one you were
7 involved in Perry vs. Hartshorn?
8   A. I don't believe I gave a deposition in
9 that one. It was the Snook case. I don't know
10 what year it was.
11   Q. What was the name of that case as best
12 you can remember?
13   A. Snook vs. I believe Sheriff Hartshorn.
14   Q. S-n-o-r-k?
15   A. S-n-o-o-k.
16   Q. Was that in the federal court or state
17 court if you know?
18   A. I don't recall.
19   Q. Do you remember the facts of that case at
20 all?
21   A. No.
22   Q. Did it involve was the man injured in the
23 county jail?
24   A. Yes.

Page 5

1   Q. Did he die?
2   A. No.
3   Q. Do you know what happened with that case?
4   A. I believe it was resolved. I don't know
5 the outcome of it though.
6   Q. Do you remember what year you gave the
7 deposition?
8   A. No.
9   Q. Within the last five years?
10   A. It was before that.
11   Q. For our purposes just a couple of
12 guidelines --
13    MR. CONDON: Off the record.
14    (Discussion held off the record.)
15 BY MR. DE CARO:
16   Q. Just so when we order this and we read
17 it, it is clear. Let's try not to speak over one
18 another. And also you need to answer everything
19 verbally.
20    If you nod, the court reporter can take
21 down you nodded but when we read it, we don't know
22 whether you nodded yes or no.
23   A. Okay.
24   Q. Have you reviewed anything for your

Page 6

1 deposition today?  Interrogatories, your report
2 that you wrote regarding this case, anybody else's
3 statements?  Anything like that?
4    A. Yes.
5    Q. Why don't you tell me what you reviewed.
6    A. The interrogatory.
7    Q. Okay.
8    A. My report.
9    Q. Anything else?
10    A. Personnel history.
11    Q. Anything else?
12    A. I don't recall, no.
13    Q. And when did you do that?  In the last
14 couple of days?
15    A. Yes.
16    Q. What is your highest level of education?
17    A. Associate's degree.
18    Q. From where?
19    A. Danville Area Community College.
20    Q. When did you receive that?
21    A. '92.
22    Q. Did you grow up in this area?
23    A. Yes, I did.
24    Q. You went to Danville High?

Page 7

1    A. Yes, I did.
2    Q. Why don't you just briefly tell me about
3 your employment history after high school up to
4 this point.
5    A. High school I was working for Jewel Food
6 Company and then I was terminated from there and
7 went to McLane Midwest grocery warehouse.
8    Q. What happened there?
9    A. I received this job here and quit there.
10    Q. What is your date of birth?
11    A. October 17, 1972.
12    Q. When were you first hired as a county
13 sheriff?
14    A. October 19 of '95.
15    Q. And you have told me all your jobs
16 between high school and the county?
17    A. And that I worked part time.  I mean
18 those are my full-time jobs and I worked part time
19 Tilton Police Department and Oakwood Police
20 Department.
21    Q. What did you do for the Oakwood Police
22 Department?
23    A. Police officer.
24    Q. And that was part time?

Page 8

1    A. Yes.  Still is.
2    Q. How often do you work there?
3    A. It varies from 20 to 30 hours a week.
4    Q. Did you work for the Oakwood Police
5 Department in May of '03?
6    A. 2002.
7    Q. You started?
8    A. Yes.
9    Q. And so then you would have been working
10 during May of '03?
11    A. Yes.
12    Q. In May of '03 you were on the third shift
13 for the county?
14    A. Yes.
15    Q. Are you still on the third shift?
16    A. No.
17    Q. What shift are you on now?
18    A. Day shift, first shift.  7 to 3.
19    Q. When did -- well, strike that.  Why don't
20 you tell me how long you were on the third shift.
21    A. For one year during that year for that
22 full year.
23    Q. When did you come off the third shift?
24    A. 2004, January.

Page 9

1    Q. Who on May 10 of '03 were you working
2 with on your shift in the book-in area?
3    A. Myself and Rose Walker.
4    Q. Does Rose Walker still work for the
5 county?
6    A. Yes.
7    Q. And I think from your answers you were
8 the book-in officer that day?
9    A. Right.
10    Q. What would Rose Walker's duties be that
11 night?
12    A. She would be with me up until a certain
13 time.  We start to feed at 6:00 and she will go
14 upstairs and feed so she won't be back down to
15 book-in.
16    Q. So do you -- and the third shift would be
17 11 p.m. to 7 a.m.?
18    A. Yes.
19    Q. And do you stay in the basement near the
20 book-in area the whole time?
21    A. Yes.
22    Q. And are you the only one in that area --
23 strike that.  Rose is with you in that area from
24 what time to what time?

Page 10

1  A. Probably 11 to about 5:45.
2  Q. So by the time Kevin Lucas came in that
3  morning Rose was not there?
4  A. No.
5  Q. Was there any other officer there with
6  you that morning?
7  A. No.
8  Q. Since October of '95 have you ever been
9  reprimanded, suspended or -- reprimanded or
10 suspended from the county?
11 A. Yes.
12 Q. Let's talk about reprimands. How many
13 reprimands have you had?
14 A. I believe one or two.
15 Q. Do you recall what they were for?
16 A. Using over the amount of time I have for
17 personal time.
18 Q. Both if there were two?
19 A. Yes.
20 Q. Were you ever suspended?
21 A. No.
22 Q. Is there any other type of discipline
23 that doesn't fall in under suspension or
24 reprimand? Is there a letter to the file or

Page 11

1  something like that?
2  A. Just the reprimand. It is a written
3  reprimand is what it is.
4  Q. And you said you were terminated from
5  Jewel. What years did you work at Jewel?
6  A. 1989 to 1994.
7  Q. And why were you terminated?
8  A. Due to a time adjustment I was paid an
9  hour more than what I should have been.
10 Q. Was that a -- prior to that was Jewel
11 going to be your career or was that a part-time job
12 or?
13 A. That was part time. It turned into full
14 time.
15 Q. And what was your position at Jewel back
16 in '94 before you were terminated?
17 A. Assistant produce manager.
18 Q. So in '94 -- strike that. '94, was that
19 your -- was it full time at that point in 1994?
20 A. Yes.
21 Q. Had you applied in -- prior to
22 termination had you applied to either the Oakwood
23 Police Department or the county sheriff's
24 department?

Page 12

1  A. Yes.
2  Q. Which one?
3  A. Oakwood. I mean, sorry, sheriff's
4  department.
5  Q. And that was prior to your termination?
6  A. Right.
7  Q. Do you know what month you were
8  terminated in?
9  A. It was late in the year. I don't recall.
10 Q. And then you were, your next job after
11 Jewel would have been for the county?
12 A. Would have been McLane Midwest.
13 Q. McLane Midwest? That is a food
14 processing?
15 A. It is a grocery warehouse.
16 Q. When did you start there?
17 A. In '94.
18 Q. Very soon after you left Jewel?
19 A. Yes.
20 Q. Where is that located?
21 A. Out on Eastgate, east of Danville.
22 Q. And then did you quit there when you were
23 hired by the county?
24 A. Yes.

Page 13

1  Q. Let's talk about your training with the
2  county. When you started with the county, did you
3  receive training?
4  A. Yes.
5  Q. Where did you receive it?
6  A. Champaign, Illinois. Police Institute.
7  Q. And how long of a program was that?
8  A. It was 200 hours. Approximately four
9  weeks, five weeks.
10 Q. And you do that before you do anything,
11 any work at the county or are you doing both?
12 A. I was working prior. I was working the
13 county for three months.
14    MR. CONDON: Make sure you let him finish
15 his question before you answer just so you make
16 sure you know what you are answering.
17 BY MR. DE CARO:
18 Q. In those three months you were working at
19 the county before you started the police training,
20 what was your title and what were you doing?
21 A. Correctional officer.
22 Q. How is it that they allowed you to be a
23 correctional officer for those three months without
24 being trained?

Page 14

1    A. I don't know how they work that. They
2 have to wait for an opening, a class to start.
3    Q. And were you doing basically the same
4 thing after your training in those three months
5 that you were doing before your training?
6    A. Yes.
7    Q. So you went for the training? Is that
8 full-time training or is it half a day and you go
9 back and work or you work the third shift?
10    A. No. I am gone for the whole month.
11    Q. So it was about a month of training and
12 you didn't have to work that month?
13    A. Hm-mm.
14    Q. That police training at UIC or University
15 of Illinois in Champaign, do they train you? Is
16 there any medical training -- strike that.
17        At University of Illinois do they give
18 you training in CPR or things like that?
19    A. Yes.
20    Q. Are you CPR certified?
21    A. No.
22    Q. Do they offer that at the police academy
23 to make you CPR certified?
24    A. I was certified then, yes, but not now.

Page 15

1    Q. Were you certified in May of '03?
2    A. No.
3    Q. In that police training, when I say
4 police training, this is your initial training. Do
5 they train you in responding to someone with a
6 medical emergency?
7    A. I don't recall.
8    Q. After you got out of that police
9 training, did you take any additional training that
10 the county or the state offered in responding to
11 medical emergencies?
12    A. I don't believe so.
13    Q. Do they train you at the academy - that
14 is what I am going to call the police training - on
15 recognizing whether someone is on an illegal
16 narcotic?
17    A. No.
18    Q. Do they train you on how to perform
19 Breathalyzers?
20    A. They don't teach us that there, no. I
21 went to a separate class.
22    Q. Where was that?
23    A. Champaign Police Department.
24    Q. When was that? Do you know?

Page 16

1    A. Probably 2002, 2003.
2    Q. Before this incident?
3    A. Yeah.
4    Q. And there was it basically on how to
5 perform the Breathalyzer test or is it also on if
6 you pull somebody over how to test them to
7 determine whether you want to give them a
8 Breathalyzer?
9    A. It was to operate a machine.
10    Q. Okay. Where were you trained if you were
11 on recognizing the behaviors of someone who may be
12 intoxicated?
13    A. Just field training officers from when I
14 worked at Tilton Police Department.
15    Q. And Tilton, is that Oakwood or?
16    A. I worked part time Tilton and Oakwood.
17    Q. When did you work at Tilton?
18    A. 1995.
19    Q. Until when?
20    A. Present.
21    Q. And how many hours a week is that?
22    A. Maybe 8 hours a week.
23    Q. Has that been pretty consistent since
24 '95?

Page 17

1    A. It can vary.
2    Q. So would it be fair to say that your
3 training in recognizing behaviors of someone who
4 may be intoxicated because of alcohol was
5 on-the-job training at the Tilton Police
6 Department?
7    A. Yes.
8    Q. No formal training in that?
9    A. No.
10    Q. Have you ever had on-the-job or formal
11 training in recognizing behaviors that we might
12 call that somebody is mentally impaired?
13    A. No. I don't recall.
14    Q. How about if there is a difference
15 on-the-job training or classroom training to
16 determine the characteristics of someone who might
17 be mentally disturbed?
18    A. We just had a recent class on suicide.
19    Q. That was with the county?
20    A. Um-hum.
21    Q. Yes?
22    A. Yes.
23    Q. And when was that?
24    A. It was within the last probably six

Page 18

1 months.
2    Q. And all of these might be coming under
3 the same definition but I don't know. I will ask
4 you that later.
5        But any on-the-job or classroom training
6 to determine whether somebody has an altered mental
7 status?
8    A. I don't recall.
9    Q. Any on-the-job or classroom training at
10 any police department or any training facility
11 regarding how to respond to a prisoner who may be
12 having a medical emergency because of diabetes,
13 epilepsy, asthma?
14    A. What was the first part of the question?
15    Q. Any on-the-job training or classroom
16 training, formal training regarding how to respond
17 to someone who has diabetes?
18    A. No.
19    Q. How about same question for anyone who
20 has epilepsy or is having an epileptic seizure?
21    A. No.
22    Q. Same question for someone who might be
23 having a medical problem because of asthma?
24    A. No.

