E-FILED
Wednesday, 15 March, 2006  03:29:06 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF ILLINOIS

URBANA DIVISION


Lucille Butler, Individually, and as
Special Administrator of the Estate
of Kevin Lucas, Deceased,
    Plaintiff,

    vs                              No. 04-CV-2048

Vermilion County Sheriff Kenneth
O'Brien, et. al.,
    Defendants.


DISCOVERY DEPOSITION


        The discovery deposition of FRANK SPORCICH
was taken on behalf of the Plaintiff at the Vermilion
County Courthouse, Danville, Illinois, on June 28,
2005, before Susan M. Randolph, Certified Shorthand
Reporter of the State of Illinois.

                CSR #084-003240

        APPEARANCES:

        KUPETS & DE CARO, P.C.
        30 N. LaSalle Street, Suite 4020
        Chicago, Illinois  60602
        BY:  Mr. Dennis J. DeCaro
        Appearing for Plaintiff

        HERVAS, SOTOS, CONDON & BERSANI, P.C.
        333 Pierce Road
        Itasca, Illinois  60143
        BY:  Mr. Michael W. Condon
        Appearing for Defendants


COPY

EXHIBIT
7

Page 2

Page 4

1                FRANK SPORCICH

2 having been first duly sworn upon his oath testified

3 as follows:

4         EXAMINATION CONDUCTED

5         BY MR. DECARO:

6     Q. Officer, would you please state your full

7 name and spell your last name.

8     **A. Frank Sporcich, S-p-o-r-c-i-c-h.**

9     Q. Let the record reflect this is the

10 deposition of Frank Sporcich. I'm going to be asking

11 you a number of questions about May 10th, 2003

12 involving Kevin Lucas, and I'm his estate's attorney

13 and his mother's attorney, and she may be coming in in

14 a little bit.

15     Just a couple of ground rules. Mike

16 probably has told you you have to answer everything

17 verbally. If you nod, the court reporter can take

18 that down but when we read it we don't know whether

19 you nodded yes or no. The other thing is we should

20 try not to speak over one another and, it's just hard

21 for the court reporter to take it down, and also I

22 might be changing my, a question that you think I'm

23 going to ask and it just gets confusing. Other than

24 that, we will be fine. I'm just going --

Page 3

1           INDEX

2 Examination conducted by:

    Mr. DeCaro. . . . .Page 3, 73

3     Mr. Condon. . . . .Page 66

4 Also present: Lucille Butler

5

6

7          EXHIBITS

    No.    Description       Page

8  1    Statement              51

9  2     Answers to Interrogatories   55

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 5

1     MR. CONDON: Plus he is from Chicago so he

2 is a fast talker so you got to try and stay with him.

3     MR. DECARO: I was going to go through

4 some of your background. Have you ever given a civil

5 deposition like this before?

6     THE WITNESS: Yes.

7     Q. Okay. When was that? Or let me withdraw

8 that. How many have you given?

9     **A. Probably a few. I don't recall**

10 **specifically over the years.**

11     Q. Okay. When was the last one?

12     **A. Probably five to seven years ago.**

13     Q. Did it involve a complaint involving the

14 county sheriff's department?

15     **A. I know there has been one involving a**

16 **complaint.**

17     Q. Okay. Have others been, and I don't

18 really want to go into those, but I mean have they

19 been involving personal things, divorce, car accidents

20 of your own?

21     **A. No car accidents.**

22     Q. Okay. As a Vermilion County sheriff, have

23 you had an opportunity over the years to testify in

24 court against individuals you've arrested?

Page 6

1    A. Yes.
2    Q. Okay. Can you give me a ballpark figure
3 of about how many times you've done that over the
4 years?
5    A. Again, I've been a police officer for
6 twenty some years so probably in the hundreds but
7 that's just a guess.
8    Q. Okay. Why don't we start with some
9 parameters. When did you become a Vermilion County
10 police officer, county sheriff?
11    A. 1985.
12    Q. You are currently still a county sheriff?
13    A. Yes.
14    Q. And you rank of sergeant?
15    A. Yes.
16    Q. Prior to 1985, were you a police officer
17 or a sheriff anywhere else?
18    A. I've been a deputy sheriff in Champaign
19 County for a couple of years. I also worked with the
20 Vermilion County MEG unit which is a drug unit.
21    Q. Were those two prior to '85?
22    A. Yes.
23    Q. Okay. Why don't we -- I'm doing this
24 poorly. Let's start with your date of birth. What's

Page 7

1 your date of birth?
2    A. August 22nd, 1956.
3    Q. Okay. Do you reside here in Danville?
4    A. Oakwood.
5    Q. Oakwood. You would have graduated high
6 school around 1974 or so?
7    A. Correct.
8    Q. Okay. Did you go to college after that?
9    A. Yes.
10    Q. Where at?
11    A. Danville Area Community College and
12 Central Missouri State University.
13    Q. Did you receive a diploma from Central
14 Missouri?
15    A. Yes.
16    Q. And was it a bachelor of arts or science?
17    A. Bachelor of science.
18    Q. Okay. And what year was that?
19    A. 1978.
20    Q. Okay. Let's talk about your employment--
21 strike that. Was the bachelor of science the highest
22 level of education?
23    A. Yes.
24    Q. Okay. And what was your major?

Page 8

1    A. Criminal justice administration.
2    Q. Okay. So from 1978 until 1985, let's talk
3 about your employment starting with '78.
4    A. Okay. Directly out of college I worked
5 for Westinghouse Supply Company here in Danville. I
6 was 20 when I graduated. Then I worked for the
7 Rantoul Police Department for about a year in Rantoul,
8 Illinois. I then worked for the Vermilion County
9 Metropolitan Enforcement Group for about two years.
10 Went to the Champaign County Sheriff's Department for
11 two years. Kansas Bureau of Investigation for about a
12 year. And then moved back here and worked for the
13 Vermilion County MEG unit again until I was hired into
14 the sheriff's department in '85.
15    Q. Okay. Rantoul, tell me again what you did
16 there?
17    A. Patrolman.
18    Q. Okay. So did you have to get training
19 before becoming a patrolman?
20    A. Yes.
21    Q. Where did you have that training?
22    A. The Police Training Institute in Urbana.
23    Q. Okay. Did you ever have to subsequently
24 go back to, and we will call that PTI, did you ever

Page 9

1 have to go back there for any of these other jobs? Or
2 because you've had that training once does it
3 grandfather you into these other positions?
4    A. I was grandfathered in.
5    Q. Okay. What year were you at the training
6 institute?
7    A. Either '78 or '79.
8    Q. Have you been back there for any type of
9 continuing learning training?
10    A. I've had some classes there, yes.
11    Q. Okay. When was your last?
12    A. Years ago there. I don't recall the exact
13 date.
14    Q. Okay. And what were the years for
15 Rantoul? 1978, not 1978, you were at Westinghouse.
16 But when did you start --
17    A. I was only at Westinghouse for a few
18 months before I turned 21, so it could have been '78
19 or '79 and I was there for less than a year.
20    Q. Okay. And then you went to Vermilion
21 County Enforcement, was that the MEG?
22    A. MEG unit, yes.
23    Q. MEG unit. And how long were you there?
24    A. About two years.

## Page 10

1    Q. Okay. So from approximately '79 to '81?

2    **A. Probably.**

3    Q. Okay. Is there any additional, and the

4    MEG unit specializes in drug enforcement?

5    **A. Yes.**

6    Q. Okay. Any additional training to be a MEG

7    agent?

8    **A. I went to a two week DEA school, and also**

9    **I think there was a local school in Springfield about**

10   **a week.**

11   Q. Okay. In that training, was there any

12   training on recognizing how a person on narcotics

13   would be acting or that's really not a concern?

14   **A. It was more focused on covert activities**

15   **and surveillance and that type of thing.**

16   Q. Okay. Have you had any training anywhere

17   over your years in recognition of someone who is on

18   narcotics, what their behaviors would be?

19   **A. Not formal I don't believe, no.**

20   Q. Okay. Do you think over the years you've

21   come to learn that through your experience?

22   **A. To some degree.**

23       MR. CONDON: Just for clarification, when

24   you say narcotics, you don't mean alcohol?

## Page 11

1        MR. DECARO: No, I'm just going to ask him

2    about that. And I'm assuming you are trained in him

3    because of DUI's, in recognition of behaviors of

4    someone who has consumed too much alcohol?

5        THE WITNESS: Yes.

6    Q. Where and when were you trained in that?

7    **A. Probably the most recent was within the**

8    **last year, maybe year and a half, and that would have**

9    **been through the East Central Illinois Training**

10   **Project in Champaign.**

11   Q. Okay. And how about prior to that? Would

12   it have been back in FTI?

13   **A. Probably really anything formal, yes.**

14   Q. Okay. Let's go back to your most recent

15   training. What are the things you are trained to look

16   for for somebody who has ingested over the legal limit

17   of alcohol? What are the characteristics you might

18   find?

