RICHARD LONG  E-FILED
Wednesday, 15 March, 2006 03:29:54 PM
Clerk, U.S. District Court, ILCD

THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
STATE OF ILLINOIS

LUCILLE BUTLER, Individually and )
as Special Administrator of the )
Estate of Kevin Lucas, Deceased, )
                                 )
         Plaintiff,              )
                                 )
    vs.                          )   No. 04-CV-2048
                                 )
VERMILION COUNTY SHERIFF         )
KENNETH O'BRIEN, et al.,         )
                                 )
         Defendants.             )

COPY

## DEPOSITION

The Deposition of RICHARD LONG, a citizen of
the State of Illinois, a witness of lawful age;
produced, sworn, and examined upon his corporeal
oath, at the Vermilion County Courthouse, Danville,
Illinois on August 5, 2005, before Becky Jessup,
CSR, RPR, Notary Public in and for the County of
Vermilion and State of Illinois, as a witness in a
certain suit and matter now pending and
undetermined in the United States District Court
for the Central District of Illinois.
    CSR License No. 84-004343


APPEARANCES:

    KUPETS & DE CARO, P.C.
    30 N. LaSalle Street, Suite 4020
    Chicago, Illinois 60602
    By: Mr. Dennis De Caro, Attorney
    Appearing for the Plaintiff


    LAW OFFICES OF MR. MICHAEL CONDON
    Attorney at Law
    333 Pierce Road
    Itasca, Illinois 60123

EXHIBIT
8

Page 2

1    I N D E X  O F  E X A M I N A T I O N
2                                    Page
3    EXAMINATION, by Mr. De Caro        3
4    EXAMINATION, by Mr. Condon        75
5    EXAMINATION, by Mr. De Caro       79
6    EXAMINATION, by Mr. Condon        81
7
8
9              EXHIBITS
10
11   No.                           Page
12   1    .................................    16
13   2    .................................    51
14   3    .................................    53
15   4    .................................    57
16   5    .................................    63
17   6    .................................    64
18   7    .................................    67
19
20
21
22
23
24

Page 3

1    RICHARD LONG, the witness herein, having
2 been first duly sworn to tell the truth, the whole
3 truth and nothing but the truth, was examined and
4 testified as follows:
5
6 EXAMINATION,
7    QUESTIONS BY MR. DE CARO:
8    Q. Officer Long, my name is Dennis De Caro
9 and I represent Lucille Butler and the estate of
10 Kevin Lucas, her son.
11      I am going to be asking you some
12 questions about his death on May 10, 2003. First I
13 am going to ask you some background questions about
14 your training and education and things like that
15 and then we will get to that day.
16      Have you ever given you deposition
17 before?
18    A. Yes, sir.
19    Q. Why don't you state your full name for
20 the court reporter?
21    A. Richard E. Long, II.
22    Q. When was the -- how many times have you
23 given a deposition?
24    A. Just once.

Page 4

1    Q. How long ago was that?
2    A. I think a year ago.
3    Q. And was it regarding a civil rights case
4 involving the county?
5    A. No.  Had nothing to do with the job.  It
6 was with my daughter's wedding.
7    Q. Let me just quickly tell you a couple of
8 rules.  When we read this so it is clear let's try
9 not speak over one another.
10      And the other is you have to answer
11 everything verbally.  If you nod she can take it
12 down but we won't know if you nodded yes or no.
13    A. Okay.
14    Q. Have you reviewed anything for your
15 deposition today?  Your interrogatories, your
16 statements, photographs?  Anything like that?
17    A. Yes, sir, a little bit.
18    Q. What did you review if you recall the
19 name of those documents?
20    A. Basically interrogatories.
21    Q. Did you look at your statements you gave?
22    A. Yes, sir.
23    Q. Did you read anyone else's statements?
24    A. No, sir.

Page 5

1    Q. Have you spoken to anyone other than your
2 attorney regarding the deposition today?
3    A. No, sir.
4    Q. What is your highest level of education?
5    A. 12 years.
6    Q. What high school was that?
7    A. Georgetown, Illinois.
8    Q. What is your date of birth?
9    A. 06/08/55.
10    Q. Are you married or single?
11    A. Married, sir.
12    Q. Children?
13    A. Yes, sir.
14    Q. How many?
15    A. Two.
16    Q. Just their ages?
17    A. 28 and 26 I do believe.
18    Q. Male or female?
19    A. Both.  One each.
20    Q. Do you live here in town?
21    A. Catlin, Illinois.
22    Q. From high school why don't you generally
23 -- I don't know how many jobs you have had but
24 generally tell me what your employment situation

Page 6

1 has been from high school to the present and then
2 we will talk more specifically.
3    A. Joined the Navy in 1974.
4    Q. How long were you in the Navy?
5    A. 22 years. Four years active duty and 18
6 years of reserve time. Worked at Chuckles candy
7 factory after I got out of active duty.
8    Q. Where is that?
9    A. Here in Danville. It is no longer open
10 anymore.
11    Q. How long did you work there?
12    A. 11 years.
13    Q. So from 1978 or so?
14    A. Yeah. About '76 when I got off of active
15 duty the first time.
16    Q. '76 to '87?
17    A. Yes, sir.
18    Q. Then where did you work?
19    A. Worked at Bond Aluminum here in town for
20 about a year and a half before I got laid off and
21 that is when I went back in the military in '85 and
22 went back. In December of '85 I went back into the
23 military.
24    Q. Full time or?

Page 7

1    A. As a recruiter here in Danville, yes,
2 sir.
3    Q. So was there a little overlap where you
4 were a recruiter and also working at Chuckles?
5    A. No, sir. I worked at Chuckles right out
6 of high school until 1974 and then I went in the
7 Navy in '74.
8    Q. And then you got out of the Navy and then
9 where did you work when you got out of the Navy?
10    A. Right back to Chuckles again.
11    Q. So there was two times that spanned 11
12 years?
13    A. Right.
14    Q. And then Bond Aluminum?
15    A. Yes, sir.
16    Q. You worked there up until '85?
17    A. Yes, sir. December of '85 I went into
18 recruiting in the Navy here in Danville.
19    Q. How long did you do that, sir?
20    A. Two years.
21    Q. And then in '87 what did you do?
22    A. I went to work at the VA hospital.
23    Q. As what?
24    A. Files clerk.

Page 8

1    Q. How long did you do that?
2    A. I think that was about a year and a half,
3 two years. Not real positive. I went to work at a
4 machine shop in Westville, Illinois as a shipping
5 and receiving clerk.
6    Q. For how long?
7    A. Five years. I believe so. Four or five
8 years.
9    Q. That brings us up to around '92?
10    A. Yes, sir. And I started with sheriff's
11 department in December 17 of '92.
12    Q. Have you been full time with the
13 sheriff's since '92?
14    A. Yes.
15    Q. Where did you receive your training for
16 to become a sheriff?
17    A. The police institute, University of
18 Illinois.
19    Q. How long of a program was that?
20    A. Five weeks.
21    Q. When did you start that program in
22 relationship to when you started with the county?
23 You started --
24    A. January.

Page 9

1    Q. And when you go for that training, is it
2 different for a correctional officer as opposed to
3 a county sheriff?
4    A. Yes, sir.
5    Q. So your five weeks were devoted to
6 training you as a correctional officer?
7    A. Basically, yes, sir.
8    Q. Do you remember, I know it is a long
9 time. Do you remember generally the types of
10 classes you took?
11    A. A lot of the stuff pertained to inside
12 the jail. Paperwork. A lot of monthly reports.
13 Just off the top of my head. The type of calories
14 that a person should have daily. What they're
15 issued when they first come in and what they are
16 allowed to have from the outside.
17    Q. Did it involve assessing inmates for
18 various things; intoxication, altered mental
19 status, medical condition? Things like that?
20    A. Yes, sir.
21    Q. Would they bring in people who would like
22 sort of act out things and you would have to
23 determine what their problem was?
24    A. No, sir.

Page 10

1  Q. Was it all out of a book?

2  A. Yes, sir.

3  Q. So for like someone intoxicated from

4 alcohol, would they say see if they have blurred

5 red eyes, slurred speech, unstable walk, things

6 like that? Was that what was written out on a

7 piece of paper?

8  A. Yes, sir. It was out of -- I believe so.

9  Q. Do you remember what they trained you on

10 to determine whether somebody was in an altered

11 mental state, whether they were mentally impaired?

12  A. I remember but I couldn't tell you what

13 it was right now. I do remember going through a

14 section of that.

15  Q. Do they give you any type of sort of

16 first responder training for somebody having an

17 epileptic seizure, somebody who has a diabetic

18 problem? Any training like that?

19  A. I don't think so. All I remember, sir,

20 is the basic first aid.

21  Q. How about after -- strike that. Basic

22 first aid, is that CPR?

23  A. We did have a class on that.

24  Q. Are you CPR certified?

Page 11

1  A. Don't know if mine has run out or not. I

2 think it is up for a year is what they are good

3 for.

4  Q. After that five week course in 1993 have

5 you had any continuing training in any courses that

6 you took during that five weeks -- strike that.

