Multi-Page™

RAYMOND LEWELLYN E-FILED
Wednesday, 15 March, 2006 03:30:40 PM
Clerk, U.S. District Court, ILCD

THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
STATE OF ILLINOIS

LUCILLE BUTLER, Individually and )
as Special Administrator of the )
Estate of Kevin Lucas, Deceased, )
                                  )
          Plaintiff,              )
                                  )
     vs.                          )   No. 04-CV-2048
                                  )
VERMILION COUNTY SHERIFF          )
KENNETH O'BRIEN, et al.,          )
                                  )
          Defendants.             )

DEPOSITION

    The Deposition of RAYMOND LEWELLYN, a citizen
of the State of Illinois, a witness of lawful age;
produced, sworn, and examined upon his corporeal
oath, at the Vermilion County Courthouse, Danville,
Illinois on August 9, 2005, before Becky Jessup,
CSR, RPR, Notary Public in and for the County of
Vermilion and State of Illinois, as a witness in a
certain suit and matter now pending and
undetermined in the United States District Court
for the Central District of Illinois.
    CSR License No. 84-004343

APPEARANCES:

     KUPETS & DE CARO, P.C.
     30 N. LaSalle Street, Suite 4020
     Chicago, Illinois  60602
     By:  Mr. Dennis De Caro, Attorney
     Appearing for the Plaintiff

     LAW OFFICES OF MR. MICHAEL CONDON
     Attorney at Law
     333 Pierce Road
     Itasca, Illinois  60123

COPY



EXHIBIT
9

Page 2

1          I N D E X   O F   E X A M I N A T I O N
2                                    Page
3  EXAMINATION, by Mr. De Caro              3
4  EXAMINATION, by Mr. Condon              71
5  EXAMINATION, by Mr. De Caro             75
6
7
8
9                  EXHIBITS
10  No.                    Page
11  1   .....................................              58
12  2   .....................................              59
13  3   .....................................              60
14  4   .....................................              64
15
16
17
18
19
20
21
22
23
24

Page 3

1          RAYMOND LEWELLYN, the witness herein,
2  having been first duly sworn to tell the truth, the
3  whole truth and nothing but the truth, was examined
4  and testified as follows:
5
6  EXAMINATION,
7       QUESTIONS BY MR. DE CARO:
8       Q. Would you please state your full name and
9  spell your last name for the court reporter?
10      A. Raymond A. Lewellyn, l-e-w-e-l-l-y-n.
11      Q. My name is Dennis De Caro. You are a
12  lieutenant?
13      A. Yes.
14      Q. I represent Lucille Butler who is here
15  this morning, along with the estate of her son
16  Kevin Lucas.
17         I am going to be asking you a series of
18  questions regarding his incarceration and death of
19  the Vermilion County jail on May 10, 2003.
20         I will ask initially some background
21  questions and then we will talk about the event and
22  then we will talk about some policies and
23  procedures of the jail.
24         Have you ever given a deposition before?

Page 4

1       A. No, sir.
2       Q. Just a couple guidelines just so when we
3  order this and we read this it is clear. One, we
4  should try not to speak over one another.
5         Let me get my full question out and I
6  will try to let you get your full answer out before
7  I ask another question so the court reporter can
8  get everything down.
9         Second thing is you have to answer
10  everything verbally. If you nod she can take down
11  that you nodded but when we read it we won't know
12  whether you nodded yes or no. So when you do that
13  we will ask did you mean yes or no.
14         In this particular case I saw that you
15  had given a statement, correct?
16      A. Yes, sir.
17      Q. Sorry. Not a statement. You filled out
18  a report, actually two reports. Do you recall
19  that?
20      A. I recall one report, yes.
21      Q. Did you ever provide a tape recorded
22  statement to anyone?
23      A. No, sir.
24      Q. And it seems as though everyone was

Page 5

1  involved with one particular case being named as a
2  defendant.
3         Have you been named in your official
4  capacity as a defendant in the last 10 years in any
5  case?
6       A. That one case you are referring to is the
7  only one.
8       Q. And the name escapes me.
9         MR. CONDON: Perry.
10      A. David Perry.
11  BY MR. DE CARO:
12      Q. Do you remember the facts of that case at
13  all?
14      A. Some. I seem to remember he sued us
15  because he broke his tooth.
16      Q. Is that the spaghetti case?
17         MR. CONDON: Yes.
18  BY MR. DE CARO:
19      Q. Did you give a deposition in that case?
20      A. No, sir.
21      Q. Have you reviewed anything for your
22  deposition here today?
23      A. Yes, sir.
24      Q. What was that?

Page 6

1    A. My report.
2    Q. Now I have a May 10 report and I have
3 another report from May 12 which may have been a
4 summary by someone else. Do you know the date of
5 the report you reviewed?
6    A. The one I wrote was May the 10th.
7    Q. What is your date of birth?
8    A. 8/22/62.
9    Q. What is your highest level of education?
10    A. Associate's degree.
11    Q. From where?
12    A. Danville Area Community College.
13    Q. When did you receive that?
14    A. 1983.
15    Q. When did you start with the Danville
16 sheriff's office?
17    A. Vermilion County Sheriff's Department?
18    Q. Yes.
19    A. January 1986.
20    Q. Now I did notice from your personnel file
21 that yours lacked a background investigation which
22 is a packet that everyone else has had that
23 includes personal interviews, criminal history,
24 neighborhood interviews and so on.

Page 7

1        Is that because you when you were hired
2 they did not perform the type of checks that are
3 contained in this background investigation?
4    A. I can't say. I have never seen one of
5 those before.
6        (Discussion held off the record.)
7 BY MR. DE CARO:
8    Q. Back on the record. We had a discussion
9 off the record and Counsel is going to look into
10 why there wasn't a background investigation packet
11 in your personnel file.
12        After high school why don't you just
13 generally tell me what types of employment you had
14 leading up to January of '86 when you started with
15 the county?
16    A. While I was in high school I started work
17 at First Midwest Bank part time. I eventually
18 became a security maintenance man there and that
19 was the only job I had prior to this one.
20    Q. When you say security maintenance, did
21 you do security and maintenance?
22    A. Yes, sir.
23    Q. Was that part time up until January '86?
24    A. No. Once I graduated from high school I

Page 8

1 started full time.
2    Q. When did you graduate high school?
3    A. 1980.
4    Q. So you had that job for about six years,
5 five years?
6    A. Yes, sir.
7    Q. To be a security person for the bank, did
8 they provide you with any type of training?
9    A. No, sir.
10    Q. Prior to becoming a county sheriff, did
11 you have any type of police training?
12    A. No, sir.
13    Q. Any type of medical training?
14    A. No, sir.
15    Q. I am assuming in January or shortly
16 thereafter of '86 you did receive some training for
17 the sheriff's office?
18    A. Yes, sir.
19    Q. Where was that done?
20    A. Peoria County Sheriff's Department.
21    Q. Was the Peoria County sheriff's office
22 used as a training center or did they actually do
23 the training?
24    A. Yes, sir. It was a training center.

Page 9

1    Q. Do you know who did your training?
2    A. No, sir.
3    Q. Do you know who does the training now for
4 the new sheriffs?
5    A. No, sir. It is provided by the State of
6 Illinois.
7    Q. Do you know if when you did the training
8 if it was provided by the State of Illinois?
9    A. Yes, sir.
10    Q. Can you tell me generally was it a
11 classroom setting that you had your training?
12    A. Yes, sir.
13    Q. How long of a course was it? Number of
14 hours or weeks?
15    A. I believe it was five weeks.
16    Q. Could you tell me generally the type of
17 classes you were trained in if you recall?
18    A. We had one week of fire arms training.
19 The rest of it was just general jail settings and
20 things that we have to do. It has been so long ago
21 it is hard for me to remember.
22    Q. Did you ever have a paramedic or EMT or
23 doctor or nurse come in and give you any training
24 on medical emergencies?

Page 10

1    A. No, sir.
2    Q. Subsequent to becoming a sheriff have you
3 had any continuing education type training either
4 formally or training that the county offers?
5    A. Any type of training?
6    Q. Yeah.
7    A. Yes, sir.
8    Q. Can you tell me the training you have had
9 since this initial training that you recall?
10    A. The ones I recall I went to a law review
11 class. It was an update. A CPR class. A training
12 session for how to train new officers. Those are
13 the only ones I can recall.
14    Q. The law review class, what was that? A
15 review of current case law at the time?
16    A. Yes, sir.
17    Q. That affects your job?
18    A. Yes, sir.
19    Q. CPR class I am assuming I know what that
20 means. Did you become CPR certified?
21    A. At that time, yes, sir.
22    Q. How long does a certification last?
23    A. I believe one year. I am not sure.
24    Q. Were you certified in May of 2003 in CPR?

