IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
STATE OF ILLINOIS

LUCILLE BUTLER, individually, and )
as Special Administrator of the   )
Estate of KEVIN LUCAS, deceased,  )
                                  )
        Plaintiff,                )
                                  )
-vs-                              ) No. 04 CV 2048
                                  )
VERMILION COUNTY SHERIFF W. PATRICK)
HARTSHORN, et al.,                )
                                  )
        Defendants.               )

DEPOSITION

The deposition of COLE A. ELDER, a citizen of the State of Illinois, a witness of lawful age; produced, sworn, and examined upon his corporeal oath, at the Vermilion County Courthouse, 7 North Vermilion, Danville, Illinois, on the 26th day of August, 2005, before Amy L. Prillaman, CSR, License No. 084-003275, in and for the County of Vermilion and State of Illinois; as a witness in a certain suit and matter now pending and undetermined in the United States District Court for the Central District of Illinois.

APPEARANCES:

   Mr. Dennis De Caro
   KUPETS & DE CARO, P.C.
   30 North LaSalle, Suite 4020
   Chicago, Illinois  60602
   Appearing for the Plaintiff

   Mr. Jason W. Rose
   HERVAS, SOTOS, CONDON & BERSANI
   333 Pierce Road, #195
   Itasca, Illinois  60143
   Appearing for the Defendants

   ALSO PRESENT:  Lucille Butler



EXHIBIT 14

AREA WIDE REPORTER (800)747-6789

**Page 2**

```
                    I N D E X
Examinations                              Page

EXAMINATION,                                3
BY: MR. DENNIS DE CARO:
EXAMINATION CONDUCTED:                     21
BY: MR. JASON W. ROSE:


                    E X H I B I T S

No.                                       Page

(No exhibits marked)
```

**Page 3**

1   (Commencing at 12:55 PM)
2           COLE A. ELDER,
3   the deponent herein, called as a witness after having
4   been first duly sworn, was examined and testified as
5   follows:
6   EXAMINATION,
7   BY: MR. DENNIS DE CARO:
8       Q. Mr. Elder, my name is Dennis De Caro. I
9   represent Lucille Butler, who is here today, and the
10  Estate of her son, Kevin Lucas. I'm going to ask you
11  some questions about a call you and Mr. Allison
12  responded to on May 10th of '03.
13          Would you please state your full name and
14  spell your last name for the court reporter?
15      A. Cole Ashley Elder, E L D E R.
16      Q. Have you ever given a deposition before?
17      A. No, sir.
18      Q. It's basically just question and answer. A
19  couple things, you have to answer everything verbally
20  so the court reporter can get that down because she
21  types this up and if you nod we don't know if you
22  nodded yes or no.
23      A. Okay.
24      Q. If you nod, we'll say did you mean yes or

**Page 4**

1   no. The other one is we should try not to speak over
2   one another.
3       Q. What is your current mailing address?
4       A. 202 Boiling Springs Road.
5       Q. Boiling Springs Road. What town is that?
6       A. Here in Danville.
7       Q. What is your date of birth?
8       A. 12-26 of '82.
9       Q. And your Social Security number?
10      A. 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.
11      Q. What is your highest level of education?
12      A. Currently enrolled in college.
13      Q. Where at?
14      A. Keiser College in Sarasota, Florida.
15      Q. Do you go down there to go to school?
16      A. No, I do it on the internet.
17      Q. Who do you live with on Bowling Springs?
18      A. Myself.
19      Q. How long have you lived there?
20      A. Since December of '04.
21      Q. Any plans on moving in the next year or
22  two?
23      A. Just all depends if I get hired on the fire
24  department.

**Page 5**

1       Q. Okay. And this is a home or an apartment?
2       A. Home.
3       Q. How many more hours until you get your
4   degree?
5       A. November of '06.
6       Q. And that will be a Bachelor of Arts or
7   Science?
8       A. Associate's in Fire Science.
9       Q. Are you currently employed?
10      A. Yes.
11      Q. Where at?
12      A. The Newport Chemical Depot.
13      Q. With Ryan?
14      A. Yes, sir.
15      Q. When did you begin there?
16      A. May of '04.
17      Q. Are you still working part-time for Medix?
18      A. Yeah.
19      Q. When did you start at Medix?
20      A. 2001 right after school, so probably in
21  August of 2001 I started there.
22      Q. How often do you work there now?
23      A. Very miscellaneous, maybe ten hours a
24  month.