Page 19

1    Q. In the course of you being a police
2 officer and a county sheriff, have you ever come
3 across anyone having a medical emergency because of
4 what you may have later learned to be because of
5 diabetes, epilepsy or asthma?
6    A. Yes.
7    Q. And would you just then use your common
8 sense as how to treat those people or what to do?
9    A. Yes.
10    Q. Are there any written procedures,
11 guidelines, regulations regarding how to care for
12 somebody having a medical emergency such as
13 diabetes, epilepsy or asthma that the county has,
14 that the Vermilion County has that you are aware
15 of?
16    A. Yes.
17    Q. And where would those be found?
18    A. That would be with the nurse.
19    Q. So if someone comes to your attention
20 that someone might be having a medical problem
21 related to one of those three illnesses, you would
22 contact the nurse?
23    A. Right.
24    Q. Back in May of '03, was there a nurse

Page 20

1 that was at the Vermilion County jail 24 hours?
2    A. No.
3    Q. Was there a nurse there at any time there
4 during the day or night?
5    A. That particular day, I do not know.
6    Q. Let's just talk generally. Was there a
7 nurse back in May of '03? Would there be a nurse
8 on any shift?
9    A. Usually day shift.
10    Q. And that would be from 7 to 3 or?
11    A. Just day shift.
12    Q. So it might be 9 to 5, 8 to 4 or
13 something like that?
14    A. Yeah.
15        MR. CONDON: Let me interrupt.
16        (Discussion held off the record.)
17 BY MR. DE CARO:
18    Q. If there was a medical emergency outside
19 of the day shift in the evening or over night back
20 in May of '03, who would you contact?
21    A. My immediate supervisor.
22    Q. And on May 10 of '03, who was that?
23    A. That would be Sergeant Reynolds.
24    Q. And do the supervisors change with each

Page 21

1 shift?
2    A. Yes.
3    Q. And your shift that night was the third
4 shift so Sergeant Reynolds would have been off at
5 7:00 also?
6    A. Yes.
7    Q. Do you happen to know who he would
8 contact then?
9    A. It would be the day shift supervisor.
10 There are several.
11    Q. And they may contact ambulance or
12 hospital or something?
13    A. Yes.
14    Q. Is there a procedure, is there a written
15 procedure where I would find that the officer would
16 contact a supervisor and the supervisor would
17 contact day shift supervisor and so on?
18    A. Yes. In the jail manual.
19    Q. Do you have asthma by any chance?
20    A. No.
21    Q. Anyone in your family have asthma?
22    A. I don't know.
23    Q. What I would like to do now is just go
24 through a step by step when you first found out

## Page 22

1 that Kevin Lucas was coming to the jail and what
2 happened after that.
3     But first let me ask you prior to May 10,
4 2003, did you know who Kevin Lucas was?
5     **A. Yes.**
6     Q. How did you know who he was?
7     **A. Just by him coming in the jail being**
8 **arrested.**
9     Q. Now were you always the book-in officer
10 or would you work in some other capacity?
11    **A. It changes daily.**
12    Q. So there is multiple levels of cells at
13 the public safety building?
14    **A. Yes.**
15    Q. And would you as a correctional officer,
16 would you ever be out on the road making arrests or
17 anything like that?
18    **A. No.**
19    Q. So you are always working in the public
20 safety building?
21    **A. Yes.**
22    Q. And that was full time back in May 2003?
23    **A. Yes.**
24    Q. And it is still full time?

## Page 23

1     **A. Correct.**
2     Q. When did you first learn that Kevin Lucas
3 was coming to the building or was in the building?
4     **A. When he arrived in book-in.**
5     Q. And he arrived I am assuming in the
6 elevator?
7     **A. Right.**
8     Q. Who was he with?
9     **A. Correctional Officer Sergeant Reynolds,**
10 **Deputy O'Brien and Deputy Sporcich.**
11    Q. Did you know Deputy O'Brien prior to this
12 day?
13    **A. Yes.**
14    Q. I am assuming he would bring in prisoners
15 from time to time?
16    **A. Correct.**
17    Q. And you all work out of the same office?
18 Same building anyway?
19    **A. Same building.**
20    Q. Do the county sheriffs come to that
21 building and prepare the reports and things like
22 that?
23    **A. Yes.**
24    Q. And same thing for Sporcich?

## Page 24

1     **A. Yes.**
2     Q. When you first saw Kevin, what was he
3 wearing?
4     **A. I know his pants were down to his**
5 **ankles. Other than that I don't know the color of**
6 **clothes.**
7     Q. Was he wearing a shirt when you first saw
8 him?
9     **A. Yes.**
10    Q. Do you remember what color that was?
11    **A. No.**
12    Q. Was he handcuffed?
13    **A. Yes.**
14    Q. Behind his back?
15    **A. Yes.**
16    Q. Were his ankles cuffed in any way?
17    **A. No.**
18    Q. Was he able to -- strike that. When you
19 first saw him, where was he?
20    **A. Walking off the elevator.**
21    Q. Were you in the control room at that
22 point?
23    **A. Yes.**
24    Q. Was he able to walk off of the elevator

## Page 25

1 on his own or was he being carried?
2     **A. He was walking on his own.**
3     Q. Then what is the next thing that happened
4 after they came off the elevator?
5     **A. They walked to the main area in book-in.**
6 **I believe at that time the deputies were trying to**
7 **tell him to sit down, to calm down but he was real**
8 **fidgety, agitated.**
9     **At that time I went out and told him**
10 **let's just go ahead and lock him up. About at that**
11 **time somebody mentioned to take him to the padded**
12 **cell.**
13    Q. So the three officers walked with Kevin
14 to the book-in area?
15    **A. Yes.**
16    Q. Did you come out of the control room or
17 did you remain in the control room for a period?
18    **A. I remained in there and I walked out when**
19 **they was en route to take him to the padded cell.**
20    Q. So there was a period where you were in
21 the control room and they were by the bench in the
22 book-in area?
23    **A. Correct.**
24    Q. How much time elapsed from them getting

Page 26

1  him to the bench until they started walking him
2  towards the padded cell?
3     **A. I don't recall.**
4     Q. Was it less than a minute? More than a
5  minute?
6     **A. I don't recall.**
7     Q. At any point did any of the Officers
8  Reynolds, O'Brien or Sporcich come into the control
9  room while you were in the control room?
10    **A. I don't recall.**
11    Q. Did you see any of the officers doing
12 anything -- strike that. Was Kevin standing by the
13 bench or was he seated?
14    **A. I believe he was standing. I believe**
15 **maybe he sat down and got back up. He was just**
16 **(witness indicating.)**
17    Q. Did any of the officers block your view
18 of Kevin?
19    **A. I don't recall.**
20    Q. Was it something out of the ordinary
21 where you were? You know, there are three officers
22 with him.
23       Was your attention on the four of them
24 the whole time or were you still going about your

Page 27

1  work?
2     **A. My attention was not on them at all**
3  **times.**
4     Q. Other than Kevin being fidgety, did you
5  notice anything else about him that you formulated
6  any opinion he was drunk, he was high, he was, you
7  know, had an altered mental state? Anything like
8  that?
9     **A. I believe he was intoxicated on**
10 **something.**
11    Q. On alcohol or illegal narcotic or both?
12    **A. I would not know that.**
13    Q. And what was it? The fidgetiness and the
14 getting up and down that caused you to believe
15 that?
16    **A. Yes.**
17    Q. Anything else?
18    **A. No.**
19    Q. And you testified you were familiar with
20 Kevin. Had you ever seen him act in a similar
21 fashion?
22    **A. No.**
23    Q. Did you have -- strike that. So the
24 three officers are with Kevin. He is sitting, he

Page 28

1  is standing. Possibly sits, gets up and then you
2  came out and said let's lock him up?
3     **A. Right.**
4     Q. Is that the typical procedure that would
5  -- strike that.
6        Is that the typical procedure for when
7  someone is brought into the book-in area that your
8  initial response would be let's lock him up?
9     **A. Yes.**
10    Q. And then were they walking towards the
11 padded room, padded cell area before you said that
12 or after you said that?
13    **A. It was right around the same time.**
14    Q. Okay. And also how far were they towards
15 the padded cell because Mike and I were there today
16 and there is also holding cells back there.
17       So they were walking in that general
18 direction towards the cells?
19    **A. It was right outside the control room.**
20    Q. Okay. And then I think you said somebody
21 said something about the padded cell?
22    **A. Right.**
23    Q. What was said?
24    **A. Let's take him to the padded cell.**

Page 29

1     Q. Do you know who said that?
2     **A. No, I don't.**
3     Q. Did you not recognize the voice that said
4  that?
5     **A. No.**
6     Q. Was it one of the three officers though
7  or was there another person?
8     **A. No. There was just us four.**
9     Q. So it would have been Sergeant Reynolds,
10 Officer O'Brien or Officer Sporcich that said that?
11    **A. Right.**
12    Q. And let's assume for my question here
13 that it was Officer O'Brien or Sporcich that said
14 that. Would those typically be officers you would
15 take direction from?
16    **A. Yes.**
17    Q. Even though they are not correctional
18 officers they can say which type of cell a prisoner
19 would go into?
20    **A. No. We would, it is more for his safety**
21 **than it is anything.**
22    Q. Right. No, I understand. But I am just
23 saying as far as determining how to classify?
24    **A. That is what we would do as correctional**

Page 30

1 officers.
2    Q. So if you didn't think that was a good
3 idea and you thought it was O'Brien or Sporcich who
4 said it, you could overrule that and say you know
5 what, I am going to put him in a holding cell?
6    A. Right.
7    Q. In the book-in area did you obtain any
8 information from Kevin?
9    A. No.
10    Q. Did you fingerprint him before putting
11 him into the book-in -- strike that. Did you
12 fingerprint him before putting him into the padded
13 cell?
14    A. No.
15    Q. Why not?
16    A. Due to his intoxication or I can't think
17 of the word.
18    Q. Fidgetiness or agitation?
19    A. Right.
20    Q. How long would you say you observed Kevin
21 before you said let's lock him up?
22    A. Possibly 5 minutes maybe. Not even 5
23 minutes.
24    Q. Do you recall at that time did you have

Page 31

1 any conversations with Kevin?
2    A. No.
3    Q. During that time did you perform any
4 physical assessment of Kevin?
5    A. No.
6    Q. During that time did you see any of these
7 officers engage in a conversation with Kevin?
8 Meaning Officers Reynolds, O'Brien or Sporcich?
9    A. I don't recall.
10    Q. If they were having a conversation with
11 them, were you close enough to overhear that if you
12 were in the control room?
13    A. Yes. I can hear it.
14    Q. And you don't recall whether you
15 overheard any conversation?
16    A. No.
17    Q. Did you see from the control room at any
18 time any of these three officers search Kevin?
19    A. No.
20    Q. Did you search Kevin before putting him
21 into the padded cell?
22    A. No.
23    Q. Would it be your procedure to search a
24 person going into a cell prior to putting into

Page 32

1 a cell?
2    A. Yes.
3    Q. And what type of search would you
4 conduct? A pat down search, a strip search or
5 something in between there?
6    A. Pat down.
7    Q. And if you could verbalize how you would
8 do that and what areas of the person you would pat
9 down?
10    A. We would run our inside of our hands,
11 just pat them down throughout the body.
12    Q. When you do a pat down search, do you
13 take, and they are going into a cell, do you take
14 their shoes off and examine their shoes in any way?
15    A. We take shoes and that is our procedure
16 is to take their shoes and we lock them up.
17    Q. Do you have them take their socks off and
18 turn them inside out?
19    A. No.
20    Q. Do you pat down their feet at all?
21    A. We just rub down the leg.
22    Q. When you do that are their shoes already
23 off?
24    A. Yes.

Page 33

1    Q. So when you go, do you go all the way
2 down to the floor and hit the sides of their feet
3 and top of their feet?
4    A. Yes.
5    Q. And that wasn't done in Kevin's case that
6 you know, that you saw?
7    A. No.
8    Q. Somebody says let's put him in the padded
9 cell and then all four of the officers and Kevin
10 walk toward the padded cell?
11    A. Yes.
12    Q. Was there anyone else -- strike that. Is
13 there only one padded cell down there?
14    A. In book-in, yes.
15    Q. On that day was there anybody in the
16 holding cell that is by the fingerprint area?
17    A. I don't recall.
18    Q. Do you recall if there was anyone in the
19 other holding cells that morning?
20    A. I don't recall.
21    Q. Do the work release people go through the
22 lower level for any reason?
23    A. No. Usually not.
24    Q. When Kevin was down there from the time

## Page 34

1 he was brought into book-in until the time he went
2 in the padded cell, did you see anyone other than
3 the three officers, yourself and Kevin down in that
4 lower area?
5    **A. No.**
6    Q. Back in May of '03 was the Breathalyzer
7 room still next to the padded cell room?
8    **A. Yes.**
9    Q. And did it have a working machine on that
10 date?
11    **A. I would not know that.**
12    Q. In your memory is there a time when the
13 Breathalyzer was not operating?
14    **A. I don't recall.**
15    Q. Do you know about what time of morning
16 this was?
17    **A. Yes.**
18    Q. What time was it?
19    **A. About 6:45.**
20    Q. And you were due to get off at 7?
21    **A. Right.**
22    Q. Had Karla Young or Richard Long gotten to
23 the basement yet?
24    **A. No.**

## Page 35

1    Q. Do you know about what time they showed
2 up?
3    **A. Pretty close to 7 I believe.**
4    Q. Let's talk about how Kevin was put into
5 the padded cell. Well, why don't you just
6 generally describe if you can how the five of you
7 walked down the hallway to the padded cell.
8      Who was in front where Kevin was, who was
9 behind him?
10    **A. I believe he was in front. Kevin was in**
11 **front. I believe the deputies were escorting him**
12 **back there.**
13    Q. And were you and Reynolds behind the
14 deputies?
15    **A. Yes.**
16    Q. And then do all five of you go into the
17 padded cell area?
18    **A. Yes.**
19    Q. And then what is Kevin's initial position
20 once he gets in the padded cell? Does he just
21 stand there? Is he on the ground?
22    **A. I believe he was standing when we entered**
23 **there, yes.**
24    Q. Then what happened?