19       THE WITNESS: Bloodshot eyes, slurred

20   speech, poor balance.

21   Q. Falling down?

22   **A. Yes.**

23   Q. Anything else?

24   **A. Those are the ones that in the forefront**

## Page 12

1    come to mind.

2    Q. Okay. And in Vermilion County how is a

3    person who you believe has consumed too much alcohol,

4    how are they tested in the field? Is it, what type of

5    Breathalyzer do you use?

6    **A. I don't carry one with me.**

7    Q. Okay. So how, what would occur if you

8    pulled over somebody suspected of a DUI? Do you bring

9    them back to a building to be tested?

10   **A. For the actual breath test, yes.**

11   Q. Okay. And what building would that be?

12   **A. The Public Safety Building.**

13   Q. And what type of machinery do they have

14   there to test?

15   **A. I don't, I'm not trained in the machinery**

16   **so I don't know the name --**

17   Q. Okay. So why don't you --

18   **A. -- of the machinery or the model.**

19   Q. Sorry for cutting you off. Why don't you

20   tell me what happens when you bring somebody back who

21   you suspect is drunk?

22   **A. Once they have been placed under arrest**

23   **and they are taken to the PSB booking area, if they**

24   **haven't been read the warning to motorist on the scene**

## Page 13

1    **they are read it there. If they agree to take the**

2    **test, then an operator is called to the book-in area**

3    **to perform the test.**

4    Q. Okay. And at the Public Safety Building

5    do they take, do they actually take your blood or do

6    they use a Breathalyzer if you know?

7    **A. Breathalyzer.**

8    Q. Okay. And is it just merely blowing into

9    a tube or something like that?

10   **A. Yes.**

11   Q. Okay. And the results are fairly quick?

12   **A. Yes.**

13   Q. And then after the Vermilion County MEG

14   you went to Champaign County?

15   **A. Yes.**

16   Q. As a police officer?

17   **A. Yes, deputy sheriff.**

18   Q. Okay. And what years or year was that?

19   **A. From '80 to '81 probably to '83.**

20   **Somewhere in there.**

21   Q. Okay. And basically the same duties as

22   you have in Vermilion County as a sheriff?

23   **A. Yes.**

24   Q. Other than now you are a Sergeant. Then

Page 14

1  you went to Kansas, and I didn't get what the official
2  title of that was?
3      A. I was a special agent with the Kansas
4  Bureau of Investigation in narcotics.
5      Q. Again was that similar-- strike that.  Did
6  you have to take additional training to become a
7  special agent?
8      A. Yes, they had their own school.
9      Q. And was that similar training as the MEG
10 training?
11     A. Yes.  It was just a little bit more
12 intensified.
13     Q. Okay.  And that was, it's more, your
14 training is more in investigative techniques as
15 opposed to like I asked you before determining a
16 person's behavior?
17     A. Correct.
18     Q. And then would that take us up to
19 Vermilion County, 1985?
20     A. Yes.  When I first moved back from Kansas,
21 I did work for the MEG unit again until I was hired
22 into the sheriff's department.
23     Q. Okay.  And you were hired in 1985 into the
24 sheriff's department?

Page 15

1      A. Yes, in March.
2      Q. Okay.  And how long were you a sheriff
3  before becoming a Sergeant?
4      A. About six years.
5      Q. Okay.  So you became a Sergeant in
6  approximately 1991?
7      A. Right.
8      Q. And what additional duties as Sergeant do
9  you have as opposed to just being a sheriff?
10     A. Not a whole lot of difference here.  Just
11 in charge of the shift.
12     Q. Okay.  And what does that mean?  Do you
13 keep track of where the sheriffs are or do you need to
14 be there for their arrests or what does that mean?
15     A. We are still assigned an area, work an
16 area just like the deputies, if there is a
17 decision to be made we make it but that doesn't happen
18 really a whole lot here.
19     Q. Okay.  Do the sheriffs, they can determine
20 whether to arrest somebody on their own without
21 contacting you and running the facts past you?
22     A. Yes.
23     Q. And we previously have taken the
24 deposition of former Sheriff O'Brien who made the

Page 16

1  arrest in this case.  And this was May of '03.  How
2  long had he been on your shift prior to May 10th of
3  '03?
4      A. I'm guessing, he hadn't been on real long.
5  I'm guessing maybe a year.
6      Q. And you were in charge of the third shift?
7      A. Yes.
8      Q. How long had you been, prior to May of
9  '03, been in charge of the third shift?
10     A. Since '91.
11     Q. Okay.  So that was your shift and you
12 pretty much worked the third shift all the time?
13     A. Unfortunately.
14     Q. Do you, as the Sergeant, would you conduct
15 any training seminars?
16     A. No.
17     Q. As Sergeant, do you have -- strike that.
18 Your duties as a county sheriff are distinct and
19 separate from the correctional officer's duties?
20     A. Yes.
21     Q. Okay.  So do any duties overlap between
22 those two departments?
23     A. Not, I would say no.
24     Q. Okay.  Is there a formal policy or

Page 17

1  regulation that I could look at that would tell me
2  when a county sheriff's responsibility over a prisoner
3  ends and when the correctional officers begins or is
4  that just common sense?
5      A. I don't know if I call it common sense or
6  common policy.  I don't know if it's in writing
7  specifically, but in generality once they reach the
8  book-in area they are turned over to the correctional
9  personnel.
10     Q. And as you sit here today you can't think
11 of a, something in writing that tells us that?
12     A. Not in the deputy's policy manual that I'm
13 aware of.  I'm not saying it's not there.  I just
14 don't recall it.
15     Q. Okay.  Would I be correct that Sheriff
16 Hartschorn is the sheriff for both the county sheriff
17 and the correctional officers?
18     A. Yes.
19     Q. Had, prior to May 10th, 2003, had you ever
20 arrested or seen Kevin Lucas in the jail?
21     A. Not to my knowledge.
22     Q. Okay.  Would you have occasion, prior to
23 May of '03, to be in the jail for any reason other
24 than dropping off a prisoner?

Page 18

1    A. No.
2    Q. Okay. Are your, the county sheriff's
3 offices in that same building?
4    A. Yes.
5    Q. And what floor are they on?
6    A. We are on the first floor, the main
7 offices.
8    Q. Okay. And the jail is where?
9    A. The book-in is on the lower level and then
10 the cells are on the third and fourth level.
11    Q. Okay. And you typically would have no
12 reason to go to the third or fourth level cells for
13 any reason?
14    A. No.
15    Q. Okay. Would the prisoners for any reason
16 have to come through the county sheriff's area if they
17 are going from book-in to the third or fourth floor?
18 Do they take stairs? Do they take a common elevator?
19    A. Normally there is a sallyport where you
20 pull into the lower level and then they, they are
21 either kept in book-in or taken to the upper level,
22 excuse me, by elevator. At that particular time of
23 Lucas' arrest they were under construction so we used
24 the front door and went through the main lobby so that

Page 19

1 would be the only time during that time period that
2 they had access to that area.
3    Q. Okay. Let's go through, what I want to do
4 is just run through from what your recollection is and
5 then we will go through your statement. Do you know
6 how you first learned of this call?
7    A. Over the police radio.
8    Q. Okay. Do you remember what the dispatcher
9 said?
10    A. It involved, I think, a black male
11 knocking or banging on a door asking for help or
12 saying he was being kidnapped or something like that.
13    Q. Okay. And from -- strike that. Was this
14 occurring in your section where you were working that
15 night?
16    A. I really don't recall what section I was
17 assigned to that night.
18    Q. How many sections are there in Danville?
19    A. Well the county is generally divided up
20 into two.
21    Q. Okay.
22    A. So it's either the north or the south.
23    Q. Okay. And how many sheriffs would be
24 working in a section?