7  Have you been back to University of

8 Illinois at all for additional training?

9  A. No, sir.

10  Q. Have you received any type of training

11 with the county since '93?

12  A. Yes, sir.

13  Q. What kind of training?

14  A. CPR class we had there at the jail. I am

15 trying to think. We had a class last year. I

16 can't really remember what it was now and then we

17 had a juvenile, how to handle juveniles. What the

18 recommendations and stuff were on, you know, state

19 law.

20  Q. Any training with the county on assessing

21 inmates for medical problems, altered mental status

22 or intoxication?

23  MR. CONDON: After the basic training?

24  A. No, sir.

Page 12

1 BY MR. DE CARO:

2  Q. After the basic training?

3  A. No, sir.

4  Q. Do you have asthma by any chance?

5  A. No, sir.

6  Q. On February 10, 2003 you were working on

7 the first shift?

8  MR. CONDON: You said February.

9 BY MR. DE CARO:

10  Q. May?

11  A. Yes, sir.

12  Q. And you were working with Karla Young?

13  A. Yes, sir.

14  Q. Why don't you tell me how that worked

15 with Karla. Would you both be working in the

16 book-in area all day your entire shift?

17  A. Basically, yes, sir.

18  Q. And what were your duties and what were

19 her duties?

20  A. Basically the same other than I would

21 make the cell checks. We have two typewriters,

22 well, now with all the new changes we have had.

23  Q. Let's talk about in February of '03. So

24 tell me about what how it was set up then.

Page 13

1  A. Basically when people are brought into

2 book-in we take their information. We take their

3 property, lock it up and we place them in a cell.

4  And then we have what we call a turn over

5 and an ins and outs. And the information is put on

6 both those typewriters.

7  Q. And so if people were going to court that

8 day, would they go through book-in and you would

9 record who was coming in and out?

10  A. Yes, sir.

11  Q. When an officer, a county sheriff brought

12 in a new arrestee, would they stay? Would the

13 sheriff stay there during the book-in process or

14 would they handcuff them to the bench and leave you

15 the cuff key and they would go back to the field

16 generally?

17  A. Either way. You know, sometimes they

18 stay and do their paperwork there. Sometimes they

19 go out and do it out in the squad car.

20  Q. Do you ever book in anybody from the

21 Danville Police Department?

22  A. Yes, sir.

23  Q. So you book in both the county and

24 Danville?

Page 14

1  A. Yes, sir.
2  Q. And the holding cells are for both type
3 of arrestees; county and city?
4  A. Yes, sir.
5  Q. When you arrived on May 10, 2003, how did
6 you learn that Kevin Lucas was there?
7  A. Officer Mike Schull.
8  Q. What did he tell you?
9  A. Told me that Kevin was in the padded cell
10 and that he was acting very strange.
11  Q. Is that the extent of the conversation?
12  A. Yes, sir.
13  Q. Did he instruct you how long to keep him
14 in the padded cell?
15  A. No.
16  Q. Did he tell you what he meant by acting
17 strange?
18  A. No, sir.
19  Q. So you don't know if he was there because
20 he was mentally impaired, he was high on narcotics,
21 he was uncooperative or for what reason?
22  A. No, sir.
23  Q. How did you -- I read in one of your
24 reports or your statement that prior to finding him

Page 15

1 dead you determined you were going to go in and it
2 was time to process him?
3  A. Yes, sir.
4  Q. I am trying to get at why at 11:00 did
5 you determine that was the time? Did you think if
6 he was sleeping he had enough sleep and --
7  A. Well, it had been 4 hours, somewhere
8 around that area. And usually right before lunch,
9 try to get somebody out and get them processed and
10 give them lunch.
11  Q. So as you checked him every half hour --
12 and I sort of jumped ahead of myself. Did you
13 check him every half hour until 11:00?
14  A. Yes, sir.
15  Q. As you checked him every half hour you
16 didn't really -- you didn't have in mind that you
17 were checking him for any special reason? You were
18 just checking him -- do you understand my
19 question? Strike that.
20  Let me ask it differently. When you
21 check people in holding cells, how do you do it?
22 How do you check them?
23  A. Visually.
24  Q. And what are you looking for?

Page 16

1  A. Just basically that they are not usually
2 hanging themselves, you know, or doing bodily harm
3 to themselves.
4  Q. And when look at your sheet, maybe we
5 should have it out, what we are going through.
6  (The court reporter marked a document as
7  Exhibit No. 1.)
8 BY MR. DE CARO:
9  Q. We have handed you what we have marked as
10 Long Exhibit 1. It is the Cell Check Book-in sheet
11 for May 10, 2003, correct?
12  A. Yes, sir.
13  Q. And the top line there under the date I
14 am assuming that tells that at 7 a.m. Officer
15 Schull and Walker were off duty and Officers Long
16 and Young came on duty at 7 a.m.?
17  A. Yes, sir.
18  Q. And single cells they have PC with a
19 number 1. Is that the padded cell?
20  A. Yes, sir.
21  Q. And 1 indicates there is one person in
22 there?
23  A. Yes, sir.
24  Q. What is L13?

Page 17

1  A. That is a single cell that we have.
2  Q. There was no one in there?
3  A. No, sir.
4  Q. And then L14 is another single cell?
5 There was one person in there?
6  A. Yes, sir.
7  Q. L44 is another single cell and there was
8 nobody in there?
9  A. No, sir.
10  Q. Right? No one?
11  A. Right.
12  Q. L45 and L46, other single cells which did
13 not have any prisoners, correct?
14  A. Yes, sir.
15  Q. And then there is three holding cells
16 down there?
17  A. Seven not including the padded cells.
18  Q. Well, --
19  A. 8 holding cells.
20  Q. You are calling all of the cells holding
21 cells other than the padded cell?
22  A. Yes, sir.
23  Q. You see here they have named them single
24 cells and holding cells so some of the cells L11,

Page 18

1  L24 and L29 are larger cells?
2    A. Yes.
3    Q. And on May 10, L11 had 5 inmates,
4  correct?
5    A. Yes, sir.
6    Q. L24 did not have any, correct?
7    A. Correct.
8    Q. And L29 had 8?
9    A. Right. 39, sir.
10    Q. Thank you. So you would walk past the --
11  strike that. The holding cells on the single
12  cells, are those -- do those have bars or a glass
13  where you can see in?
14    A. Glass, sir.
15    Q. So you can just walk by those and look in
16  as you are walking and see what is going on in
17  there?
18    A. Yes, sir.
19    Q. When you look in the cells, is it your
20  custom and practice for this sheet for this
21  check-in sheet to have a conversation with the
22  inmates to see if they are okay?
23    A. Not usually, sir.
24    Q. It is basically just to see if anyone is

Page 19

1  hanging themselves?
2    A. Basically. Make sure the count is
3  correct.
4    Q. And you do that even if you don't have a
5  reasonable belief that any of these inmates are
6  suicidal? It is just a procedure you have to
7  follow?
8    A. Yes, sir.
9    Q. And one of my questions when I looked at
10  this is even though like in L13, 44, 45, 46 where
11  there is no prisoner in there, do you still go by
12  and look in there?
13    A. Yes, sir.
14    Q. Why is that? I mean how can somebody get
15  in there?
16    A. Who knows. A lot of time, check to see
17  if blankets or sheets or something were left in
18  there.
19    Q. Now on this particular day under initials
20  here KY is I am assuming Karla Young?
21    A. Yes, sir.
22    Q. And Long is you?
23    A. Yes, sir.
24    Q. And Karla Young, her initials appear at

Page 20

1  7:03 a.m. and then your name appears for every
2  other check after that, right?
3    A. Yes, sir.
4    Q. How do you initial off on this? Do you
5  carry this list around with you?
6    A. First thing in the morning, yes, sir.
7    Q. But I mean do you carry it with you and
8  as you walk by you make an L or do you have this,
9  you look at the cells, go back somewhere to the
10  control room and then make your initials?
11    A. The way I do it personally is I usually
12  take the sheet around and then like on cell 39,
13  let's say 7 guys there and then I write down 7 and
14  then you walk back to the other side of the book-in
15  area and you have got 6 or 7 guys and you write
16  down for each cell.
17    Q. That is initially?
18    A. When you are down there by yourself that
19  is what I do.
20    Q. Let's talk about if you recall how it
21  occurred on this particular day. It looks as
22  though Karla did the initial count. Would that be
23  right?
24    A. No, sir.