Page 11

1    A. No, sir.
2    Q. Had you taken that CPR class prior to May
3 of 2003 or after?
4    A. Prior.
5    Q. And you went to a training class on how
6 to train correctional officers, correct?
7    A. Yes, sir.
8    Q. You are strictly a correctional officer,
9 not a sheriff who goes out and make arrests. Would
10 that be fair?
11    A. That is correct.
12    Q. In your capacity as lieutenant do you
13 train correctional officers today?
14    A. Sometimes, yes.
15    Q. And why don't we define training. And
16 just let me know if it goes outside of this. When
17 I mean training, you get together after work or on
18 a Saturday in a classroom, you hand out information
19 and you go over procedures or policies or
20 techniques, okay.
21    If you have a broader view of training
22 meaning on-the-job training, you know, going down
23 there and showing them how to do it, just let me
24 know that. Okay?

Page 12

1    A. Okay. That is what it is. It is
2 on-the-job training.
3    Q. Okay. And what types of things would you
4 do for on-the-job training and what types of areas?
5    A. Paperwork, running control panels, cell
6 checks. Things of that variety.
7    Q. In May of 2003 how many correctional
8 officers were under your supervision? I don't mean
9 on a given day.
10    A. All together?
11    Q. Yeah.
12    A. Approximately 35.
13    Q. And how many would there be working on a
14 given shift on a given day?
15    A. It is according to what shift.
16    Q. How about the third shift?
17    A. At least six officers.
18    Q. Have you ever -- I am just going to go
19 through a few things. Have you ever had training
20 formal or informal?
21    And you can explain it to me. Have you
22 ever had training in recognizing whether an inmate
23 may be suffering from a drug overdose?
24    A. No, sir.

Page 13

1    Q. Have you ever had training in providing
2 medical assistance to an inmate for any reason?
3    A. No, sir.
4    Q. Ever have training in determining whether
5 an inmate is emotionally or mentally impaired or
6 disturbed?
7    A. Emotionally or mentally disturbed?
8    Q. Yeah.
9    A. As in mental illness?
10    Q. Sure. I mean it would cover that.
11    A. Since the incident of May the 10th we
12 have had some training in recognizing mental
13 illness and suicide prevention.
14    Q. Who provided that?
15    A. State of Illinois.
16    Q. Was that as a result of this incident?
17    A. No, sir.
18    Q. So other than that would it be fair to
19 say prior to May 10, 2003 you did not have any
20 training in that area?
21    A. That would be fair to say, yes, sir.
22    Q. Any training in recognizing whether
23 someone is in -- strike that. Have you had
24 training in performing Breathalyzers and

Page 14

1 determining whether someone is intoxicated?
2    A. Yes, sir.
3    Q. Do you perform, are you certified to
4 perform Breathalyzers?
5    A. Yes, sir.
6    Q. Is there any training in determining
7 whether someone is exhibiting symptoms of alcohol
8 withdrawal?
9    A. No, sir.
10    Q. And because I don't have your background
11 information I am just going to ask you a few
12 questions that may be in there. Have you ever been
13 in the last 10 years convicted of a felony?
14    A. No, sir.
15    Q. Or a misdemeanor involving dishonesty or
16 deception?
17    A. No, sir.
18    Q. Do you have asthma?
19    A. No, sir.
20    Q. Anyone in your family have asthma?
21    A. No, sir.
22    Q. Any training in treating or responding to
23 inmates that might be suffering from asthma?
24    A. Formal training?

Page 15

1    Q. Yes.
2    A. No, sir.
3    Q. I am assuming you have informal training
4 the way you answered that, correct, or on-the-job
5 training?
6    A. Yes, sir.
7    Q. And my understanding is that the jail
8 there if an inmate has asthma and needs an inhaler
9 there are certain forms of inhalers that you will
10 give to an inmate?
11    A. Yes, sir. They are available to us.
12    Q. Are they inhalers or are they some kind
13 of mist machines or what are they?
14    A. We have inhalers and we also have a
15 machine that the name escapes me now.
16    Q. Nebulizers?
17    A. Yes.
18    Q. How is it determined at the Vermilion
19 County jail whether an inmate receives an inhaler
20 or a Nebulizer?
21    A. If possible it is up to the nurse to
22 decide that or the jail medical staff.
23    Q. In your position as lieutenant do you
24 schedule the correctional officers?

Page 16

1    A. Yes, sir.
2    Q. Do you also schedule the nurse?
3    A. No, sir.
4    Q. Who does that scheduling?
5    A. She is technically employed by the
6 sheriff's department but she is through the county
7 health department.
8    Q. Do you know back in May of 2003 what
9 hours a nurse was actually working at the county
10 jail?
11    A. Yes, sir.
12    Q. Could you tell me?
13    A. Usually it was Monday through Friday, 7
14 to 3.
15    Q. On the weekends was there a nurse?
16    A. No, sir.
17    Q. Other than the nurse Monday through
18 Friday 7 to 3, would there be a doctor on staff at
19 the jail?
20    A. Could you define on staff?
21    Q. Well, in the building?
22    A. No, sir.
23    Q. Where would the closest doctor be? A
24 nearby hospital?

Page 17

1    A. Or --
2    Q. Let me withdraw that. If the nurse
3 Monday through Friday between 7 and 3 needed to
4 consult a doctor or need a doctor to respond to the
5 county jail, who would she call?
6    A. Normally Dr. Ehrhart.
7    Q. What is his first name?
8    A. Melvin.
9    Q. And is he on staff at a hospital or does
10 he have an office nearby or does he live nearby?
11    A. I am not sure, sir.
12    Q. From 3:01 on Monday through Friday 3:01
13 p.m. until 6:59 a.m. there was no nurse at the
14 county jail Monday through Friday in May of '03?
15 Would that be fair?
16    A. When the nurse left the building, there
17 wasn't another one. That is correct.
18    Q. Was there any other medical person or
19 staff or assistant or anyone else that can provide
20 medical treatment in the jail when she wasn't
21 there? She or he, the nurse?
22    A. No, sir.
23    Q. Is there any requirement that any
24 officer, any correctional officer at any rank have

Page 18

1 any medical training at all?
2    A. By who?
3    Q. By any entity? The state, the county,
4 the federal government? Is there any requirement
5 that correctional officers have medical training?
6    A. I am not sure, sir.
7    Q. That is not -- is that a requirement in
8 any way for hiring?
9    A. No, sir.
10    Q. Was there a requirement back in May of
11 '03 that on each shift there must be one officer
12 that knows how to perform CPR or anything like
13 that?
14    A. Not that I am aware of, sir.
15    Q. In May of '03 were there any type of --
16 was there any type of medical equipment that was
17 kept in the county jail? By that I am thinking of
18 an object in some public buildings if someone has a
19 heart attack they have those things that will shock
20 them back. Do you know what I am talking about?
21    A. No, sir.
22    MR. CONDON: The defib?
23 BY MR. DE CARO:
24    Q. The defibrillators. In May of '03 were

Page 19

1 there any defibrillators kept in the county, the
2 public safety building as far as you know?
3    A. As far as I know, no.
4    Q. So if an inmate needed medical attention
5 when the nurse was not there, could you just walk
6 through with me what would occur?
7        Let's say the correctional officer who
8 was checking cells sees that an inmate is choking
9 let's say. What would occur? How would that
10 inmate get medical attention?
11    A. It is according to how severe the
12 condition was. If it was something that was
13 immediate we could call an ambulance, transport the
14 inmate to the hospital.
15        If it was something else we could page
16 the doctor, Dr. Melvin Ehrhart. He would call us
17 back. We tell him what we have and we proceed with
18 his directions.
19    Q. The correctional officer who first sees
20 that an inmate is in immediate of medical
21 attention, do they have the authority to call 911
22 or call the doctor?
23        Do they have to report this to their
24 immediate supervisor who then decides whether to

Page 20

1 call or report it up to their supervisor?
2    A. Once again it is according to how serious
3 or how emergent the condition is. If the officer
4 feels that an ambulance is necessary immediately,
5 yes, we can call somebody.
6    Q. Are there any rules or regulations that
7 you are aware of that govern the correctional
8 officers that identify the procedure of what to do
9 in a medical emergency?
10    A. No, sir. Not that I am aware of.
11    Q. Are the correctional officers authorized
12 -- let's say the correctional officer who finds a
13 person who may be suffering a heart attack or needs
14 CPR, can they unilaterally on their own initiate
15 CPR without asking a supervisor?
16    A. Yes, sir.
17    Q. Is there a rule or regulation or written
18 policy about that or is that just something that is
19 known?
20    MR. CONDON: Let me object to the form of
21 the question in terms of I guess my objection is
22 are we talking about just to give CPR to someone or
23 emergency medical care to someone? Which? I don't
24 know.