Page 6

1   Q. How many hours do you work at Newport
2   Chemical?
3   A. 40 a week, full-time job.
4   Q. Are you a licensed paramedic or an EMT?
5   A. Paramedic, yes.
6   Q. When did you become licensed?
7   A. January of '04.
8   Q. And this occurred on May 10th of '03. What
9   were you licensed as on that day?
10  A. A basic EMT.
11  Q. That's a license through the state of
12  Illinois?
13  A. Yes, sir.
14  Q. Where did you get your training for that?
15  A. At the Provena Regional EMS office or
16  system.
17  Q. When did you go through that training?
18  A. From July of '01 to August of '01, right
19  out of high school I took basic class.
20  Q. Okay. And then in August of '01 you
21  started working for Medix?
22  A. Yeah.
23  Q. And you needed your license to do that?
24  A. Yes, sir.

Page 7

1   Q. Have you had any conversations with any
2   Vermilion county correctional officers or sheriffs
3   regarding this case?
4   A. No, I don't --
5   Q. Have you had any conversations with their
6   attorneys?
7   A. No, other than yesterday I talked to
8   Mr. Rose.
9   Q. What was the substance of that
10  conversation?
11  A. Just asked basic questions as far as if I
12  was there and what I remembered.
13  Q. And why don't we just jump right in. What
14  do you remember about that call?
15  A. I was with Ryan obviously, we got called
16  down to the Public Safety Building, they met us at
17  the front doors like usual, took us down to the
18  holding cell area right where we found Mr. Lucas in
19  one of the padded cells. I remember he was in the
20  fetal position laying on his left side and he was
21  unresponsive and it was obvious that he was apneic,
22  which means not breathing. So we started checking to
23  see if he had a pulse or not and -- which he didn't
24  and that's the time I tried to roll him over on to

Page 8

1   his back so that we could begin our steps for someone
2   that's in cardiac arrest and --
3   Q. What are those steps?
4   A. CPR, get an airway established, doing chest
5   compressions. Then we would start with our advanced
6   skills, we would intubate the patient, start IVs,
7   given Epinephrine and Atropine and defibrillate if
8   necessary.
9   Q. But you didn't do that stuff?
10  A. No.
11  Q. Why not?
12  A. Because he met the criteria for field
13  termination.
14  Q. Which was what in his case?
15  A. Rigor mortise is one thing I can remember.
16  I didn't know if he had lividity or not. I didn't
17  see it in Ryan's report. Ryan is a very good
18  documenter so if it was there I'm sure it would be in
19  there. But it was rigor mortise which is where the
20  body becomes stiff.
21  Q. Okay.
22      MR. ROSE: I'm sorry, you said earlier, you
23  said he met the criteria for what?
24  A. Field termination.

Page 9

1   Q. And let's back up a little bit. Let's go
2   through -- you went through that quickly. Let's go
3   through when you first get there, there were some
4   things you went through before you came to that
5   determination. Can we go through those again? You
6   arrive in the padded cell, what's the first thing you
7   did?
8   A. Tried to gain patient contact. I walked
9   up, like I say he was laying on the left side, I
10  remember I touched his right arm, I guess that's just
11  where I touched him and then I moved on to the
12  carotid.
13  Q. So you felt for a pulse?
14  A. Yes, sir.
15  Q. And you couldn't find one?
16  A. No, sir.
17  Q. And then what did you do?
18  A. Well, I tried to roll him over and when I
19  tried to roll him over rigor mortise had set in which
20  is the stiffening of the body.
21  Q. So when you went to feel for the pulse you
22  couldn't tell at that point that he had rigor
23  mortise, right?
24  A. Correct.