## Page 36

1    **A. I believe we laid him down onto the**
2 **floor. He kept turning on his side and we kept**
3 **trying to get him on his stomach.**
4    Q. Does he have his pants on at that point?
5    **A. They are down to his ankles.**
6    Q. Does he have a shirt on in the padded
7 cell?
8    **A. I believe so.**
9    Q. So at some point who is, who has control
10 of Kevin in the padded cell to the greatest
11 extent? Who is trying to turn him on his stomach
12 to get the handcuffs off? All of you? Two of you?
13    **A. I don't recall.**
14    Q. At some point do you get him in a prone
15 position so you can get at the cuffs?
16    **A. Yes.**
17    Q. How long does it take to do that from the
18 time you get him into the padded cell?
19    **A. Approximately a few minutes.**
20    Q. And then once he is in a prone position
21 were his cuffs taken off?
22    **A. After we were able to secure him without**
23 **moving his hands, yes.**
24    Q. How long did that take?

## Page 37

1    **A. I have no idea.**
2    Q. Do you remember where -- at the time when
3 you were securing him, I am assuming that that was
4 done by applying force to various parts of his back
5 and legs?
6    **A. Yes.**
7    Q. Do you remember where each officer was on
8 Kevin's body? And I will start with you. Where
9 were you on his body?
10    **A. I was at his waist area.**
11    Q. And how were you touching him?
12    **A. I was holding him down with my hands on**
13 **his waist.**
14    Q. Around his waist or on top of his waist?
15    **A. Around his waist.**
16    Q. Where was Sergeant Reynolds?
17    **A. He was at his feet.**
18    Q. Was he holding his feet?
19    **A. I don't recall if he was holding his**
20 **feet.**
21    Q. How about Officer Sporcich?
22    **A. He was to the left of me holding the left**
23 **shoulder.**
24    Q. How was he doing that? With his arms or

Page 38

1  knee?
2      A. I believe with his arm.
3      Q. And how about Officer O'Brien?
4      A. Same.  On the right side.
5      Q. And then who was, were you trying to get
6  the handcuffs off or Officer O'Brien?
7      A. I believe Deputy O'Brien was trying to
8  get one cuff off and he succeeded on that and then
9  he would, kept moving his hands relieving the other
10  cuff.
11      Q. And eventually he got them both?
12      A. Yes.
13      Q. Was Kevin resisting during that period?
14      A. No.  Just moving.
15      Q. Moving his hands?
16      A. Right.
17      Q. Was he squirming his body or kicking?
18      A. Yes.
19      Q. Was he saying anything?
20      A. I don't recall.
21      Q. During this whole time until you left the
22  padded cell did you ever hear Kevin say anything to
23  anyone?
24      A. No.

Page 39

1      Q. When you left the cell did Kevin have his
2  shirt on?
3      A. Yes.
4      Q. Did you take his pants or?
5      A. Took his pants and his shoes.
6      Q. If a person is in a different cell in a
7  holding cell or goes upstairs into another floor,
8  is there ever a time where you would check their
9  socks, take their socks off, turn them inside out
10  and put them back on?
11      A. No.
12      Q. That is just not a procedure you guys
13  follow?
14      A. Unless we have a suspicion that they have
15  a weapon or drugs.
16      Q. That morning did you ever believe that
17  Kevin might be high on narcotic?
18      A. I believe he was intoxicated on
19  something.
20      Q. Okay.  You get the handcuffs off and then
21  what happens?
22      A. I held him, held his hands behind his
23  back while everybody exited.  Then I let him go and
24  I exited and then I shut the door.

Page 40

1      Q. Was he still in a prone position when you
2  got up and left?
3      A. He was still laying down, yes.
4      Q. And then you shut the door that is
5  padded?
6      A. Yes.
7      Q. Did you shut the other door, the outside
8  door then or just the one?
9      A. I do not recall.
10      Q. What is the custom and practice when
11  someone is in the padded cell?  Do you shut
12  typically the outside door so they can use the
13  restroom or do you shut the padded door or does it
14  depend on the actions of the inmate?
15      A. We usually -- we definitely shut the
16  padded door.
17      Q. And then how do they -- do they somehow
18  let you know they have to go to the washroom?
19      A. Yes.
20      Q. And you shut the outside door?
21      A. Yes.
22      Q. And they go back in and you shut the
23  padded door?
24      A. Correct.

Page 41

1      Q. And so when you left, did you leave
2  around 7:00 that morning?
3      A. Yes.
4      Q. When you left, the outside door was open
5  and the padded door was locked?
6      A. I don't know about the outside door.
7      Q. But when you left immediately after
8  taking handcuffs off of Kevin, you just locked the
9  padded door and the outside door was open?
10      MR. CONDON: Object.  Mischaracterises
11  his testimony.
12  BY MR. DE CARO:
13      Q. When you left Kevin in the cell, you shut
14  the padded door?
15      A. Correct.
16      Q. Do you know what you did with the outside
17  door?
18      A. No.
19      Q. Now when you are an officer who is
20  checking inmates, I am assuming you do that from
21  time to time?
22      A. Yes.
23      Q. And that is done every half hour?
24      A. Yes.

## Page 42

1    Q. When someone is in the padded cell and
2 the padded door is shut and the outside door is
3 open, how do you check them in the padded cell?
4    A. Usually we will go back and look at the
5 food slot open area. It is at the bottom.
6    Q. And that is about how high from the
7 ground?
8    A. Approximately a few feet maybe.
9    Q. And why do you look through the food slot
10 if there is a glass up higher?
11    A. You can look better. There is more of a
12 view through the food slot.
13    Q. What if they are standing up? Can you
14 see the person's head?
15    A. Yes.
16    Q. Is that written anywhere or is that just
17 through, you know, on-the-job training or common
18 sense?
19    A. No.
20    Q. It is not written anywhere?
21    A. I don't believe so.
22    Q. So is it up to you how you look in there?
23    A. Right.
24    Q. And if you do look through the glass and

## Page 43

1 if somebody was laying on the floor because of the
2 padding on the doors, is it a little hard to see
3 them?
4    A. Yes.
5    Q. But if you look through the food slot you
6 get -- do you get a view of the entire floor
7 through the food slot?
8    A. No.
9    Q. What can't you see through the food slot?
10    A. Just below the food slot.
11    Q. After you leave Kevin in the padded cell,
12 what do you do?
13    A. After I left him in the padded cell I
14 went back to the control room.
15    Q. Did you fill out any paperwork then?
16    A. I fill out a book-in officer sheet, yes.
17    Q. Where did you get that information from
18 that you filled out?
19    A. I just wrote his name down and the time
20 he came in.
21    Q. And then what did you do with his pants
22 and shoes?
23    A. They were sitting outside of the door of
24 the padded cell.

## Page 44

1    Q. Did you at any time prior to leaving did
2 you hear Kevin yelling or screaming or saying
3 anything?
4    A. At 6:55 I went back to check on him and
5 he was looking through the food slot and asked me
6 to get him out of there.
7    Q. Did you say anything to him?
8    A. No.
9    Q. Did he seem coherent at that time?
10    A. Yes.
11    Q. Did you smell alcohol on his breath?
12    A. No.
13    Q. And you had looked through the food slot
14 and he was looking out so you were close to his
15 mouth?
16    A. No.
17    Q. Where was he positioned?
18    A. He was positioned in the food slot.
19    Q. And then you open it? I mean how far are
20 you from the food slot when you look in there?
21    A. Probably from the hallway I can see his
22 face from the outer door.
23    Q. Can he open the food slot?
24    A. No. It is already open.

## Page 45

1    Q. So it is open all the time?
2    A. Yes.
3    Q. And you were by the outer door when you
4 had this conversation?
5    A. Yes.
6    Q. Was Richard Long or Karla Young there at
7 6:55?
8    A. No.
9    Q. Did you have any conversations with
10 Officer or Deputy O'Brien regarding Kevin after you
11 guys left the padded cell?
12    A. I don't recall.
13    Q. How about Deputy Sporcich?
14    A. I don't recall.
15    Q. How about Sergeant Reynolds?
16    A. I don't recall.
17    Q. Any conversation with Richard Long about
18 Kevin?
19    A. Yes.
20    Q. What did you tell him?
21    A. I advised him that there was a subject in
22 the padded cell who I told him was Kevin Lucas and
23 he was not processed and that he was intoxicated.
24    Q. Now when you say intoxicated, what do you

Page 46

1  mean by that? Do you mean by alcohol? By drugs?
2      A. Both, one or the other.
3      Q. And was that the extent of the
4  conversation with Mr. Long?
5      A. Yes. Because it was right at the time of
6  shift change.
7      Q. Any conversation with Karla Young?
8      A. I don't believe I even seen her.
9      Q. As a correctional officer are you trained
10  or through your experience have you learned that
11  someone on narcotics and/or alcohol might, that may
12  cause a medical problem?
13      MR. CONDON: Object to the form of the
14  question.
15      A. Can you repeat that?
16  BY MR. DE CARO:
17      Q. Sure. Have you learned through the
18  course of your experience or have you been trained
19  that taking narcotics along with alcohol or on
20  their own may create medical problems for certain
21  people?
22      A. I don't recall.
23      Q. Are you aware that taking excessive
24  amounts of narcotics could cause an overdose?

Page 47

1      A. I am sure it could.
2      Q. Do you have any training on recognizing
3  when someone may have overdosed?
4      A. No.
5      Q. And then you left. When was the next --
6  have we covered all of the conversations you had
7  prior to you leaving the public safety building
8  regarding Kevin Lucas?
9      A. I believe so.
10      Q. When was the next time you heard about
11  Kevin Lucas that day?
12      A. I believe when I came in that night.
13      Q. For the third shift at 11:00?
14      A. Yes.
15      Q. And who told you what?
16      A. I don't remember who told me.
17      Q. And what did you learn?
18      A. That he passed away.
19      Q. I may have asked you this. Typically if
20  you felt that there was, a prisoner was not in any
21  type of altered state for any reason you would
22  fingerprint them in the book-in area?
23      A. Yes.
24      Q. What else would you do with them in the

Page 48

1  book-in area?
2      A. We would take their information. We
3  would process them.
4      Q. Processing them, taking their
5  information?
6      A. Information, fingerprints, picture,
7  property.
8      Q. And what exactly was it that prevented
9  you from doing that with Kevin? You know, describe
10  to me what you saw that in your mind said I cannot
11  do this with Kevin Lucas.
12      A. It is easier to cooperate with someone
13  who is sober.
14      Q. But prior to saying let's lock him up,
15  you had no conversation with him and conducted no
16  physical assessment of him, correct?
17      A. Right.
18      Q. And did you receive -- prior to saying
19  let's lock him up had you received any radio
20  communication from anybody saying he was
21  intoxicated or that we are bringing Kevin in, he is
22  combative?
23      A. All I heard was radio traffic at the
24  beginning that they needed help in the lobby, that

Page 49

1  they were bringing a subject in.
2      Q. Do you place all intoxicated prisoners in
3  the padded cell?
4      A. Most of the time. It depends on how
5  intoxicated, how cooperative they are.
6      Q. So is it more to do with cooperation
7  determining if you put them in the padded cell or
8  intoxication?
9      A. It is more for their safety.
10      Q. I am trying to figure out which would get
11  you into a padded cell quicker. If you were really
12  intoxicated or if you were just uncooperative with
13  the police, if you tried to print somebody and they
14  didn't give you their hand, which would get someone
15  their quicker?
16      A. Probably intoxication.
17      Q. And is that because they might fall over
18  and hit their head on a bench or something like
19  that?
20      A. Correct.
21      Q. At any time now -- strike that. In
22  response to your interrogatories you cite to me
23  part of the administrative code that says if a
24  person has blood alcohol level of .30 or greater

Page 50

1 you have to get medical attention for them. Are
2 you familiar with that?
3    A. Yes.
4    Q. Did you ever determine on May 10, '03
5 what Kevin's blood alcohol level was?
6    A. No.
7    Q. Could you have given him a Breathalyzer
8 exam that morning?
9    A. There was no need to.
10   Q. Why was that?
11   A. That is for DUIs, driving under the
12 influence.
13   Q. He is so intoxicated I get from your
14 testimony that you had to put him in a padded
15 cell.
16       How did you determine that he wasn't
17 intoxicated enough where he might not need medical
18 attention?
19   A. Because he was conscious.
20   Q. So at .30 most people become unconscious?
21   A. I don't know about that. That is just
22 the standards.
23   Q. How was the Breathalyzer administered
24 back in May of '03 in the county jail there next to

Page 51

1 the padded cell? What would a person have to do to
2 take the Breathalyzer?
3    A. Be arrested for driving under the
4 influence of alcohol, illegal consumption by a
5 minor.
6    Q. How is the test administered? Do you
7 have to blow into something?
8    A. Yes.
9    Q. At any point that morning did you believe
10 that Kevin was having difficulty breathing?
11   A. No.
12   Q. Did you know Kevin had asthma?
13   A. Yes.
14   Q. Had you ever seen Kevin use an inhaler
15 while he was in the county jail?
16   A. In the past, yes.
17   Q. Was that if you know an inhaler he
18 brought with him or an inhaler that the jail
19 provided to him?
20   A. I don't recall.
21   Q. What does a prisoner have to do to get --
22 my understanding is the county will give somebody
23 an inhaler if they need it?
24   A. Yes.