Page 20

1    A. At that time of the morning three, four at
2 the most usually.
3    Q. So it's not unusual for more than one
4 sheriff to respond to a call, it just depends on your
5 location?
6    A. Right.
7    Q. Okay. And when a dispatcher puts out a
8 call how does the sheriff determine whether they are
9 one, one of the sheriffs that needs to respond?
10    A. Typically when a call is put out then they
11 will usually give it to the area car first and he will
12 respond. When he responds on the radio, he will give
13 him location. If someone is closer than him, then
14 they speak up and respond first or respond also.
15    Q. Okay. In this case, apparently the
16 closest sheriff was Sheriff O'Brien?
17    A. Yes.
18    Q. Okay. Did, and you also responded at some
19 point?
20    A. When there was an indication he needed
21 some assistance, yes.
22    Q. Okay. And that's what I want to ask. Did
23 he, did he call you and say I need assistance
24 specifically or did he just put out a general call for

Page 21

1 assistance?
2    A. As I remember, there was a neighbor or
3 something in the area that had called into 911 that
4 said there is a deputy out here that needs some help.
5    Q. Okay. Do you know, and at that point you
6 decided you were going to go and assist?
7    A. Yes.
8    Q. Okay. Do you know from that point when
9 that second call came in saying the officer needs help
10 how long it took you to get there?
11    A. I was just west of Danville on the west
12 side of Danville, so probably no more than five
13 minutes.
14    Q. So you arrive. What is the first thing
15 you see when you arrive?
16    A. Deputy O'Brien had a black male
17 handcuffed. He was trying to secure him against the
18 side of his squad car. He was struggling to get free
19 or to break loose.
20    Q. And this occurred about what time in the
21 morning?
22    A. I know it was toward the end of the shift.
23 6 to 6:30 I'm guessing without looking at the report.
24    Q. Do you know if you had your lights and

Page 22

1 sirens on or would you go with just your lights
2 because of the hour or --
3     A. Probably due to light traffic, just
4 lights.
5     Q. Now when you said Officer O'Brien had, we
6 will assume it's Kevin, I will say Kevin on the side
7 of his car, was Kevin facing the car or was he, did he
8 have his back to the car if you know?
9     A. As I remember, he was facing the car with
10 his back to Deputy O'Brien generally.
11     Q. And was Kevin handcuffed at that time?
12     A. Yes.
13     Q. Okay. And when you say he was struggling,
14 what do you mean? What was Kevin, what were his
15 actions? What was he doing that led you to that
16 conclusion?
17     A. He was trying to pull away or push off of
18 Deputy O'Brien and get free.
19     Q. Okay. And what did you do then when you
20 pulled up?
21     A. I just went to their location and helped
22 try to hold on to Mr. Lucas.
23     Q. Okay. And were you able to control him on
24 the side of the car?

Page 23

1     A. No. We ultimately placed him on the
2 ground and Deputy O'Brien got the door of the squad
3 car open and we picked him up and put him back in the
4 squad car.
5     Q. Okay. When you first got there, can you
6 tell me if you recall what clothing Kevin had on?
7     A. All I can recall specifically is that his
8 pants had fallen down and he had boxers and,
9 apparently the pants were baggy with no belt and they
10 had fallen down.
11     Q. Do you recall if he had a shirt on at that
12 time?
13     A. I don't recall him not having a shirt on.
14 I think that would have stood out so I'm guessing that
15 he did.
16     Q. While you were at the scene, did you ever
17 see Kevin holding an inhaler that asthmatics have?
18     A. No.
19     Q. Did you ever see an inhaler on the ground
20 in the area of the police car?
21     A. No.
22     Q. Did anyone ever tell you at any time on
23 the 10th that knew Kevin and that he was, had asthma?
24     A. No.

Page 24

1     Q. Okay. At any point while you were at
2 the -- this is a trailer lot on Griffin?
3     A. Yes.
4     Q. With three or four trailers on it?
5     A. Just a few, yes.
6     Q. Okay. At any time when you were at the
7 trailer lot, did you see Officer O'Brien with his knee
8 on Kevin's back while Kevin was on the ground?
9     A. No.
10     Q. While Officer O'Brien went to open his car
11 door, did you have to put your knee on Kevin's back
12 while he was on the ground to keep Kevin down on the
13 ground?
14     A. I could have my knee or my shin of my leg
15 across like his butt area to help secure him.
16     Q. Okay. Do you recall doing that?
17     A. Yeah. I mean I recall holding him down
18 and securing him to the ground, yes.
19     Q. While Officer O'Brien went to open his
20 door, did you have any conversation with Kevin?
21     A. No.
22     Q. Okay. Did you ever have any conversation
23 with Kevin that morning prior to leaving the padded
24 cell?

Page 25

1     A. No exchange. I mean I'm not saying he
2 wasn't talking or didn't say anything but I don't
3 recall any specifics, no.
4     Q. All right. Did you ever give him any
5 commands that morning that he did not follow or was
6 unresponsive to?
7     A. I don't think I gave him any specific
8 commands.
9     Q. Okay. How long did it take Officer
10 O'Brien to open his doors and get back to where you
11 were?
12     A. A matter of seconds.
13     Q. Okay. And then what did you do, you and
14 Officer O'Brien do?
15     A. Lifted him up, I think each more or less
16 helped under one arm and guided him to the rear seat
17 of the squad car.
18     Q. Okay. How did Kevin get into the squad
19 car? Did you put him in head first, feet first or did
20 he just get in like a person would get in a car?
21     A. I don't recall anything out of the
22 ordinary but I don't really recall.
23     Q. Okay. Do you know, do you recall if at
24 that point Kevin was bleeding from any area of his

Page 26

1 body?
2    A. No.
3    Q. Okay. Do you recall if Kevin had saliva
4 or a film around his mouth at that time?
5    A. I don't recall it, no.
6    Q. Okay. Did you hear Kevin speaking at all
7 at the trailer lot? I think you said you may have
8 heard him but we didn't determine where that was at.
9    A. Again, he was talking, I think, but I
10 don't recall specifically what he was saying.
11    Q. Okay. When he was talking, was he, was he
12 coherent or was he mumbling?
13    A. Again, I don't recall.
14    Q. Okay. Did you, while you were responding
15 to the call, did you ever have any conversation with
16 Officer O'Brien regarding what was going on at the
17 scene?
18    A. I don't think there was any radio
19 conversation between he and I at that time, no.
20    Q. When you got to the scene and were
21 restraining Kevin and then put him in the car, did you
22 have any idea why Kevin was handcuffed and being put
23 in the car?
24    A. I assumed it was disorderly conduct based

Page 27

1 on what I had heard before I got there.
2    Q. Okay. So Kevin gets in the car. Do you
3 know how he is in the car? Is he seated in the back
4 seat or is he laying on the back seat?
5    A. I think he was seated.
6    Q. Then what happens?
7    A. Deputy O'Brien transported him to the
8 Public Safety Building. I followed. And I helped him
9 in the front door. I think correctional officers had
10 been called to help because he had been, for lack of a
11 better word, combative and he was ultimately taken to
12 the lower level.
13    Q. Okay. How long did it take to get from
14 701 Griffin to the Public Safety Building?
15    A. Maybe three to five minutes I'm guessing.
16    Q. Okay. And I don't know would you, was
17 there any need for lights and sirens or anything at
18 that point or you were just driving normally?
19    A. Just drive normally.
20    Q. Okay. Any communication between you and
21 anyone regarding this arrest from, while you were
22 driving from the trailer lot to the Public Safety
23 Building?
24    A. I don't believe so.

Page 28

1    Q. Okay. Did you call the Public Safety
2 Building for any reason to tell the correctional
3 officers that you were bringing someone in or anything
4 like that?
5    A. I believe Deputy O'Brien did.
6    Q. Okay. When you get to the Public Safety
7 Building, you said there was some construction going
8 on so you went to the front door?
9    A. Right.
10    Q. Okay. And you said you helped Kevin into
11 the building, how did he actually get in? Did he walk
12 and you were assisting him by his arms or holding him
13 or letting him walk on his own or did you carry him?
14    A. I would say it was more of assisting him.
15 Each of us took an arm or reached under an arm. I
16 think Deputy O'Brien was probably on his left and me
17 on his right.
18    Q. Okay. Was Kevin able to walk in the
19 building on his own?
20    A. I don't remember.
21    Q. Okay. Was Kevin saying anything as you
22 walked him into the building?
23    A. I don't remember one way or the other.
24    Q. Okay. As you were walking him into the

Page 29

1 building, could you smell alcohol coming off of Kevin?
2    A. Again, I think I would be guessing at this
3 point to say that I did or didn't.
4    Q. Okay. At any point did you -- strike
5 that. Did Officer Reynolds come out and assist you in
6 any way while you were outside the PSB building?
7    A. I think he met us outside.
8    Q. Okay. Did he help you -- strike that.
9 Did he have to touch Kevin for any reason outside?
10    A. I don't think so.
11    Q. Okay. And then you go inside and you, do
12 you immediately get, go up to the elevator and press
13 the button to go down or --
14    A. Right. I think there were work release
15 prisoners coming in at that time also and we may have
16 went to an upper floor and not go off and then rode
17 the elevator back down.
18    Q. Right. Do you know when you initially get
19 on the elevator who is on the elevator with you and
20 Officer O'Brien and Kevin? Was anybody else with you?
21    A. There may have been some work release
22 prisoners, Sergeant Reynolds and I'm thinking
23 Correctional Officer Watkins.
24    Q. When you are in the elevator with Kevin,

Page 30

1 is Kevin facing a wall or is he facing the door of the
2 elevator or turned sideways or --
3       A. I know he was, began struggling again and
4 at some point on the elevator Deputy O'Brien just more
5 or less secured him against the side of the wall or
6 leaned into him to try and hold him from turning
7 around in the elevator.
8       Q. Okay. Did he have to do that forcefully?
9       A. I would call it mild force. I mean it was
10 just a matter of leverage more than anything as I
11 recall.
12      Q. Okay. And I think from your statement the
13 elevator did not go directly to booking. You actually
14 had to go to three or four and then went back down to
15 booking; is that your recollection?
16      A. Right.
17      Q. Okay. And where would the work release
18 inmates have gotten on, on three or four, and then
19 gone down to one and gotten off?
20      A. Again, I don't remember if there was some
21 coming in that had been working during the night and
22 getting on the elevator and returning or if there was
23 some actually that they were going up to pick up. I
24 just remember that we had to make that trip.