Page 21

1    Q. Why did she initial at 7:03?
2    A. Because I called into them over the
3  radio.
4    Q. You are walking around with your radio,
5  you call to Karla, tell her how many people are in
6  each cell?
7    A. Yes, sir.
8    Q. 7:33, how did you initial each one of
9  those? Did you carry this sheet with you and walk
10  by?
11    A. No, sir.
12    Q. How did you do it?
13    A. Went through, did the cell checks, come
14  back into the control room and made the initials.
15    Q. Is that how you did all of these after
16  7:03?
17    A. Yes, sir.
18    MR. CONDON: I got to talk to him real
19  quick.
20
21    (At this time a short break in the
22    proceedings was had.)
23
24

Page 22

1 BY MR. DE CARO:
2    Q. Let's go back to Kevin. You were told
3 that Kevin was acting strange. So when you looked
4 in the padded cell, did you -- you looked in there
5 just to see if he was in there, No. 1, and No. 2 to
6 see if he was hanging himself?
7    **A. Well, making sure he was all right.**
8    Q. From 7:03 until 11:05 did you have any
9 conversation with Kevin?
10    **A. No, sir.**
11    Q. And you felt he was okay during that
12 period from 7:00 until 11:00?
13    **A. Yes, sir.**
14    Q. You know, we have got from Officer
15 Schull's deposition his Exhibit 7 is administrative
16 code on jail standards.
17        And we have, it is not marked as an
18 exhibit but we have the department rules and
19 regulations.
20        In these documents or if you would want
21 to tell me if there is some other document, does it
22 anywhere describe how you are supposed to check
23 these cells and for what reasons you are checking
24 them or is that something you were just told on how

Page 23

1 to do?
2    **A. Other than just, you know, going through**
3 **the training, you know, that I have been taught by**
4 **other officers.**
5    Q. Now when you say the training you say
6 from other officers, is that on-the-job training?
7    **A. Yes, sir.**
8    Q. Did you learn what -- your initial
9 training at University of Illinois, did they tell
10 you how to check cells?
11    **A. Yes, sir.**
12    Q. Is there any time you are supposed to
13 engage the person in the cell in a conversation to
14 see if they are okay?
15    **A. Not that I recall.**
16    Q. If someone might be having, someone has a
17 medical condition and you are -- strike that. Do
18 you ever check inmates who are -- strike that.
19        Do you ever have in your experience an
20 inmate who has a medical condition such as asthma
21 that you are aware of that is in a cell?
22    **A. That I know that he has asthma?**
23    Q. Yeah. Might be having a breathing
24 problem while he was in the cell?

Page 24

1    **A. We have had some.**
2    Q. Those particular circumstances have you
3 been trained that because they might have a medical
4 condition you should engage in them in some
5 conversation to see how they are?
6    **A. No, sir.**
7    Q. In that instance you would still just
8 look in and see how they are?
9    **A. Yes, sir.**
10    Q. Kevin was in the padded cell and Mike and
11 I were here today to look at it and I just want to
12 know which of the two doors were open and closed on
13 May 10, 2003 and where you were observing him from.
14 There is two doors on the padded cell, correct?
15    **A. Yes, sir.**
16    Q. Why don't you tell me were the doors that
17 were shut while Kevin was in there, were they --
18 was the same door shut all the time? I mean did
19 you open any doors?
20    **A. Just the main one to get into the padded**
21 **cell area, the outside door.**
22    Q. So would you then shut that door when you
23 left or was that door open and the padded door was
24 shut all the time?

Page 25

1    **A. Padded cell door is shut all the time.**
2    Q. So is it your recollection that on May 10
3 while Kevin was in there the padded cell door was
4 shut all the time but the door beyond the washroom
5 was open all the time?
6    **A. Yes, sir.**
7    Q. Why don't you tell me how you looked in
8 on Kevin through the padded door each time you went
9 to check on him.
10    **A. Through the food slot.**
11    Q. And the food slot is about how high off
12 of the ground?
13    **A. 3 foot.**
14    Q. And would you happen to know the
15 dimensions of the slot?
16    **A. No, sir.**
17    Q. And what is the reason to look through
18 the food slot as opposed to the glass up above, up
19 around eye level?
20    **A. It is a lot easier to see through.**
21    Q. Because the glass is darker?
22    **A. Yes, sir.**
23    Q. When you look through the food slot, do
24 you get a view of the entire cell?

Page 26

1    A. Yes, sir.
2    Q. This might be academic but I want to go
3 through what you recall when you looked in on Kevin
4 each of these times.
5        At 7:01 when you reported back to Karla
6 Young that there was one person in the padded cell,
7 do you remember where Kevin was?
8        MR. CONDON: Just for the record it says
9 7:03.
10 BY MR. DE CARO:
11    Q. At 7:03. Where he was in the cell?
12    A. He was on the left -- well, left side of
13 the wall, the padded cell.
14    Q. How was his body positioned?
15    A. He was on his knees leaning up against
16 the wall.
17    Q. Was his back to the door or?
18    A. No, sir.
19    Q. His chest was to the door?
20    A. His left side.
21    Q. And so he was sort of facing the door
22 leaning on the wall with his right shoulder?
23    A. Yes, sir.
24    Q. Was he kneeling like you kneel in a

Page 27

1 church pew or sort of sitting back on his heels?
2    A. Kind of like on his haunches.
3    Q. Were his eyes open?
4    A. That I don't know, sir.
5    Q. Did you have any conversation with him?
6    A. He talked to me, mumbled incoherent. I
7 couldn't understand him, sir.
8    Q. When he did mumble to you, did you try
9 and find out what he was saying?
10    A. No, sir.
11    Q. How long does it take you to do or how
12 long did it take you to do that particular check?
13 I mean do you look down and see the person and
14 immediately leave?
15    A. 20, 30 seconds.
16    Q. So you actually -- do you get down on a
17 knee and observe?
18    A. No, sir.
19    Q. Lean over?
20    A. Yes.
21    Q. And so you actually watched him for 20 or
22 30 seconds and then left the room?
23    A. Yes, sir.
24    Q. During that 20 or 30 seconds, was he

Page 28

1 mumbling during that whole period or was it just a
2 mumble at some point during that period?
3    A. Just a real short incoherent. I couldn't
4 understand.
5    Q. And you could see -- could you see where
6 his hands were?
7    A. Not that I recall.
8    Q. When you looked in there initially, what
9 was he wearing?
10    A. A pair of boxer shorts and white socks I
11 believe.
12    Q. Did he have a shirt on?
13    A. No, sir. I don't think so.
14    Q. Did you ever take his shirt out of the
15 padded cell area?
16    A. No, sir, I didn't.
17    Q. So the first time you saw him he was
18 shirtless?
19    A. Yes, sir.
20    Q. And you said you were able to see the
21 entire padded cell when you looked in there at
22 7:03? Did you see a white baggy of -- a baggy with
23 a white substance in it?
24    A. Not on the first initial one, no, sir.

Page 29

1    Q. I am assuming you didn't see that until
2 11:05?
3    A. Correct.
4    Q. So I don't need to ask you at each half
5 hour increment. Is there anything else that you
6 noticed about Kevin at 7:03? Could you
7 characterise his condition at that point?
8        Would you be able to say from looking at
9 him after 20 or 30 seconds did you come to any
10 conclusions about his condition physically or
11 mentally?
12    A. No, sir.
13    Q. Is the padded cell the first cell you
14 look into or the last cell or there is no rhyme or
15 reason as to how you do it?
16    A. No rhyme or reason, sir.
17    Q. And the next time you looked in was 7:33?
18    A. Yes, sir.
19    Q. And you on the 7:33, this sheet was left
20 in the control room and you would go look at
21 everyone and come back and initial it?
22    A. Yes, sir.
23    Q. Now 7:33 and then 8:05 -- you went back
24 at 7:33, did you do all of these L's for Long all

Page 30

1 the way across or do you do these all at the end of
2 the day? When do you do them?
3    **A. You do them, sir, when you do the cell**
4 **checks.**
5    Q. Let me just ask you: We were down there
6 today and I saw that there are video cameras and a
7 monitor in the control room. Was that there in May
8 of 2003?
9    **A. Yes, sir.**
10    Q. Have those cameras ever record -- do they
11 record anything?
12    **A. I don't believe so, sir.**
13    Q. Do you know if the pictures that those
14 cameras take in the book-in area go anywhere else
15 other than the book-in control room?
16    **A. No, sir.**
17    Q. There is not a master control room
18 anywhere?
19    **A. Not that I know of, sir.**
20    Q. From the control room can you switch
21 where you are looking and look on the fourth floor
22 or anything like that?
23    **A. No, sir.**
24    Q. At 7:33 when you went to check Kevin the

Page 31

1 second time, had he changed his position at all?
2    **A. Not at that time, no, sir. I don't think**
3 **so.**
4    Q. So he was still in the same position when
5 you first saw him?
6    **A. Yes, sir.**
7    Q. Any conversation with him at that point?
8    **A. No, sir.**
9    Q. Did he mumble anything to you?
10    **A. No, sir.**
11    Q. Could you see his hands?
12    **A. I don't know.**
13    Q. Did it appear?
14    **A. Thinking back I can't say yes or no.**
15    Q. That food slot that you looked into is
16 open all the time, right? There is not a door on
17 it, a little latch?
18    **A. Yes, sir, there is.**
19    Q. So it is down so the inmate doesn't know
20 you are coming, does he?
21    **A. No, sir.**
22    Q. And is it pretty soundproof, that padded
23 cell?
24    **A. Yes, sir.**