Page 21

1 BY MR. DE CARO:
2    Q. I guess it really is emergency medical
3 care. If a correctional officer sees that an
4 individual inmate needs emergency medical care, can
5 that individual officer initiate that care without
6 authority from a supervisor?
7    A. Yes, sir.
8    Q. Is there authority written anywhere in a
9 policy a rule or regulation that you are aware of?
10    A. Not that I am aware of, sir.
11    Q. How would that correctional officer have
12 known that he could do that?
13    A. It is just understood.
14    Q. You have been there quite a long time.
15 Are there meetings with correctional officers where
16 something like that might come up as a question and
17 they are told if somebody needs emergency medical
18 treatment you can do it?
19    A. If the situation arises and it is safe
20 for the officer to do it, yes, sir.
21    Q. Let's talk about May 10, 2003. What
22 shift were you working that day?
23    A. First shift.
24    Q. So your hours were 7 to 3?

Page 22

1    A. That is correct.
2    Q. And I saw from your report that you
3 arrived about a half an hour prior to 7:00?
4    A. Approximately, yes, sir.
5    Q. Why don't you tell me the first time you
6 saw Kevin Lucas and where he was at, what he was
7 doing?
8    A. The first time I saw Kevin Lucas?
9    Q. Yes, that morning?
10    A. First time I saw him was shortly after
11 11:00 when Officer Long called me to book-in.
12    Q. So up to that point prior to Officer Long
13 calling you around 11:00, were you aware that Kevin
14 Lucas was in the building?
15    A. Yes, sir.
16    Q. How did you become aware of that?
17    A. Sergeant Reynolds the third shift
18 sergeant advised me of it.
19    Q. Where is your office located or where was
20 it located on May 10, '03 in the building?
21    A. Third floor.
22    Q. What else is on the third floor other
23 than your office?
24    A. Cells for inmates, the kitchen, laundry.

Page 23

1    Q. And during your shifts back in May of
2 '03, what were your duties during your shift?
3    A. On that particular day I was lieutenant.
4 There was a sergeant there. Sergeant Rush was
5 there who was actually the shift supervisor and I
6 was his supervisor but my job mainly consists of
7 paperwork and the such.
8    Q. In your office do you have any form of
9 monitors that you can monitor any cells anywhere?
10    A. We have a monitor for third and fourth
11 floor, yes, sir.
12    Q. Would the monitor be in your office or
13 control room?
14    A. There is a special one in my office, yes,
15 sir.
16    Q. And you can monitor both the third and
17 fourth floor?
18    A. One camera at a time, yes, sir.
19    Q. Can you monitor anything that goes on in
20 the book-in area?
21    A. No, sir.
22    Q. And there is holding cells in the book-in
23 area, correct?
24    A. Yes, sir.

Page 24

1    Q. Is there any reason that you know of why
2 the monitors don't include the book-in area?
3    A. None that I know of, no, sir.
4    Q. Can you monitor the book-in area now from
5 your office?
6    A. No, sir.
7    Q. Let's talk about do you have an idea
8 about what time Sergeant Reynolds came up and spoke
9 with you?
10    A. Approximately 5 minutes until 7.
11    Q. And to the best of your recollection can
12 you tell me what he said to you and what you said
13 to him?
14    A. In regards to Mr. Lucas or just?
15    Q. Yes.
16    A. He advised me that Mr. Lucas had been
17 brought to jail and that they had been, he had been
18 placed in a padded cell.
19        And I did inquire to Sergeant Reynolds
20 whether it was Kevin Lucas, Junior or Senior and he
21 advised me that it was junior.
22        And I asked him if it was the one that we
23 have that has asthma and he said yes. And he said
24 he did not have his inhaler with him.

Page 25

1    Q. Why did you ask him about the asthma?
2    A. I was familiar with Mr. Lucas from the
3 times he had been in the jail before.
4    Q. And on those times did he have problems
5 with his asthma or?
6    A. Not every time he was there but there
7 have been times in the past, yes, sir.
8    Q. Had you had to -- strike that. In the
9 past had Mr. Lucas gone to the hospital from the
10 jail as a result of his asthma?
11    A. Yes, sir.
12    Q. On how many occasions?
13    A. I wouldn't know. I know of at least
14 once.
15    Q. In the past when Mr. Lucas in the past
16 prior to May 10, 2003 if you know would he be
17 allowed to keep his inhaler in the cell with him?
18    A. Yes, sir.
19    Q. Is that normal procedure?
20    A. Yes, sir. That is common practice.
21    Q. Did you take any -- strike that. In this
22 particular case you are aware that Mr. Lucas did
23 not have his inhaler. Did you take any steps to
24 find out whether he needed his inhaler or what his

Page 26

1 condition was on May 10 of '03?
2    A. Personally, no, sir.
3    Q. Do you know if anybody did anything
4 regarding his inhaler prior to his death?
5    A. Not that I am aware of.
6    Q. Was that the extent of the conversation
7 with Sergeant Reynolds regarding Kevin Lucas?
8    A. Regarding Mr. Lucas, yes, sir.
9    Q. And the other conversation not about
10 Kevin Lucas was that just typical conversation that
11 the shift sergeant would be telling the lieutenant
12 of the next shift?
13    A. The shift supervisor from one shift would
14 tell the shift supervisor from the oncoming shift.
15 I am only lieutenant at the jail so usually it
16 is a sergeant that he would be talking to.
17    Q. Let's talk about the procedure and custom
18 and practice of that when a shift supervisor leaves
19 one shift and the new shift supervisor arrives,
20 what types of things does the leaving supervisor
21 need to inform the new supervisor of?
22    A. Any unusual or uncommon things that are
23 going on at the time. All the sergeants or command
24 officers have been there long enough to know what

Page 27

1 needs to be passed on from one shift to the other.
2 If some inmate needs to go to court, those type of
3 things. Just general workings of the jail.
4    Q. And the new, the first shift supervisor
5 was Sergeant Rush?
6    A. I am Sergeant Rush's supervisor so
7 technically I guess I would have been the
8 supervisor that day over first shift.
9    Q. Okay. So if Sergeant Reynolds was going
10 to give you any relevant information about the
11 inmates, he would have given it to you as opposed
12 to Sergeant Rush that morning?
13    A. Yes. I don't think he even talked to
14 Sergeant Rush that morning since I was there. They
15 passed that type of information on to me.
16    Q. Have we covered everything that Sergeant
17 Reynolds told you regarding Kevin Lucas?
18    A. I know he also told me that they had
19 placed Kevin in the padded cell.
20    Q. Did he tell you why?
21    A. He informed me that Mr. Lucas was
22 agitated and they thought it was in his best
23 interest.
24    Q. Did he tell you what Kevin had been

Page 28

1 charged with? Why he was in the jail?
2    A. He may have but I can't remember for
3 sure, sir.
4    Q. Did he elaborate on what he meant by
5 agitated at all?
6    A. He said that he thought he was under the
7 influence of something but he didn't smell any
8 alcohol on him and he wasn't sure.
9    Q. Did he say he wasn't in his right mind?
10    A. No. I don't remember him saying that,
11 sir.
12    Q. Have you ever had a shift supervisor tell
13 you that we have got somebody in the padded cell
14 because he is not in his right mind?
15    MR. CONDON: Object to the form of the
16 question. Go ahead.
17    A. Those exact words, no, sir.
18 BY MR. DE CARO:
19    Q. In your experience why is someone
20 typically put in the padded cell if there is a
21 typical situation?
22    A. For us to place an inmate in the padded
23 cell it is usually for their protection or for
24 ours.

Page 29

1    Q. Are there any written rules, regulations
2 or procedures that you are aware of that govern the
3 correctional officers that delineate the type of
4 behavior when a person should be put into a padded
5 cell?
6    A. Not that I am aware of.
7    Q. Is that typically the book-in officer's
8 decision, left up to him?
9    A. It can be, yes, sir.
10    Q. So he can do that unilaterally without
11 asking the shift supervisor whether to put somebody
12 in a padded cell?
13    A. If he thinks the circumstances warrant,
14 yes, sir.
15    Q. Now have we covered everything that
16 Sergeant Reynolds told you about Kevin Lucas that
17 morning?
18    A. To the best of my recollection.
19    Q. And we will go through your statements
20 and something might pop up. So that you said was
21 about 7:05 and the next time you heard anything
22 about Kevin Lucas was 11:05 or so? Is that about
23 right?
24    A. Approximately, yes, sir.