Page 10

1  Q. By just feeling his neck?
2  A. No.
3  Q. It was actually you had to actually try and
4  move him and you felt stiffness in his arm?
5  A. Yeah, most of his body.
6  Q. Okay. I mean you can't tell whether
7  somebody has rigor mortise by just looking at them,
8  can you?
9  A. No.
10 Q. And is there a level of rigor mortise, I
11 mean if we went from zero to ten can you put a number
12 on someone's rigor mortise?
13 A. No, I wouldn't say that you could. I mean
14 it's kind of -- it might be a little bit worse, but
15 it depends on the person I guess as to how severe it
16 actually would become.
17 Q. So somebody could have rigor mortise like
18 five minutes after he's dead or it might take an hour
19 after he's dead?
20 A. Yeah, I wouldn't say an exact time frame,
21 but it takes more -- it's more than 15 minutes, it's
22 not something that is immediate after death.
23 Q. Okay. So you felt, he had no pulse, you
24 went to move him and he had rigor mortise, correct?

Page 11

1  A. Yes.
2  Q. What's the next thing you did?
3  A. That was -- that was it. After you
4  determine a patient has rigor mortise they're meeting
5  the criteria for field termination which they are
6  beyond, I don't know how to term it, it's just --
7  that's a determination that in the field that we
8  would make and they meet -- if a person meets one of
9  the criteria for field termination then that's where
10 you stop your process.
11 Q. I see. Let's look at this. I think he
12 documented you felt for the pulse but then there's
13 strips here. At what point did you monitor him that
14 created those strips? After you knew there was rigor
15 mortise or before?
16 A. Immediately after we put that on.
17 Q. And so I am a little bit confused. Once
18 there is rigor mortise and you have determined the
19 person dead, why do you even bother with the strips?
20 A. To confirm that the heart has no electrical
21 activity.
22 Q. Can someone have rigor mortise and have
23 electrical activity in the heart?
24 A. I suppose anything is possible. I wouldn't

Page 12

1  say that the odds would be very good, but...
2  Q. I mean because Ryan also talked about that,
3  you know, they have the three zeros or three zeros
4  and then rigor mortise and then you just stop. So
5  I'm just wondering why even bother doing anything
6  after that if you are sure the person is dead?
7  A. This is also, I mean it -- for a situation
8  such as this that we covered our bases to show that
9  the heart had no electrical activity. There's lead
10 one, lead two and lead three which looks at different
11 aspects of the heart and confirms that the heart has
12 no electrical activity.
13 Q. And that was taken after you determined
14 there was rigor mortise. But let me ask you, you
15 said anything is possible, if there were some blips
16 on there where there was electrical activity would
17 you start life-saving procedures?
18 A. I guess it depends on your definition of a
19 blip. A monitor can have what's referred to as
20 artifact.
21 Q. I mean if there -- if you monitor them
22 after you see there's rigor mortise and there is some
23 heart activity, is there some level of heart activity
24 you need before you would start life-saving?

Page 13

1  A. It would have to be V fib.
2  Q. There would be a certain level of heart
3  activity?
4  A. Yeah.
5  MR. ROSE: I mean Mr. Cole hasn't said he
6  ever encountered that situation where a person had
7  rigor mortise and there was electrical activity. Do
8  you want to ask him that or I'll ask him that? Okay.
9  Q. I just want -- are you 100 percent certain
10 that you checked for the heart activity after you
11 determined there was rigor mortise or could it have
12 been before?
13 A. No, it wasn't before because in order to do
14 this I have to put these stickers on the chest is
15 usually where we prefer to put these stickers at and
16 we try to roll them over.
17 Q. You were trying to roll him over, you felt
18 the rigor mortise?
19 A. We're going to roll him over to begin CPR,
20 we can't do that on the his side, or to determine
21 asystole; but usually practice is it goes on the
22 front, the stickers do, for the three lead, but in
23 this case that's when we found that the rigor mortise
24 was there and I mean that's it.

Page 14

1  Q. Did you roll him over and put the leads on
2  his chest?
3  A. No, sir.
4  Q. What did you guys do?
5  A. We used his back, which is just as
6  acceptable on them, you can use the backside. It
7  depends upon the person and what you need to do as to
8  where you put the patches at. It's not going to
9  affect the way the monitor reads at all.
10 Q. How long does it take to get a reading?
11 A. Just a second. Long enough to turn the
12 machine on and let it come up and it's there.
13 Q. When you first arrived at the padded cell,
14 how many people were in the cell, if anyone, other
15 than Kevin?
16 A. I can't answer that question. I don't
17 honestly remember.
18 Q. Was there anyone in there other than Kevin?
19 A. I don't believe so.
20 Q. Did -- I think you said earlier that
21 someone brought you down to the book-in area?
22 A. Uh-huh.
23 Q. Yes?
24 A. Yeah. I'm sorry.