Page 52

1    Q. And is it as simple as asking for it?
2    A. You would have to go through the nurse.
3    Q. And what if the nurse isn't there?
4    A. We would call a jail doctor.
5    Q. And is there a doctor designated each
6 evening as to who to call or do you just call the
7 closest hospital?
8    A. We call our jail doctor.
9    Q. Do you know who that was in May of '03?
10   A. I believe it was Dr. Ehrhart or
11 Dr. Pliura.
12   Q. Are they at Provena? Do you know?
13   A. No.
14   Q. Is there any way of telling when somebody
15 is on an illegal narcotic if they have taken a
16 little bit or a lot?
17       MR. CONDON: Object to the form of the
18 question.
19   A. No.
20 BY MR. DE CARO:
21   Q. I am going to jump around a little bit.
22 I just want to quickly go through your statement.
23       (The court reporter marked a document as
24       Exhibit No. 1.)

Page 53

1 BY MR. DE CARO:
2    Q. We have handed you what we have marked as
3 Exhibit 1. This is a statement you gave on May 11,
4 2003, correct?
5    A. A report.
6    Q. Right. Have you ever given a statement,
7 a tape recorded statement to anyone?
8    A. No.
9    Q. Were you asked to do that and you refused
10 or were you not asked?
11   A. I was never offered.
12   Q. And this report, it was given to Captain
13 Riggs. Is he the one who requested it?
14   A. Correct.
15   Q. So this would have been given during your
16 very next shift?
17   A. Yes.
18   Q. So everything was fresh in your mind?
19   A. Yes.
20   Q. Actually this is consistent with what you
21 told me. I just want to make sure that is your
22 statement and signature on the bottom.
23   A. Yes.
24   Q. I am going to hand you what I am going to

Page 50 - Page 53

Page 54

1  mark as Exhibit 2.
2       (The court reporter marked a document as
3       Exhibit No. 2.)
4  BY MR. DE CARO:
5       Q. I have handed you what I have marked as
6  Exhibit 2 and it is entitled To Filled Out by
7  Book-in Officer. You were the book-in officer the
8  morning that Kevin came in?
9       A. Correct.
10      Q. Did you fill out this report?
11      A. I filled out the name.
12      Q. Just his name or?
13      A. And doped up.
14      Q. You put doped up?
15      A. Yes.
16      Q. Did you fill out the race, the date of
17  birth, sex, height, weight, all that?
18      A. No. The only thing I filled out was his
19  name and the doped up with the apostrophe.
20      Q. I hate to belabor the point. What
21  conduct if you could just give me an exhaustive
22  list of Kevin's behavior that led you to the
23  conclusion he was doped up?
24      A. Doped up or a lot of times we use drunk.

Page 55

1  This is just a form for us to use.
2       Q. But I would imagine if you thought he was
3  acting that way because of alcohol you would have
4  put drunk, correct? Or no?
5       A. It doesn't matter. Usually just --
6       Q. But so am I correct in concluding that
7  when you put doped up you didn't necessarily mean
8  he was high on an illegal narcotic only? It could
9  have been he was drunk and high, just high or just
10 drunk?
11      A. Correct.
12      Q. And again so what of his behaviors led
13 you to that conclusion? We talked about the
14 fidgetiness of him standing and sitting and
15 standing but anything else?
16      A. No.
17      Q. Was he -- to my recollection of your
18 testimony is that he, the only conversation you had
19 with him was when you went back to the cell at 6:55
20 to look in there and he said get me out of here or
21 something to that effect?
22      A. Yes.
23      Q. Was he slurring at that point?
24      A. I do not recall.

Page 56

1       Q. But he seemed -- he didn't seem to be
2  impaired or did he?
3       MR. CONDON: Object to the form of the
4  question. Misstates his testimony.
5  BY MR. DE CARO:
6       Q. Let me ask it: When he said that to you,
7  did he say it in a way that supported your belief
8  that he was doped up or did he say it sort of in a
9  neutral way?
10      A. I am not familiar with his tone of voice.
11      Q. So would it be -- would I be correct then
12 that what you observed in the book-in area was all
13 the evidence that you had from observing him there
14 that he was doped up?
15      A. Yes.
16      Q. And that was him standing, sitting and
17 standing basically?
18      A. And being fidgety.
19      Q. On this Exhibit 2 would this information,
20 his social security, his address, arresting agency,
21 all of that, would that have been filled out by the
22 arresting officer or maybe Richard Long?
23      A. Arresting officers have their own sheet
24 they have to fill out.

Page 57

1       Q. Is this something Richard Long once he
2  learned of Kevin's name could have looked up on a
3  computer?
4       A. Yes.
5       Q. Do you typically sign these as the
6  book-in officer?
7       A. Sometimes; sometimes not.
8       Q. And what happens with these forms?
9       A. These forms, we use these to enter them
10 in our fingerprint machine, our turnover and then
11 we send them up to records which they take care of
12 the fingerprint cards and they dispose of it.
13      Q. I want to ask you about a couple
14 incidents that were in your personnel file.
15      (The court reporter marked a document as
16      Exhibit No. 3.)
17 BY MR. DE CARO:
18      Q. Handing you what we have marked as
19 Exhibit 3, it is a little hard to read in areas but
20 I think the top says Vermilion County Sheriffs
21 Department, Danville, Illinois memorandum.
22      It is to Captain Morgan from Officer
23 Schull. Subject altercation with inmate Tyson
24 Jones. Date, July 18, 1997.

Page 58

1    And the reason, what was this if you
2 could just generally tell me about this altercation
3 with Tyson Jones?
4    A. I would have to read through it.  It has
5 been a long time ago.
6    Q. Sure.  Go ahead and refresh your memory.
7    A. I can't read this.
8    MR. CONDON: Second page?
9    THE WITNESS: Yeah.
10 BY MR. DE CARO:
11    Q. You have had a chance to look that over?
12    A. Yes.
13    Q. So Tyson Jones, this incident, he was in
14 -- was he in a holding cell and you were going to
15 take him up to the fourth floor and put him in a
16 different cell?
17    A. Correct.
18    Q. And the bottom of the first page and the
19 top of the second page involve his socks.  And that
20 is why I was asking you about the socks and turning
21 out the socks.
22    And let me just read to you what I think
23 it says and I want to ask you some questions.  I am
24 going to start in the middle of the bottom

Page 59

1 paragraph on page 1.
2    Jones started arguing with me about
3 taking the boxers off.  I reached for my OC spray
4 and stated to Jones I am not asking you again.
5 Jones observed me reach for my can of OC and slowly
6 took off his boxers.
7    After removing them I asked him to take
8 off his -- and this is the difficult part to read
9 but this is what I think it says -- take off his
10 socks and turn them inside out and he could keep
11 the socks as they were all.  Well he would
12    Jones stated I am not taking off my socks
13 for anybody.  I advised him that I was not asking
14 him again nor was I playing any more of his games.
15 Jones stated I am still not taking off my socks.
16    I then sprayed Jones with OC spray
17 hitting him in the left shoulder.  Jones backed up
18 in the corner and stated okay, I will take them
19 off.
20    Now you had said earlier that taking off
21 the socks and turning inside out is not what
22 you guys do there.  Why did this guy have to take
23 his socks off?
24    A. What I told you earlier is the book-in

Page 60

1 procedures.  He was being brought into population.
2 He was brought back from court taken back upstairs
3 into population.
4    Q. And I think you said that is a procedure
5 if you think they have contraband you would have
6 them take their socks off?
7    A. Correct.  In book-in.
8    Q. In --
9    A. When they are first arrested.
10    Q. Okay.  In book-in that would be a
11 procedure you would do is ask the inmate to take
12 their socks off, turn them inside out, see that
13 nothing is in them and if you had a suspicion that
14 they might have some narcotics on them?
15    A. Correct.
16    Q. And that suspicion arises from what they
17 are arrested for is that if they are arrested for
18 drugs?
19    A. No.
20    Q. What would the suspicion that they might
21 have contraband in their socks arise from?
22    MR. CONDON: Object to the form of the
23 question.  Incomplete hypothetical situation.
24

Page 61

1 BY MR. DE CARO:
2    Q. Let me withdraw that.  Do you ask
3 everyone who comes into book-in to take their socks
4 off and turn them inside out?
5    A. No.
6    Q. Which inmates do you ask to do that?
7    A. A lot of the inmates like to hide stuff.
8 Like you will see them mess around and see them
9 mess around with their foot.  That is a suspicion
10 they just stuck something down in their sock.
11    So unless you see them put something in
12 their sock you wouldn't ask them to turn their
13 socks inside out?
14    A. No.
15    Q. Had you seen Tyson Jones put something in
16 his sock?
17    A. No.
18    Q. Why did you ask him to do it?
19    A. He was remitted back to court.  We take
20 them back upstairs.  Any time they are brought back
21 upstairs we do a total strip search.
22    They can have anything that is white;
23 white socks, underwear.  They have to turn them
24 inside out so they don't have any contraband to

Page 58 - Page 61

Page 62

1 take back into a cell back with other inmates.
2     Q. This guy came in from the book-in area
3 and was going back upstairs. So you do that once
4 you get them on the fourth floor, have them take
5 their socks off or is that done in the book-in
6 area?
7     A. That is done up on fourth floor.
8     Q. But some inmates who come in to book-in
9 that you see put things in their socks you will ask
10 them to take their socks off?
11     A. Correct.
12     Q. Any other people that you would ask to
13 take their socks off in book-in?
14     A. No.
15     Q. Are socks -- well, obviously socks are
16 obviously a place where someone might try to hide
17 contraband. Is that your experience?
18     A. It could be anywhere, yes.
19     Q. For individuals who are arrested for
20 perhaps selling cocaine or things like that when
21 they come into book-in, are you told what they are
22 arrested for?
23     A. Yes.
24     Q. If someone has a narcotic related arrest,

Page 63

1 do you ask those people to turn their socks inside
2 and out in book-in?
3     A. No.
4     Q. Have you found that once you get people
5 up to the fourth floor and they do turn their socks
6 inside and out that they have contraband in them?
7     A. Sometimes, yes.
8     Q. Is there any reason why you would allow
9 the prisoner to have contraband in the book-in
10 cells and then search for it on the fourth floor?
11 Why don't they search the socks in the book-in
12 area?
13         MR. CONDON: Let me object to the form of
14 the question. He never testified, that
15 mischaracterises his testimony. He never testified
16 that he would allow an inmate to have contraband in
17 the book-in area.
18 BY MR. DE CARO:
19     Q. I will withdraw that question. I guess
20 what I am wondering apparently they recognize when
21 you get up to the fourth floor you might have
22 contraband in your socks because they ask people to
23 take their socks off and turn them inside out,
24 correct?