Page 31

1       Q. Okay. Do you know where the work release
2 inmates gather when they go into the -- strike that.
3 Maybe I don't understand it. Are the work release
4 people, we are talking about people who are inmates
5 who get to leave for the day and then come back?
6       A. Or whatever their shift may be. Some, I
7 think, leave during the night even if they work the
8 night shift.
9       Q. Okay. So you get Kevin down into booking.
10 Is there an officer in booking when you get there?
11      A. There normally is but I don't know what
12 Sergeant Reynolds had been working book-in. I don't
13 recall specifically what officers were down there when
14 we arrived.
15      Q. Okay. Do you have any idea what time it
16 is at this point when you are in booking?
17      A. I'm thinking getting close to 7 in the
18 morning but I don't know exactly.
19      Q. Okay. Do you recall whether you got off
20 your shift late that day, meaning -- strike that.
21 Your shift ended at 7 that day?
22      A. Right.
23      Q. Do you know whether you got off at 7 that
24 day or if you got off afterwards?

Page 32

1       A. It was probably pretty close to 7 as I
2 remember.
3       Q. Okay. So when you get to booking, what do
4 you do?
5       A. I think I went in the control room
6 initially and then I think there was some problems
7 with Mr. Lucas complying with what he was told to do
8 and the decision was made by Sergeant Reynolds, I'm
9 assuming, who would have been in charge at that point,
10 to go ahead and place him in the padded cell.
11      Q. Well you said you went into the control
12 room, what is the control room?
13      A. It's adjacent to the book-in area. It's
14 just an office area where all the cell doors and
15 stuff, excuse me, on that level are.
16      Q. Do they have, back in May of '03, any
17 monitoring, you know, like TV's that they could
18 monitor via video of the cell doors or anything like
19 that?
20      A. I really don't know. We have monitors but
21 a correctional officer would be better to answer that.
22      Q. Sure. Was anybody in the control room
23 when you went in there?
24      A. I'm sure there was but I don't recall who.

Page 33

1       Q. And that control room is on the same floor
2 as where booking is?
3       A. It's right next to it, yes.
4       Q. And that room controls what, the holding
5 cells and the cells on the booking level?
6       A. Yes.
7       Q. Okay. They don't control what's going on
8 on the third or fourth floor?
9       A. I don't think there is any way of doing
10 that from there. Again, I have never worked that area
11 so I really don't know.
12      Q. Why did you go in the control room, sir?
13      A. Just, just there, you know. There was no
14 reason to go there other than just to wait to leave.
15      Q. Okay. And then where did Kevin go? When
16 you went in the control room, do you know where he
17 went?
18      A. Immediately outside there is a bench area
19 there and, where they take their personals and that
20 type of thing and --
21      Q. And was Sheriff O'Brien with Kevin at that
22 point?
23      A. He would have been in the immediate
24 vicinity. I don't really recall where he was in

Page 34

1 **proximity to him.**
2    Q. Okay. And Kevin is still handcuffed at
3 this point?
4    **A. Yes.**
5    Q. At what point do you come out of the
6 control room? What's going on when you come out of
7 the control room?
8    **A. There was just a problem with him**
9 **complying with doing, or the instructions or whatever**
10 **he was being told to do by the correctional officer or**
11 **Deputy O'Brien, I'm not sure who. The decision was**
12 **made to go ahead and place him in the cell due to him**
13 **still being combative.**
14    Q. Now is that something you overhear or
15 something you see when you come out or can you see a
16 problem from the control room?
17    **A. You can see it. I mean it's all glass and**
18 **so --**
19    Q. Okay. And what do you see? What are you,
20 you are telling me there was a problem but what was
21 the problem? What was going on?
22    **A. Again specifics I just, I think he**
23 **wouldn't remain seated when he was told to. He was**
24 **pulling away when they were trying to control him.**

Page 35

1 **That type of thing. There may have been some yelling.**
2 **I don't, and again I'm guessing to some degree.**
3    Q. And so at some point you leave the control
4 room and go over to where they are all at?
5    **A. Right.**
6    Q. Okay. And so when you reach where Kevin
7 is has the decision already been made to put him in a
8 padded cell or is it made about the time you get there
9 or after you get there?
10    **A. As I remember, it was already made.**
11    Q. Okay. How much time elapsed from you
12 going into the control room till you went back to
13 where Kevin was seated?
14    **A. Like I said, the control room, we are**
15 **talking five feet. I mean you just walk out the door**
16 **type of thing.**
17    Q. Okay. How long were you in there before
18 you, did you just walk in and walk right back out?
19 Did you stay in there for any period of time?
20    **A. I don't think there was any period of time**
21 **that elapsed, no.**
22    Q. Okay. And did you hear Sergeant Reynolds
23 say let's put him in a padded cell or how do you--
24 strike that. Did you hear Sergeant Reynolds say that,

Page 36

1 let's put him in a padded cell?
2    **A. I don't recall him saying those words. I**
3 **just know that that decision had been made and I don't**
4 **recall how I knew it.**
5    Q. Okay. So my understanding is you assisted
6 Officer O'Brien to bring Kevin to the padded cell?
7    **A. Right. And Sergeant Reynolds was there**
8 **also and another correctional officer.**
9    Q. Right. But how did you know that that's
10 where you were bringing him? Did someone tell you we
11 are putting him in a padded cell?
12    **A. I know it was said but I don't, you know,**
13 **know who told me. I mean I don't recall.**
14    Q. Okay. And again if you could just tell me
15 in minutes or seconds from the time you get down to
16 the book-in area how much time elapsed before you
17 start walking Kevin to the padded cell?
18    **A. Again, I'm just guessing a matter of less**
19 **than three minutes since we arrived. And again that's**
20 **just a guess.**
21    Q. Okay. While you were down there prior to
22 bringing Kevin to the padded cell, did you see or
23 overhear Sergeant Reynolds have any conversation with
24 Kevin?

Page 37

1    A. No.
2    Q. Were you close enough that if Sergeant
3 Reynolds had a conversation with Kevin you would have
4 heard it?
5    A. If I had been paying attention to that,
6 but I don't know that, you know, that would have drawn
7 my attention until we took him back to the cell.
8    Q. Did you see or overhear the other, I think
9 Officer Schull, and let's assume that's his name, have
10 any conversation with Kevin prior to taking Kevin to
11 the padded cell?
12    A. I don't recall it, no.
13    Q. Okay.
14    MR. CONDON: It's Schull.
15    MR. DECARO: Schull, sorry. I keep saying
16 Schull. In your 18 years as a Vermilion County
17 sheriff, how many arrestees of yours were placed
18 initially in a padded cell?
19    THE WITNESS: I'm guessing over those
20 years maybe, maybe ten, you know, if it came to that.
21    Q. And what's typically the reason for
22 putting an arrestee in a padded cell as opposed to any
23 other type of cell?
24    A. If they are combative, and again this is

Page 38

1 something better answered by a correctional officer,
2 but there is a risk of them hurting themselves, if
3 they are fighting around and flailing around where,
4 they are placed there where they are less otherwise to
5 harm themselves.
6     Q. From the control room, I just want to nail
7 down what actions you saw Kevin doing. Did you see
8 him standing up from the bench?
9     A. Again, I don't recall specifics. I just
10 know there was a problem and that decision was made to
11 place him in a padded cell.
12     Q. Okay. But you don't know specifically
13 what actions led to that decision? What actions by
14 Kevin led to that decision?
15     A. Not today I don't remember, no.
16     Q. Okay. How is Kevin taken to the padded
17 cell? Who assists him and how do they assist him?
18     A. Deputy O'Brien, myself, I think Sergeant
19 Reynolds and Correctional Officer Schull, and as I
20 recall he was just more or less taken arm to arm,
21 someone took each arm and was walked down it's like a
22 corridor, probably about 20 to 30 feet, slight turn
23 and padded cell is there.
24     Q. Okay. Once, was Kevin resisting walking

Page 39

1 to the cell?
2     A. I think he, as I recall again, had to be
3 guided to say the least but I don't, I can't recall
4 any specifics again.
5     Q. Okay. Was anyone having any conversation
6 with Kevin from the booking area as they walked to the
7 padded cell?
8     A. I don't recall.
9     Q. Do you recall whether Sergeant Reynolds
10 recognized Kevin?
11     A. I think after the fact that there might
12 have been discussion that he had been there before and
13 knew him by name. He may have called him by name on
14 the elevator but --
15     Q. Okay. Was there anything about the way
16 Kevin was acting from when you first saw him at the
17 trailer lot up to this point where he is walking to
18 the padded cell in your mind that he was acting
19 unusual?
20     A. I assumed he was under the influence of
21 alcohol at the time.
22     Q. Okay. And what led you to that
23 assumption?
24     A. Just based on the slurred speech, the