Page 32

1    Q. So at any point between 7:03 and 11:05
2 when you looked in there on Kevin Lucas, you would
3 come up to him and you would open that latch and
4 look in, right?
5    **A. Yes. The latch was already down.**
6    Q. But you would have to lift it up to look
7 in?
8    **A. No, sir. When it is down it is open.**
9    Q. So it was down the whole time?
10    **A. Yes, sir.**
11    Q. So the inmate could also see you coming?
12    **A. Right. Once you get into the padded cell**
13 **area.**
14    Q. And at any time when you looked in there
15 at any of these half hour intervals did you ever
16 see Kevin Lucas act like he was hiding anything
17 from you?
18    **A. No, sir.**
19    Q. At 8:05 was Kevin in the same position
20 that he was at 7:33 and 7:03?
21    **A. I really can't recall what time, sir,**
22 **that I saw him change positions.**
23    Q. Well, why don't we do this. How many
24 positions did you see him in? We know the one up

Page 33

1 against the wall on his haunches. Then what
2 position did he go to next?
3    **A. Then he was laying on his side the next**
4 **time I saw him.**
5    Q. Do you have an idea of whether that was
6 in the 8:00 hour, 9:00 hour?
7    **A. I want to say between 8:30 and say 9.**
8    Q. He went on his side laying on which side?
9    **A. Would have been his right side, sir.**
10    Q. So his face and stomach would be facing
11 the door?
12    **A. Yes, sir.**
13    Q. And he was on the left side of the cell?
14    **A. Yes, sir.**
15    Q. Is that how he remained until you
16 determined he had died?
17    **A. No, sir.**
18    Q. So at some point he changed position
19 again?
20    **A. Yes.**
21    Q. And what was the next position?
22    **A. I found him on his stomach.**
23    Q. What area of the cell was he in on his
24 stomach?

## Page 34

1   A. Basically the same side. The left side
2 of the padded cell.
3   Q. And about what time was that? Is that
4 11:00 the first time you noticed he changed
5 positions again?
6   A. It was about 10:40 I do believe.
7   Q. So around 10:40 when you looked in he was
8 in a prone position?
9   A. Yes, sir.
10   Q. Then at 11:05 why don't you tell me what
11 happens at 11:05?
12   A. At that time I was going to have him get
13 up and fingerprint him and process him, put him in
14 a different cell. Get him some lunch.
15   Q. So do you open the padded door and go in
16 and say get up and go in or do you say it through the food --
17 how does it work?
18   A. I opened the door at that time.
19   Q. And what did you say to him?
20   A. Pat him on the back. Said come on Kevin,
21 get up. Let's get you processed.
22   Q. Had you known Kevin before this day?
23   A. Through work, yes, sir.
24   Q. How many times had he been in the county

## Page 35

1 lockup while you have been working there?
2   A. I have no idea, sir.
3   Q. More than five?
4   A. That I don't know.
5   Q. So you had been his jailer in the past?
6   A. Yes, sir.
7   Q. Had you ever been his book-in officer?
8   A. I couldn't tell you that. I don't
9 remember, sir.
10   Q. Do you know if he, what kind of crimes he
11 had been arrested for in the past?
12   A. No, sir.
13   Q. Let me ask you about how long had you
14 worked in book-in prior to May of '03?
15   A. It varies, sir.
16   Q. I mean over the course of a year are you
17 there one day a week or you might not be there for
18 a month? How often are you in there?
19   A. Two days a week. It all depends on how
20 the sergeant makes up the schedule.
21   Q. You say you would have a lot of
22 experience being a book-in officer?
23   A. Yes, sir.
24   Q. Let me talk to you a little bit about

## Page 36

1 searches, new people who come in. What is the
2 search that you conduct when a new person comes in
3 to the book-in area?
4   A. We have them -- we do a pat down search.
5 Remove their shoes, belts, any jewelry that they
6 have on and we do a pat down search.
7   Q. Describe to me how you do the pat down
8 search.
9   A. We have them up against the wall, their
10 hands up against the wall. Have them step back,
11 spread their legs out.
12     We actually physically go down with our
13 hands starting with arms down to the left side or
14 right side down to their feet.
15   Q. And so I am assuming it is more than just
16 patting them? Are you putting your hands along
17 their body to make sure they don't have anything
18 under their clothing?
19   A. Yes, sir.
20   Q. And when you get down to their ankles and
21 feet, do you also do the same thing, put your whole
22 hand around the ankle on top of the foot and under
23 the foot to make sure there is nothing in their
24 socks?

## Page 37

1   A. Yes, sir.
2   Q. Do you ever ask them to take their socks
3 off and turn them inside out to make sure there is
4 no contraband in their socks?
5   A. No. Usually the arresting officer does
6 that, sir.
7   Q. Do you ever ask them to take their
8 pockets out to make sure there is nothing in their
9 pockets?
10   A. We can, yes.
11   Q. But do you assume that the arresting
12 officers have done those types of searches before
13 they get to the book-in area?
14   A. A lot of times we do assume that.
15   Q. Do you do different types or more
16 intensive types of pat down searches for various
17 types of arrests or for crimes that they are being
18 arrested for?
19   A. Yes, sir.
20   Q. And why don't you just tell me generally
21 the difference in like what types of crimes you
22 would do a light pat down search and what type of
23 crime you would do a more intensive search?
24   A. All pat downs should be done the same

Page 38

1 except for a strip search. And that is when it is
2 the arresting officer asks for a strip search.
3    Q. So if an arresting officer asks you to
4 strip search someone, you will do it no matter what
5 type of crime they are alleged to have committed?
6    A. Yes, sir.
7    Q. And even if it is a municipal ordinance,
8 your fellow officer says I need you to strip search
9 him, you will do it?
10    A. I don't know about that.
11    Q. Are you typically aware of the crime that
12 they have committed before you do any type of
13 search?
14    A. Yes, sir.
15    Q. And that is do you do the book-in
16 paperwork before you do a search?
17    A. Not usually.
18    Q. Where do you conduct the strip searches
19 in the book-in area?
20    A. Usually it is done in the bathroom where
21 there is no cameras.
22    Q. So it is 11:05. You are patting Kevin on
23 the back to get up. And I am assuming there is no
24 response?

Page 39

1    A. Correct.
2    Q. And then what do you do?
3    A. I grabbed him by his arm trying to get
4 him up and there was no response. And I felt for a
5 pulse and didn't get any. And then that is when I
6 called the lieutenant.
7    Q. Where did you feel for a pulse?
8    A. I do believe the first time was on his
9 neck.
10    Q. And then when was the second time?
11    A. Just immediately after that it was on his
12 left wrist I do believe.
13    Q. And there was no pulse?
14    A. No, sir.
15    Q. And then you called whom?
16    A. Lieutenant Greg Lewellyn.
17    Q. On your radio?
18    A. Yes, sir.
19    Q. And what did you tell him?
20    A. I told him I needed him in book-in.
21    Q. And then did he come down?
22    A. Yes, sir.
23    Q. Is that the very next thing you did?
24    A. No, sir. Before I called him I called

Page 40

1 Karla to bring me a couple of ammonia tablets.
2    Q. So you take the pulse, the two pulses and
3 then you call Karla?
4    A. Yes.
5    Q. And you tell her what?
6    A. I asked her to bring back two ammonia
7 tablets to the padded cell.
8    Q. Where are those kept?
9    A. Control box in the control room.
10    Q. And did she do that?
11    A. Yes, sir.
12    Q. About how much time elapsed before she
13 got there?
14    A. Less than a minute.
15    Q. Now at 11:05 you have initialed all of
16 these cells. When did you initial them? I am
17 assuming once you got to the padded cell you were
18 there for a while?
19    MR. CONDON: Are you talking about when
20 he went there at 11:05?
21 BY MR. DE CARO:
22    Q. Right. I assume you were there for a
23 while?
24    A. Yes, sir.

Page 41

1    Q. Had you already checked all of the other
2 cells by that time?
3    A. Yes, sir.
4    Q. And so at some point later in the day or
5 after the paramedics came is that when you went
6 back and put 11:05 and initialed all those?
7    A. No.
8    Q. When was that done?
9    A. I went, I did my cell check then went in
10 to get Kevin processed.
11    Q. So you went -- at 11:05 you actually went
12 and looked in the cell and saw that he was in the
13 same position that he was in at 10:40?
14    A. Right.
15    Q. He was in a prone position at 10:40. And
16 11:05 he was in a prone position?
17    A. Yes, sir.
18    Q. You go back, make all these initials and
19 you decide I am going to get Kevin up?
20    A. Yes, sir.
21    Q. Were you relieved from duty then after
22 11:05 after this incident?
23    A. No, sir.
24    Q. Where are the rest of the cell checks?

Page 42

1    A. The cell check sheet and the turn over
2 are taken by the command officer at that time.
3    Q. Every day at 11:05?
4    A. No, sir.
5    Q. Whenever he comes by?
6    A. In this case, sir.
7    Q. So there is another sheet somewhere that
8 starts around 11:30 for the rest of your shift?
9    A. I am not sure of that, sir.
10    Q. So Karla comes with ammonia within a
11 minute and then what happens?
12    A. I tried using the ammonia tablets, I
13 believe one of them and didn't get a response at
14 that time. And then that is when I called the
15 lieutenant.
16    Q. And how long did it take him to get down?
17    A. Less than 5, 7 minutes.
18    Q. And I am assuming that is the protocol
19 you are trained to call your --
20    A. Yes, sir.
21    Q. He was your supervisor?
22    A. That day, yes, sir.
23    Q. And what did you see Lieutenant Lewellyn
24 do when he got down there?