Multi-Page™                                      RAYMOND LEWELLYN

Page 30

1   Q. Do you recall having any conversation
2 with either Karla Young or Richard Long between
3 7:05 and 11:05 regarding anything that day?
4   **A. No, sir.**
5   Q. So when you first received a call from
6 Long you were in your office?
7   **A. Yes, sir.**
8   Q. Did he call over the phone or over your
9 radio?
10   **A. I need to make a correction. It was**
11 **Karla Young that called me shortly after 11, not**
12 **Officer Long. I am sorry. Officer Young called me**
13 **on the telephone.**
14   Q. And the telephone she had access to would
15 be in the control room?
16   **A. There were other phones she had access to**
17 **but that was the one she was calling me from.**
18   Q. How do you know that?
19   **A. There is a readout on my telephone that**
20 **tells me where the call is coming in from.**
21   Q. She was in the control room in the
22 book-in area?
23   **A. That is correct.**
24   Q. And what did she say to you?

Page 31

1   **A. She said that Kevin was unresponsive and**
2 **I needed to come to book-in.**
3   Q. Was that the extent of the conversation?
4   **A. She also at the end she stated but you**
5 **know how Kevin can be.**
6   Q. Do you have any idea what she meant by
7 that?
8   **A. No, sir.**
9   Q. When she said unresponsive, what did you
10 take that to be? Unresponsive to orders,
11 unresponsive physically or?
12   **A. I took it to mean unresponsive. That he**
13 **was -- they couldn't wake him up.**
14   Q. Had Kevin ever acted that way as far as
15 you know prior to this date?
16   **A. As far as I know, no, sir.**
17   Q. Was the tone of her voice if you recall
18 that this was an emergency or she was just giving
19 you information and if you can make your way down
20 and, you know?
21      MR. CONDON: Object to the form of the
22 question.
23   **A. I didn't recognize anything from the tone**
24 **of her voice but she did make it sound as if it was**

Page 32

1 **urgent.**
2 BY MR. DE CARO:
3   Q. And is the only way to get down from the
4 third floor to the book-in area the elevator or are
5 there stairs?
6   **A. There are stairs but they don't lead**
7 **directly to book-in.**
8   Q. What would be the quickest route? Would
9 it be quicker to take the elevator or the stairs to
10 get down to the book-in area?
11   **A. My opinion it would be quicker to take**
12 **the elevator.**
13   Q. How did you get to the book-in area?
14   **A. Elevator.**
15   Q. Approximately how long after Karla called
16 did you arrive at the padded cell?
17   **A. Approximately 2 to 3 minutes.**
18   Q. Other than what we just talked about, was
19 that the extent of the conversation with Karla?
20   **A. Yes, sir.**
21   Q. Now I think in one other report did she
22 ever ask you to bring some ammonia with you or is
23 that something that occurred once you got down
24 there?

Page 33

1   **A. Someone, I can't remember if it was her**
2 **or Officer Long asked me to bring an ammonia**
3 **inhaler with me, yes, sir.**
4   Q. Where are those kept?
5   **A. Usually they are kept in control rooms,**
6 **third and fourth floor, book-in. There are some in**
7 **the nurse's office. Sometimes I may have some in**
8 **my office.**
9   Q. Where is the nurse's office?
10   **A. Third floor.**
11   Q. Do you remember getting an ammonia
12 inhaler?
13   **A. I remember having one at some point.**
14   Q. Do you know where you got that? Was it
15 at the control room in the book-in area, was it the
16 control room on the third floor? Was it the
17 nurse's office?
18   **A. I had one in my office.**
19   Q. So is it your recollection that Karla in
20 the initial phone call asked you to bring it?
21   **A. Honestly I can't remember whether it was**
22 **her or Officer Long on the radio talking to me. It**
23 **was either/or; on the phone or Officer Long on the**
24 **radio.**

Page 34

1  Q. You didn't go down there and then go back
2  up to your office to get it?
3  A. No, sir.
4  Q. So you brought one with you? And now do
5  you recall Officer Long calling you on the radio at
6  some point and telling you to come downstairs?
7  A. No, sir.
8  Q. How many ammonia inhalers did you bring?
9  A. I took one with me.
10  Q. So when Karla spoke to you, you did not
11  instruct her to call an ambulance? Would that be
12  fair?
13  A. At that time, no, sir.
14  Q. After you got off of the phone with
15  Karla, what did you do next do?
16  A. Picked up the ammonia inhaler, went
17  directly to the elevator.
18  Q. When you pressed the elevator and it
19  came, did you go directly to book-in or was there
20  people on the elevator that had to stop at 2 and 1
21  or go up to 4?
22  A. To the best of my recollection I went
23  directly to book-in.
24  Q. When you got off the elevator, did you go

Page 35

1  directly to the padded cell?
2  A. Yes, sir.
3  Q. And when you first got to the padded
4  cell, what did you find?
5  A. Mr. Lucas was laying on the floor.
6  Officer Long was there with him.
7  Q. Was Officer Long touching him in any
8  manner at that point?
9  A. I seem to remember Officer Long had a
10  hold of his wrist.
11  Q. And what is the next thing that
12  happened? Did you talk? Did Long say anything to
13  you? Did you say something to Long? Did you
14  immediately go and do something to Kevin?
15  A. I seem to remember Officer Long saying
16  that he couldn't find a pulse. That is when I --
17  Q. That is when you what?
18  A. I proceeded to check for myself.
19  Q. And where did you first check?
20  A. His neck.
21  Q. Where exactly on his neck? Left side,
22  right side, center?
23  A. Left side.
24  Q. And did you feel a pulse?

Page 36

1  A. No, sir.
2  Q. And where on the neck? Middle neck,
3  lower neck, upper neck, towards the Adam's apple,
4  towards the ear? Do you know where?
5  A. Below the ear.
6  Q. And you felt somewhere on your neck. So
7  did you have like an inch below the ear on the left
8  side of the neck?
9  MR. CONDON: If you remember. Don't
10  guess.
11  A. I can't remember to be honest.
12  BY MR. DE CARO:
13  Q. Have you been trained by anyone at any
14  time on where to locate a pulse on an individual's
15  neck?
16  A. In the CPR class, yes, sir.
17  Q. And when was that if you recall?
18  A. Don't recall.
19  Q. Prior to 2000?
20  A. Yes, sir.
21  Q. Prior to 1995?
22  A. Possibly. I can't recall the exact
23  date. I know it was in the 90's.
24  Q. Then you did not find a pulse there.

Page 37

1  What is the next thing you did?
2  A. Checked his wrist for a pulse.
3  Q. Which wrist?
4  A. Left wrist.
5  Q. And where on the wrist?
6  A. Middle of the wrist.
7  Q. Middle of the other side of the wrist?
8  Did you feel a pulse there?
9  A. No, sir.
10  Q. At this point are you having
11  conversations with Long or Young about anything?
12  A. I was speaking to Officer Long about what
13  had happened.
14  Q. What did he tell you happened?
15  A. Officer Long advised me he went back
16  there to try to process Mr. Lucas and found him in
17  that state.
18  Q. Did he tell you how long Kevin was in the
19  position he found him in prior?
20  A. No, sir.
21  Q. Is that the extent of the conversation
22  with Long? Just that he went back there to process
23  him and that is how he found him?
24  A. Yes, sir.

Page 38

1    Q. After you felt the wrist and there was no
2 pulse, what is the next thing you did?
3    A. I asked Officer Young to call
4 communications and have the rescue squad respond to
5 the PSB.
6    Q. Now when you called communications, are
7 those the people that call an ambulance service?
8 Is that like calling 911 you would get
9 communications?
10    A. Communications is 911.
11    Q. And was she able to do that over the
12 radio or did she have to go back to use a phone
13 somewhere?
14    A. She couldn't do it over the radio. She
15 could have either knocked on the door or called
16 them on the telephone and I am not sure which she
17 did.
18    Q. Where is communications located in the
19 building?
20    A. It is in the book-in area.
21    Q. Where in relationship to the padded cell
22 if you can describe that?
23    A. Down the hallway next to the book-in
24 office. Maybe 40 feet, 50 feet away.