Page 15

1  Q. Did they walk in with you into the padded
2  cell?
3  A. No, they always usually stay behind us and
4  people will be scattered down the hallway pointing us
5  to where we need to go.
6  Q. Was anybody observing you while you guys
7  worked on Kevin if you recall?
8  A. I don't remember.
9  Q. Okay. Do you remember while you were in
10 there with Kevin if any other -- if any other people
11 came into the padded cell?
12 A. No, nobody came in after -- that's one
13 thing that I do is after I establish patient contact
14 in a situation like that it's -- nobody is going in
15 there until somebody -- until the hospital says okay
16 that they -- we have told them our report, which is
17 what this page is about and until that report is done
18 and the hospital gives a time of death.
19 Q. You're referring to the EMS run record?
20 A. Yes, sir.
21 Q. Okay. So your recollection is from the
22 time you and Ryan went in to the padded cell until
23 the time of death, which appears to be 11:33, it
24 would have been just you and Ryan and Kevin in the

Page 16

1  padded cell?
2  A. Yes, sir.
3  Q. When you first arrived at the padded cell
4  did anything in the padded cell lead you to believe
5  that there was an investigation going on as to
6  Kevin's death or the cause of his death or anything
7  like that?
8  A. Not initially, no.
9  Q. So what led you to believe that later on?
10 You said not initially. Did you come to learn later
11 there was an investigation going on?
12 A. I'm not understanding your question.
13 Q. I said did anything lead you to believe an
14 investigation was going on and you said not
15 initially, which leads me to believe subsequently you
16 found out.
17 A. Oh, yes, the only thing I was going to say
18 was that there was the white substance in the baggy
19 at the end of his feet. I look around when I'm in a
20 situation, but, you know, initially I was focused on
21 him because we were in that cell and I noticed that
22 after the fact.
23 Q. Did you notice whether it was one bag or
24 two bags?

Page 17

1  A. Honestly I don't remember. I know there
2  was at least one. I wouldn't say there was two
3  because I don't remember. Ryan says there was two so
4  there was two.
5  Q. Okay. After -- after 11:33 and it was
6  determined that Kevin was deceased, what happened?
7  What did you do? Did you leave -- here's where I'm
8  going. Did you leave the building immediately or did
9  you speak with any officers?
10 A. No, we spoke with officers but I don't
11 remember who it was honestly.
12 Q. Was it -- were they questioning you, was it
13 that kind of conversation?
14 A. Just my name and address and date of birth,
15 basic information.
16 Q. Okay. There was no conversation about
17 Kevin's condition and causes of death or what you
18 found in your -- your examination of him?
19 A. I don't remember. It's been a while.
20 Q. Sure. Did -- do you know what time you
21 worked till that day or what your typical shift was
22 in May of '03?
23 A. I work 24 hour shifts, so I would have been
24 there till 8:00 the next morning.

Page 18

1   Q. Do you recall any officer calling you later
2 that day conducting an interview over the phone or
3 coming to your station and conducting an interview in
4 person?
5   A. No, I don't.
6   Q. Do you recall when you examined Kevin who
7 was examining him, was it either you or Ryan or both?
8   A. I believe I was the first one to enter the
9 room. I don't -- I know that -- I know that I placed
10 the monitor on Kevin.
11   Q. Once you determined that Kevin had rigor
12 mortise, did Ryan confirm that by feeling Kevin or
13 did he rely on what you told him?
14   A. I don't know. I don't remember him going
15 in there honestly.
16   Q. Where was Ryan while you were conducting
17 the examination?
18   A. Right behind me.
19   Q. Okay. But he wasn't -- he wasn't actually
20 laying his hands on Kevin?
21   A. No, I don't believe so, not at the time,
22 no. I don't recall if he did yes or no at all.
23   Q. Have you ever responded to a drug overdose
24 which you later found out to be cocaine overdose in