Page 64

1     A. Correct.
2     Q. And some of those people are held in the
3 holding cells in book-in before they go to the
4 fourth floor, correct?
5     A. Correct.
6     Q. I guess my question is: Why don't they
7 look at their, in their socks before they go into
8 any cell?
9     A. That is why we pat them down.
10     Q. So when you pat them down you also pat
11 their feet down to make sure there is no
12 contraband?
13     A. We pat down to their ankles and a quick
14 pat down.
15     Q. I am assuming nothing occurred but as a
16 result of this incident you weren't reprimanded or
17 suspended?
18     A. No.
19         (The court reporter marked a document as
20         Exhibit No. 4.)
21 BY MR. DE CARO:
22     Q. I just want to quickly ask you about 4.
23 I have handed you several documents out of your
24 personnel file and you told me about I think the

Page 65

1 reprimand regarding the absenteeism.
2         What I want to ask you about on the third
3 page there starts a letter to Sheriff Hartshorn
4 from Captain Morgan regarding an incident with
5 Charles Devault?
6     A. Correct.
7     Q. Do you remember that incident?
8     A. Yes.
9     Q. Basically what I want to ask you as a
10 result of this incident were you reprimanded or
11 suspended or was there a letter put into your file?
12     A. No.
13         (The court reporter marked a document as
14         Exhibit No. 5.)
15 BY MR. DE CARO:
16     Q. I have handed you what we have marked as
17 Exhibit No. 5. It is a copy of your
18 interrogatories. If you will look at the last
19 page, page 10, that is your signature?
20     A. Yes.
21     Q. And when we started the dep you said that
22 you had an opportunity to review this document in
23 the last few days?
24     A. Yes.

Page 66

1    Q. I want to ask you a couple of questions.
2 If you look at question 9 I asked for the name and
3 address of any person other than those listed who
4 has knowledge of any of the defenses that has been
5 raised or will be interposed by the defendants in
6 this case.
7        And the answer is IDOC Specialist Mike
8 Talkington, Office of Jail and Detention Standards.
9 It talks about a letter that he sent regarding
10 this incident.
11       Have you ever spoken with IDOC Specialist
12 Talkington?
13    A. No.
14    Q. Then if you go down to the answer to No.
15 10 the question asks about lawsuits brought within
16 the last 10 years for various civil rights
17 violations and the answer is David P. Perry, Sr.,
18 vs. Hartshorn. Were you a named defendant in that
19 case?
20    A. Yes.
21    Q. Can you tell me a little bit about that
22 case if you know what the allegations were?
23    **A. He broke a tooth eating spaghetti.**
24    Q. How was it that you were -- do you

Page 67

1 remember what the allegations were that you did?
2    **A. No.**
3    Q. And that case was settled?
4    **A. I believe so.**
5    Q. I am assuming the person was a prisoner
6 in the county jail at the time he broke the tooth?
7    **A. Correct.**
8    Q. Was that the extent of your knowledge of
9 that case?
10   **A. Yes.**
11   Q. And you have already answered 14. You
12 never gave an oral statement to any investigator in
13 this case? You just prepared the one written
14 report; is that true?
15   **A. True.**
16   Q. I am going to show you these. I am not
17 going to mark these as exhibits. These documents
18 were provided to me by your attorney. I just want
19 to make sure.
20       I am going to show you some documents
21 that were provided to me regarding what rules and
22 regulations govern your employment with the
23 county.
24       I was given a book-in procedure. Are

Page 68

1 those rules and regulations that you follow as a
2 book-in officer?
3    A. Yes.
4    Q. And that is entitled Book-in Procedure
5 but it is a three page document. At the top it has
6 got a fax date of June 27, 2003 from the Vermilion
7 County Sheriff.
8        The other document I was given was a
9 Joint Committee on Administrative Rules,
10 Administrative Code, Title 20 Corrections, Criminal
11 Justice and Law Enforcement, Chapter 1, Department
12 of Corrections, Part 701 County Jail Standards.
13       Are those the jail standards that you
14 were bound to govern by?
15    **A. We was given some but I don't know if --**
16 **these don't look like it. I don't know if they are**
17 **the same exact ones.**
18       (Discussion held off the record.)
19 BY MR. DE CARO:
20    Q. Officer, you are bound -- you know you
21 are bound by certain Illinois county jail
22 standards?
23    A. Correct.
24    Q. And that they are contained in the

Page 69

1 Illinois Administrative Code?
2    A. Correct.
3    Q. Let me also show you what I was
4 forwarded. This is the Departmental Rules and
5 Regulations from Vermilion County.
6        If you want to take a look at that and
7 let me know if you are familiar with those and if
8 you are governed by those rules also.
9    **A. Yes. This looks familiar.**
10   Q. Now I have given you three documents.
11 Two look familiar, one you are aware of that you
12 are governed by but they are in a different form
13 but they don't look very familiar.
14       How are you trained to know that these
15 are your rules and regulations? Were you trained
16 initially at the academy with these rules?
17    **A. The county jail standards, yes.**
18   Q. And then the Vermilion County Rules and
19 Book-in Procedures, were you trained at the county
20 jail subsequent to your initial training?
21   A. Yes.
22   Q. Contained in these administrative codes
23 if you look at Section 701.70 I just want to ask
24 you about a couple of definitions.

## Page 70

1     And if you look at subparagraph 6 it is
2 entitled Mentally or Emotionally Disturbed or
3 Impaired. You see that?
4     A. Um-hum.
5     Q. Do you have, were you ever trained in how
6 to recognize whether a prisoner was mentally or
7 emotionally disturbed or impaired or is that
8 something you would just determine on your own?
9     A. I would have to recall it, the training I
10 got from the academy.
11     Q. Do you have in your mind as we sit here
12 today would you be able to define what if somebody
13 was mentally impaired? Would you be able to give
14 me their characteristics that they would exhibit?
15     MR. CONDON: Object to the form of the
16 question.
17     A. No.
18 BY MR. DE CARO:
19     Q. Have you ever in your course of
20 correctional officer contacted a physician or nurse
21 because you felt a prisoner was mentally impaired
22 and may need medical attention?
23     A. Yes.
24     Q. What characteristics or what mannerism

## Page 71

1 was that person exhibiting?
2     A. I have only contacted if they need
3 emergency medical treatment, injured, unconscious,
4 stuff like that. But no, I haven't done that, no.
5     Q. So you have not contacted a physician or
6 a nurse because somebody you thought was mentally
7 impaired?
8     A. Correct.
9     Q. How about under mentally or emotionally
10 disturbed or impaired, do you consider that all one
11 category?
12     A. Yes.
13     Q. Would you also add to that category
14 altered mental status?
15     MR. CONDON: Object to the form of the
16 question.
17     Q. I guess what I am asking is if you were
18 to look, if one of your assessment duties was to
19 see whether the inmate had an altered mental
20 status, would that be different from mentally or
21 emotionally disturbed or impaired?
22     MR. CONDON: Object to the form of the
23 question.
24     A. I believe it is the same.

## Page 72

1 BY MR. DE CARO:
2     Q. And these three documents that you have
3 in front of you, those are the rules that you are
4 governed by, correct?
5     A. Correct.
6     Q. Those aren't suggestions that they
7 suggest you follow? You have to follow those
8 rules?
9     A. Correct.
10     Q. Did prior to putting Kevin in the padded
11 cell did you perform any physical assessment of him
12 at all?
13     A. I believe I answered that no.
14     Q. How would you categorize his mental
15 status, Kevin's mental status when you put him into
16 the padded cell?
17     Would you say he was acting normal?
18 Would you say it was impaired? Would you say it
19 was altered in any way?
20     A. I believe he was not normal as usual.
21     MR. CONDON: I didn't hear your answer.
22     A. He was not his usual self. He wasn't
23 acting normal.
24

## Page 73

1 BY MR. DE CARO:
2     Q. When you put him in the cell I believe
3 you testified that he was doped up which we went
4 over.
5     Could be a conglomerate of either alcohol
6 by itself, narcotics by itself or a combination
7 thereof, correct?
8     A. Correct.
9     Q. When you put him in the padded cell, did
10 you have a belief as to the extent of him being
11 doped up? Was he mildly doped up or did you think
12 this guy is really screwed up?
13     MR. CONDON: Object to the form of the
14 question.
15     A. I believe he was intoxicated but not to
16 an extent. I can't tell you the extent.
17 BY MR. DE CARO:
18     Q. Did you ever hear from anyone at what
19 time Kevin died?
20     A. I don't recall, no.
21     Q. When you work with a partner in the
22 book-in area, how does the checking of the inmates
23 go? Do you carry -- there is a check-off list; is
24 that correct?

Page 74

1   A. A check sheet, yes.
2   Q. Do you carry that sheet with you as you
3 go from cell to cell and check off or do you
4 mentally make a note and check it off when you are
5 done or how does it work?
6   A. We usually walk around, check inmates,
7 come back and sign the sheet.
8   Q. And when you are in the book-in area, do
9 you just stay on the lower floor there or those are
10 the cells you check?
11   A. Correct.
12   Q. And how many cells are down there?
13   A. Nine.
14   Q. Nine cells?
15   A. Yes.
16   Q. Are you -- strike that. What are you
17 checking for?
18   A. What am I checking for?
19   Q. Yeah.
20   A. To see if the inmates are still there,
21 the count is right. Make sure nobody is attempting
22 to commit suicide.
23   Q. When you work with a partner, have you
24 ever radioed back to the partner, you know, cell 1

Page 75

1 is fine, check that cell, 2 is fine, check that?
2 Or do you walk back always and check them off
3 yourself?
4   A. I might have done that. It has been many
5 years I have done this.
6   Q. You have done it a lot of different ways?
7   A. I don't recall so.
8   Q. Your code doesn't have this page but are
9 you aware at 701.140 of the administrative code
10 that some inmates who are exhibiting escape risks,
11 suicidal, mentally disturbed, impaired or who
12 present special security concerns shall be given
13 special care and supervision and be checked more
14 frequently than the standard 30 minute check?
15   A. I would have to look at it.
16   Q. Before that are there any circumstances
17 that you have been trained that certain inmates
18 need to be checked more often than every 30
19 minutes?
20   A. Yes.
21   Q. And would those be suicidal type inmates?
22   A. Yes.
23   Q. How about inmates who are acting bizarre
24 and may be mentally impaired?

Page 76

1   A. No.
2   Q. What other types would you check more
3 often than 30 minutes?
4   A. I can't think of any.
5   Q. Would you agree with me that is contained
6 in part of the administrative code?
7   MR. CONDON: What is?
8 BY MR. DE CARO:
9   Q. The section 701.140 under security and it
10 is subparagraph C(8). Would you agree with me that
11 that is -- the reason I didn't show it in there is
12 it is not in that packet but it is right there. It
13 would be the next section.
14   But that section, I guess all I am asking
15 is I am representing to you that it is contained in
16 that section.
17   A. Okay.
18   Q. Have we covered all of the conversations
19 you have had with any employee or supervisor with
20 the Vermilion County regarding this incident with
21 Kevin Lucas?
22   A. Correct.
23   Q. Have you ever had a conversation with
24 Sheriff Hartshorn about it?

Page 77

1   A. No.
2   Q. After you gave your report to I believe
3 Captain Riggs did you ever have a conversation with
4 him about it?
5   A. No.
6   Q. Have you ever spoken to the other
7 officers who were down in the padded cell with
8 Kevin that morning?
9   MR. CONDON: Other than conversations he
10 may have had when I was present with him?
11 BY MR. DE CARO:
12   Q. Yes.
13   A. No.
14   Q. Have you had any conversations with any
15 of Kevin's family?
16   A. Yes, I have.
17   Q. When was that?
18   A. I believe it was her son. I booked him
19 not too long ago.
20   Q. Another son of Lucille Butler?
21   A. Yes.
22   Q. And what conversation did you have with
23 him? Why don't you tell me what you said and he
24 said.

## Page 78

1    A. Just processed him as normal. I mean
2 that is the only contact I have had with him.
3    Q. So no conversation about his brother?
4    A. No.
5    Q. Any other conversation with any other
6 inmates who said they saw Kevin Lucas in the public
7 safety building on May 10 of 2003?
8    A. No.
9    Q. Let me give you a catchall. Any
10 conversation with anyone other than your friends
11 and family and your attorney regarding this case
12 and the facts around it?
13    A. No.
14        MR. DE CARO: That is all I have.
15        MR. CONDON: I may have some follow-up.
16
17 EXAMINATION,
18    QUESTIONS BY MR. CONDON:
19    Q. Officer Schull, I got some follow-up
20 questions for you relative to this matter. First
21 of all, you said you received your basic training
22 at the Illinois Police Training Institute; is that
23 correct?
24    A. Correct.