Page 40

1 excitability, the way he was refusing to be reasonable
2 I guess.
3     Q. Okay. And let's talk about that. What
4 did he do, in your opinion, that was unreasonable?
5 You said he was being unreasonable, wasn't being
6 reasonable. What was he doing that was unreasonable?
7     A. Well the initial call of banging on doors
8 and waking people up and appeared to be asking for
9 help that there was no justifiable reason that he
10 needed it.
11     Q. Did you ever have a conversation or
12 attempt to ask Kevin who was trying to kidnap him and
13 why they were trying to kidnap him? Anything like
14 that?
15     A. No.
16     Q. Did it seem unreasonable to you that
17 someone would be banging on doors at 6:30 in the
18 morning saying someone is trying to kidnap me?
19     A. Yes.
20     Q. And you said he was excitable. What types
21 of things was he doing that led you to that conclusion
22 that he was excitable?
23     A. Again, I don't recall. I recall him
24 yelling at points, struggling, just not listening to

Page 41

1 Deputy O'Brien's instructions.
2     Q. And you said he had slurred speech. Where
3 and when was it that you heard him speaking?
4     A. I think he was talking on the elevator
5 going up and down. That's probably the most I heard
6 him talking as I can remember.
7     Q. Do you remember anything he said?
8     A. No.
9     Q. Okay. Based on those facts that he had
10 slurred speech, was excitable and was, conduct was
11 unreasonable for the time of day and what he was
12 telling people, did it ever cross your mind that he
13 might need some type of medical attention?
14     A. No.
15     Q. If he did need medical attention, that's
16 something, would you have the authority to just drive
17 him to the hospital as opposed to bringing him to the
18 Public Safety Building?
19     A. Yes.
20     Q. Okay. We get him to the padded cell, who
21 is initially in the padded cell with Kevin?
22     A. Myself, Sergeant Reynolds, Deputy O'Brien
23 and Correctional Officer Mike Schull.
24     Q. And how is Kevin placed into the cell? Do

## Page 42

1  you just walk him in there and leave him alone or is
2  he put down on the ground?  Is he up against the wall?
3      A. He was put down on the floor.  He was
4  still handcuffed at that time.
5      Q. Okay.  And when he was initially, so
6  initially when he goes into the cell he is put down on
7  the floor?
8      A. Yes.
9      Q. Do you know if the floor is padded or it's
10 just the walls?
11     A. I'm not sure.
12     Q. Where are you positioned in relationship
13 to Kevin while he is on the floor?
14     A. I don't recall specifically where I was at
15 once we went in there.
16     Q. Okay.  Do you know where Officer O'Brien
17 was?
18     A. I'm thinking around his upper torso some
19 place but again I'm not exactly sure.
20     Q. And he was, Kevin was positioned that way
21 to get his handcuffs off?
22     A. Yes.
23     Q. Who is attempting to get his handcuffs
24 off?

## Page 43

1      A. Initially I think Deputy O'Brien was.  I
2  don't know if one of the cuffs were turned wrong or
3  Deputy O'Brien was at a bad angle to get a key in.  I
4  think he ultimately gave his keys to Officer Schull
5  who I think got the last one off of the last hand out.
6      Q. What is officer or Sheriff Reynolds doing
7  during this period?
8      A. I don't remember.  He was there but I
9  don't remember.
10     Q. Was any, did you ever see any of the
11 officers sitting on Kevin's torso area above his
12 buttocks?
13     A. I don't know if they were sitting.  They
14 would have been over that area of his body but I don't
15 know if they were sitting.
16     Q. Is that an area that you would be trained
17 to apply pressure to keep someone down?
18     A. Yes.
19     Q. Also the shoulder area?
20     A. Yes.  I mean if they are trying to hold
21 him down, yes.
22     Q. Did you see anyone holding Kevin's legs?
23     A. I don't recall.  I assumed someone was, or
24 controlling him since he had been struggling, but I

## Page 44

1  don't recall who was doing what.
2      Q. Do you remember if Kevin was kicking while
3  he was on the ground?
4      A. I think he was struggling and trying to
5  move about.
6      Q. Was Kevin -- strike that.  How long of a
7  period are we talking about that Kevin is on the
8  ground while the officers are trying to take off the
9  handcuffs?  How long does it take them to get the
10 cuffs off?
11     A. I'm guessing less than a minute.
12     Q. Is Kevin saying anything during that
13 period or moaning or --
14     A. I believe he was talking but I don't
15 recall what he was saying.
16     Q. Was his speech slurred at that time?
17     A. I don't remember.
18     Q. What happens after the handcuffs are taken
19 off?
20     A. His pants and shoes were taken, I think,
21 and we left the padded cell.  It was secured.
22     Q. Okay.  And then someone closed the door?
23     A. Yes.
24     Q. Okay.  Did you ever see Officer O'Brien

## Page 45

1  search Kevin at any time that morning?
2      A. No.
3      Q. Did you ever search Kevin that morning?
4      A. No.
5      Q. Did you ever see Officer Reynolds search
6  Kevin that morning?
7      A. No.
8      Q. Did you ever see Officer Schull search him
9  that morning?
10     A. No.
11     Q. I'm assuming as an officer for 20 years
12 now you've, even longer than that, you've searched
13 hundreds of people?
14     A. Probably.
15     Q. Okay.  And you were trained on how to
16 properly search someone?
17     A. Yes.
18     Q. Okay.  Can you tell us the proper way to
19 search someone?  Are there certain areas you search or
20 do you search every area of the body?
21     MR. CONDON:  Just for clarification
22 purposes, are you talking about someone they arrest at
23 the scene or --
24     MR. DECARO:  Yes, someone under arrest.

Page 46

1    MR. CONDON: You are not talking about a
2 strip search?
3        MR. DECARO: Right. Someone under arrest
4 at a scene what would be the proper search?
5        THE WITNESS: At the scene I'm generally
6 searching just for any weapon or something that might
7 harm me so it's a pat-down over the outside of the
8 clothes.
9    Q. Okay. What about, do you ever search the
10 shoes and the sock area?
11    A. Again just a pat-down on top of them, yes.
12    Q. Okay. Is there a different search for
13 prisoners who are about to enter a cell?
14    A. Again, I don't conduct those type of
15 searches but I would assume there would be.
16    Q. Okay. Is there a rule or regulation that
17 was in effect in May of 2003 that required, in
18 Vermilion County, that required that all persons
19 arrested be searched by the arresting officer?
20    A. Without looking at the policy manual, I
21 wouldn't know if there is a specific rule or not.
22    Q. Okay. Is that something in your practice
23 as an officer that you did when you arrested people,
24 that you would search them?

Page 47

1    A. For weapons, yes.
2    Q. Okay. Well what about for narcotics and
3 things like that. If you were going to arrest them,
4 then wouldn't you want to find out whether they had a
5 bag of cocaine, you know, in their shoe or something
6 like that?
7    A. Generally that's done once we reach the
8 jail or a more thorough search is done then.
9    Q. Are there circumstances -- strike that.
10 So you are not aware of whether there is a policy or
11 procedure requiring a search?
12        MR. CONDON: You talking about a
13 written policy?
14        MR. DECARO: Right, a written policy.
15        THE WITNESS: Again, I would have to look
16 through the manual to see if there is something
17 specifically that addresses that. I don't know that
18 there is.
19    Q. Okay. And if there wasn't, have you been
20 trained that you should search every arrestee in the
21 field?
22    A. Yes.
23    Q. Okay. Are there exceptions as to
24 individuals that you don't need to search from your

Page 48

1 experience?
2    A. I wouldn't say there is exceptions to ones
3 you don't need to, no.
4    Q. Well in this case, I mean you observed
5 Kevin beginning very shortly after he was handcuffed,
6 would there have been any reason in this case that
7 Kevin would not have been searched?
8    A. Again this is, in looking back, but as I
9 said his pants were down when I arrived on the scene.
10 My concern at that point would have been for a weapon.
11 It was pretty apparent he had no weapons on him so --
12    Q. Okay. Did you ever think that this guy
13 might have ingested a narcotic?
14    A. I didn't give it any thought, a specific
15 thought at the time. I mean I knew he wasn't, in my
16 opinion, acting normal.
17    Q. And you attributed his actions solely to
18 alcohol consumption?
19    A. I really didn't know at the time. That
20 was my best guess again.
21    Q. Okay. After you left the padded cell,
22 what did you do?
23    A. I think I stopped back in the control room
24 and had to make a call and, telephone call and then