Page 43

1    A. He I believe checked for a pulse also at
2 that time and he either had one of his own that he
3 brought down or got another one out of the control
4 room. He used one.
5    Q. And you said it took him about 5 minutes
6 to get down there. What did you and Karla do for
7 those 5 minutes?
8    A. I don't recall, sir.
9    Q. Did you stay in the padded cell or did
10 you leave and go back to the control room?
11    A. No. I think we stayed in the padded
12 cell.
13    Q. Both of you?
14    A. I am not sure, sir. I really don't
15 know. I know I did. I don't know if Karla stayed
16 or not.
17    Q. During those 5 minutes did you think that
18 there was a possibility of reviving Kevin?
19    A. I don't know, sir.
20    Q. When you went to pick him up, do you know
21 which arm you grabbed?
22    A. His left arm.
23    Q. Was it stiff?
24    A. No, sir.

Page 44

1    Q. So have you ever had any experience with
2 rigor mortis setting in on a body?
3    A. No, sir.
4    Q. When you felt his neck and his wrist, was
5 his body temperature, was he still warm or was he
6 cold?
7        MR. CONDON: Don't guess if you don't
8 know. If you don't remember, tell him you don't
9 remember.
10    A. I don't remember.
11 BY MR. DE CARO:
12    Q. And when you went to grab him by the arm,
13 he didn't have a shirt on, you grabbed his arm with
14 your whole hand, did it strike you at that point
15 that he felt very cold?
16    A. I don't remember, sir.
17    Q. Did you observe Karla Young attempt to
18 revive Kevin in any way?
19    A. No, sir.
20    Q. Did you attempt to start performing CPR
21 on Kevin?
22    A. No, sir.
23    Q. Did you observe Lieutenant Lewellyn
24 perform CPR on Kevin?

Page 45

1    A. No, sir.
2    Q. When Lieutenant Lewellyn got down there,
3 what did he do?
4    A. I do believe he snapped the ammonia
5 capsule, checked for a pulse.
6    Q. And then what did he do?
7    A. Then we were instructed by Lieutenant
8 Lewellyn to contact medics.
9    Q. Where was Lieutenant Lewellyn coming
10 from? Does he have an office in the building?
11    A. He does. I don't know if he was in
12 there, sir.
13    Q. And you contacted the paramedics?
14    A. Yes, sir.
15    Q. How was that done? Through a phone in
16 the control room?
17    A. Yes, sir.
18    Q. And do you know how long it was before
19 the paramedics got there?
20    A. No, sir, I don't.
21    Q. Between the time that Lieutenant Lewellyn
22 and the paramedics arrived, did you, Lieutenant
23 Lewellyn or Karla Young attempt to revive Kevin in
24 any manner?

Page 46

1  A. No, sir.
2  Q. When was the first time that you saw the
3  baggy with the white substance in it?
4  A. About 11:05 when I went in to get him up.
5  Q. Where was the baggy?
6  A. It was about a foot towards his feet.
7  Q. Was it beyond his feet towards the back
8  wall?
9  A. Yes, sir.
10  Q. Was it behind his body in some way?
11  A. No, sir.
12  Q. So you said at 10:40 he was in the same
13  position as he was at 11:05.  But at 10:40 when
14  you looked in there you didn't see the white baggy
15  on the ground, did you?
16  A. No, sir.
17  Q. And at 11:05 when you looked in there
18  before you went in there to get him you didn't see
19  the baggy on the ground?
20  A. That is when I went in at 11:05.  That is
21  when I noticed it.
22  Q. But what I thought you said was you had
23  done all your checks.  You went back into the
24  control room, you filled this sheet out.  Then you

Page 47

1  went back to Kevin and you were going to get him
2  up, correct?
3  A. Yes, sir.
4  Q. So when you did your checks and you
5  looked in there at 11:05 before you went back to
6  the control room and initialed this, did you see
7  the baggy in there at 11:05?
8  A. No, sir.
9  Q. During your shift prior to 11:05 did you
10  have any conversation with Sergeant Reynolds
11  regarding Kevin?
12  A. No, sir.
13  Q. Did you see Sergeant Reynolds at all when
14  you came to work that day?
15  A. No, sir.  I don't believe so.
16  Q. So when you got to work the only one you
17  saw and spoke with was Officer Schull?
18  A. Yes, sir.
19  Q. And I am assuming at no time you -- at no
20  time after 7:00 and before 11:05 did you see Kevin
21  Lucas ingest cocaine in the padded cell?
22  A. No, sir.
23  Q. When the paramedics got there, what did
24  you see them do?

Page 48

1  A. Nothing, sir.  I wasn't in that area.
2  Q. Where did you go?
3  A. I went back to the control room.
4  Q. And there is not a camera in that padded
5  cell for you to watch what they did?
6  A. No, sir.
7  Q. Ever have any conversation with any of
8  the paramedics that responded?
9  A. No, sir.
10  Q. Do you know who was in the room with the
11  paramedics?
12  A. There were several people down there.  I
13  couldn't tell you who.
14  Q. Who then came down?
15  A. Captain Riggs.  The sheriff.  And I do
16  believe the investigators but I can't tell you who
17  they were.
18  Q. Cell L -- strike that.  There is a
19  holding cell next to the area where you take the
20  fingerprints, correct?
21  A. Yes, sir.
22  Q. What number is that?
23  A. 24.
24  Q. So on this particular day there was

Page 49

1  nobody in there that morning?
2  A. No, sir.
3  Q. And as you are walking to the padded cell
4  there is a cell that ends at that hallway?
5  A. Yes, sir.
6  Q. What cell is that?
7  A. That is 14, sir.
8  Q. And then there was one person in there,
9  correct?
10  A. Yes, sir.
11  Q. While that morning between 7 and 11 did
12  any work release people come through the book-in
13  area?
14  A. Not that I know of.
15  Q. So you don't check in and out work
16  release people?
17  A. No.
18  Q. Did you have to check in and out anyone
19  who went to court?
20  A. No, sir.
21  Q. How do you know that?
22  A. I do believe it was a Saturday, sir.
23  Q. Did you check anybody in and out on the
24  weekends or just check people in the cells?  Are

## Page 50

1 there people that go home on the weekends or
2 anything like that?
3    A. I don't understand your question.
4    Q. Are there some people who have to go to
5 jail Monday through Friday and they are out on the
6 weekends or anything like that?
7    A. Not down in book-in.
8    Q. Where do the work release people check
9 in?
10   A. Third floor, sir.
11   Q. And then to get to the third floor you
12 have to take the elevator?
13   A. Yes, sir.
14   Q. During this period from 7:03 to 11:05 did
15 you ever form an opinion as to what Kevin Lucas'
16 condition was whether he was drunk, high, on
17 narcotics, had an altered mental state or did you
18 not think about it?
19   A. Didn't think about it, sir.
20   Q. Have you ever in your experience -- this
21 is in non-DUI cases. Have you ever given a
22 prisoner a Breathalyzer to determine how
23 intoxicated they are?
24   A. No, sir.

## Page 51

1    Q. Is there anything, is there a rule or
2 some training you have received that would prevent
3 you from doing that?
4    A. No, sir. I am not a Breathalyzer
5 operator. I can't do it.
6    Q. Is Officer Schull a Breathalyzer
7 operator?
8    A. I am assuming he is, sir.
9    Q. Why do you assume that?
10   A. Because he usually runs the Breathalyzer
11 tests.
12      (The court reporter marked a document as
13      Exhibit No. 2.)
14 BY MR. DE CARO:
15   Q. Handing you what we have marked as Long
16 Exhibit 2, that is a death investigation complaint
17 form that was dated 05/12 of '03.
18      Apparently prepared by Captain Miller and
19 it was reported by Officer Richard Long, II. Would
20 you take a look at that and tell me if that is a
21 summary of what you reported to Captain Miller?
22   A. Yes.
23   Q. It appears as though some of that is not
24 attributed to you and perhaps starts at the fourth

## Page 52

1 paragraph of what you would have relayed to Captain
2 Miller. Is that accurate or is all of that
3 information from you?
4    A. I do believe that is all from me, sir.
5    Q. So it talks about the adhesive strips
6 that were attached by the paramedics. They may
7 have been EMTs but I am going to call them
8 paramedics.
9      Did you at some point observe that they
10 had attached some monitors to his back?
11   A. No, sir.
12   Q. And also it talks about the small clear
13 plastic bag that was found in the cell. And here
14 it says in the bag was a light brown powdery
15 substance assumed to be some type of controlled
16 substance.
17      Is it your recollection that inside the
18 bag was a brown substance?
19   A. I am not sure, sir. Brown or white or
20 just saw.
21   Q. Well, this was given two days after his
22 death so would it be fair to say assume that back
23 then on May 12 you may have considered the
24 substance to be brown?