Page 39

1    Q. Is it on the other side from the control
2 room? Is it across from the control room?
3    A. It is east of the control room.
4    Q. So if you come down on the elevators, is
5 it to your right? Is that east?
6    A. When you get off the elevators -- or
7 sorry. It is to the west. That is my fault. Come
8 off the elevators, it is to the left.
9    Q. If you came off the elevators, went
10 through the book-in area where the bench is, is it
11 on the other side of that?
12    A. It is on the other side of that wall
13 where the bench is.
14    Q. And there is a door somewhere to go
15 through there?
16    A. At the end of the bench there is a door.
17    Q. You don't know whether she went over
18 there or whether she called?
19    A. I have no idea.
20    Q. Do you know which would be quicker?
21    A. I would think knocking on the door.
22    Q. Do you have any idea about what time it
23 was when you told her to do that?
24    A. No, sir. It was if I am guessing maybe a

Page 40

1 quarter after 11.
2    Q. And that would be a guess?
3    A. That would be strictly a guess.
4    Q. And then at some point two paramedics or
5 EMT or EMT or paramedic ambulance personnel
6 arrived?
7    A. Yes, sir.
8    Q. From the time you told Karla Young to go
9 call communications to the time the ambulance
10 personnel arrived, how much time had passed?
11    A. I would say approximately 4 to 5 minutes.
12    Q. Do you know if that was a private
13 ambulance service or a city ambulance or who they
14 were?
15    A. No, sir. I don't know.
16    Q. In those 4 or 5 minutes did you see
17 Officer Long providing any life saving treatment or
18 techniques to Kevin Lucas?
19    A. No, sir.
20    Q. Did you provide any life saving
21 techniques or any type of life saving methods or
22 techniques to Kevin Lucas during that 4 or 5
23 minutes?
24    A. No, sir.

Page 41

1    Q. Did you see Karla Young do anything to
2 Lucas during those 4 or 5 minutes?
3    A. No, sir.
4    Q. Did you see anyone by the time you got to
5 the padded cell until the paramedics came provide
6 any type of medical treatment to Kevin Lucas?
7    A. No, sir.
8    Q. Other than when you arrived in the padded
9 cell, could you tell me what Kevin was wearing?
10    A. Seem to remember boxer shorts and a pair
11 of socks.
12    Q. Did you see anything else in the padded
13 cell when you arrived?
14    A. When I arrived?
15    Q. Yes.
16    A. No, sir.
17    Q. At some point you saw something in the
18 cell?
19    A. Yes, sir.
20    Q. When was that? Well, was it after the
21 paramedics came or before?
22    A. Before.
23    Q. And what did you see?
24    A. A baggy, plastic bag that was twisted

Page 42

1 with a ball shape at the end.
2    Q. When you say twisted, was it -- was the
3 top tied in a knot or just twisted?
4    A. I didn't inspect it that close.
5    Q. Do you know who ultimately picked up that
6 baggy and started the chain of custody?
7    A. I am sure it was one of the investigators
8 but which one I don't know.
9    Q. Do you know how long the baggy layed on
10 the floor? Was it -- strike that. Were you in the
11 padded cell with Kevin when the paramedics arrived?
12    A. Yes, sir.
13    Q. Did you observe what they did to Kevin?
14    A. Yes, sir.
15    Q. What did they do?
16    A. Attach the leads to his chest to check
17 for a heartbeat.
18    Q. So they turned him over and attached the
19 leads to his chest?
20    A. I think they moved him, yes.
21    Q. And you know, I should have asked you
22 when you arrived can you describe the position of
23 Kevin's body in the padded cell when you first went
24 down there the first time?

Page 43

1    A. When I arrived he was laying on his side
2 facing the doorway to the padded cell with his feet
3 to the west, head to the east.
4    Q. So his stomach -- strike that. His head
5 and feet were pointing -- strike that. His head --
6 you enter the cell.
7     His head would be closest to the left
8 side of the padded cell and his feet would be
9 closer to the right side of the padded cell?
10    A. That is correct.
11    Q. And he sort of was facing the door on his
12 side?
13    A. That is correct.
14    Q. He was on his right side?
15    A. That is correct.
16    Q. So when the paramedics I am assuming, and
17 correct me if I am wrong, that he stayed in that
18 position until the paramedics arrived?
19    A. That is correct.
20    Q. When the paramedics arrived, what did you
21 see them do?
22    A. Like I said they attached the leads to
23 his chest to check for a heartbeat.
24    Q. Did they ask any questions regarding

Page 44

1 Kevin?
2    A. They may have but I don't recall.
3    Q. When you felt Kevin's neck, did he feel
4 unusually cold?
5    A. Could you define unusually?
6    Q. Did you form an opinion from the
7 temperature of his body that he had died?
8    A. Yes, sir.
9    Q. What was your opinion?
10    A. That Mr. Lucas was deceased.
11    Q. And why is that? What did his body feel
12 like that led you to that conclusion other than no
13 pulse?
14    A. Just the stillness.
15    Q. Did he feel -- did his body feel cold as
16 opposed to what your body would feel like right
17 now, you know, your normal temperature?
18    A. Yes, sir.
19    Q. Is that one of the things that led you to
20 believe that he had died, the temperature of his
21 body?
22    A. Yes, sir.
23    Q. Were you able to -- when you were in
24 there, were you able to view his face?

Page 45

1    A. Yes, sir.
2    Q. And this is before the paramedics came?
3    A. Yes, sir.
4    Q. Was he bleeding or did he have mucus
5 running from his nose or his mouth?
6    A. I seem to remember there being a white
7 substance around his mouth.
8    Q. Anything else?
9    A. Not that I recall, no, sir.
10    Q. Did you notice any blood on any other
11 part of his body?
12    A. No, sir.
13    Q. I am correct he wasn't handcuffed, either
14 his hands or his ankles at that point?
15    A. No, sir.
16    Q. Other than putting the leads on Kevin's
17 chest, did you observe the paramedics do anything
18 else?
19    A. No, sir.
20    Q. Did they -- did you hear -- or strike
21 that. Did the paramedic's question you about what
22 had occurred?
23    A. They may have asked what had happened.
24    Q. And who would have told them? Would it

Page 46

1 have been you or Long?
2    A. It would have been me or Officer Long.
3    Q. Did they ever ask you about time frames
4 about how long Kevin was like this, when is the
5 first time you observed him? Things like that
6 regarding time?
7    A. Not that I recall in that manner, no,
8 sir.
9    Q. Other than Kevin being still and you
10 testified now that he was a little cold to the
11 touch, did you take any steps to see if rigor
12 mortis had set in by the time you initially
13 responded?
14    A. No, sir.
15    Q. Have you ever felt a dead body prior to
16 Kevin Lucas?
17    A. Yes, sir.
18    Q. Was it related to finding a prisoner in a
19 cell that had passed away?
20    A. Yes, sir.
21    Q. When was that? Was it more than one
22 occasion or one prior occasion?
23    A. One prior occasion.
24    Q. And I am correct it was prior to May of

Page 47

1 '03?
2    A. That is correct.
3    Q. And do you have any idea in that instance
4 how long the person had been dead prior to you
5 touching them?
6    MR. CONDON: Just object, lack of
7 foundation. Really calls for a medical opinion
8 that I don't know he is qualified to give. That is
9 my objection.
10    A. Could you repeat the question?
11 BY MR. DE CARO:
12    Q. That other person you touched, do you
13 know how long they were dead before you touched
14 them?
15    A. No, sir.
16    Q. Was it a similar situation where you felt
17 for that person's pulse?
18    A. No, sir.
19    Q. How did it come about that you touched
20 that person?
21    A. I was in another part of the jail. They
22 called me because of the problem. I went up there
23 and other people had already checked to see.
24    Q. But where did you touch the person and

Page 48

1 why?
2    A. Just reached out to touch his wrist and
3 see if there was a pulse. Check for myself.
4    Q. And that person didn't have a pulse by
5 the time you touched them?
6    A. No, sir.
7    Q. Was that person also cold to the touch?
8    A. I wouldn't classify it as cold. Maybe
9 colder than normal.
10    Q. And let's go back when you felt Kevin,
11 would you classify that as cold or would you just
12 say he was cooler than normal?
13    A. I would say cooler than normal.
14    Q. Would you be able to give me any type of
15 degree?
16    A. No, sir.
17    Q. Did you remain in the padded cell --
18 strike that. Who removed Kevin's body from the
19 padded cell?
20    A. The coroner's office had arrived and
21 placed him in a body bag.
22    Q. And I noticed there was a name of Tony
23 Jones. Does he work for the coroner's office?
24    A. Yes, sir.

Page 49

1    Q. Is that the person who placed Kevin in a
2 body bag?
3    A. He was there.
4    Q. Did the officers assist him in doing
5 that?
6    A. Yes, sir.
7    Q. And who was that? Who were the officers?
8    A. Officer Long, myself, Captain Riggs.
9    Q. Was the baggy with the white substance
10 still in the room at the time Kevin was placed in a
11 body bag?
12    A. I don't believe so, no, sir.
13    Q. And you may have answered this but do you
14 know who picked up the baggy?
15    A. I am sure it was one of the investigators
16 but which one I have no idea.
17    Q. Do you have an idea about what time
18 Kevin's body was removed from the padded cell?
19    A. It was after noon but any closer than
20 that I couldn't say.
21    Q. After 12 noon or in the afternoon?
22    A. After 12 noon.
23    Q. Before 1:00 would that be? Just to set
24 up some time frame?