Page 19

1 your career?
2   A. I'm sure at some point in time. I can't
3 think of one right off the top of my head, but I'm
4 sure at some point in time I did, yes.
5   Q. Are there protocols for responding to a
6 cocaine overdose? By protocols I mean certain drugs
7 you would administer to the person.
8   A. You would have to -- I mean the only drug
9 we have that would really reverse anything would be
10 Narcan.
11   Q. And is that -- are you trained that Narcan
12 can reverse --
13   A. Of a narcotic.
14   Q. Okay. As you sit here today or reviewing a
15 record do you have an opinion one way or the other
16 how long Kevin had been dead before you arrived on
17 the scene that day?
18   A. No.
19   Q. Is that something you would be able to
20 formulate if you had more information?
21   A. No.
22   Q. Do you have any opinion as to the cause of
23 his death?
24   A. No.

Page 20

1   Q. Were you ever told by anyone you saw those
2 white -- one or two white baggies at Kevin's feet,
3 were you ever told by anyone whose they were, what
4 was in them, anything like that?
5   A. No.
6   Q. Last conversation you had with anyone
7 regarding this case other than maybe like friends and
8 family, would it have been on May 10th of '03 and
9 then with defendant's counsel just briefly the other
10 day?
11   A. Yeah.
12   Q. Never spoke to any Vermilion county sheriff
13 or correctional officer regarding it?
14   A. No.
15   Q. Ever have any runs that you came in contact
16 with any correctional officer that was in the book-in
17 area on May 10th, runs subsequent to this where they
18 said this is what happened?
19   A. Nothing spoke of about it, I mean I've had
20 runs I'm sure that I've ran into those folks, but
21 once a call is over, it's over. I can't take it home
22 with me.
23   Q. Sure. So are you trained that if someone
24 is triple zero and they have rigor mortise, even if

Page 21

1 you find those facts during your examination you
2 cannot determine that the person is dead, you still
3 have to call a physician or a coroner to make that
4 determination?
5   A. Correct. Any determination on an actual --
6 on a confirmation is what it's termed as has to go to
7 the hospital.
8   Q. And is one of the reasons why you send
9 those strips to the hospital so the doctor can also
10 see those strips before he makes that determination?
11   A. I would assume as much, yes.
12   Q. Do you remember any history that any
13 officer may have given you when you got to the Public
14 Safety Building that day outside of what's in that
15 report?
16   A. No.
17   Q. You don't have an independent recollection
18 of what any officer said to you that day?
19   A. No, not at all.
20      MR. DE CARO: That's all I have.
21 EXAMINATION CONDUCTED:
22      BY: MR. JASON W. ROSE:
23   Q. Good afternoon, my name is Jason Rose, I
24 represent Vermilion county. What do you do currently

Page 22

1  at Newport Chemical Depot?
2  A. I am a firefighter/paramedic.
3  Q. And Newport chemical, though, that's a
4  private company, correct?
5  A. Yes.
6  Q. And they have their own team of
7  firefighters and paramedics?
8  A. Yeah.
9  Q. How many people work there in that
10 department as firefighter or paramedic?
11 A. Roughly 30.
12 Q. And that's located in Newport, Indiana?
13 A. Yeah.
14 Q. So you have been a paramedic or an EMT for
15 the last four years, correct?
16 A. Yes, sir.
17 Q. Could you give me any estimate as to the
18 number of calls that you may have in a week or a
19 month or a year?
20 A. At Medix?
21 Q. Right now I'm starting globally, so talk in
22 terms of your career.
23 A. It varies anywhere from sometimes just two
24 or three to sometimes 15.