## Page 79

1    Q. And that is in Champaign?
2    A. Yes.
3    Q. That is a 200 hour course?
4    A. Yes.
5    Q. And is there a training curriculum that
6 they use at the Illinois Police Training Institute?
7    A. Yes, there is.
8    Q. When they train correctional officers?
9    A. Yes.
10    Q. As you sit here, do you recall did you
11 get training on how to determine if someone is
12 intoxicated or under the influence?
13    A. I don't recall. I would have to look at
14 the curriculum.
15    Q. Do you recall if you got training on
16 various signs that someone who is intoxicated may
17 exhibit when they are drunk?
18        For instance, slurred speech, their gait
19 is off, they smell of alcohol? Things like
20 bloodshot eyes? Things like that?
21    A. Yes.
22    Q. You say yes. You recall you got some
23 training in that area at the Illinois Police
24 Training Institute?

## Page 80

1    A. No, I did not. I don't know. I don't
2 recall.
3    Q. You don't remember?
4    A. I don't remember.
5    Q. How many years ago did you go there?
6    A. In '96.
7    Q. So you would have to look at the training
8 curriculum to see if you recall that?
9    A. Correct.
10    Q. But you recall during the period of time
11 you have been employed as a correctional officer
12 that you have gotten some training, whether it was
13 at the police training institute or somewhere else
14 to determine the signs that one exhibits when they
15 are under the influence?
16    A. Correct.
17    Q. But you don't remember where?
18    A. No.
19    Q. Now you testified that Kevin Lucas was
20 not searched before he was put into a padded cell;
21 is that correct?
22    A. Correct.
23    Q. Is the reason that Kevin was not searched
24 was because he was uncooperative?

## Page 81

1    A. Correct.
2    Q. Have you put other individuals who have
3 been arrested and who have been uncooperative, have
4 you put them in a padded cell without searching
5 them?
6    A. Yes.
7    Q. And have you put other individuals into
8 padded cells in the past who have been intoxicated?
9    A. Yes.
10    Q. And you have put the individual into the
11 padded cell for their safety and for the officer's
12 safety?
13    A. Correct.
14    Q. And on May 10 of 2003 did you believe
15 that Kevin was intoxicated or under the influence
16 of some drug?
17    A. Yes.
18    Q. And I believe in response to Mr. De
19 Caro's questions you said that Kevin was fidgety;
20 is that correct?
21    A. Correct.
22    Q. Take a look at your police report which
23 is Exhibit 1. You wrote this report the day after
24 Kevin's death, correct?

Page 82

1    A. Correct.
2    Q. You state in your report the fourth
3 sentence down that you knew the subject to be Kevin
4 Lucas, correct?
5    A. Yes.
6    Q. And you had dealt with Kevin in the past?
7    A. Correct.
8    Q. So in the past you had interacted with
9 Kevin and observed his demeanor on different
10 occasions; is that correct?
11    A. Correct.
12    Q. And when Kevin walked into the book-in
13 area you have in your report that his pants were
14 down to his ankles; is that correct?
15    A. Correct.
16    Q. Did you find that a little unusual that
17 his pants were down to his ankles?
18    A. Yes.
19    Q. And in the report you say you come out of
20 the control room and into the main area. Kevin
21 seemed very fidgety and would not sit still; is
22 that correct?
23    A. Correct.
24    Q. Did you write in your report that Kevin

Page 83

1 would not sit still because -- did you see him
2 actually sitting on the bench and then getting up
3 and sitting back down? Do you recall?
4    A. I don't recall.
5    Q. A little bit farther down in the report
6 you indicate that Kevin was taken to the padded
7 cell, correct?
8    A. Correct.
9    Q. And that he was placed face down,
10 correct?
11    A. Correct.
12    Q. And midway down in the report it states
13 "as Lucas was on the floor he was on his side and
14 would not turn over on to his stomach." Do you see
15 that?
16    A. Yes.
17    Q. Was Kevin being uncooperative by turning
18 over on his side?
19    A. Yes.
20    Q. And next thing you have written is "Lucas
21 locked his legs around O'Brien's right leg"; is
22 that correct?
23    A. Correct.
24    Q. As you sit here do you recall him doing

Page 84

1 that?
2    A. Yes.
3    Q. Was Kevin being uncooperative by wrapping
4 his legs around Deputy O'Brien's right leg?
5    A. Correct.
6    Q. In addition to being fidgety, would you
7 also describe Kevin as being agitated?
8    A. Yes.
9    Q. You write in the report that Deputy
10 O'Brien had a difficult time getting the cuffs off
11 due to Lucas kept trying to roll over on his side
12 or back. Do you see that there?
13    A. Yes.
14    Q. Do you recall that Kevin kept trying to
15 roll over onto his back when you were trying to get
16 the cuffs off?
17    A. Yes.
18    Q. And the next sentence it says "Lucas also
19 kept bending his wrist which made it difficult to
20 get the cuffs off." Do you see that there?
21    A. Yes.
22    Q. Is that what Kevin was doing?
23    A. Yes.
24    Q. Was he being uncooperative by doing that?

Page 85

1    A. Yes, he was.
2    Q. And you have a little bit further down
3 Sergeant Reynolds had Lucas' legs pinned down at
4 some point. Do you see that?
5    A. Yes.
6    Q. And that you were holding his waist to
7 keep him from attempting to roll over, correct?
8    A. Correct.
9    Q. And were you doing that because he had
10 previously been trying to roll over onto his back?
11    A. Yes.
12    Q. Had you ever in the past seen Kevin act
13 like this before when you dealt with him?
14    A. No.
15    Q. A little bit farther down you say Deputy
16 O'Brien got one cuff off of Lucas' right hand and
17 then I attempted to get the left one off but was
18 unable to. Do you see that?
19    A. Correct.
20    Q. Why were you unable to get the left cuff
21 off?
22    A. He was still trying to bend his wrist.
23    Q. So he was still being uncooperative?
24    A. Yes.

Page 86

1  Q. Did Kevin ever call you by your name at
2  any point when you interacted with him that
3  morning?
4  **A. I believe so, yes. He was, come off the**
5  **elevator and he was walking through there. He said**
6  **Schull.**
7  Q. Was there any doubt in your mind that
8  Kevin recognized you when he got off the elevator?
9  **A. He recognized me.**
10  Q. Now Mr. De Caro asked you whether or not
11  Kevin was searched before he was put into the cell
12  and you said he wasn't, correct?
13  **A. Correct.**
14  Q. And are there different circumstances --
15  strike that. Had there been occasions in the past
16  where you have also not been able to search an
17  individual before you put him in the padded cell?
18  **A. Yes, sir.**
19  Q. Does that happen when you are dealing
20  with intoxicated inmates or individuals?
21  **A. Yes. Uncooperative.**
22  Q. And uncooperative ones?
23  **A. Yes.**
24  Q. So it is the policy of the department to

Page 87

1  search an individual who is brought into book-in
2  but there is occasions where that is not always
3  possible; is that correct?
4  **A. Correct.**
5  Q. And when Kevin was put into the padded
6  cell, did you at that point have any reason, any
7  suspicion that he was carrying either a weapon or
8  contraband?
9  **A. No.**
10  Q. And an individual that is brought into
11  book-in, they haven't been convicted of any crime
12  at that point, correct?
13  **A. Correct.**
14  Q. So is there a difference between an
15  individual who is brought in the book-in who has
16  been arrested on an offense versus someone who is
17  put into the general population?
18  **A. Yes.**
19  Q. I believe you testified earlier that
20  someone who is brought into book-in you try to do a
21  pat down search, correct?
22  **A. Correct.**
23  Q. Before an inmate is put into the general
24  population, you do a different kind of search?

Page 88

1  **A. Yes, we do.**
2  Q. What search is that?
3  **A. Strip search.**
4  Q. And that is the practice of the sheriff's
5  department, correct?
6  **A. Correct.**
7  Q. For every individual who is brought into
8  the book-in area who is intoxicated, do you do a
9  strip search of every such individual?
10  **A. No.**
11  Q. Are you aware that the 4th amendment
12  prohibits a correctional officer and a county jail
13  to do a strip search of an individual who is
14  brought in on a misdemeanor charge?
15  **A. I would have to look at that.**
16  Q. Now after you put Kevin into the padded
17  cell, you took his pants and his shoes, correct?
18  **A. Correct.**
19  Q. So at that point he had on a shirt,
20  correct?
21  **A. Correct.**
22  Q. And I believe a pair of boxer shorts; is
23  that right?
24  **A. Correct.**

Page 89

1  Q. And a pair of socks, correct?
2  **A. Correct.**
3  Q. Did you have any suspicion or belief that
4  Kevin was carrying a weapon in his shirt or his
5  boxer shorts or his socks?
6  **A. No.**
7  Q. Did you have any suspicion that he was
8  carrying contraband somewhere in his shirt or boxer
9  shorts or socks?
10  **A. No.**
11  Q. In your report you say you went back to
12  check on Kevin at 6:55 and Kevin stated you get me
13  out of here; is that correct?
14  **A. Correct.**
15  Q. Is it unusual for an individual who has
16  been put into a padded cell to tell you they want
17  to get out of there?
18  **A. No.**
19  Q. And Kevin -- strike that. Was Kevin
20  coherent at that point when he was saying to you
21  get me out of here?
22  **A. Yes.**
23  Q. Each year at the Vermilion County jail
24  can you give an estimation as to how many

Page 90

1 individuals who are brought into the book-in area
2 are intoxicated or high on some drugs?
3    **A. That is pretty high.**
4    Q. Would you say it is in the hundreds?
5    **A. Yes.**
6    Q. How many individuals do you book in at
7 the Vermilion County jail each year approximately?
8    **A. Probably over a thousand.**
9    Q. And out of that thousand would you say it
10 is in the hundreds in terms of the number of people
11 that are brought in who are either intoxicated or
12 high on something?
13    **A. Yes.**
14    Q. Other than your opinion that you thought
15 Kevin was intoxicated or high on something that
16 night, did you notice anything else about him that
17 I mean was out of the ordinary?
18    **A. Just his normal, his not-normal self.**
19 **Uncooperativeness.**
20    Q. So when you dealt with him in the past he
21 had always been cooperative with you?
22    **A. Correct.**
23    Q. In this instance he was not cooperative,
24 correct?

Page 91

1    **A. Correct.**
2    Q. Other than that did he just appear to be
3 intoxicated or high to you?
4    **A. Either or.**
5    Q. At any time that morning did you believe
6 Kevin needed medical treatment?
7    **A. No, I did not.**
8    Q. Did he ever ask you for medical
9 treatment?
10    **A. No, he did not.**
11    Q. When you went back to check on him at
12 6:55 and he said to you get me out of here, did he
13 say to you I need medical treatment?
14    **A. No, he did not.**
15    Q. Did he say he needed his inhaler?
16    **A. No, he did not.**
17    Q. Did you ever when you observed -- strike
18 that. In response to Mr. De Caro's questions I
19 believe you said you didn't do a physical
20 assessment of him, correct?
21    **A. Correct.**
22    Q. But you did observe him when he was
23 brought into book-in, correct?
24    **A. Correct.**

Page 92

1    Q. And you said he was agitated and fidgety?
2    **A. Correct.**
3    Q. And you did observe him when he was in
4 the padded cell and you were attempting to control
5 him, correct?
6    **A. Correct.**
7    Q. Did you at any time observe Kevin having
8 difficulty breathing?
9    **A. No.**
10    Q. Did you ever observe him wheezing?
11    **A. No.**
12    Q. And the sheriff's department has rules
13 and regulations that are contained in the jail
14 manual that apply to medical situations, correct?
15    **A. Correct.**
16    Q. And sheriff's department employs a jail
17 nurse and a jail doctor to provide medical
18 treatment to inmates in the jail; is that correct?
19    **A. Yes.**
20    Q. And in medical emergencies I believe you
21 stated, and correct me if I am wrong, that if you
22 believe that an inmate needs emergency medical
23 treatment then you would contact your supervisor,
24 correct?

Page 93

1    **A. Correct.**
2    Q. And then would you get the person or the
3 inmate emergency medical treatment?
4    **A. Somebody would.**
5    Q. Either yourself or the supervisor?
6    **A. Yes.**
7    Q. And when Kevin was brought into the
8 book-in area, he was walking, correct?
9    **A. Correct.**
10    Q. Did you observe any physical injuries at
11 all of Kevin?
12    **A. No.**
13    Q. Did you notice him bleeding from any part
14 of his body?
15    **A. No.**
16    Q. Inside the jail that morning did you
17 observe at any time any correctional officer or
18 anybody strike or punch Kevin?
19    **A. No.**
20    Q. Did you ever strike or punch him?
21    **A. No.**
22    Q. On prior occasions when Kevin was in the
23 jail did he receive medical treatment when he was
24 there?