Page 49

1 left.
2    Q. Okay. Do you know what Officer O'Brien
3 did? Could you see him?
4    A. I don't remember.
5    Q. Is that, is that the extent of your
6 interaction with this particular arrest?
7    A. Yes.
8    Q. And then your shift was over?
9    A. Yes.
10    Q. Okay. And then how did you learn of
11 Kevin's death?
12    A. I was contacted by phone at home later
13 that day.
14    Q. And you had to come in and give a
15 statement that day?
16    A. Yes.
17    Q. And your statement, I believe, was given
18 to Captain Miller?
19    A. Okay.
20    Q. Is he one of your supervisors?
21    A. He was at the time. He has since retired.
22    Q. Is that typically -- well strike that.
23 Have you ever in your experience, prior to this case,
24 been involved in a death investigation where one of

Page 50

1 the persons, you or another sheriff that you were
2 working with, arrested somebody who died either while
3 they were in your custody or in the custody of the
4 correctional department?
5      A. I know not in my custody.  I'm trying to
6 recall, there may have been one other incident over
7 the years but I don't recall a name or a time.
8      Q. Was the same procedure followed here as
9 the procedure that occurred back then, that you had to
10 give a statement to a superior officer?
11      A. I think that would be pretty standard,
12 yes.
13      Q. Are there any written policies and
14 procedures as to what occurs in a death investigation
15 like this?
16      A. Not that I'm aware of.
17      Q. If Kevin did need medical attention prior
18 to turning him over to the correctional officers, is
19 that something Officer O'Brien could have determined
20 on his own?
21      A. He could have made that decision, yes.
22      MR. DECARO: Let's look at your statement
23 and we will mark this as Sporcich exhibit one.  She
24 will give you a marked one.

Page 51

1          (At this point the court reporter
2          marked Sporcich exhibit number
3          one, after which the following
4          proceedings were conducted:)
5      MR. DECARO: I've handed you what we have
6 marked as Sporcich exhibit one.  And that is your
7 statement on May 10th, 2003 for investigation V as in
8 Victor 03 dash 05095, correct?
9      THE WITNESS: Yes.
10      Q. Okay.  And your statement was given around
11 2:15 p.m. the date of Kevin's death, correct?
12      A. Yes.
13      Q. Okay.  So the facts were pretty fresh in
14 your mind of what had transpired that morning?
15      A. Yes.
16      Q. Okay.  And you gave this statement to
17 Captain Gary Miller?
18      A. Yes.
19      Q. Okay.  And where was that done?  At the
20 Public Safety Building?
21      A. Yes.
22      Q. Was there anyone else in the room with you
23 when you gave the statement?
24      A. According to the preamble here, no.  And I

Page 52

1 really don't recall.
2      Q. And the statement was tape-recorded?
3      A. Yes.
4      Q. Do you know how -- strike that.  Captain
5 Miller asked you a series of questions during this
6 interview.  Do you know how Captain Miller obtained
7 his information about what had occurred?
8      A. No.
9      Q. Did you have a conversation with Captain
10 Miller prior to him tape-recording these questions?
11      A. It would have just been a brief
12 conversation telling me what had occurred and why, or
13 why they were going to conduct this investigation.
14      Q. Okay.  Cause as I read this he asks
15 several questions beginning on page four about what
16 transpired in the elevator.  Did anything unusual
17 transpire in the elevator as you were transporting
18 Kevin from the car to the book-in area other than what
19 we talked about?
20      A. Not that I haven't already mentioned, no.
21      Q. Was Kevin yelling or screaming while he
22 was in the elevator?
23      A. He was talking as I remember.  I don't
24 remember how loud or --

Page 53

1      Q. When Kevin was talking, did it appear that
2 he was making sense or it was just nonsensical sort of
3 stuff?
4      A. Again, this is a long time, and I'm at
5 best, you know, guessing again.  It just, the general
6 gist of it just seemed at times he was and other times
7 he was not.
8      Q. Is that common, I mean in your experience
9 -- strike that.  Over the years, how many DUI arrests
10 have you made generally?
11      A. Maybe a couple hundred over the years.
12      Q. Okay.  I mean were his actions consistent
13 with what other drunk people's actions were like that
14 you've had experience with in the past?
15      A. Yes.
16      Q. Okay.  So they would, they would at points
17 talk incoherently and then at other points be coherent
18 and make sense?
19      A. Yes.
20      Q. If you look on page four, and this is just
21 really to refresh your recollection, it talks about
22 who was on the elevator and then one of your answers
23 say, "And the elevator work release prisoners, so we
24 got to go into the third, fourth floor, before we went

## Page 54

1 down to book-in." So does that refresh your
2 recollection that once you got in the elevators you
3 went up to the third floor, then the fourth floor and
4 then went down to book-in? Do you see that? It's
5 about the one, two, third answer on page four.
6     A. Yes, but again I don't recall whether they
7 were picking them up on the third or fourth floor or
8 taking them back up from the main floor.
9     Q. Yeah. And I'm not so concerned about the
10 work release prisoners. I just want to clarify that
11 you didn't go directly from the first floor down to
12 book-in, you went up actually and then back down?
13     A. Right.
14     Q. And then after you left the padded cell,
15 as I'm looking at page five in the center of the page
16 the question is asked, "After you left the padded
17 cell, you were back in the book-in area, did you ever
18 hear the suspect?" Answer, "No, I did not."
19 Question, "You didn't hear?" Answer, "No." Question,
20 "You didn't hear him talking or anything like that?"
21 Answer, "No." That's your recollection you never
22 heard Kevin say anything after you left him in the
23 padded cell?
24     A. No, I don't.

## Page 55

1     MR. DECARO: Let me show you what we have
2 marked, or what we are going to mark as Sporcich
3 exhibit two.
4         (At this point the court reporter
5         marked Sporcich exhibit number
6         two, after which the following
7         proceedings were conducted:)
8     MR. DECARO: I've handed you what we have
9 marked as Sporcich exhibit two. It's your answers to
10 interrogatories in this case. Have you had an
11 opportunity to review this today?
12     THE WITNESS: Not today.
13     Q. At an earlier date?
14     A. Yes, I believe so.
15     Q. Okay. I just want to ask you about some
16 of the cases you list here, some of the facts. We
17 will start with your answer to number ten. I asked
18 state whether you have ever been named in a, named a
19 defendant in any lawsuit within the last ten years
20 brought pursuant to the United States Constitution or
21 42 U.S.C. Section 1981, 1983, 1985, and/or 1986. And
22 then I asked you for certain things related to those
23 cases. And I don't want to know about your personal
24 cases, and if you respond about those we will just

## Page 56

1 move on. This first case Eddie L. Heath, H-e-a-t-h
2 versus Sporcich, case number 95-2144 which was brought
3 in the Central District of Illinois. What kind of
4 case was that?
5     A. I don't recall the exact complaint. It
6 had to do with him being arrested and I don't know
7 what his complaint was. Specifically I don't
8 remember.
9     Q. Okay. And it looks as though a default
10 judgement was entered against the plaintiff on the
11 counterclaim filed by your behalf. Did you file a
12 counterclaim against him?
13     A. Yes.
14     Q. Okay. The second case is Estock,
15 E-s-t-o-c-k versus Vermilion County Sheriff, case
16 number 99-2176, also filed in the Central District
17 Court in Urbana Division. Do you remember what the
18 facts of that case were about?
19     A. Yes. He was injured when he was placed
20 under arrest and filed suit for that.
21     Q. Okay. Do you know, were you the arresting
22 officer?
23     A. Yes.
24     Q. Okay. What type of injuries was he

## Page 57

1 complaining of?
2     A. He was struck in the eye with a
3 flashlight.
4     Q. Okay. And that case settled?
5     A. Yes.
6     Q. Okay. Did you give a deposition in that
7 case?
8     A. I'm assuming I did. I don't remember it
9 but --
10     Q. Okay. And if you look at the next page
11 your answer to number 11 lists a case Edwards versus
12 Hartschorn, case number 97-L-107 filed here at
13 Vermilion County. Do you know what that case was
14 about?
15     A. Yes. He was also injured when being
16 placed under arrest.
17     Q. And that case was also settled?
18     A. Yes.
19     Q. Were you the arresting officer in that
20 case?
21     A. Yes.
22     Q. Did you give a deposition in that case?
23     A. Yes, I believe so.
24     Q. Do you know what types of injuries he was

Page 58

1 complaining of?

2     A. He had an injury to a testicle.

3     Q. Okay. Do you know what he, how he--

4 strike that. Do you know how the plaintiff alleged he

5 was injured in that case?

6     A. He said he was struck I believe.

7     Q. By you?

8     A. Yes.

9     Q. And, I'm sorry, did you say you gave a

10 deposition in that case?

11     A. I believe I did.

12     Q. As a result of either Edwards or Estock,

13 were you ever reprimanded by the county sheriff's

14 office for anything related to those cases?

15     A. No, I was not.

16     Q. Over your 18, 20 years now, have you ever

17 been reprimanded by the county sheriff's office for

18 any of your conduct?