## Page 53

1    A. Yes, sir.
2    Q. And it says in the middle of paragraph 4
3 Correctional Officer Long stated that he had
4 checked on the victim periodically, noted the
5 victim was laying down but assumed the victim was
6 asleep. That is accurate? You thought he was
7 sleeping when he was lying down on the ground?
8    A. Yes, sir.
9    Q. Also when he was on his side?
10   A. Yes, sir.
11   Q. And then when he was prone?
12   A. Yes, sir.
13      (The court reporter marked a document as
14      Exhibit No. 3.)
15 BY MR. DE CARO:
16   Q. I gave you what we have marked as Richard
17 Long Exhibit 3 and that is a transcript from a tape
18 recorded statement taken on May 10, 2003 at
19 approximately 2:33 p.m. Do you recall giving a
20 tape recorded statement that day?
21   A. Yes, sir.
22   Q. And who did you give it to?
23   A. I can't remember if it was Rod Kaag or
24 Damilano to be honest with you.

Page 54

1  Q. Have you had a chance prior to the
2 deposition to look through this statement?
3  **A. Yes, sir.**
4  Q. And this is your statement to the best of
5 your recollection?
6  **A. Yes, sir.**
7  Q. You said you had known Kevin from being
8 in the jail before. Had you had a little contact
9 with him as far as communications?
10     You said he had mumbled something
11 incoherent that morning. Had you ever seen him
12 acting like this before?
13  **A. Not while in the jail, no.**
14  Q. While in the jail prior had you ever had
15 conversations with him or did you just see him?
16  **A. I have had conversations with him.**
17  Q. Was he a friendly guy or was he, you
18 know, sort of standoffish or was he gregarious?
19  **A. Wasn't overly friendly. He was cordial.**
20 **Spoke to me, I spoke to him.**
21  Q. Did you ever meet him off duty?
22  **A. No, sir.**
23  Q. Did you know he had asthma?
24  **A. Yes, sir.**

Page 55

1  Q. Did you ever see him use an inhaler while
2 in the jail?
3  **A. Yes, sir.**
4  Q. Do you know if it was his inhaler or it
5 was provided to him by the jail?
6  **A. No, sir.**
7  Q. Do you know if he was ever taken to the
8 hospital from the jail because of asthma?
9  **A. I can't answer that, sir.**
10  Q. Do you know if a nurse or doctor was ever
11 called to go to his cell because he was having a
12 problem breathing?
13  **A. No, sir.**
14  Q. In your interrogatory answers you list a
15 couple of cases where you have been named as a
16 defendant.
17     I just want to find out your recollection
18 of those cases. One is Perry vs. Hartshorn. That
19 was back in 1998. Do you remember the facts of
20 that case?
21  **A. No, sir.**
22  Q. Did you give a deposition in that case?
23  **A. No, sir.**
24  Q. Another one is Dunn vs. Rice. Do you

Page 56

1 remember -- that was filed in '04. Do you know
2 the facts of that case or the allegations?
3  **A. Yes, sir.**
4  Q. What are the allegations -- strike that.
5 First are you a named defendant in that case?
6  **A. I believe so, sir.**
7  Q. What are the allegations the plaintiff
8 has made in that case?
9  **A. To be honest with you, I don't know. I**
10 **can basically tell you what I did.**
11  Q. Well, I don't want you to make any
12 statements for the record on that case but is it
13 involving an incident at the jail?
14  **A. Yes, sir.**
15  Q. Did the plaintiff -- has the plaintiff
16 alleged that he was injured as a result of
17 something you did?
18  **A. No, sir.**
19  Q. Is he alleging that he was injured as a
20 result of something anyone did?
21  **A. No, sir.**
22  Q. It is not an injury case or is it a false
23 arrest or like a 1983 civil rights case?
24  **A. No, sir.**

Page 57

1    MR. CONDON: Off the record.
2    (Discussion held off the record.)
3    (The court reporter marked a
4    document as Exhibit No. 4.)
5 BY MR. DE CARO:
6  Q. Counsel has informed me this involved a
7 hanging of a prisoner in the jail. I am handing
8 you, Officer, what we have marked as Long Exhibit 4
9 which are your interrogatory answers.
10     You want to just take a look at the last
11 page and is that your signature?
12  **A. Yes, sir.**
13  Q. And I think you said this is one of the
14 documents you reviewed prior to the deposition?
15  **A. Yes, sir.**
16  Q. I just want to confirm a few things. If
17 you look at question 17, I asked state whether you
18 have ever received any formal or informal training
19 regarding the recognition of a person suffering
20 from a drug/narcotic induced overdose. And your
21 answer is no.
22     Would it be fair to say your initial
23 training and at the PTI they did not train you in
24 recognizing someone who might be suffering from a

Page 58

1 narcotic overdose?
2    **A. Yes, sir.**
3    Q. That would be true?
4    **A. Yes, sir.**
5    Q. Also somebody who might have ingested too
6 much alcohol?
7        MR. CONDON: You mean -- object to the
8 form of the question.  You mean alcohol overdose?
9 BY MR. DE CARO:
10    Q. Alcohol overdose where they might slip
11 into a coma or something like that as opposed to
12 pulling someone over for a DUI?
13    **A. No, sir.**
14    Q. So you did not receive that type of
15 training?
16    **A. No, sir.**
17    Q. Did you ever receive training at PTI
18 regarding how to determine whether someone is
19 mentally or emotionally disturbed or impaired?
20    **A. I don't believe so, sir.**
21    Q. If you look at question 19 and then the
22 answer can you tell me about some procedures in the
23 jail where if someone has a blood alcohol level of
24 over .30 they should be taken to the hospital and

Page 59

1 examined, correct?
2        MR. CONDON: Just for the record it says
3 who are arrested for DUI.
4 BY MR. DE CARO:
5    Q. Individuals who are arrested for DUI and
6 they give a blood, they blow and their blood
7 alcohol is over .30.  Those can't be accepted into
8 the jail until they are seen by a doctor.  Would
9 that be fair?
10    **A. Yes, sir.**
11    Q. And here is what I am trying to find out.
12  If someone has a blood alcohol level of less than
13  .30 and they are a little tipsy and they come in
14 and they are cooperative, you will just follow your
15 normal procedures and put them ultimately into a
16 cell?  You will book them and put them into a cell?
17    **A. Yes, sir.**
18    Q. And you would follow the procedures in
19 the county rules and regulations and the
20 administrative code?
21    **A. Yes, sir.**
22    Q. And then if someone is really
23 intoxicated, drunk with a blood alcohol level of
24 over .30, there is a procedure in the rules as to

Page 60

1 what to do with them, correct?
2    **A. I do believe so, sir.**
3    Q. Is there a written policy or procedure
4 for an individual who falls in between those
5 parameters where they might have ingested an
6 unknown amount of alcohol or a narcotic and is
7 uncooperative and you don't follow the -- is there
8 a procedure for them where you can't book them in,
9 you can't take their fingerprints?  They are not
10 following direction?  Is there a procedure of what
11 you do with them?
12    **A. I don't know if it is written or not,**
13 **sir, but there is a procedure that we follow.**
14    Q. What is that?
15    **A. We just place them in a cell and let them**
16 **sleep it off.**
17    Q. If they are uncooperative is there a
18 written procedure as to whether you put them into a
19 holding cell or padded cell?
20    **A. I am not positive on that, sir.**
21    Q. Is that something that would be left up
22 to the individual book-in officer?
23    **A. Yes, sir.**
24    Q. Because you only have one padded cell I

Page 61

1 am assuming and you have multiple other holding
2 cells I am assuming that there isn't a need too
3 often to put a person in a padded cell?  Would that
4 be fair?
5    **A. No.**
6    Q. There is not or that is not a fair
7 characterization?
8    **A. There is several times that several**
9 **people go into a padded cell.**
10    Q. Does that padded cell only hold one
11 person?
12    **A. Yes, sir.**
13    Q. If that padded cell is filled up and
14 another person needs a second padded cell but you
15 don't have one, what do you do with those people?
16    **A. We take them to the fourth floor.  There**
17 **is a padded cell up there.**
18    Q. How many padded cells are there in the
19 whole building?
20    **A. Two.**
21    Q. Have you ever put people in padded cells?
22    **A. Yes, sir.**
23    Q. For what types of things or what was your
24 reasoning for doing it?

Page 62

1    A. Combative. Once they are put in a cell
2 and they start kicking the door and trying to do
3 bodily harm to themselves.
4    Q. Now when you say combative, what is your
5 definition of combative? What would you say
6 someone is combative when they exhibit what type of
7 behavior?
8    A. Overly aggressive.
9    Q. Towards an officer?
10    A. Or another inmate.
11    Q. Any other characteristics that you would
12 call combative?
13    A. No, sir.
14    Q. Do you know Captain Morgan?
15    A. Yes, sir.
16    Q. Is he still alive?
17    A. Yes, sir.
18    Q. Where would I find him if you know?
19    A. Tilton, Illinois.
20    Q. He is retired?
21    A. Yes, sir.
22    Q. I want to look at a few incidents that I
23 have pulled from your personnel file. We will do
24 them in oldest to most recent.