Page 50

1    MR. CONDON: If you know.
2    A. I am not sure.
3 BY MR. DE CARO:
4    Q. Did the investigators speak with Officer
5 Long or Young in your presence that morning?
6    A. No, sir.
7    Q. Who were the investigators in the room
8 that morning?
9    A. Sheriff Hartshorn. Investigator Kaag,
10 Investigator Jerry Davis, Investigator Todd
11 Damilano. Those are the four I can remember.
12    Q. Did you witness them all come into the
13 padded cell and view Kevin's body?
14    A. Yes, sir.
15    Q. Did you overhear any of them, Officer
16 Long or Young where that bag of white powder came
17 from?
18    A. No, sir.
19    Q. Did anyone enter the room, the padded
20 cell from the -- that we haven't talked about from
21 the time you entered and the time the paramedics
22 left?
23    A. No, sir.
24    Q. How long were the paramedics in the room

Page 51

1 doing what they were doing?
2    A. Just a few minutes.
3    Q. And at what point did they determine that
4 Kevin had died? Was it after they ran their tests
5 with the leads?
6    A. Yes, sir.
7    Q. Did you see them touch him for a pulse
8 anywhere?
9    A. I wasn't paying that close of attention.
10    Q. Did you have any conversation with the
11 paramedics other than what we talked about? Them
12 perhaps asking you what happened?
13    A. No, sir.
14    Q. Is it policy that the paramedics then
15 would not take the body to a hospital but rather to
16 call the coroner?
17    A. Yes, sir.
18    Q. Is that part of the jail policy?
19    A. Yes, sir.
20    Q. Prior to the paramedics leaving, let's
21 use that as an endpoint. Have we talked about all
22 the conversations you had that morning with Richard
23 Long regarding Kevin Lucas?
24    A. To the best of my recollection, yes, sir.

Page 52

1    Q. I mean during the 4 or 5 minutes while
2 you were waiting for the paramedics did you guys
3 engage in more conversation about last time I
4 checked him he was like this or like that?
5    A. Yes. That type of conversation with
6 Officer Long, yes.
7    Q. Let's talk about that. To the best of
8 your recollection tell me what he told you and what
9 you said to him.
10    A. Once again it was the conversation about
11 he had went back there to check him, get him up.
12 It was almost lunch time, going to try to process
13 him.
14      Found him in that position. Called me or
15 had Karla call me, that type of conversation. That
16 was all we talked about.
17    Q. How about same thing with Karla Young?
18 After she initially called you and said Kevin is
19 unresponsive and you told her to call
20 communications, did you have any more conversations
21 with her up to the point when the paramedics left?
22      You know, so during the time you are
23 waiting for the paramedics or the paramedics are
24 there did she come back and did you have any

Page 53

1 conversations with her?
2    A. I believe we had a conversation in
3 regards to -- this was after the paramedics had
4 come and checked and made sure everything was the
5 way it was, that the investigators would be coming
6 in and they would have to give a statement.
7    Q. Do you train the correctional officers on
8 how to do cell checks? Is that part of the
9 training you provide?
10    A. On third shift when I was on third shift,
11 yes, sir.
12    Q. So if a person is in a padded cell and
13 they have remained in the same position for the
14 last hour or so, would part of the training be that
15 the only thing you need to do is just keep looking
16 at them or do you need to engage them in
17 conversation or try and stir them to make sure they
18 are okay? What is the training for that?
19    A. There is no policy that says we need to
20 wake them up or try to stir them, no.
21    Q. Is there any policy regarding new
22 conversation or engaging the inmate if the inmate
23 is in there for say we know Kevin had asthma so we
24 know he has a medical condition and we know he

Page 54

1 didn't have his inhaler, would those additional
2 facts, does the policy change or is there just the
3 policy you look in there to make sure they are not
4 hanging themselves?
5     MR. CONDON: Object to the form of the
6 question. It is very compound.
7 BY MR. DE CARO:
8     Q. Let me withdraw the question. Is there a
9 policy on checking inmates, how to do it?
10     A. Yes, sir.
11     Q. What is that policy?
12     A. We need to make sure that they are
13 visibly well and accounted for.
14     Q. And how? Is there more ways than one
15 that that can be done? I mean what is the policy?
16 Is the only way just look in and make sure they are
17 okay?
18     A. That is the way it is normally done, yes,
19 sir.
20     Q. Are there any exceptions to that general
21 policy if the person has a known medical problem?
22 If the person is in alcohol detox, something like
23 that, does the policy vary for varying situations?
24     A. No, sir.

Page 55

1     Q. Are there any situations involving an
2 inmate where the policy would be we need to engage
3 them in conversation?
4     A. Not that I am aware of, no, sir.
5     Q. And if there were such a policy or
6 exception you would know that?
7     A. I believe so.
8     Q. Is there a policy regarding, and I may
9 have asked you this and I am sorry, regarding
10 providing life saving medical attention to an
11 inmate while waiting for an ambulance to arrive for
12 that inmate?
13     Is there a policy regarding that whether
14 it should be done or should not be done?
15     A. I am not aware of one.
16     Q. And if Officer Long or Karla Young wanted
17 to, you know, initiate some type of CPR on Kevin
18 Lucas that morning, that would have been left up to
19 them to decide whether to do it or not?
20     A. Yes, sir.
21     Q. And am I correct there wasn't between 7
22 and 11 a.m. on May 10, 2003 there would not have
23 been a nurse on duty in the public safety building
24 that morning, correct?

Page 56

1     A. There was not one that day, no, sir.
2     Q. And because it was a Saturday?
3     A. Yes, sir.
4     Q. Is there a policy when you went down
5 there and you felt Kevin Lucas and you took his
6 pulse on his neck, first on his neck and then on
7 his wrist, did you have an opinion at that point
8 that he had died?
9     MR. CONDON: Objection, asked and
10 answered. Go ahead.
11     A. Yes, sir.
12 BY MR. DE CARO:
13     Q. What was your opinion?
14     A. That he was deceased, yes, sir.
15     Q. Is there a policy for the county jail as
16 to when an inmate dies, what is the policy? What
17 is the procedure? What takes place when an inmate
18 has died while incarcerated?
19     A. First thing is we call the ambulance or
20 rescue squad.
21     Q. Even though the person is dead?
22     A. That is correct.
23     Q. And where is that written in the rules
24 and regulations of the county jail or do you know

Page 57

1 if that is a state code?
2     A. I think that is the rules and regulations
3 of the jail.
4     Q. And is that because the officers don't
5 have medical training to actually determine whether
6 someone has died, that you leave it up to a medical
7 professional?
8     A. That would be my guess.
9     Q. Do you know when your involvement with
10 the Kevin Lucas matter ended that morning? After
11 they took his body out of the building, did you go
12 back up to your office?
13     A. No, sir.
14     Q. What did you do after they removed his
15 body?
16     A. One at a time we all spoke to the
17 investigator and gave a statement.
18     Q. And the investigators are other employees
19 for the Vermilion County sheriff?
20     A. Yes, sir.
21     Q. Did any independent investigator not an
22 employee of the county ever speak to you regarding
23 this case?
24     A. No, sir.

Page 58

1    (The court reporter marked a document as
2    Exhibit No. 1.)
3 BY MR. DE CARO:
4    Q. We marked for identification Lewellyn
5 Exhibit 1 is your report of May 10, 2003. The time
6 on there was 2:47 p.m. Is that the report you
7 prepared in response to Kevin Lucas' death?
8    A. This one?
9    Q. Yes.
10    A. No, sir.
11    Q. Then tell me what this investigative
12 report is.
13    A. This is when I spoke to Investigator Rod
14 Kaag.
15    Q. So this would be a summary that Officer
16 Kaag prepared after speaking with you?
17    A. Yes, sir.
18    Q. If you would look down at the second to
19 last paragraph and you see Karla Young is in big
20 capital letters there.
21    It states that he stated that Karla Young
22 stated to him that something was wrong with Lucas.
23 That correctional Officer Long had told her to
24 contact Lewellyn and asked him to come down as

Page 59

1 something was wrong.
2    Do you remember whether the conversation
3 with her was that she told you something was wrong
4 or that he was unresponsive?
5    A. I seem to remember it being that she was
6 saying something was wrong.
7    Q. And she didn't elaborate on that?
8    A. No. I don't think so.
9    Q. And here is where I am going with this.
10 When she calls up and says something is wrong and
11 you testified earlier that and I think you said her
12 voice was that it was urgent, did you rush down
13 there as though this was an emergency or did you
14 just go down there because she said come on down
15 and take a look?
16    A. I went as quickly as I could.
17    Q. But I mean you didn't run down the stairs
18 or anything like that? Strike that.
19    (The court reporter marked a document as
20    Exhibit No. 2.)
21 BY MR. DE CARO:
22    Q. We have given you what we have marked as
23 Lewellyn Exhibit No. 2. This is a memorandum dated
24 May 12, 2003. Is this the report you prepared in

Page 60

1 response to Kevin's death?
2    A. Yes, sir.
3    Q. And that is your signature on the bottom?
4    A. That is correct.
5    Q. Did you ever learn whose decision it was
6 to place Kevin in the padded cell?
7    A. I believe it was Sergeant Reynolds.
8    Q. Now if you look in the center of
9 paragraph 4 it says I then laid the back of my
10 right hand on Lucas's back, felt for a pulse in his
11 left wrist and left side of his neck.
12    I couldn't find a pulse. I advised Young
13 to call communications and have them send rescue
14 squad to the PSB.
15    Why did you lay your hand on his back?
16    A. To see if he was breathing.
17    Q. And what did you find when you laid your
18 hand on his back?
19    A. He wasn't breathing.
20    Q. When you laid your hand on his back, did
21 his back feel cold to your touch?
22    A. Colder than normal, yes, sir.
23    (The court reporter marked a document as
24    Exhibit No. 3.)