Page 23

1  Q. And that would be on a weekly basis?
2  A. Yeah.
3  Q. And that's at your current position or at
4  Medix?
5  A. Either one. If I go to work at Medix it
6  would be a lot more than that.
7  Q. And I assume that in your job as a
8  paramedic or EMT you've undoubtedly come across
9  individuals who have died either before you got there
10 or after you got there, correct?
11 A. Yes, sir.
12 Q. How many death cases do you think you have
13 witnessed?
14 A. I couldn't even begin to -- upwards of 50 I
15 would say at least.
16 Q. And how many times have you -- would you
17 say that you have encountered instances of rigor
18 mortise?
19 A. On a lot of them.
20 Q. Have you ever encountered a person with
21 rigor mortise who showed any electrical activity in
22 the heart?
23 A. No.
24 Q. Could you describe in this case the rigor

Page 24

1  mortise that you witnessed with respect to Kevin
2  Lucas?
3  A. It was just when I went to roll him over,
4  everything, I mean his arms, his legs, they were
5  stiff, I mean it was obvious that rigor mortise had
6  set in. I hope that answered your question. I'm not
7  exactly sure what you're after.
8  Q. Would you say that you observed a
9  significant amount of rigor mortise?
10 A. I guess rigor mortise was apparent I guess
11 would be my answer to that question.
12 Q. Okay.
13 A. They don't have examples for you to, I
14 guess, really base off whether it's significant or
15 not significant.
16 Q. Okay. So you're not able to give a --
17 quantify it or put a level in terms of the amount of
18 rigor mortise that was present?
19 A. No.
20 Q. I'm going to show you what was marked
21 during the prior deposition as Allison Exhibit 2. It
22 happens to be a Vermilion County Sheriff's Department
23 Investigative Report prepared by a Deputy Damilano.
24 There is maybe a half a page regarding his

Page 25

1  conversations with you after the relevant events on
2  May 10, 2003.
3  Have you ever seen this document?
4  A. No.
5  Q. I'd ask you to read the document beginning
6  with approximately 3:56 PM, officer spoke with Cole
7  Elder.
8  You have had an opportunity to review it?
9  A. Yes.
10 Q. Is there anything in the report that you
11 believe to be inaccurate or inconsistent with your
12 recollection?
13 A. No, I wouldn't say so.
14 Q. The report is consistent with your
15 recollection of the events, correct?
16 A. Yes, sir.
17 Q. And Mr. De Caro asked you about part of
18 your protocol is to call the hospital and they are
19 the ones that actually pronounce an individual dead,
20 correct?
21 A. Yes, sir.
22 Q. But when you called the hospital at that
23 point as a paramedic you had no doubt in your mind
24 that Kevin Lucas was in fact dead, correct?

Page 26

1  A. Yes, sir, as a basic I didn't have a doubt
2  in my mind, no.
3  Q. And that was based on both your training,
4  as well as your observations of the body at the
5  scene, correct?
6  A. Correct.
7  Q. And so essentially what the doctor at the
8  hospital is doing is he's confirming the information
9  that you are providing him that the patient doesn't
10 have any electrical -- any heart rate, doesn't have
11 any pulse. You give him this information and based
12 on that information the doctor makes a formal
13 pronouncement that the patient is dead?
14 A. Yes, sir.
15 Q. And did a coroner ever arrive on scene?
16 A. I don't remember.
17 Q. And take your time, you can take a minute
18 to review Exhibit 1.
19 A. Yeah, according to this they showed up. We
20 wait most 99 percent of the time unless if we're
21 really busy and somebody else needs an ambulance,
22 then we'll leave it to the authority of a police
23 officer that's there.
24 Q. How does the coroner become involved? Do

Page 27

1  you call the coroner?
2  A. Our base does.
3  Q. So is the coroner called after a physician
4  at the hospital pronounces the individual dead?
5  A. Yeah.
6  Q. Okay. So the doctor at the hospital in
7  this case, based on the EMS system run record, which
8  is part of Allison Exhibit 1, we know that it was Dr.
9  Sidman that pronounced Mr. Lucas dead.
10 A. Okay.
11 Q. And then who contacts the coroner?
12 A. Our base, the Medix base will contact the
13 Public Safety Building and they contact the on call
14 coroner.
15 Q. And can we tell from any of these reports
16 who the on call coroner was?
17 A. I doubt it.
18 Q. Can we tell from any of your reports, when
19 I say your reports I believe that the testimony was
20 that it was paramedic Allison that prepared these
21 reports, but I'm speaking in a general sense, can we
22 tell from any of these reports when the coroner
23 arrived on the scene?
24 A. No.