Page 94

1  A. Yes.
2    Q. Was he taken to the nurse when he had
3 complaints regarding his asthma?
4  A. Yes.
5    Q. Are you aware that he was also taken to
6 the hospital during occasions when he was in the
7 Vermilion County jail for treatment?
8  A. Yes.
9    Q. You were personally aware of that?
10  A. Yes.
11    Q. Group Exhibit 4 contains a report
12 regarding an incident that you were involved in in
13 the jail with Charles Devault, correct?
14  A. Correct.
15    Q. And I believe in response to Mr. De
16 Caro's questions you said that you weren't
17 disciplined as a result of the incident?
18  A. Correct.
19    Q. Were you orally reprimanded by either
20 Captain Morgan or the sheriff with respect to that
21 incident?
22  A. Captain Morgan just advised me not to do
23 that again.
24    Q. Captain Morgan told you?

Page 95

1  A. Verbally.
2    Q. Not to do similar type conduct again?
3  A. Correct.
4    Q. And have you ever done that again?
5  A. No.
6    Q. And that incident happened back in 1998?
7  A. Correct.
8    Q. And in that incident you taped Mr.
9 Devault's mouth shut, correct?
10  A. Correct.
11    Q. Why did you do that?
12  A. He was very verbal towards the
13 housekeeping lady that was in the room causing a
14 scene.
15    Also there was a young child across the
16 hallway. I advised him to keep it down or quiet
17 down or not yell several times and he did not
18 comply.
19    (The court reporter marked documents as
20    Exhibits Nos. 6 and 7.)
21 BY MR. CONDON:
22    Q. First take a look at Exhibit No. 7, the
23 county jail standards. Mr. De Caro showed you
24 701.70 I believe was the first one. Do you have

Page 96

1 701.70 in front of you?
2  A. Yes.
3    Q. And that is the county jail standard that
4 pertains to classifications and separation of
5 inmates, correct?
6  A. Correct.
7    Q. And if you go to the last section,
8 Section 6 that Mr. De Caro showed you under the
9 heading Mentally or Emotionally Disturbed or
10 Impaired, do you see that there?
11  A. Yes.
12    Q. Section 6(A) reads "the mentally or
13 emotionally disturbed or impaired shall be housed
14 or tiered and maintained under supervision as
15 recommended by a mental health professional." Do
16 you see that there?
17  A. Yes.
18    Q. Every intoxicated person that is brought
19 into the Vermilion County jail, you don't take them
20 to be seen by a mental health professional, do you?
21  A. No.
22    Q. In reading this, does this section apply
23 when you believe that an inmate is in need of
24 mental health treatment?

Page 97

1  A. Yes.
2    Q. This section doesn't apply to a person
3 off the street that is brought into book-in who is
4 drunk, does it?
5  A. No.
6    Q. And I guess in response to Mr. De Caro's
7 questions, any individual you believe who is
8 intoxicated has an altered mental state to some
9 degree; isn't that correct?
10  A. Yes.
11    Q. But that isn't the same as someone who in
12 your opinion is in need of mental health treatment,
13 is it?
14  A. I didn't hear that.
15    MR. CONDON: Can you read that back?
16    (The Court Reporter read back the
17 requested testimony as follows:
18    "QUESTION: But that isn't the same as someone
19 who in your opinion is in need of mental health
20 treatment, is it?")
21  A. Correct.
22    Q. That is correct?
23  A. Yes.
24    Q. And in Section 6(b) it says suspected

Page 98

1 disturbed or impaired persons shall be immediately
2 examined by a mental health professional and action
3 shall be taken to transfer them to an appropriate
4 facility; is that correct?
5    A. Correct.
6    Q. Again that section pertains to inmates in
7 the jail who you may believe are mentally disturbed
8 or in need of mental health treatment, correct?
9    A. Correct.
10    Q. That section doesn't apply to an
11 individual who was brought into book-in who was
12 drunk, does it?
13    A. No.
14    Q. And does the Vermilion County jail
15 utilize the Crosspoint Human Services facility to
16 get mental health treatment for inmates?
17    A. Yes.
18    Q. And Crosspoint employs psychiatrists who
19 treat inmates from the jail who may be having
20 psychiatric problems, correct?
21    A. Correct.
22    Q. Is it the practice of the sheriff's
23 department to send intoxicated individuals who come
24 into book-in to Crosspoints for mental health

Page 99

1 treatment by a psychiatrist?
2    A. No.
3    Q. In response to Mr. De Caro's questions
4 you said that Kevin wasn't acting normal that
5 morning, correct?
6    A. Correct.
7    Q. And when you say he wasn't acting normal,
8 is that based on the fact that you had had prior
9 interactions with him?
10    A. Yes.
11    Q. And had you ever known in the past for
12 Kevin to be uncooperative the way he was on the
13 morning of May 10?
14    A. No.
15    Q. Before I ask you about that, showing you
16 Schull Exhibit No. 6, that is the book-in
17 procedures for the jail, correct?
18    A. Correct.
19    Q. In the second paragraph of the book-in
20 procedures it states "when an arrestee is so
21 intoxicated or under the influence of drugs that
22 they are in a state of unconsciousness, do not
23 accept the subject until they have been examined by
24 medical personnel." Is that what the policy

Page 100

1 states?
2    A. Correct.
3    Q. And when Kevin was brought into book-in
4 that morning, he was conscious, wasn't he?
5    A. Correct.
6    Q. So that provision of the policy didn't
7 apply, correct?
8    A. Correct.
9    Q. The fourth paragraph states -- strike
10 that. The third paragraph has to do with a subject
11 who is brought in on a DUI and has blown .3 or
12 more, correct?
13    A. Correct.
14    Q. And those individuals are not to be
15 admitted into the jail until they go to the
16 hospital, correct?
17    A. Correct.
18    Q. And then the next paragraph states "if
19 the arrestee has been injured or seriously ill or
20 unconscious, he or she is not to be accepted until
21 a medical examination has been conducted by a
22 physician." Is that what the policy states?
23    A. Yes.
24    Q. Did you observe any injuries to Kevin

Page 101

1 that morning?
2    A. No.
3    Q. Did you observe anything about him that
4 led you to believe he was seriously ill?
5    A. No.
6    Q. Did you observe -- strike that. Did you
7 ever observe him unconscious?
8    A. No.
9    Q. So in your mind this provision didn't
10 apply either, did it?
11    A. No.
12    Q. Did you ever observe Kevin vomit that
13 morning at any time?
14    A. No, I didn't.
15    Q. And then Mr. De Caro showed you Section
16 701.140 of the county jail standards which apply to
17 security. Do you see that there?
18    A. Yes.
19    Q. And specifically showed you section C(8)
20 which reads "jail sections housing persons who are
21 escape risks, suicidal, mentally disturbed or
22 impaired or who present special security concerns
23 shall be given special care and supervision and
24 checked more frequently than the standard 30 minute

Page 98 - Page 101

Page 102

1 check." Is that what the standards says?
2    A. Yes, it does.
3    Q. Now going through that, first of all,
4 Kevin was checked every 30 minutes, correct, when
5 he was in the jail?
6    A. Yes. I believe.
7    Q. Now the first part of this refers to
8 escape risks. Did you view Kevin as an escape
9 risk?
10    A. No.
11    Q. The next part, suicidal. Did you believe
12 Kevin was suicidal when he was brought into the
13 jail?
14    A. No.
15    Q. The next section mentally disturbed or
16 impaired. Again did you think Kevin was in need of
17 any mental health treatment?
18    A. No.
19    Q. Or who presents special security
20 concerns. Did you think Kevin presented a special
21 security concern?
22    A. No.
23    Q. You don't do 30 -- strike that. If an
24 intoxicated subject is put into the padded cell, is

Page 103

1 it the policy of the sheriff's department to do a
2 30 minute check on the padded cell?
3    A. Yes.
4    Q. And is it the policy of the sheriff's
5 department and of the Vermilion County jail that
6 you would do a check more frequently than every 30
7 minutes if the individual poses an escape risk or
8 he is suicidal or is mentally disturbed?
9    A. Correct.
10    Q. You didn't think Kevin was mentally
11 disturbed that morning, did you?
12    A. No.
13    Q. You thought he was drunk or high on
14 something?
15    A. Correct.
16    MR. CONDON: That is all I have.
17    MR. DE CARO: I have got a couple.
18
19 EXAMINATION,
20 QUESTIONS BY MR. DE CARO:
21    Q. Officer, I thought you had told me that
22 you had never been trained on how to assess someone
23 who is mentally or emotionally impaired or
24 disturbed; is that correct?

Page 104

1    A. I don't recall.
2    Q. You don't recall telling me that? Did
3 you receive training on how to determine whether
4 someone was mentally impaired or mentally or
5 emotionally disturbed or impaired?
6    MR. CONDON: Object to the form of the
7 question.
8 BY MR. DE CARO:
9    Q. Have you received training anywhere to
10 determine from someone's actions or verbal
11 responses whether they are mentally impaired?
12    A. I don't recall. Maybe through the
13 academy.
14    Q. Do you know one way or the other?
15    A. No.
16    Q. Do you have in your mind what
17 characteristics or behavior someone would exhibit
18 before you would conclude they're mentally
19 impaired?
20    A. No.
21    Q. So you don't know one way or the other
22 whether being intoxicated either from alcohol or
23 narcotics would qualify as being mentally impaired?
24    MR. CONDON: Object to the form of the

Page 105

1 question. Can you read that back?
2    (The Court Reporter read back the
3 requested testimony as follows:
4    "QUESTION: So you don't know one way or the
5 other whether being intoxicated either from alcohol
6 or narcotics would qualify as being mentally
7 impaired?")
8    A. I can tell the difference between the
9 two, yes.
10 BY MR. DE CARO:
11    Q. What would the difference be?
12    A. Bloodshot eyes, resisting. Slurred
13 speech.
14    Q. That would be which? Mentally impaired
15 or intoxicated?
16    A. Intoxicated.
17    Q. What would somebody mentally impaired,
18 what would they be doing?
19    MR. CONDON: Again I am going to object
20 to the form of the question and lack of foundation
21 for the question.
22    A. I wouldn't recall.
23 BY MR. DE CARO:
24    Q. You said in your statement and Counsel

Page 106

1 asked you at 6:55 Kevin said get me out of here and
2 I thought you answered he said that in a rather
3 normal voice?
4     MR. CONDON: I am not sure you are
5 accurately characterising his testimony.
6 BY MR. DE CARO:
7     Q. When you looked on Kevin at 6:55 in the
8 cell and he said get me out of here, did you think
9 he was having any problems at that time?
10     A. No.
11     Q. Why didn't you process him at that time
12 then?
13     A. Because I was about ready to leave.
14     Q. If you weren't about ready to leave,
15 would you have processed him?
16     A. No.
17     Q. Why not?
18     A. Probably until he sobered up, that I
19 believe he was sober.
20     Q. At 6:55?
21     A. No.
22     Q. Until you believed he was sober?
23     A. Yes.
24     Q. What would he have had to demonstrate for

Page 107

1 you to believe he was ready to be processed?
2     A. The Kevin I always knew, he was normal.
3 I knew him prior and then until then I mean he had
4 to be back to normal.
5     Q. What would you have done? Do you have
6 something in mind that you would have done to
7 determine that he was okay to be processed or would
8 it have just been a gut feeling?
9     A. Just maybe talking to him.
10     Q. Do you know what Kevin had been arrested
11 for in the past?
12     A. I don't know.
13     Q. Do you know if he was ever arrested when
14 he was high in the past?
15     A. I don't know.
16     Q. Now Counsel had asked you about the
17 difference of people in the general population and
18 being convicted and not convicted.
19     Let me just ask you this: People in the
20 general population I am assuming some of those
21 individuals are there waiting pending trial? They
22 haven't been convicted already, correct?
23     A. Correct.
24     Q. And those people are strip searched prior

Page 108

1 to going in the general population?
2     A. Inmates that are remanded back from court
3 that are sentenced that go up to third or fourth
4 floor are strip searched before they go into
5 general population.
6     Q. So if an inmate cannot pose bond and is
7 in the county jail for a year and goes to court
8 several times and may be found not guilty, as long
9 as they are in the county jail they are never strip
10 searched?
11     A. Yes. They are strip searched.
12     Q. You said that there are thousands of I
13 think -- strike that. How many would you say
14 arrestees a year -- well, let's say in 2003 were
15 arrested and kept in the Vermilion County jail for
16 intoxication or narcotics or being high? I don't
17 know if you said thousands or hundreds?
18     MR. CONDON: I am going to object. It
19 mischaracterises his testimony. I think he said of
20 the people who were brought in and were arrested
21 there were hundreds who were intoxicated or high.
22 He didn't say that is what they were arrested for.
23 BY MR. DE CARO:
24     Q. Okay. Sorry. Would that be the same for

Page 109

1 the year 2003?
2     A. Probably.
3     Q. And did you work in the book-in area
4 throughout 2003?
5     A. Different places.
6     Q. In 2003 while you were working in the
7 book-in area, how many of those individuals that we
8 just talked about did you place in the padded cell?
9     A. I would not know that.
10     Q. Would it be hundreds?
11     A. I wouldn't know.
12     Q. Would it be more or less than 25?
13     A. I can't recall.
14     Q. Would Kevin have his underwear on, his
15 shirt and his socks on while he was in the padded
16 cell? Would requiring him to take his socks off
17 constitute a strip search?
18     A. No.
19     Q. And one of the reasons Kevin was put into
20 the padded cell was for his own protection?
21     A. Correct.
22     Q. He wasn't free to leave? He was under
23 arrest? He couldn't just have walked out if he
24 wanted to or said okay I am going to leave?