19     A. I don't know if it's called conduct. I

20 missed a day of work once that there was a

21 misunderstanding as far as a hire back date and that's

22 a day off when you don't report on time.

23     Q. Okay. These two cases that were settled,

24 did you have to approve the settlement in any fashion?

Page 59

1 Did you have to say okay go ahead and settle it or is

2 that something done without your consult?

3     A. That would have been done without my

4 consult.

5     Q. Okay. If we look at your answer to number

6 16, I asked, "On May 10th, 2003, prior to his death,

7 did you believe that Kevin Lucas was under the

8 influence of a narcotic and/or alcohol. If so, state

9 the basis of that belief." And your answer is, "I

10 believed that Lucas was under the influence of

11 something because he was staggering and swaying.

12 Additionally, I considered his speech to be somewhat

13 incoherent." We talked about the speech but the

14 staggering and swaying. Was there, did you have an

15 opportunity to see Kevin stagger while he walked on

16 his own?

17     A. Not absolutely on his own never, no.

18     Q. Okay. And swaying, to me that would be he

19 might be standing stationary but swaying. Did you

20 have an opportunity to see that, or if you mean

21 swaying in another way tell me?

22     A. I don't remember now. Again, that's just

23 my general recollection of how his behavior was.

24     Q. Okay. Is there a, let's assume for this

Page 60

1 question that Kevin was drunk. Is it illegal in

2 Illinois to be drunk in public?

3     A. Not unless you are on a roadway.

4     Q. Or driving?

5     A. Right.

6     Q. Okay. Go ahead.

7     A. You don't necessarily have to be driving

8 on the roadway. I mean a pedestrian intoxicated is

9 illegal also in the State of Illinois.

10     Q. I just want to ask you one question about

11 your personnel file. Unfortunately it's the same

12 thing and I'm sure the statute of limitations is long

13 gone on yours because this was probably filled out in

14 '85. I'm looking at the personal interview section of

15 your personnel file with the Vermilion County

16 Sheriff's Department. It's seven pages. I'm not

17 going to mark it as an exhibit but its got your

18 signature, correct?

19     A. Yes.

20     Q. Number seven asks, "Have you ever used any

21 narcotic drugs, barbituates, amphetamines, marijuana

22 or any hallucinogenic drugs?" And you answered "yes."

23 Which of those had you used prior to this application?

24     A. Marijuana.

Page 61

1     Q. Okay. Have you had any conversation,

2 after you left the Public Safety Building on the

3 morning of May 10th, 2003, and other than speaking

4 with Captain Miller that afternoon, have you had any

5 conversations with anyone regarding this case other

6 than your attorney?

7     A. In passing with Deputy O'Brien, but he

8 left a short time after this so nothing in detail I

9 don't think.

10     Q. Okay. Let's talk about that with O'Brien.

11 Like what types of, what was the substance of your

12 conversation with him?

13     A. I just know he has applied with the state

14 police and this is apparently, this pending case has

15 held up his application process. I remember that

16 being mentioned.

17     Q. Okay. Did this case have anything to do

18 with him leaving the county sheriff as far as you

19 know?

20     A. As I remember, he had every intention to

21 leave before this ever happened.

22     Q. So the substance of your conversation with

23 him was basically I've applied to the state but this

24 is holding me up?

Page 62

1    A. Yes.
2    Q. Did you ever discuss the facts of this
3 case with him?
4    A. No. No.
5    Q. Did you ever, I don't know how accessible
6 Sheriff Hartschorn is to your department, but did you
7 ever have a conversation with him regarding the facts
8 of this case?
9    A. No.
10    Q. Have you ever been out to Lucille Butler's
11 home for any reason?
12    A. I didn't know I had until I read her
13 interrogatories.
14    Q. Okay. Did that refresh your recollection?
15    A. Again, when I was there, I didn't know who
16 she was.
17    Q. Okay. And you didn't know Kevin before
18 this?
19    A. No.
20    Q. I think I asked you this earlier on. Have
21 you spoken to any inmate who was in the Public Safety
22 Building that morning that said they saw Kevin or you
23 or Officer O'Brien with Kevin that day?
24    A. No.

Page 63

1    Q. Have you spoken to any, anyone, former
2 prisoner or current prisoner who said they have
3 information regarding this case?
4    A. No.
5    Q. Has any, other than the statement to
6 officer, Captain Miller, has there been any further
7 investigation by the county into this case?
8    A. I don't know.
9    Q. Has the coroner or a pathologist ever
10 contacted you regarding the facts of the case?
11    A. No.
12    Q. Have you ever spoken with Sergeant
13 Reynolds about the case?
14    A. Other than just acknowledging to each
15 other that it's pending, no.
16    Q. How often, I mean do you know how long
17 Sergeant Reynolds has been with the correctional side
18 of the county?
19    A. Not exactly, no. He has been there
20 several years.
21    Q. I mean do you, do you socialize with
22 Sergeant Reynolds at all?
23    A. I don't socialize with anyone from work.
24    Q. Okay. Do you see, do you see the same

Page 64

1 correctional officers time and time again because you
2 are in that building and those are the guys you hand
3 over the prisoners to?
4    A. Yes. He has been on the same shift for
5 quite a few years.
6    Q. And that would be your shift also?
7    A. Third shift, yes.
8    Q. How about Officer Schull?
9    MR. CONDON: Schull.
10    MR. DECARO: Schull. Any conversations
11 with him?
12    THE WITNESS: No. I don't even know if he
13 is on the same shift any more.
14    Q. And you made reference to an Officer
15 Watkins who may have been on the elevator. Is she a
16 sheriff such as yourself or is she a correctional
17 officer?
18    A. She is a correctional officer.
19    Q. Okay. Ever have a conversation with her?
20    A. No.
21    Q. Do you have asthma by any chance?
22    A. No.
23    Q. Okay. Would asthma be a medical condition
24 that if a person, if an arrestee was suffering from

Page 65

1 asthma, would that be something that you would either
2 seek medical attention for or take them to the
3 hospital directly?
4    A. I'm not real familiar with the symptoms of
5 asthma but unless it was some type of severe attack I
6 would not think so.
7    Q. Okay. Have you ever taken a prisoner,
8 arrestee, over your last 20 years, to the hospital for
9 an altered mental state? Someone who you just thought
10 was out of their mind and feared for their safety and
11 your safety?
12    A. Suicidal subjects, yes.
13    Q. Is that a person, you got a call that it
14 was a suicide or how did you come upon the suicide?
15    A. They actually made an attempt or made
16 statements that they were going to make an attempt.
17 That type of thing.
18    Q. Okay. Is there anything else about this
19 case that we haven't covered that you think is
20 important that we should know?
21    MR. CONDON: I will object to the form of
22 the question.
23    MR. DECARO: Well any conversations or
24 anything you've heard that you think is relevant to

Page 66

1 this case that I haven't asked you about?
2    A. No.
3    MR. DECARO: That's all I have.
4    EXAMINATION CONDUCTED
5    BY MR. CONDON:
6    Q. I just have a couple of follow-ups.
7 Sergeant Sporcich, after May 10th of 2003, did you
8 come to learn that you had gone to Lucille Butler's
9 residence to serve a warrant?
10    A. Yes.
11    Q. When did you first learn about that?
12    A. When I read a copy of her interrogatories
13 I believe.
14    Q. Okay. Do you remember was it a copy of
15 her interrogatories or was it a summary of her
16 deposition?
17    A. One of the two. I don't know which it
18 was.
19    Q. Okay. How long ago was it that you went
20 and served this warrant?
21    A. Without looking at her statement, I
22 wouldn't know.
23    Q. Okay. And do you remember who the warrant
24 was for?

Page 67

1    A. No.
2    Q. Okay. Was it for Lucille Butler herself?
3 Do you remember?
4    A. I don't think so. But again I don't
5 remember.
6    Q. Okay. And when you went to serve that
7 warrant, did you even know that Lucille Butler was
8 Kevin Lucas' mother?
9    A. No, I did not.
10    Q. Okay. Now at any time on May 10th of 2003
11 did you think that Kevin Lucas needed medical
12 attention?
13    A. No.
14    Q. At any time did you observe that he was
15 having any difficulty breathing?
16    A. No.
17    Q. Or wheezing at all?
18    A. No.
19    Q. At any time did Kevin Lucas ask you for
20 medical attention?
21    A. No.
22    Q. When you first arrived on the scene, you
23 said that you saw Deputy O'Brien holding Kevin, trying
24 to hold him up by the squad car; is that correct?