Page 63

1    (The court reporter marked a document as
2    Exhibit No. 5.)
3 BY MR. DE CARO:
4    Q. Officer, I have handed you what we have
5 marked as Long Exhibit No. 5. It is a memorandum
6 from the Vermilion County Sheriff's office, front
7 page is to Richard Long from Captain Morgan.
8 Subject, letter of reprimand. Dated March 6, 1998.
9    This is an event where there was some
10 dispute over who was going to serve a warrant on
11 someone at the jail facility, correct?
12    A. Yes, sir.
13    Q. And you received a letter of reprimand
14 for that. What is the -- if you could just tell me
15 in the hierarchy of discipline, what is a letter of
16 reprimand? Is that the first level?
17    A. I believe so, sir.
18    Q. Was this the extent of this incident, the
19 letter of reprimand?
20    A. Yes, sir.
21    Q. Are letters of reprimand then put into
22 your permanent personnel file?
23    A. I am just aware of it, yes.
24

Page 64

1    (The court reporter marked a document as
2    Exhibit No. 6.)
3 BY MR. DE CARO:
4    Q. I have given you what we have marked as
5 Exhibit 6. It is a group of documents. Subject is
6 to -- strike that. To Sergeant Lewellyn from
7 Captain Morgan.
8    Subject, failure to check cell -- failure
9 to make cell checks dated August 25, 1998. And
10 this group of letters is regarding an investigation
11 of your failure to make some cell checks back on
12 August 24, 1998; is that correct?
13    A. Yes, sir.
14    Q. And is this a similar -- these cell
15 checks, I know it is a different floor?
16    A. Yes, sir.
17    Q. What floor were these cells on?
18    A. Third floor, sir.
19    Q. And is this a similar situation just in
20 form and procedure as to Exhibit 1 where you check
21 a cell and then go back and initial that it was
22 checked?
23    A. Yes, sir.
24    Q. And what was the ultimate resolution of

Page 65

1 this complaint? Were you reprimanded in any
2 manner?
3    A. Just a letter that I remember, sir.
4    Q. Another letter?
5    A. I am not sure if I received a letter of
6 reprimand or what to be honest with you, sir. It
7 has been so long ago.
8    Q. The ultimate finding I think was the
9 sheriff ultimately determined what happens in these
10 cases?
11    A. I don't know if the captain, you know,
12 the severity of the case whether the captain starts
13 and where the sheriff starts.
14    Q. If you look at the last page there it was
15 the Captain Morgan's conclusion that no cell checks
16 were made during the time in question which were in
17 violation of Section 701.130 A2 of the Illinois
18 County Jail Standards which state a jail officer
19 shall provide personal observation not including
20 observation by a monitoring device at least once
21 every 30 minutes.
22    So that was Captain Morgan's conclusion
23 that you did not make these cell checks even though
24 that they were initialed?

Page 66

1  A. Yes, sir.
2  Q. Are you aware of any Illinois county jail
3 standard that requires you to check cells more
4 frequently than every 30 minutes?
5  **A. I do believe. I am not sure which one it**
6 **is though, sir.**
7  Q. So there might be some circumstances I
8 think if it is a risk of escape, risk of suicide,
9 altered mental status or mental or emotional
10 disturbance that you would check those individuals
11 more than every 30 minutes?
12  A. Yes, sir.
13  Q. Had you been informed that Kevin Lucas
14 might have an altered mental state would you have
15 checked him more than every 30 minutes?
16  MR. CONDON: Just object. It calls for
17 speculation.
18 BY MR. DE CARO:
19  Q. Well, pursuant to your training and
20 pursuant to this compiled statutes and
21 administrative code?
22  **A. Yeah. Usually, you know, the command**
23 **officer or the person that worked the shift before**
24 **you will inform you of that, you know, that this**

Page 67

1 **person is on a suicide watch or this person**
2 **whatever.**
3  Q. In your experience or training is the
4 consumption of no matter, you know, little or a lot
5 of alcohol or narcotics ever considered a medical
6 condition?
7  **A. Not that I am aware of, sir.**
8  Q. Are you aware that consuming too much
9 alcohol or too much narcotics could possibly be a
10 health hazard?
11  A. Yes, sir.
12  **(The court reporter marked a document as**
13  **Exhibit No. 7.)**
14 BY MR. DE CARO:
15  Q. We have handed you what we have marked as
16 Exhibit 7. It is another memorandum, several
17 pages.
18  This one is dated May 24, 2000 to Captain
19 Morgan from Richard Long regarding a response to
20 officer K. Dewitt's memo dated 05/18 of 2000.
21  And I don't want to go into the facts of
22 this, it involves an off-colored joke but I just
23 want to find out what was the result of this
24 inquiry. Was this another letter of reprimand?

Page 68

1 Was there a suspension?
2  **A. No suspension, sir. As far as I know I**
3 **was told not to do it again.**
4  Q. After the paramedics left after
5 responding to the Kevin Lucas call, were you still
6 working in the book-in area that morning? Did you
7 remain there throughout your shift?
8  A. I do believe so, sir.
9  Q. Do you know who came down there to remove
10 Kevin's body?
11  **A. Tony Jones I think is his name.**
12  Q. Who was he?
13  **A. I think he does transports for the**
14 **coroner's office, sir. I don't know.**
15  Q. Do you know how long Kevin's body
16 remained in the padded cell?
17  A. No, sir.
18  Q. Do you know who retrieved and inventoried
19 the baggy?
20  **A. One of the investigators, sir.**
21  Q. A county investigator?
22  A. Yes, sir.
23  Q. From Vermilion County?
24  A. Yes, sir.

Page 69

1  Q. Do you remember seeing the Vermilion
2 County coroner down in the padded cell area that
3 morning?
4  A. No, sir.
5  Q. Do you remember if an evidence technician
6 or some other officer came down there to take
7 photographs of Kevin that morning?
8  **A. One of the investigators I do believe,**
9 **sir.**
10  Q. Have you had any conversation with any of
11 the responding paramedics since the day this
12 happened?
13  A. No, sir.
14  Q. Any conversation with Officers O'Brien or
15 Sporcich regarding what happened?
16  A. No, sir.
17  Q. Any conversation with Sergeant Reynolds
18 regarding Kevin Lucas?
19  A. No, sir.
20  Q. Any conversation with Michael Schull
21 regarding Kevin Lucas at all?
22  MR. CONDON: You are referring to
23 conversations that didn't happen in the presence of
24 his attorney?

Page 70

BY MR. DE CARO:

Q. Right. Do you know Lucille Butler or any of Kevin Lucas' brothers?

A. No, sir.

Q. Have you had any conversation with any other officer or administrator for the county outside of the presence of your attorney regarding Kevin Lucas other than your statements?

A. No, sir.

Q. I think there is a photograph of Kevin's T-shirt in the hallway outside the padded cell area. Did you ever see his T-shirt out in the hallway that day?

A. I don't recall, sir.

Q. Was there anything outside either of the padded door cells that belonged to Kevin that morning?

A. I don't recall.

Q. If an Officer Schull took his shoes and shirt that morning before putting him into the padded cell, where would they have put those for him?

A. Those would be usually right there outside the padded cell.

Page 71

Q. Of which door?

A. Either the first or the second one.

Q. And I know you don't recall it but had they been there is that something you would have seen?

MR. CONDON: I will object. It calls for speculation. He said he doesn't recall.

BY MR. DE CARO:

Q. I am asking more of your ability to observe a pair of shoes in the hallway. Do you think you would have seen that?

MR. CONDON: Same objection.

A. I believe I would have saw his shoes if they were out there. I don't believe his shoes were out there.

BY MR. DE CARO:

Q. And you think you would have seen them if they were inside by the padded door somewhere by the bathroom?

A. Yes, sir. I would have had to move them to open the door.

Q. Have you ever had any conversations with anyone who said that they had called the police to come and arrest Kevin?

Page 72

A. No, sir.

Q. Are there any rules or regulations or procedures in any of the documents we have here today or any documents that you are aware of of what the proper procedure to be followed is when you come upon an inmate who is unconscious?

A. I am not sure, sir. I don't believe so but I am not positive. Couldn't answer that.

Q. Is there any requirement, state, federal or local that you are aware of that requires one or more correctional officers to be certified in CPR and be on duty at one time?

A. No. I don't know, sir.

Q. You are not certified as an EMT or paramedic?

A. No, sir.

Q. What is the procedure if you come across someone who is in need of medical attention? What are you supposed to do?

A. Our first initial one is to contact command officer.

Q. In this case it was Lieutenant Lewellyn?

A. Yes, sir.

Q. And then what is the next step?

Page 73

A. And then he takes over.

Q. Have we talked about everything, all of your interactions with Kevin between 7:03 and 11:05 on May 10 of '03?

Have we covered all of your interaction? By that I mean was there a time where you went to the padded cell for any reason outside of these checks?