Page 61

1 BY MR. DE CARO:
2    Q. Handing you Lewellyn Exhibit 3, it is
3 your answers to interrogatories. If you look at
4 the last page and just tell me if that is your
5 signature?
6    A. Yes, sir.
7    Q. Did you have an opportunity to review
8 these before the deposition today?
9    A. Yes, sir.
10    Q. Is there anything you would like to amend
11 or modify your answers in any way?
12    A. No, sir.
13    Q. Prior to May 10, 2003, and I may have
14 asked you this, how many times had you actually
15 seen Kevin Lucas in the public safety building?
16    A. Personally seen?
17    Q. Yes.
18    A. I don't recall that I ever personally
19 seen him, no, sir.
20    Q. How did you know about the asthma and the
21 inhaler situation?
22    A. There were notes that are left for each
23 shift that each shift does on the turnover.
24    Q. And you as the supervisor in the past you

Page 62

1 would have reviewed those notes and that is how you
2 learned?
3    **A. That is correct.**
4    Q. Now you talked, you had asked whether it
5 was Kevin Lucas, Sr., or Kevin Lucas the son.
6 Kevin Lucas his father had been in the county
7 building on prior occasions?
8    **A. I believe so. Yes, sir.**
9    Q. Did you know the father personally if you
10 saw him?
11    **A. No, sir.**
12    Q. How did you know that there was a son and
13 a father that had been in the public safety
14 building prior?
15    **A. Having seen the names.**
16    Q. So they would identify Kevin Lucas, Sr.,
17 differently than Kevin Lucas, Jr.?
18    **A. Yes, sir.**
19    Q. By junior and senior?
20    **A. Yes, sir.**
21    Q. As part of the information you received,
22 does it have the inmate's date of birth and social
23 security number and picture and things like that or
24 is it just their name?

Page 63

1        MR. CONDON: At what point?
2 BY MR. DE CARO:
3    Q. He said he reviewed notes from the shift
4 supervisors and that is how you knew about Kevin
5 and the asthma. Is that how you also knew about
6 Kevin Lucas, Sr.?
7    **A. There are documents that we review that**
8 **have everybody's name that is brought to jail. And**
9 **I seem to remember one being Kevin Lucas, Sr., and**
10 **one being Kevin Lucas, Jr.**
11    Q. When you were down in the book-in area on
12 May 10, did you have any conversation with any of
13 the prisoners in any of the holding cells?
14    **A. No, sir.**
15    Q. Have you or do you know of any
16 investigator that questioned any of the inmates in
17 the holding cell area in the book-in area that
18 would have been there on May 10?
19    **A. I don't know if they did or not.**
20    Q. You did not?
21    **A. No, sir.**
22    Q. Do you have any reason to believe that
23 Kevin Lucas was treated any differently that
24 morning by the correctional officers than any other

Page 64

1 inmate or individual would have been treated had
2 they presented in the same manner that Kevin Lucas
3 did that morning?
4    **A. No, sir.**
5    Q. I am going to hand you what we will mark
6 as Lewellyn Exhibit 4.
7        (The court reporter marked a document as
8        Exhibit No. 4.)
9 BY MR. DE CARO:
10    Q. And before I forget, you said that the
11 procedures you follow following the death of an
12 inmate are contained in some rules or regulations.
13        Do you know which rules or regulations
14 lay out that procedure?
15    **A. They may be in the policy manual.**
16    Q. For the Vermilion County sheriff?
17    **A. That is correct.**
18    Q. I have handed you what we have marked as
19 Exhibit 4. It is the public safety building
20 standing orders. Do you see that?
21    **A. Yes, sir.**
22    Q. And after reading that first paragraph it
23 seems as though those orders are directed to the
24 nurse.

Page 65

1        Do these orders apply to just the nurse
2 or are these for all the correctional officers?
3    **A. I believe they are the nurse's standing**
4 **orders.**
5    Q. Are there standing orders for the
6 correctional officers?
7    **A. Do you mean -- let me just clarify.**
8 **Apart from the jail manual and the county jail**
9 **standards, something like this?**
10    Q. Yeah. Are there similar standing orders
11 regarding abrasions and lacerations, suspected
12 alcohol withdrawal, asthma, common respiratory and
13 cold symptoms?
14        Are there similar standing orders for the
15 correctional officers?
16    **A. No. These are the standing orders we**
17 **have.**
18    Q. Are these given to the correctional
19 officers or is there any?
20    **A. I don't believe so.**
21    Q. Are they trained in dealing with like
22 alcohol withdrawal? Is there any training that the
23 correctional officers receive on how to respond to
24 someone who is profoundly confused or is having

Multi-Page™

Page 66

1 delusions from alcohol withdrawal?
2    A. No.
3    Q. So if would it be fair to say that if
4 someone is delusional, having vivid hallucinations,
5 abnormal behavior and the nurse is not on duty, the
6 correctional officers are not trained on how to
7 respond to that person?
8    A. The correctional officers would advise
9 their supervisor and it would be him that calls the
10 doctor and tells him what is going on and the
11 doctor would advise us what to do.
12    Q. But I guess my question is if the
13 correctional officers are not trained and I know
14 you are not aware of what they are trained with
15 their initial training but as long as you have been
16 there has there been training at the Vermilion
17 County sheriff's officers to the correctional
18 officers on what behavior to look for to determine
19 that somebody is acting abnormally, is having
20 delusions, is having hallucinations, is there
21 training on what to look for in a person to
22 determine whether they are acting abnormally?
23    A. You mean such as a formal class that we
24 would attend?

Page 67

1    Q. Yes.
2    A. No, sir.
3    Q. My point is somebody might be acting
4 abnormally but they haven't had the training to
5 recognize that behavior as something that is
6 abnormal that might be from alcohol withdrawal?
7 Would that be fair?
8    MR. CONDON: Object to the form of the
9 question.
10    A. They may have received some of that type
11 of training in PTI the state provided six week
12 course that we all go through. I don't know. It
13 may have changed since I was there.
14 BY MR. DE CARO:
15    Q. But the Vermilion County Sheriff's office
16 does not train them in that?
17    A. No, sir.
18    Q. And so -- strike that. Have we gone
19 through everything that occurred -- strike that.
20    After you were interviewed by the
21 investigating officer on the morning or the
22 afternoon of the 10th, did you then resume your
23 normal duties?
24    A. Yes, sir.

Page 68

1    Q. Have we gone through -- I think you were
2 interviewed at 2:47 p.m. on the 10th by Officer
3 Kaag?
4    A. Yeah.
5    Q. So were you down in the book-in area from
6 approximately 11 a.m. to about a quarter to 3 that
7 day?
8    A. No, sir.
9    Q. At some point did you go back up to your
10 office?
11    A. Yes, sir.
12    Q. Is that where Officer Kaag interviewed
13 you?
14    A. No, sir.
15    Q. Where did he interview you?
16    A. Second floor.
17    Q. When you left the book-in area, what was
18 going on at that point when you left after Kevin
19 had died, paramedics came, the coroner's office
20 came, what was going on when you left? Had Kevin's
21 body been removed already?
22    A. Yes, sir.
23    Q. How long did you remain down there after
24 Kevin's body had been removed?