Page 28

1  Q. Would there be a meeting or any discussion
2  between the paramedics and the coroner after the
3  coroner arrives on scene?
4  A. Yeah, we always tell them our findings.
5  Usually give them our list of medications or medical
6  history or whatever that we have because they always
7  ask for the information.
8  Q. Okay. And in this case Exhibit 1 indicates
9  that your ambulance was returned to service at 12:04,
10 correct?
11 A. Yeah.
12 Q. So you left the Public Safety Building at
13 12:04 so do we know based on that that the coroner
14 would have arrived sometime before 12:04?
15 A. Yes.
16 Q. And do you recall in this case that the
17 coroner did arrive on the scene?
18 A. According to this, yes.
19 Q. But specifically what report are you
20 referring to?
21 A. This is the Medix report, it's -- it states
22 right there at the bottom that we remained on scene
23 with the Vermilion county --
24 Q. Can you read that out loud?

Page 29

1  A. "Patient was" -- I'm sorry. It says that
2  we returned to the cell, Ryan returned to the cell
3  where the patient was and remained with the Vermilion
4  County Sheriff's Department until Vermilion County
5  Coroner's Office arrived on the scene.
6  Q. So did you go back to the cell or were
7  you --
8  A. I never left the cell.
9  Q. What's that?
10 A. I never left the cell while Ryan was gone
11 on the phone.
12 Q. How many coroners do they have at the
13 Vermilion county coroner's office?
14 A. I don't have any clue.
15 Q. And so you don't have any recollection as
16 to who may have come out that morning?
17 A. No. I have at least three I can think of
18 off the top of my head and I don't remember.
19 Q. What three individuals can you name off the
20 top of your head?
21 A. Miss Johnson and Mr. Hardy and I can't even
22 think of his last name, his first name is Mike.
23 Q. But as you sit here today you can't recall
24 whether it was one of those three individuals that

Page 30

1  came out?
2      A. No, I can't.
3      Q. Do you stay on the scene for the coroner to
4  begin his work or do you believe -- pretty much leave
5  when the coroner gets there or you're out of there?
6      A. We leave. It's a pretty busy service, run
7  40 plus calls a day, we've got to get going because
8  once we get there and we relinquish the patient's
9  care to them we leave.
10     Q. Okay.
11         MR. ROSE: I don't have any other
12 questions.
13         MR. DE CARO: I don't have anything. You
14 can reserve or waive your signature. You have to let
15 us know. Reserving is if we get this typed up you
16 will have an opportunity to review what the court
17 reporter has taken down but you can change typos and
18 things like that, but you can't change the substance
19 of your testimony. Waiving it is we'll get it typed
20 up and you wouldn't see it unless one of us sent it
21 to you.
22     A. I'll waive it.
23         (Concluding at 1:30 PM)
24 AND FURTHER THE DEPONENT SAITH NOT

Page 31

1  (Signature Waived)
   _____
2     COLE A. Elder

Page 32

1  STATE OF ILLINOIS   )
                       )
2  COUNTY OF VERMILION)
3
       I, Amy L. Prillaman, a Certified Shorthand
4  Reporter, in and for the County of Vermilion, State
   of Illinois, do hereby certify that COLE A. ELDER,
5  the deponent herein, was by me first duly sworn to
   tell the truth, the whole truth and nothing but the
6  truth, in the aforementioned cause of action.
       That the foregoing deposition was taken on
7  behalf of the Defendant, at the Vermilion County
   Courthouse, 7 North Vermilion, Danville, Illinois, on
8  the 26th of August, 2005;
       That said deposition is a true record of the
9  testimony given by the deponent and was taken down in
   stenograph notes and afterwards reduced to
10 typewriting under my instruction; and that it was
   agreed by and between the witness and attorneys that
11 said signature on said deposition would be waived.
       I do hereby certify that I am a disinterested
12 person in this cause of action; that I am not a
   relative of any party or any attorney of record in
13 this cause, or an attorney for any party herein, or
   otherwise interested in the event of this action, and
14 am not in the employ of the attorneys for either
   party.
15     IN WITNESS WHEREOF, I have hereunto set my hand
   this 19th day of September, 2005.
16
                     *Amy A. Prillaman* (signature)
17
       AMY L. PRILLAMAN, CSR