Page 110

1  A. Correct.
2     Q. Now Counsel has asked you the Vermilion
3  County Rules and the Illinois Administrative Code
4  we have gone through and it seems as though
5  somebody comes in intoxicated yet they are
6  cooperative you will put them through the normal
7  procedures of book-in, correct?
8     A. Correct.
9     Q. And those, the normal procedures of
10 booking a person are found in the documents we
11 looked at today?
12    A. Correct.
13    Q. Then if someone comes in and they are so
14 intoxicated they are unconscious, that is also in
15 these procedures because we are going to call for a
16 doctor because they are unconscious, correct?
17    A. Correct.
18    Q. Where is it written as to how we handle
19 somebody who is intoxicated and uncooperative but
20 not yet to the point of unconsciousness?
21       What do you do with those people and is
22 there a written standard on what to do with them.
23       MR. CONDON: I will object to the form of
24 the question. It is vague.

Page 111

1     A. I don't believe there is.
2  BY MR. DE CARO:
3     Q. And if you look at the administrative
4  code exhibit, I think you answered in response to
5  Counsel's question you didn't search Kevin because
6  he was uncooperative, correct?
7     A. Correct.
8     Q. If you look at the administrative code,
9  the administrative code section 701.40 subparagraph
10 B on admissions procedures states frisk search
11 detainees shall be given an immediate frisk search.
12 So if a detainee comes in, it is required you
13 frisk search them, right?
14    A. Correct.
15    Q. Where in these documents does it say that
16 if the detainee is uncooperative you don't have to
17 frisk search them?
18       MR. CONDON: If you know without going
19 through the whole code.
20    A. I don't believe there is.
21 BY MR. DE CARO:
22    Q. Have we talked about everything that
23 happened from the time you first saw Kevin in the
24 book-in area to the time you went off duty that

Page 112

1  morning?
2        Have we talked about all the
3  conversations, all of your observations of Kevin
4  and anything else that happened down in the book-in
5  area?
6     A. I think everything was covered.
7     Q. If Kevin's behavior that morning could be
8  characterised as mentally disturbed or impaired,
9  assume this for my question, if we can characterise
10 his behavior as that, do you feel he -- would your
11 procedures require you to give him medical
12 attention?
13       MR. CONDON: I will object to the form of
14 the question and incomplete hypothetical and
15 assumes facts not in evidence.
16    A. Do I still need to answer that?
17       MR. DE CARO:  Sure.
18    A. Can you repeat that again?
19 BY MR. DE CARO:
20    Q. Let me just ask it a different way.
21 Would you agree with me that your rules and
22 regulations that govern your conduct at work
23 require you to get someone medical attention who is
24 mentally or emotionally disturbed or impaired?

Page 113

1     A. Yes.
2     Q. Do your rules and regulations anywhere
3  define what mentally or emotionally disturbed or
4  impaired is?
5     A. Without looking I am not for sure.
6     Q. And you don't recall whether you have
7  been trained in those definitions of what mentally
8  or emotionally disturbed or impaired is?
9     A. Correct. Without looking at the
10 curriculum.
11    Q. Let's assume for my question you were
12 trained in that. At some point on May 10, 2003 did
13 you have a clear understanding of how to assess
14 someone to determine whether they were mentally or
15 emotionally disturbed or impaired?
16       MR. CONDON: Object to the form of the
17 question. Can you read that back?
18       (The Court Reporter read back the
19 requested testimony as follows:
20    "QUESTION: Let's assume for my question you
21 were trained in that. At some point on May 10,
22 2003 did you have a clear understanding of how to
23 assess someone to determine whether they were
24 mentally or emotionally disturbed or impaired"?)

Page 114

1    MR. CONDON: Assumes facts not in
2 evidence.
3    **A. I don't recall.**
4 BY MR. DE CARO:
5    Q. Well, it is really more of a yes or no
6 answer.
7    MR. CONDON: I object.
8    **A. That is yes. If I was trained, yes.**
9 BY MR. DE CARO:
10    Q. And if you weren't trained, no?
11    **A. No.**
12    MR. DE CARO: I have nothing else.
13
14 EXAMINATION,
15    QUESTIONS BY MR. CONDON:
16    Q. Officer Schull, again we will go to
17 section 6(a) which talks about mentally or
18 emotionally disturbed or impaired shall be housed
19 or tiered and maintained under supervision as
20 recommended by a mental health professional. Do
21 you see that?
22    **A. Yes.**
23    Q. Have you ever been trained either at the
24 police academy or anywhere else that a person who

Page 115

1 is intoxicated is someone who is viewed as mentally
2 or emotionally disturbed or impaired as set forth
3 in this provision?
4    MR. DE CARO: Just object to the form,
5 incomplete hypothetical and vagueness on what we
6 are talking about, his intoxication.
7 BY MR. CONDON:
8    Q. Have you?
9    **A. No.**
10    Q. Are you aware of any jail in the United
11 States that gets mental health treatment for every
12 individual that is brought into the jail who is
13 drunk?
14    MR. DE CARO: Object to foundation.
15 BY MR. CONDON:
16    Q. Are you aware of any?
17    **A. No.**
18    Q. How long have you been a correctional
19 officer?
20    **A. Almost 10 years.**
21    Q. Are you aware of any jail in the country
22 that provides medical treatment for every
23 individual who is brought into their jail who is
24 drunk?

Page 116

1    **A. No.**
2    Q. And then going to 701.140 section C(8)
3 that we talked about earlier referring to inmates
4 who are escape risks or suicidal, they are to be
5 checked more than every 30 minutes. Do you see
6 that?
7    **A. Yes.**
8    Q. And it also refers to mentally disturbed
9 or impaired inmates that they are to be checked
10 more than every 30 minutes, correct?
11    **A. Correct.**
12    Q. Does this provision say anything about
13 intoxicated inmates being checked more than every
14 30 minutes?
15    **A. No.**
16    Q. Are you aware of any provision within the
17 Illinois county jail standards that state that any
18 intoxicated or drunk individual that is brought
19 into the jail must immediately be taken for medical
20 treatment?
21    **A. No.**
22    MR. CONDON: That is all I have.
23
24

Page 117

1 EXAMINATION,
2    QUESTIONS BY MR. DE CARO:
3    Q. Prior to putting Kevin into the padded
4 cell, you didn't have a conversation with him,
5 correct?
6    **A. No.**
7    Q. Your physical assessment entailed viewing
8 him prior to putting him in the padded cell and
9 then viewing him again at 6:55 and he saying to you
10 get me out of here?
11    **A. Correct.**
12    Q. But the Illinois jail standards found on
13 701.40 of the admission procedures subparagraph I
14 requires you as part of your physical assessment
15 not to observe him but to question him.
16    No. 1 states the admitting officer which
17 you were shall observe the detainee for obvious
18 injuries or illnesses requiring immediate emergency
19 medical care, rashes, unusual cough, high
20 temperature, body pests and general mental status.
21    The officer shall determine by
22 questioning the detainee: A, has any medical
23 condition which requires medical attention such as
24 dependence on drugs or alcohol, diabetes, epilepsy,

## Page 118

1 allergies, asthma, heart condition, etc; B, has had
2 past treatment for mental disorders; C, has any
3 suicidal tendencies as determined by the use of an
4 approved screening instrument or history of medical
5 illness; D, is on medication; E, if female is
6 pregnant.
7      And when the detainee shows signs or
8 reports any unusual physical or mental distress he
9 or she will be referred to health care personnel as
10 soon as possible.
11      That is what is stated there in
12 subparagraph I?
13   A. Correct.
14   Q. But you did not question Kevin on any of
15 these criteria, did you?
16   A. Correct.
17   MR. DE CARO: Nothing else.
18
19 EXAMINATION,
20   QUESTIONS BY MR. CONDON:
21   Q. When you observed Kevin that morning, did
22 you observe any obvious injuries or illnesses which
23 you felt required Kevin get immediate medical
24 attention?

## Page 119

1   A. No.
2   Q. And you had dealt with Kevin on numerous
3 occasions in the past while he was in the jail,
4 correct?
5   A. Correct.
6   Q. And you were aware that he had asthma,
7 correct?
8   A. Correct.
9   Q. And when you observed Kevin that morning,
10 did you ever observe him having shortness of
11 breath?
12   A. No.
13   Q. Or wheezing?
14   A. No.
15   Q. And when you went and checked on him at
16 6:55, did he tell you he was having an asthma
17 attack?
18   A. No.
19   Q. Did he tell you he was having difficulty
20 breathing?
21   A. No.
22   Q. Under 1(b) it says has had past treatment
23 for mental disorders. Were you aware that Kevin
24 had ever been treated in the past for psychiatric

## Page 120

1 problems?
2   A. No.
3   Q. C refers to suicidal tendencies. During
4 your past interactions with Kevin in the jail, had
5 he ever threatened suicide?
6   A. I don't recall.
7   Q. Are you aware that he was ever on a
8 suicide watch?
9   A. No.
10   Q. When you dealt with him that morning, did
11 he ever say to you that he felt suicidal?
12   A. No.
13   Q. When you went back and saw him at 6:55,
14 did he tell you that he was on any medication?
15   A. No.
16   Q. And when you saw him and then talked to
17 him when you went back to the cell did Kevin seem
18 to be suffering from any unusual physical or mental
19 distress?
20   A. No.
21   MR. CONDON: That is all I have.
22   MR. DE CARO: I don't have anything.
23   MR. CONDON: We will reserve.
24

## Page 121

1
2 BUTLER,
3     Plaintiff,
4     vs.
5 VERMILION COUNTY SHERIFF, et al.,
6     Defendants.
7 This is to certify that I have read the
transcript of my deposition taken in the
above-entitled cause, and that the foregoing
8 transcript taken on August 5, 2005 accurately
states the questions asked and the answers given by
9 me, with the exception of the corrections noted, if
10 any, on the attached errata sheet(s).
11
12     MICHAEL SCHULL
13 Subscribed and Sworn before
14 me this ____ day of _____, 2005.
15 Notary Public
16
17
18
19
20
21
22
23
24

Page 122

1   STATE OF ILLINOIS      )
                            ) SS
2   COUNTY OF VERMILION )

3       I, BECKY L. JESSUP, CSR, RPR, a Notary Public
    in and for the County of Vermilion, State of
4   Illinois, do hereby certify that MICHAEL SCHULL,
    the deponent herein, was by me first duly sworn to
5   tell the truth, the whole truth and nothing but the
    truth in the aforementioned cause of action.
6       That the foregoing deposition was taken on
    behalf of the Plaintiff, on the 5th day of August,
7   2005.
        That said deposition was taken down in
8   stenograph notes and afterwards reduced to
    typewriting under my instruction; and that the
9   typewritten transcript is a true and accurate
    record of the testimony given by said deponent; and
10  that it was agreed by and between the witness and
    attorneys that said signature on said deposition
11  would not be waived.
        I do hereby certify that I am a disinterested
12  person in this cause of action; that I am not a
    relative or attorney of any of the parties, or
13  otherwise interested in the event of this cause of
    action, and am not in the employ of the attorneys
14  for either party.
        IN WITNESS WHEREOF, I have hereunto set my
15  hand and affixed my notarial seal this 16th day of
    August, 2005.

16

17

18       Becky L. Jessup, CSR, RPR
         Notary Public

19

20

21

22

23

24