Page 68

1    A. Yes.
2    Q. And it appeared that he was having
3 difficulty maintaining control of Kevin?
4    A. Yes.
5    Q. And that Kevin, I believe you said that
6 Kevin was trying to pull away or push away from him?
7    A. Yes.
8    Q. Okay. And when you approached Deputy
9 O'Brien and Kevin, you and Deputy O'Brien decided to
10 take Kevin down to the ground in order to control him;
11 is that correct?
12    A. Yes.
13    Q. Okay. And so that Deputy O'Brien could
14 then go and unlock the passenger door of the squad
15 car?
16    A. Correct.
17    Q. And at this point Kevin is handcuffed,
18 right?
19    A. Yes, he is.
20    Q. And after Deputy O'Brien unlocked
21 the squad car door then the two of you brought Kevin
22 to his feet and took him to the squad car, correct?
23    A. Yes.
24    Q. Okay. And at that point was it your

Page 69

1 objective to get Kevin to the Public Safety Building
2 and get him booked in?
3    A. Yes.
4    Q. And when you saw Kevin at the scene for
5 the first time you said that his pants were down by
6 his ankles, correct?
7    A. Yes.
8    Q. Okay. So you didn't have a concern at
9 that point that Kevin could be hiding a weapon in his
10 pants area; is that correct?
11    A. Correct.
12    Q. And he was also handcuffed at that point,
13 right?
14    A. Yes.
15    Q. Okay. And then I believe you indicated
16 when you got to the Public Safety Building that Kevin
17 was taken to the booking area?
18    A. Yes.
19    Q. Okay. And within a minute the decision
20 was made that Kevin was going to be taken to the
21 padded cell; was that your previous testimony?
22    A. Yes, it was.
23    Q. And, again, that's because it's your
24 understanding Kevin was being uncooperative?

Page 70

1    A. Yes.
2    Q. Okay. So he is walked to the padded cell
3 and then he is put into the cell, correct?
4    A. Yes.
5    Q. And I believe in response to Mr. DeCaro's
6 questions you said that Kevin was placed face down and
7 then the cuffs were removed from him; is that right?
8    A. Yes.
9    Q. Okay. And then Kevin's pants and his
10 shoes were taken from him, correct?
11    A. Yes.
12    Q. Okay. So if Kevin had been hiding any
13 weapons in his pants or in his shoes a weapon would
14 have been located at that point; is that correct?
15    A. Yes.
16    Q. Okay. I'm going to show you, and if you
17 want me to wait a minute, Ms. Butler, I would be happy
18 to.
19        (Lucille Butler exiting the room)
20    Q. I'm going to show you what was previously
21 marked as O'Brien group exhibit four which is a series
22 of photographs that were taken of Kevin Lucas in the
23 cell at the Vermilion County jail. When you left the
24 padded cell that morning and the door was closed,

Page 71

1 Kevin was in his underwear at that time; is that
2 correct?
3    A. Yes.
4    Q. Does this photograph that I'm showing you,
5 does that depict the underwear that he was wearing to
6 the best of your recollection?
7    A. I wouldn't remember without looking at the
8 photograph.
9    Q. Okay. But you do remember that his pants
10 had been taken from him?
11    A. Yes.
12    Q. And that his shoes had been taken from
13 him, correct?
14    A. Yes.
15    Q. And in this photograph, and all of these
16 photographs, Kevin is not wearing a shirt; do you see
17 that?
18    A. Yes, I do.
19    Q. Okay. Do you remember when you left the
20 padded cell did Kevin still have his shirt on?
21    A. I wouldn't have been able to recall
22 really.
23    Q. Okay. Now when you left the padded cell
24 that morning did you have any concern that Kevin had a

Page 72

1 weapon in his underwear?
2    A. No.
3    Q. Or in his socks?
4    A. No.
5    Q. And in looking at his socks do you believe
6 that if Kevin had been concealing a weapon in the
7 socks that it would have been noticeable?
8    A. Yes.
9    Q. Okay. Now have you since later learned
10 that a baggy of cocaine was found in Kevin's cell?
11    A. Yes.
12    Q. Okay. And I take it you never saw Kevin
13 in possession of a baggy of cocaine that morning; is
14 that correct?
15    A. Correct.
16    Q. If Kevin had brought the cocaine with him
17 into the jail and into the cell, based on the fact
18 that his pants were removed and his shoes were
19 removed, do you believe that Kevin had to have
20 concealed the cocaine either in his underwear or in
21 his socks?
22    A. Yes.
23        MR. CONDON: That's all I have.
24        EXAMINATION CONDUCTED

Page 73

1        BY MR. DECARO:
2    Q. Do you have a, we talked about the
3 different types of searches that the correctional
4 officers would do as opposed to what the sheriff would
5 do out in the field, correct?
6    A. Yes.
7    Q. I mean over your 20 years would it be your
8 understanding that one of the things that the
9 correctional officers are looking for when they
10 conduct a search is contraband such as cocaine or
11 marijuana?
12    A. Yes.
13    Q. So their search would be much more
14 thorough?
15        MR. CONDON: I will object to the form of
16 the question.
17        MR. DECARO: I will withdraw that. I
18 think you testified your search is for weapons --
19        THE WITNESS: Yes.
20    Q. -- basically? So their search would be
21 for objects that could be much smaller and hidden in
22 different places?
23    A. Generally speaking, I think they do a more
24 thorough search than what we do in the field.

Page 74

```
1      Q. At Vermilion County do they do, in fact
2  when they take a new arrestee, do they do a strip
3  search?
4      A. I don't know.
5      Q. How did you learn about the cocaine?
6  Other than if it came from your attorney, how did you
7  learn that there was cocaine in his cell?
8      A. I don't recall if I was told that, you
9  know, later in the day that day or later when, through
10 a conversation with the attorney. I don't remember.
11     Q. Did you ever find out what the cause of
12 death was in this case?
13     A. No.
14     Q. Let me just go back a little bit. We
15 talked about a couple of cases where you were named as
16 a defendant where the arrestees were injured during an
17 arrest. Other than those two, were there any other
18 occasions where arrestees made complaints to the
19 county about being injured during one of your arrests
20 but did not file lawsuits?
21     A. Not that I can remember, no.
22     Q. Is that kind of information documented if
23 there is a complaint against you?
24     A. If someone made a complaint, it would be
```

Page 75

```
1  in my personnel file I'm sure.
2      Q. Okay. Both you and Officer O'Brien
3  testified that when you bring a person into the Public
4  Safety Building who is going to be placed into a cell
5  your job typically ends at booking; is that right?
6      A. As far as our control over the prisoner,
7  yes.
8      Q. Right. What was it about Kevin's case
9  that required you and Officer O'Brien to continue past
10 booking and actually placing the prisoner into the
11 cell in this particular case?
12     A. It's not unusual if a deputy is in the
13 booking area, whether it's his arrest or someone
14 elses, if they look like they need assistance,
15 escorting someone back to a cell for their help.
16     Q. Okay. Did Officer Reynolds or Schull or
17 Schull ask for your help in this particular case?
18     A. I don't recall a specific request, no.
19     Q. Could they have brought Kevin to a cell,
20 unhandcuffed him and returned the handcuffs to Officer
21 O'Brien in this case?
22     A. I don't know.
23     MR. DECARO: I have nothing else.
24     MR. CONDON: We will reserve signature.
```

Page 76

```
1      (Deponent is excused.)
```

Page 77

```
1  STATE OF ILLINOIS  )
                      )  SS
2  COUNTY OF COLES    )
3        I, SUSAN M. RANDOLPH, a Notary Public in
   and for the County of Coles, State of Illinois, do
4  hereby certify that FRANK SPORCICH, the deponent
   herein, was by me first duly sworn to tell the truth,
5  the whole truth and nothing but the truth in the
   aforementioned cause of action.
6        That the foregoing deposition was taken on
   behalf of the Plaintiff on June 28, 2005.
7        That said deposition was taken down in
   stenograph notes and afterwards reduced to typewriting
8  under my instruction and said transcription is a true
   record of the testimony given; and that it was agreed
9  by and between the witness and attorneys that said
   signature on said deposition would be not waived.
10       I do hereby certify that I am a
   disinterested person in this cause of action; that I
11 am not a relative of any party or any attorney of
   record in this cause, or an attorney for any party
12 herein, or otherwise interested in the event of this
   action, and am not in the employ of the attorneys for
13 either party.
         In witness whereof, I have hereunto set my
14 hand and affixed my notarial seal this 4th day of
   July, 2005.
15
16
17
          Susan M. Randolph, CSR
18            NOTARY PUBLIC
19
   "OFFICIAL SEAL"
20 Susan M. Randolph
   Notary Public, State of Illinois
21 My Commission Expires 6/16/07
22
23
24
```

Page 78

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

Lucille Butler, Individually, and as
Special Administrator of the Estate
of Kevin Lucas, Deceased,
    Plaintiff,

    vs        No. 04-CV-2048

Vermilion County Sheriff Kenneth
O'Brien, et. al.,
    Defendants.

       This is to certify that I have read the
transcript of my deposition taken in the
above-entitled cause, and that the foregoing
transcript taken on June 28, 2005, accurately states
the questions asked and the answers given by me, with
the exception of the corrections noted, if any, on the
attached errata sheet(s).


    _____
    Frank Sporcich

Subscribed and Sworn before
me this _____ day of
_____, 2005.
_____
Notary Public