A. No, sir.

Q. Now you said earlier that the padded cell was soundproof?

A. Yeah. I think I said that but I don't actually mean it is soundproof but it is, you can hear people pounding on it.

Q. Can you hear people calling from there?

A. Yes, sir.

Q. So if he were calling you while you were in the control room, you can hear that?

A. Yes, sir.

Q. Can you hear that even if the food door is closed?

A. Yes, sir.

Q. How do the inmates with the padded door shut get your attention to go to the washroom?

Page 74

1  A. By hollering.
2  Q. And how do you safely let them do that?
3 How do you open that padded door and then get out
4 in time to shut the other door? Is there a
5 procedure for that or you just move quickly?
6  A. You just tell them to back up against the
7 wall. And once they back up against the wall you
8 unlock the door, step back and close the outer
9 door.
10  Q. Have you ever had to call a mental health
11 professional for any inmate while during your
12 career there?
13  A. Not that I am aware of, sir.
14  Q. Have you ever had to call an ambulance
15 for an inmate who had a drug overdose?
16  A. No, sir.
17  Q. And by that I don't mean you personally
18 but your procedure of calling your supervisor and
19 things like that?
20  A. Right.
21  Q. Is this the first time that an inmate has
22 died while in the cell area where you were
23 checking?
24  A. Yes, sir.

Page 75

1  MR. DE CARO: I have nothing else.
2  MR. CONDON: Just a few questions.
3
4 EXAMINATION,
5  QUESTIONS BY MR. CONDON:
6  Q. Do you know, Correctional Officer Long,
7 if Kevin Lucas took his shirt off and threw it out
8 of the cell area?
9  A. No, sir.
10  Q. Are you aware of individuals who have
11 come into the Vermilion County jail who have hidden
12 drugs in body cavities?
13  A. Yes, sir.
14  Q. And would you be able to detect if
15 someone had hidden drugs in a body cavity by doing
16 a pat down search?
17  A. No, sir.
18  Q. If you take a look at Exhibit No. 3 which
19 is the statement that you gave, if you go to page 2
20 actually it starts at the end of page 1 and then
21 goes to 2.
22  You are asked if Officer Schull advised
23 you of anything regarding Kevin Lucas. And up at
24 the top of page 2 you say that he stated he was

Page 76

1 combative, wouldn't come in and so that is why they
2 placed him in there; is that correct?
3  A. Yes, sir.
4  Q. So Officer Schull told you that Kevin
5 Lucas had been combative prior to them putting him
6 into the padded cell?
7  A. Yes, sir.
8  Q. I am going to show you what was marked as
9 Schull Exhibit No. 2 in Officer Schull's
10 deposition. Do you see this document?
11  A. Yes, sir.
12  Q. And what is that document?
13  A. That is our book-in sheet.
14  Q. Do you know if that was -- strike that.
15 Do you know who prepared it?
16  A. Possibly could have been book-in officer
17 or the arresting officer.
18  Q. Do you see where the words written doped
19 up are on the sheet there?
20  A. Yes, sir.
21  Q. Did you see that sheet that morning?
22  A. Yes, sir.
23  Q. So when you went to check on Kevin Lucas
24 -- strike that. What did you believe the words

Page 77

1 doped up meant when they were written on there when
2 you saw it?
3  A. That he was high on something, alcohol or
4 drugs.
5  Q. So when you went to check on Kevin Lucas
6 that morning, did you believe that he was either
7 intoxicated or he was high on some drugs?
8  A. Yes, sir.
9  Q. And did you believe that he was in the
10 padded cell as you had referred to earlier to sleep
11 it off?
12  A. Yes, sir.
13  Q. At any time did Kevin Lucas ever request
14 medical treatment from you?
15  A. No, sir.
16  Q. Did you ever observe any physical
17 injuries to him?
18  A. No, sir.
19  Q. At any time did you ever physically punch
20 or strike Kevin Lucas?
21  A. No, sir.
22  Q. Did you ever observe any correctional
23 officer or any officer do that to him?
24  A. No.

Page 78

1    Q. If an inmate in the jail needs medical
2 treatment, there is a nurse who is employed at the
3 jail Monday through Friday; is that correct?
4    **A. Yes, sir.**
5    Q. Is the inmate then taken to the nurse to
6 get treatment?
7    **A. Either that or she comes to the inmate.**
8    Q. And there is also a doctor that is
9 employed who is on staff at the jail; is that
10 correct?
11    **A. Yes, sir.**
12    Q. And if you believe that an inmate needed
13 medical treatment I believe you said you contact
14 your supervisor; is that correct?
15    **A. Yes, sir. If the nurse isn't there.**
16    Q. And if an inmate is in need of emergency
17 medical treatment, is the inmate then taken to the
18 hospital?
19    **A. That would be the decision up to the**
20 **command officer.**
21    Q. Are you aware of any circumstances where
22 an inmate needed emergency medical treatment and he
23 wasn't taken to the hospital?
24    **A. No, sir.**

Page 79

1    Q. Are you aware that the Vermilion County
2 jail utilizes Crosspoint Human Services as their
3 mental health facility?
4    **A. Yes, sir.**
5    Q. And if an inmate is in need of mental
6 health treatment, are arrangements made for the
7 inmate to be taken to Crosspoints?
8    **A. Yes, sir.**
9    MR. CONDON: That is all I have.
10
11 EXAMINATION,
12    QUESTIONS BY MR. DE CARO:
13    Q. On Saturday at 7 a.m. there is not a
14 nurse at the jail, is there?
15    **A. Sometimes.**
16    Q. Do you know if there was one on May 10,
17 2003?
18    **A. No, sir. I don't think so.**
19    Q. Is there typically a doctor there on
20 Saturday mornings at 7 a.m.?
21    **A. Not at 7 a.m.**
22    Q. And you said that the decision to take
23 someone to a hospital is left up to the commanding
24 officer?

Page 80

1    **A. Yes.**
2    Q. And in this case who would have been the
3 commanding officer after 7 a.m.? Lewellyn?
4    **A. That would be Lieutenant Lewellyn.**
5    Q. Is he a physician?
6    **A. No, sir.**
7    Q. So the decision as to whether someone is
8 given medical attention at a hospital when there is
9 not a nurse or doctor there is left up to a
10 commanding officer?
11    **A. Yes, sir. Sometimes they call the doctor**
12 **on call and give them, you know, the information**
13 **and then he lets them know what he wants done with**
14 **them.**
15    Q. How many people have you sent to
16 Crosspoint for medical conditions or not medical
17 but mental conditions or needing psychiatric care
18 in your years as an officer there?
19    **A. Me personally?**
20    Q. Yes?
21    **A. Never any, sir.**
22    Q. You said that typically people are put in
23 a padded cell if they are combative. Is that if
24 they are combative to the book-in officer or?

Page 81

1    **A. Or to other inmates or to arresting**
2 **officers or they are going to do harm to themselves**
3 **by pounding on the steel doors.**
4    Q. That is determined at the time of book
5 in?
6    **A. By the book-in officer, yes, sir.**
7    MR. DE CARO: Nothing else.
8
9 EXAMINATION,
10    QUESTIONS BY MR. CONDON:
11    Q. Would it be the -- is it your
12 understanding that it would be the jail nurse or
13 doctor who would make the determination if an
14 inmate should be evaluated at Crosspoints for
15 mental health treatment?
16    **A. Yes, sir.**
17    MR. CONDON: That is all. We will
18 reserve.
19
20
21
22
23
24

Page 82

1

2 BUTLER,

3      Plaintiff,

4      vs.

5 VERMILION COUNTY SHERIFF, et al,

6      Defendants.

This is to certify that I have read the
7 transcript of my deposition taken in the
above-entitled cause, and that the foregoing
8 transcript taken on August 5, 2005 accurately
states the questions asked and the answers given by
9 me, with the exception of the corrections noted, if

10   any, on the attached errata sheet(s).

11

12          RICHARD LONG

13 Subscribed and Sworn before

14   me this ____ day of _____, 2005.

15 Notary Public

16

17

18

19

20

21

22

23

24

---

Page 83

1 STATE OF ILLINOIS      )
                         ) SS
2 COUNTY OF VERMILION )

3      I, BECKY L. JESSUP, CSR, RPR, a Notary Public
in and for the County of Vermilion, State of
4 Illinois, do hereby certify that RICHARD LONG, the
deponent herein, was by me first duly sworn to tell
5 the truth, the whole truth and nothing but the
truth in the aforementioned cause of action.
6      That the foregoing deposition was taken on
behalf of the Plaintiff, on the 5th day of August,
7 2005.
       That said deposition was taken down in
8 stenograph notes and afterwards reduced to
typewriting under my instruction; and that the
9 typewritten transcript is a true and accurate
record of the testimony given by said deponent; and
10 that it was agreed by and between the witness and
attorneys that said signature on said deposition
11 would not be waived.
       I do hereby certify that I am a disinterested
12 person in this cause of action; that I am not a
relative or attorney of any of the parties, or
13 otherwise interested in the event of this cause of
action, and am not in the employ of the attorneys
14 for either party.
       IN WITNESS WHEREOF, I have hereunto set my
15 hand and affixed my notarial seal this 16th day of
August, 2005.

16

17

18      Becky L. Jessup, CSR, RPR
        Notary Public

19

20

21

22

23

24