Page 69

1    A. I don't know. Not very long.
2    Q. And then did you resume your normal
3 duties at that time other than giving this
4 statement at some point?
5    A. I resumed my normal duties until they
6 called me to talk to me.
7    Q. So have we covered everything that you
8 did from the time you went to the padded cell area
9 to the point where you left to go resume your
10 normal duties?
11    A. I believe so. Yes, sir.
12    Q. Have we covered all the conversations
13 that you had with Officer Long during that time
14 frame?
15    A. To the best of my recollection, yes, sir.
16    Q. We have covered all the conversations you
17 had with Officer Young during that time frame?
18    A. I believe so, yes, sir.
19    Q. Have you ever had any conversations with
20 Officer Schull regarding Kevin Lucas and this May
21 10, 2003 --
22    A. Not that I recall, no.
23    Q. How about Sergeant Reynolds? Have you
24 had any conversations with him outside of that

Page 66 - Page 69

Page 70

1 morning?
2    MR. CONDON: For purposes of
3 clarification, he may not know this. He is not
4 asking you about conversations that you have had
5 with me present, your attorney. He is talking
6 about separate conversations.
7    **A. Just us talking?**
8 BY MR. DE CARO:
9    Q. Right.
10    **A. I may have. Yes, sir.**
11    Q. Did he shed any light on anything other
12 than what we have talked about today, what he told
13 you he witnessed that day?
14    **A. No, sir.**
15    Q. Have you had any conversations with
16 anyone other than your attorney or when your
17 attorney was present and your family and friends
18 regarding what happened to Kevin Lucas that day?
19    **A. No, sir.**
20    MR. DE CARO: I have no further
21 questions.
22    MR. CONDON: I just have a couple of
23 follow-up.
24

Page 71

1 EXAMINATION,
2    QUESTIONS BY MR. CONDON:
3    Q. Lieutenant Lewellyn, let me ask you a few
4 follow-up questions.
5    Without looking at the jail policy
6 manual, do you know if there is a provision in
7 there pertaining to emergency medical care for an
8 inmate?
9    **A. Without looking, no, sir.**
10    Q. Is it possible that there is a provision
11 in there but without reviewing the whole manual you
12 just don't recall right now?
13    **A. Yes, sir.**
14    Q. Did Sergeant Reynolds tell you when you
15 spoke to him on the morning of May 10 that Kevin
16 Lucas needed his inhaler?
17    **A. No, sir.**
18    Q. Did any correctional officer that morning
19 tell you that Kevin Lucas had requested his
20 inhaler?
21    **A. No, sir.**
22    Q. If you could take a look at Exhibit No. 1
23 which is the report that Investigator Kaag did of
24 his interview with you, if you go to the third

Page 72

1 paragraph it begins Lieutenant Lewellyn advised
2 that once he got to his own office on the third
3 floor around 6:50 to 7 a.m. he met with Sergeant
4 Marc Reynolds who came to his office and advised
5 him about Kevin Lucas.
6    Reynolds stated that the deputies had
7 trouble getting Lucas out of the car. They had
8 trouble with him on the elevator, also trouble with
9 him in book-in and that Lucas had been placed in
10 the padded cell.
11    Do you recall telling Investigator Kaag
12 those things?
13    **A. Yes, sir.**
14    Q. And those are some of the things that
15 Sergeant Reynolds had told you about Kevin?
16    **A. Yes, sir.**
17    Q. And in the next paragraph it says
18 Lewellyn stated that Sergeant Reynolds also told
19 him that they believe Lucas was under the influence
20 of some kind of drug or alcohol or a combination
21 thereof. But Reynolds had told Lewellyn that he
22 did not smell any alcohol from Lucas.
23    Do you recall telling Investigator Kaag
24 those things?

Page 73

1    **A. Yes, sir.**
2    Q. If you go down to the second to last
3 paragraph about midway down in that paragraph it
4 says Lieutenant Lewellyn stated that he himself
5 arrived at lower level book-in padded cell area and
6 brought with him ammonia inhalants and attempted to
7 revive Lucas. Do you see that there?
8    **A. Yes, sir.**
9    Q. What, if anything, did you do with the
10 ammonia inhalants?
11    **A. I believe I broke one and tried to pass
12 it under his nose like you would normally trying to
13 wake someone up.**
14    Q. So you used the tablets to try to revive
15 or wake Kevin Lucas up?
16    **A. Yes, sir.**
17    Q. But he was not responsive?
18    **A. No, sir.**
19    Q. Now if you go to your report Exhibit No.
20 2, second paragraph midway down and it says in your
21 report Mr. Lucas had been arrested for disorderly
22 conduct and resisting arrest.
23    Sergeant Reynolds advised that Lucas had
24 been uncooperative and had been placed in lower

## Page 74

1 level's padded cell. Do you see that there?
2    A. Yes, sir.
3    Q. And that morning it is true that Sergeant
4 Reynolds told you that Lucas had been
5 uncooperative?
6    A. Yes, sir.
7    Q. And if you go down to the third paragraph
8 in your report you're describing the conversation
9 you had with Karla Young?
10    A. That is true.
11    Q. Do you see that there?
12    A. Yes, sir.
13    Q. And you state "when asked what the
14 problem was she advised that he was unresponsive."
15 Do you see that?
16    A. Yes, sir.
17    Q. Is that your recollection that Karla told
18 you that Kevin was unresponsive?
19    A. Yes, sir.
20       MR. CONDON: Those are all the questions
21 I have.
22
23
24

## Page 75

1 EXAMINATION,
2    QUESTIONS BY MR. DE CARO:
3    Q. Let's look back at Exhibit 1, the
4 statement that you gave to Officer Kaag. It says
5 Reynolds stated that the deputies had trouble
6 getting Lucas out of the car. What type of trouble
7 did he tell you they had?
8    A. I don't recall that he told me exactly
9 the kind of trouble it was. I just took it to mean
10 that he was not wanting to get out of the car.
11    Q. Same thing with trouble with him on the
12 elevator. Did he use the words trouble and he
13 didn't elaborate what kind of trouble?
14    A. Not that I recall that he didn't
15 elaborate, no, sir.
16    Q. Did he tell you what kind of trouble he
17 was in the book-in area?
18    A. I believe he advised that he was fidgety
19 and wouldn't sit still.
20    Q. And disorderly conduct and resisting
21 arrest, are those felonies or misdemeanors?
22    A. Misdemeanor charges, sir.
23    Q. Typically if someone has -- if someone's
24 behavior is modified by the amount of alcohol they

## Page 76

1 have consumed, has it been your experience as an
2 administrator of Breathalyzers that typically you
3 can smell alcohol on a person's breath if it is to
4 the extent that it is modifying their behavior?
5       MR. CONDON: I will object to the form of
6 the question. Calls for speculation. You can go
7 ahead.
8    A. There are times where you will give
9 someone a Breathalyzer test that will be a positive
10 test and you can't smell anything, no, sir.
11       MR. DE CARO: That is all I have.
12       MR. CONDON: No further questions and we
13 will reserve signature.
14
15
16
17
18
19
20
21
22
23
24

## Page 77

1
2 BUTLER,
3      Plaintiff,
4      vs.
5 VERMILION COUNTY SHERIFF, et al.,
6      Defendants.
7 This is to certify that I have read the
transcript of my deposition taken in the
8 above-entitled cause, and that the foregoing
transcript taken on August 9, 2005 accurately
9 states the questions asked and the answers given by
me, with the exception of the corrections noted, if
10 any, on the attached errata sheet(s).
11
12       RAYMOND LEWELLYN
13 Subscribed and Sworn before
14 me this ____ day of _____, 2005.
15 Notary Public
16
17
18
19
20
21
22
23
24

Page 78

1  STATE OF ILLINOIS      )
                          ) SS
2  COUNTY OF VERMILION )

3       I, BECKY L. JESSUP, CSR, RPR, a Notary Public
    in and for the County of Vermilion, State of
4  Illinois, do hereby certify that RAYMOND LEWELLYN,
    the deponent herein, was by me first duly sworn to
5  tell the truth, the whole truth and nothing but the
    truth in the aforementioned cause of action.
6       That the foregoing deposition was taken on
    behalf of the Plaintiff, on the 9th day of August,
7  2005.
        That said deposition was taken down in
8  stenograph notes and afterwards reduced to
    typewriting under my instruction; and that the
9  typewritten transcript is a true and accurate
    record of the testimony given by said deponent; and
10 that it was agreed by and between the witness and
    attorneys that said signature on said deposition
11 would not be waived.
        I do hereby certify that I am a disinterested
12 person in this cause of action; that I am not a
    relative or attorney of any of the parties, or
13 otherwise interested in the event of this cause of
    action, and am not in the employ of the attorneys
14 for either party.
        IN WITNESS WHEREOF, I have hereunto set my
15 hand and affixed my notarial seal this 16th day of
    August, 2005.
16

17  _Becky L. Jessup_

18      Becky L. Jessup, CSR, RPR
        Notary Public
19

20

21

22

23

24