RYAN ALLISON E-FILED
Wednesday, 15 March, 2006 03:38:55 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
STATE OF ILLINOIS

LUCILLE BUTLER, individually, and)
as Special Administrator of the )
Estate of KEVIN LUCAS, deceased, )
                                 )
          Plaintiff,             )
                                 )
-vs-                             )No. 04 CV 2048
                                 )
VERMILION COUNTY SHERIFF W. PATRICK)
HARTSHORN, et al.,               )
                                 )
          Defendants.            )

COPY

DEPOSITION

The deposition of RYAN ALLISON, a citizen of the
State of Illinois, a witness of lawful age; produced,
sworn, and examined upon his corporeal oath, at the
Vermilion County Courthouse, 7 North Vermilion,
Danville, Illinois, on the 26th day of August, 2005,
before Amy L. Prillaman, CSR, License No. 084-003275,
in and for the County of Vermilion and State of
Illinois; as a witness in a certain suit and matter
now pending and undetermined in the United States
District Court for the Central District of Illinois.

APPEARANCES:

          Mr. Dennis De Caro
          KUPETS & DE CARO, P.C.
          30 North LaSalle, Suite 4020
          Chicago, Illinois  60602
          Appearing for the Plaintiff

          Mr. Jason W. Rose
          HERVAS, SOTOS, CONDON & BERSANI
          333 Pierce Road, #195
          Itasca, Illinois  60143
          Appearing for the Defendants

       ALSO PRESENT:  Lucille Butler

EXHIBIT
15

Page 2

I N D E X

| Examinations | Page |
| --- | --- |
| EXAMINATION, | 3 |
| BY: MR. DENNIS DE CARO: | |
| EXAMINATION CONDUCTED: | 61 |
| BY: MR. JASON W. ROSE: | |
| RE-EXAMINATION, | 75 |
| BY: MR. DENNIS DE CARO: | |
| RE-EXAMINATION CONDUCTED: | 80 |
| BY: MR. JASON ROSE: | |
| FURTHER RE-EXAMINATION, | 81 |
| BY: MR. DENNIS DE CARO: | |
| FURTHER RE-EXAMINATION, | 82 |
| BY: MR. JASON W. ROSE: | |

E X H I B I T S

| No. | Page |
| --- | --- |
| Group 1 | 23 |
| 4A and 4B | 59 |
| 4C | 60 |
| Allison 2 | 80 |

Page 3

1    (Commencing at 11:05 AM)
2            RYAN ALLISON,
3    the deponent herein, called as a witness after having
4    been first duly sworn, was examined and testified as
5    follows:
6    EXAMINATION,
7    BY: MR. DENNIS DE CARO:
8        Q. Mr. Allison, please state your full name
9    and spell your last name for the court reporter.
10       A. Ryan Allen Allison, A L L I S O N.
11       Q. We are here, I represent Lucille Butler who
12   is here today and the estate of her son, Kevin Lucas.
13   I am going to ask you questions about a call you
14   responded to when you worked for Medix back on May
15   10th, 2003. First I'm going to ask you some
16   background questions and we'll talk about that day
17   and go over the run sheet and all that.
18       Have you ever given a deposition before?
19       A. No.
20       Q. There is just a couple of ground rules and
21   the two mains ones are that you have to answer
22   everything verbally. If you nod, the court reporter
23   can take it down but when we read it we won't know
24   whether you nodded yes or no or when you shrugged

Page 4

1    what that meant, so you have to answer everything
2    verbally.
3        A. Sure.
4        Q. The other thing is try and let me get out
5    my full question. What happens, people think they
6    know what my question is going to be and they sort of
7    start answering before I get it out, but sometimes I
8    have the same beginning of a question and it will
9    change at the end and even if you do know what it is,
10   it's hard for the court reporter to take us both
11   speaking at the same time. And I'll try to do the
12   same, while you're answering sometimes I try and
13   start asking you another question, I will try to
14   avoid that.
15           Other than that, if you need to take a
16   break, let me know and we'll do that, okay?
17       A. Sure.
18       Q. What is your current address?
19       A. P.O. Box 926, Catlin, C A T L I N,
20   Illinois.
21       Q. C A T --
22       A. L I N.
23       Q. What's the zip?
24       A. 61817.

Page 5

1        Q. What's your phone number there?
2        A. (217) 427-0492.
3        Q. What's your date of birth?
4        A. 02-07, 1980.
5        Q. Are you married?
6        A. No.
7        Q. Do you live at the Catlin address with
8    anyone?
9        A. No.
10       Q. How long have you lived there?
11       A. Just about a year.
12       Q. Any plans on moving in the next year or so?
13       A. No.
14       Q. What is your Social Security number?
15       A. 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.
16       Q. And this is just a question we ask
17   everyone, don't be offended. In the last ten years
18   have you been convicted of a felony or a misdemeanor
19   involving dishonesty or deceit?
20       A. No.
21       Q. No?
22       A. No.
23       Q. What is your highest level of education?
24       A. High school graduate. I assume you are

Page 6

1  talking about high school, college.
2  Q. Sure.
3  A. Not paramedic.
4  Q. I'll ask that stuff. So high school grad,
5  then you received some subsequent training as an EMT,
6  paramedic, stuff like that?
7  A. Yes.
8  Q. Let's talk about what are you currently
9  licensed as.
10  A. Currently licensed as -- by the Illinois
11  Department of Public Health as a paramedic.
12  Q. When did you become licensed?
13  A. As a paramedic or as an EMT?
14  Q. Paramedic.
15  A. As a paramedic, January of 2001.
16  Q. Okay. Prior to that you were an EMT?
17  A. Yes.
18  Q. When did you become licensed as an EMT?
19  A. March of 1998.
20  Q. Do either licensing either as an EMT or a
21  paramedic require relicensing each year or two years?
22  A. I also hold a license as an EMT instructor,
23  I don't know if you are interested or not.
24  Q. Yeah, sure.

Page 7

1  A. EMT instructor. I have been an EMT
2  instructor for two years.
3  Q. So you became an instructor in '03
4  sometime?
5  A. Sometime in '03. But all of those
6  licenses, the instructor license and the paramedic
7  license are concurrent licenses, I hold both of
8  those. The basic license, you know, you only hold it
9  until you move on to the next level or you don't
10  recertify.
11  Q. Okay.
12  A. You have to recertify every four years and
13  recertify at the paramedic level. I believe you have
14  to have 160 hours worth of education in that four
15  year time frame.
16  Q. So when -- you were an EMT in '98, '99,
17  2000; then 2001 when you became a paramedic, that
18  paramedic license sort of circumvents the EMT
19  license?
20  A. Yes.
21  Q. You don't have to keep up the EMT license?
22  A. The EMT license, there's different levels
23  of EMTs. The EMT license is the basic level, that's
24  the beginning level.

Page 8

1  Q. Okay. And then since January of '01 you
2  have consistently been a paramedic and licensed in
3  the state of Illinois?
4  A. Yes.
5  Q. You graduated high school in about 1998?
6  A. Yes.
7  Q. Then where did you go to get trained to
8  become an EMT?
9  A. I actually received my initial education as
10  an emergency medical technician basic while I was
11  still a senior in high school.
12  Q. What high school?
13  A. First Baptist Christian High School.
14  Q. What town is that in?
15  A. Danville.
16  Q. So in March of '98 you become licensed as
17  an EMT?
18  A. Right. Graduated high school in May of
19  '98.
20  Q. Then up until 2000 I am assuming you start
21  your paramedic training. Is there any other training
22  in between there?
23  A. Yes, there's continuing education training
24  that has to go on. Just because I didn't know if I

Page 9

1  was going through the paramedic class or not, I would
2  have had to keep up continuing education hours for
3  that time frame to keep my license current.
4  Q. Where did you get your paramedic training?
5  A. Through the Provena Regional EMS office in
6  Champaign.
7  Q. Where did you get your EMT instructor
8  training?
9  A. Same place.
10  Q. Let's talk about your employment history
11  from high school till today. After high school or if
12  you had a job -- did you have jobs in high school?
13  A. Yes.
14  Q. Did you have any full-time jobs relating to
15  EMT type work in high school?
16  A. In high school, not full-time.
17  Q. Okay.
18  A. The village of Tilton is -- is where I
19  lived and they considered their EMTs part-time
20  employees, so I would have been a part-time employee.
21  Q. While you were in high school?
22  A. While I was in high school, yes.
23  Q. For the village?
24  A. Yes.

## Page 10

1  Q. And then after you graduated in May of '98
2  were you still employed there part-time?
3  A. Yes.
4  Q. Did you have any other jobs?
5  A. I worked full-time in a grocery store.
6  Q. And from May of '98 till when did you have
7  those two employments, full-time in a grocery store
8  and part-time in Tilton?
9  A. I'm sorry? Say that again.
10  Q. At some point you stopped working at the
11  grocery store?
12  A. Yeah. I -- I started working at the
13  grocery store in I believe it was June of '98, worked
14  there full-time until October of '99, I believe, in
15  the meantime got hired at Medix Ambulance in Danville
16  part-time in either March or April of '99.
17  Q. When you worked for the village of Tilton
18  as a part-time EMT. How many hours a week was that?
19  A. It varies. It varies greatly depending on
20  the number of calls because it's a -- you don't
21  actually go to the station and sit for a certain
22  amount of hours. You go when the pager goes off when
23  they have a call.
24  Q. Was that a paid position for Tilton when

## Page 11

1  you were part-time or was that a volunteer position?
2  A. Actually probably at that time it was
3  volunteer. I forgot Tilton didn't go full-time until
4  a few years later -- I'm sorry, didn't go paid until
5  a few years later.
6  Q. Okay. Were you still there when it went
7  paid?
8  A. Yes. Yeah, I am still there, I am a
9  lieutenant there now.
10  Q. Okay. So you started out in high school,
11  EMT as a volunteer. At some point it became a paid
12  position which you are still there now as a
13  paramedic?
14  A. Yeah, as lieutenant and a training officer.
15  Q. Okay. Okay. And you said you started
16  part-time with Medix in March or April of '99. I am
17  assuming that was a paid position?
18  A. Yes.
19  Q. Okay. How many hours in March and April or
20  April of '99 when you started, how many hours were
21  you working per week?
22  A. On average probably anywhere between 30 and
23  40 hours a week.
24  Q. Was that where you had a shift or where

## Page 12

1  they would page you?
2  A. You would -- a lot of times when you start
3  out part-time you are paid to be -- I'm sorry, not
4  paid to be on call, but you would be placed on call
5  and if they had a transfer from one hospital to
6  another then you would come in and take the transfer
7  and you would get paid from the time that you came in
8  until the time that you left.
9  Q. Okay. So there were six or seven months
10  when you were part-time at Medix that you were still
11  working full-time at the grocery store?
12  A. Yes.
13  Q. And then in October of '99 you stopped
14  working at the grocery store. Did you become
15  full-time at Medix at that point?
16  A. Yes.
17  Q. And that was 40 hours a week?
18  A. It averaged out to -- the position I was
19  first placed in to varied, but it averaged out to --
20  I think to be considered full-time you had to work a
21  minimum of 32 hours, so my base hours was on average
22  32 or more.
23  Q. Okay.
24  A. But I would still take call and still do

## Page 13

1  transfers and pick up overtime.
2  Q. When did you stop working at Medix?
3  A. I worked at Medix all the way up until
4  October of 2003.
5  Q. And during that time you're still part-time
6  in Tilton?
7  A. Yes.
8  Q. Any other jobs after October '99 to October
9  of '03 other than for the village of Tilton?
10  A. I started working part-time at Sager
11  campus, hyperbaric medicine.
12  Q. How do you spell that?
13  A. Hyperbaric?
14  Q. No, Sager.
15  A. S A G E R.
16  Q. And that's a school?
17  A. It's a wound care center. And hyperbaric
18  medicine treats patient with wounds with oxygen
19  therapy, things like that.
20  Q. Where is that located?
21  A. It was located at 600 Sager Drive or
22  avenue, I'm not sure which.
23  Q. Danville?
24  A. Danville, yes.

## Page 14

1  Q. That's closed?

2  A. Yes.

3  Q. When did you work part-time there?

4  A. I worked there from probably March of 2001

5  until just about October of 2002, I believe. I'd

6  have to look at my records to be sure.

7  Q. Sure. I'm not -- I'm not going to hold you

8  to the exact dates.

9  A. Sure.

10  Q. Any other jobs between October '99 to

11  October of '03 that we haven't talked about?

12  A. Yes. I worked part-time at Georgetown

13  Ambulance.

14  Q. Anything else?

15  A. No.

16  Q. When was that? When was Georgetown?

17  A. Georgetown Ambulance was probably about the

18  same time, around March or April of 2001 until

19  current.

20  Q. You're still working there?

21  A. Yes. It may only be one shift a year, but

22  I guess I'm still employed there.

23  Q. And what town is Georgetown Ambulance

24  located, their main office?

## Page 15

1  A. Georgetown, Illinois.

2  Q. Up to October of '03 we have covered all

3  your jobs?

4  A. I believe so.

5  Q. All right. What happened in October of

6  '03? How did you leave Medix?

7  A. I was offered a full-time position at the

8  Newport Chemical Depot Fire Department.

9  Q. Newport?

10  A. Newport Chemical Depot.

11  Q. Where is that located?

12  A. In Newport, Indiana, it's off of South

13  State Road 63.

14  Q. Are you still currently employed there?

15  A. Yes.

16  Q. What is your position there?

17  A. Paramedic and EMS supervisor.

18  Q. And you're still part-time at Georgetown

19  Ambulance whenever they call you and still part-time

20  at the village of Tilton?

21  A. And still part-time at Medix Ambulance.

22  Q. Oh, you are?

23  A. Yes.

24  Q. Okay. How often -- you told me about

## Page 16

1  Georgetown. How often do you work at village of

2  Tilton?

3  A. Like I said, village of Tilton is still

4  just a -- maybe one call a month or two calls a

5  month.

6  Q. How about Medix, how often?

7  A. Medix is maybe -- maybe a 24 hour shift

8  every other month. I've been busy teaching an EMT

9  class right now so it's been a little bit less.

10  Q. And Georgetown is maybe one shift a year?

11  A. Yeah.

12  Q. Two shifts a year?

13  A. One or two shifts a year, just whenever

14  they have vacations, have people going out of town.

15  Q. So we've covered all your employment

16  basically?

17  A. I think so.

18  Q. So this incident occurred on May 10th,

19  2003. On that date you were a licensed paramedic,

20  correct?

21  A. Yes.

22  Q. Were you an EMT instructor by that time in

23  May of '03?

24  A. Yes.

## Page 17

1  Q. And do you still -- I think you said you

2  don't need to, but did you still have your EMT

3  licensing or that disappears when you become a

4  paramedic?

5  A. Well, paramedic is a type of EMT, so

6  there's EMT basic, EMT intermediate, EMT paramedic

7  and they all are EMTs, it's just different levels, so

8  I didn't have the basic license, it's not something

9  that you hold concurrent with your paramedic license.

10  Q. All right. Let's talk about conversations

11  you've had regarding this case. Do you recall this

12  case? I know we spoke yesterday and you were trying

13  to get the ambulance report. Were you able to get

14  that?

15  A. No.

16  Q. Okay. Do you have an independent

17  recollection of this event?

18  A. Somewhat, yes.

19  Q. Okay. Do you recall after you left the

20  Vermilion County Jail that day, do you remember

21  giving a statement to any investigator subsequent to

22  leaving?

23  A. I actually gave a statement while I was

24  still downstairs at the jail, I gave a statement

Page 18

1 there.

2 Q. On May 10th?

3 A. Yes. And then received a phone call later

4 at the station and was asked a few more questions and

5 answered some questions via phone.

6 Q. Do you know who you gave a statement to?

7 A. I'm not sure.

8 Q. Typically when you wrote reports on a call

9 like this back in May of '03 when would you write the

10 reports? Would it be at the end of your shift or

11 immediately after?

12 A. Immediately after as long as we didn't have

13 another emergency call to go on.

14 Q. Would it be -- would you typically write

15 the reports in the ambulance or would you go back to

16 the office and do it?

17 A. Go back to the station. Most times most

18 reports are written at the hospital when you drop a

19 patient off, but in a situation like this where you

20 didn't go to the hospital to drop a patient off, we

21 would go back to the station and write it.

22 Q. Other than the conversations we just spoke

23 about, you gave a statement while you were still down

24 in the book-in area, then you were called some time

Page 19

1 later. Have you had any other conversations with

2 anyone from the Vermilion County Sheriff's Office or

3 Vermilion county correctional officers?

4 A. I don't believe so.

5 Q. Okay. You spoke to me yesterday briefly

6 because I basically told you you had a deposition

7 today.

8 A. Yeah.

9 Q. Have you spoken to the Vermilion County

10 Sheriff's attorneys other than just confirming this

11 deposition?

12 A. Just out in the hallway here, he handed me

13 a copy of the run sheet and gave me a chance to read

14 through it.

15 Q. Okay. So you have had a chance to look

16 through it?

17 A. Yes.

18 Q. Have you seen your statement that you gave

19 back on May 10th?

20 A. No.

21 Q. Back in May of '03 what -- let's say you

22 came upon a person who had passed away but they were

23 in a motor vehicle on the side of the road. What was

24 your protocol with DOA's?

Page 20

1 A. The protocol we have is called triple zero

2 protocol and they would -- by triple zero it means

3 they would not have a heart rate, they would not have

4 a pulse and they would not have a blood pressure.

5 With that you had to -- if you were going to perform

6 a triple zero protocol you had to make sure that one

7 of any of the following were present and that was

8 decapitation, rigor mortise, lividity or there was a

9 coroner or a doctor on the scene to pronounce death.

10 Q. Now, let's just define some terms before we

11 move on because a couple of them will come up. I

12 think we all have a general idea of what rigor

13 mortise is, but why don't you define it for me and

14 tell me, you know, how do you know something's rigor

15 mortise as opposed to not being rigor mortise? Why

16 don't you tell me what you mean by rigor mortise.

17 A. Rigor mortise is a stiffening of the

18 joints, usually caused after death. It's because of

19 muscles stiffening. Generally how you would tell is

20 most persons are pretty easy to lift an extremity or

21 move an extremity. A patient who may have rigor

22 mortise, when you would go to move them that

23 extremity would be fixed in the position in which you

24 found it.

Page 21

1 Q. Do you have any estimate as to how long it

2 takes for rigor mortise to occur after a person is

3 triple zero?

4 A. You know, again, this would be an opinion,

5 this would be -- I read some information this morning

6 just to kind of brush up to prepare.

7 Q. Sure.

8 A. But rigor mortise can set in within 10

9 minutes to several hours after death. I believe it

10 actually said up to 72 hours post death.

11 Q. Okay.

12 A. But it's very dependent upon the individual

13 themselves.

14 Q. Let's talk about lividity. How would you

15 define lividity?

16 A. Lividity is a -- something that you would

17 see, it looks like a bruising, usually it's caused by

18 blood that is pooled and because the blood is not

19 circulating, the blood then pools in all of those

20 portions of the body, you know. Since it is not

21 moving then it begins to seep down into the cellular

22 level and that's where bruising appears at.

23 Q. Do you have any opinion as to how long that

24 takes to occur after death?

## Page 22

1  A. No, I really don't.

2  Q. Back to that scenario where somebody is DOA

3  on the side of the road, while you were at Medix

4  was -- what would be the -- in this particular case

5  Kevin's body, correct me if I'm wrong, you and

6  Mr. Elder left the scene and left Kevin's body in the

7  padded cell, correct?

8  A. With -- when -- you are talking about

9  time -- when we left the body, yes, we didn't take

10 him with us in our ambulance, but that was after --

11 after the coroner was on the scene to assume custody

12 of him.

13 Q. So if somebody is dead the coroner comes

14 upon the scene, your protocol was you don't transport

15 and you go on to another call or back to the station?

16 A. Right.

17 Q. Okay. Do you know who the coroner or who

18 from the coroner's office was at the scene that day?

19 A. Do you have a copy of my run sheet that I

20 can see?

21 Q. Yeah.

22 A. I may have documented it.

23 Q. Actually what we'll do is we'll mark this

24 as Allison Group Exhibit 1.

## Page 23

1  (Whereupon Exhibit No. Group 1 was marked

2  for identification.)

3  Q. I am handing you Allison Group Exhibit

4  No. 1. The first page has the Medix address on it

5  and it's dated 5-10-03. That first page is a

6  two-sided document. Then there is another page

7  entitled Emergency Medical Services Narrative, the

8  third page is the EMS system run record, the fourth

9  page are your monitoring strips, the fifth page is

10 the preoperative care report. Correct?

11 A. Yes.

12 Q. Why don't you look through there and tell

13 me if anywhere it talks about who was there from the

14 coroner's office.

15 A. No, I don't have the name written down of

16 who the coroner was.

17 Q. Okay. Let's -- this is a good time to go

18 through this report so let's do that, but first go

19 through each page and just tell me who created each

20 page. The first two sided page of Exhibit 1, do you

21 know who actually filled that out?

22 A. That would have been myself.

23 Q. Okay.

24 A. Except for writing in areas that would

## Page 24

1  involve insurance or something like that, the account

2  number, invoice number, responsible party.

3  MR. ROSE: Do we have a name for the face

4  sheet?

5  Q. What would you call that sheet?

6  A. It's a Medix run report.

7  Q. Is that your signature on the bottom?

8  A. Yes.

9  Q. On the front side?

10 A. Yes.

11 Q. Is that also your signature as the

12 attendant on the second side?

13 A. Yes.

14 Q. And the driver, do you know who that is?

15 A. I believe that's Cole Elder's signature.

16 Q. Now let's look at the Emergency Medical

17 Services Narrative. Did you fill out that report?

18 A. Yes.

19 Q. And you were crew member No. 1?

20 A. Yes.

21 Q. And that line to the right of your

22 signature there where it says drivers and completed

23 report, I am assuming that slash begins showing that

24 you completed the report and Cole Elder was the

## Page 25

1  driver?

2  A. Yes.

3  Q. The next page is the EMS system run record.

4  Do you know who completed that report?

5  A. According to the signature at the bottom

6  where it says MICN, that would be Jamie Decker.

7  Q. Who is Jamie Decker?

8  A. She is a -- at the time was a nurse in the

9  emergency department in Danville. She's also an MICN

10 or an ECRN, what they classify as an ECRN. You have

11 to be licensed to speak on the ALS radio and so

12 therefore she was the one that answered the radio.

13 Q. So she was an employee of Medix?

14 A. No.

15 Q. Of who?

16 A. No, she would be an employee of Provena

17 United Samaritans.

18 Q. She is no longer there?

19 A. I don't believe so. I kind of lost track

20 of Jamie when I left the area to go to Newport.

21 Q. Jamie Decker wasn't at the Vermilion County

22 Jail that morning, right?

23 A. No.

24 Q. So the information she put on this sheet,

## Page 26

1  would it be fair to say she received from either you
2  or Mr. Elder?
3      A. It would have came from myself.
4      Q. Okay.
5      A. As you can -- as you can read in the
6  comment section on the back of the Medix run sheet,
7  it says that I went to the phone in one of the
8  officer's office and contacted the hospital via
9  phone.
10     Q. Okay. And if we go to the last page, we'll
11  skip the monitoring strips right now, but the EMS
12  prehospital care report, it's difficult to read and
13  it looks as though someone had written over it with a
14  carbon or something like that, but who --
15     A. Yeah. This is actually -- this is a copy
16  of -- this is a carbon copy itself and the original
17  goes to the state of Illinois for their -- for their
18  records and we retain a copy saying that we completed
19  it.
20     Q. It would go to the Department of Public
21  Health?
22     A. Yes. It gets turned in locally to a local
23  EMS office and then from there it's to go to the
24  Department of Public Health.

## Page 27

1      Q. And can you tell from this who filled this
2  out?
3      A. There's really -- I mean there's nowhere
4  that's going to say who filled out what, but I know
5  from my history, I generally complete my own reports.
6      Q. Okay. Let's go back to the first sheet, I
7  just want to go through it quickly with you. Up in
8  the right-hand corner this was a run sheet for May
9  10th, '03, it was run number eight, correct?
10     A. Uh-huh.
11     Q. Yes?
12     A. Yes.
13     Q. And it occurred on Saturday?
14     A. Yes.
15     Q. Do you know who gave you the information
16  about Kevin Lucas, his name, address, Social Security
17  number, things like that?
18     A. I believe that I got that information from
19  one of the officers at the public safety -- one of
20  the Vermilion County Sheriff's Department officers.
21     Q. Do you know, when you got there did you
22  know any of the officers that were there?
23     A. No, I don't believe so.
24     Q. Had you ever responded to the Public Safety

## Page 28

1  Building before?
2      A. Yes.
3      Q. Was it frequent or infrequent that you
4  would actually go to the jail to respond to a call?
5      A. It varied. I mean there would be some
6  months where you would go more, some months you would
7  go less, but I mean, yeah, it wasn't an uncommon
8  occurrence, it wasn't like a once a year big surprise
9  to go to the jail for a call.
10     Q. Do you know if yourself or anybody else at
11  Medix did any EMS or any kind of life-saving training
12  to the correctional officers?
13     A. I personally didn't and I can't speak for
14  anybody else.
15     Q. I mean did you ever hear of that occurring?
16     A. Not that I know of. I have never heard of
17  that.
18     Q. Under responsible party relationship, it
19  says name, signal 12. What does that mean if you
20  know?
21     A. That's something that's filled out by our
22  billing office, so I couldn't tell you what codes
23  they use for that.
24     Q. Okay. And then if we go below and all the

## Page 29

1  way to the left, time received, I am assuming that's
2  the time you received the call to come to the Public
3  Safety Building?
4      A. Yes.
5      Q. And that was 11:18 that morning?
6      A. Yes.
7      Q. Do you actually fill those times in or is
8  that something the dispatcher does?
9      A. I filled those times in on this report, but
10  there's a log that the dispatcher generates that I
11  would get the times from.
12     Q. Do you recall where you were when you
13  received the call? Were you at the station or were
14  you out driving around?
15     A. If you look at the box where it says
16  dispatched to, transported to, there is a line that
17  says dispatched from and base means that we were at
18  the station.
19     Q. Show me that.
20     A. Right here where it says dispatched from
21  the base.
22     Q. So you were at the station, you receive the
23  call at 11:18, you leave the station at 11:19?
24     A. Yes.

Page 30

1    Q. I am assuming the station isn't far from
2    the Public Safety Building?
3        A. The station is located 812 North Franklin
4    which is probably maybe a couple miles, if that.
5        Q. Now, just to the right there it says code
6    two and a one is circled. What does that mean?
7        A. Code two is -- we use priority numbers to
8    assign the level -- the way that we respond to
9    certain emergencies. Code two one or priority one
10   would mean lights and sirens, would mean it's an
11   emergent run. Priority two would mean no lights, no
12   sirens; priority three would mean lights and sirens
13   until you get close to the residence then you would
14   shut down, somebody may request a silent approach or
15   something.
16       Q. So this was the highest priority?
17       A. Yes.
18       Q. You arrived at the scene 11:22?
19       A. Yes.
20       Q. Do you remember how you went into the
21   building, front, back, side?
22       A. I believe at that time that the sally port
23   was still under construction. Prior to them doing
24   the construction we always went through the sally

Page 31

1    port but I believe it was under construction so then
2    we would back up to the front doors along the ramp
3    that leads up to the Public Safety Building.
4        Q. Now where it says nature of call, it says
5    possible code blue. What does possible code -- first
6    of all, is that what POSS means?
7        A. Yes.
8        Q. What does that mean in paramedic jargon?
9        A. Code blue is a term that's used by EMS
10   providers, local hospital, and code blue just means
11   that they don't have a pulse rate and they don't
12   have -- they're not breathing.
13       Q. When it is a code blue, will the dispatcher
14   or someone at the station instruct the caller on how
15   to provide CPR or anything like that?
16       A. If our dispatcher were to receive the call
17   from someone privately, the way that Medix is
18   dispatched, all 911 calls, all emergency calls go
19   into a dispatch center located at the PSB. The PSB
20   has a direct line to Medix where we have a dispatcher
21   and they would call them and a lot of times if the
22   instructions were to be given it would be given from
23   somebody at the Public Safety Building,
24   communications center. If it comes in through 911 or

Page 32

1    in this case since it was inhouse I would imagine
2    they would have contacted via radio or hard line down
3    there. So they -- if there was any instructions that
4    were to be given it would have been from the 911
5    center at the Public Safety Building.
6        Q. I got you. Do you have any knowledge or in
7    your experience that if it is a code blue situation
8    whether the dispatcher at the Public Safety Building
9    does instruct people to do that, provide CPR?
10       A. I know that just through previous
11   experiences that they've -- they've said in the past
12   upon dispatch that they are given CPR instructions,
13   so on and so forth.
14       Q. Now just looking at the times again, at
15   12:04 you were returned to service.
16       A. Yes.
17       Q. So you were at the Public Safety Building
18   for about 30 --
19       A. 42 minutes.
20       Q. Okay. 42 minutes. And during that period
21   you assessed Kevin, determined he had died and given
22   your statement?
23       A. And contacted the hospital.
24       Q. Yeah, everything -- we'll go through that,

Page 33

1    but when you returned to service does that mean you
2    had left the building?
3        A. Yes, we left the building. That was when
4    we would have put all our equipment back on there,
5    picked up the radio and called our dispatcher back at
6    the station -- I keep pointing that way. It's that
7    way. But called the dispatcher to let them know that
8    we cleared the building.
9        Q. When you arrived at the Public Safety
10   Building did you bring in a stretcher, did you just
11   bring in your bag?
12       A. You know, honestly I do not remember
13   whether we brought in the cot on this particular call
14   and I -- I know that we brought in equipment with
15   this. I would say that it's pretty standard that we
16   take the cot with us, especially when responding to
17   there, to the PSB, to the jail, whatever the case may
18   be, because you're not generally going to come back
19   out to the ambulance to get the cot and then go back
20   in again. So I would almost say that, yes, we had
21   the cot, but I'm sure that we had the heart monitor,
22   our -- what we consider our drug bag that has
23   medications and IV supplies and our airway bag.
24       Q. How did you know or does it indicate

Page 34

1 anywhere in here where in the Public Safety Building
2 you had to respond to?
3     A. The -- I'm sure that information was
4 probably given to us via the radio while we were en
5 route.
6     Q. Okay. So when you got to the Public Safety
7 Building did you have to wait for the elevator, did
8 you take the stairs?
9     A. There's -- I believe that we were -- when
10 we went in I believe that we were met by a
11 correctional officer who was holding the elevator for
12 us. We got on the elevator, he took us down to
13 the -- to where we were to get off the elevator.
14     Q. Okay. Let's look on the other side of page
15 one and at status it's circled stable. What does
16 that mean?
17     A. It's -- really it's left up to the person
18 completing the report as to what status you place
19 them in, stable, mild, moderate or severe. Someone
20 who's obviously dead is a stable status because
21 they're not going to be transported, you know, it's
22 not a life-threatening incident because there is no
23 reason for it to be a life-threatening incident.
24     Q. Under chief complaint it's SRS No. 6679750.

Page 35

1 What does that mean?
2     A. That's the state run sheet number, which is
3 this page here, the Illinois state run sheet.
4     Q. Okay. And then the ALS under that is ALS
5 03-0974?
6     A. And that would be the Vermilion county run
7 report or EMS system run record.
8     Q. Okay. Then let's look at med/surgical
9 history, you have asthma. Someone told you Kevin had
10 asthma?
11     A. From just having glanced through the run
12 report here, the state run report, it states in here
13 Vermilion county correctional officer denied patient
14 complaining of anything. Vermilion county
15 correctional officer stated, in quotation marks, "he
16 has asthma real bad and if he has problems he usually
17 tells us right away", end quotation mark.
18     Q. Do you know who told you that?
19     A. No, I don't. I just know it was a
20 Vermilion county correctional officer.
21     Q. All right. So when -- just looking at some
22 of the vitals -- well, not vitals.
23     A. Which page?
24     Q. Back on page -- the second side of the

Page 36

1 page.
2     A. Okay.
3     Q. When you got there he was unconscious?
4     A. According to the box that I marked, yes, he
5 was unconscious.
6     Q. And pupils were dilated?
7     A. Yes.
8     Q. Correct?
9     A. Dilated and fixed.
10     Q. What is the significance of that?
11     A. It's an indication, another indication of
12 death or the body's inability to control the
13 pupillary response is when pupils are fixed and
14 dilated, it's a reaction that occurs.
15     Q. And the color of skin was pale/ashen. Is
16 that what you would also expect from a deceased
17 person?
18     A. Yes. But if you notice that I circled the
19 pale, so that meant that he was pale only and not
20 ashen.
21     Q. Okay. Moisture - normal. What exactly are
22 we talking about moisture?
23     A. Moisture is perspiration that would be on
24 the skin. Usually if your body goes into a state of

Page 37

1 shock it will vasoconstrict your blood vessels and
2 release perspiration and a lot of times you will see
3 that the blood is shunted away from the skin because
4 the skin is a nonvital organ at this point, your body
5 is trying to compensate, so your skin becomes cool,
6 usually pale and diaphoretic, but in this case he was
7 not diaphoretic.
8     Q. What do you mean by that?
9     A. Diaphoretic is moist or would have the
10 perspiration.
11     Q. Okay. Do you remember, do you have an
12 independent recollection of how Kevin was positioned
13 in the cell when you got there or did you get it from
14 reading that?
15     A. Yeah, just from reading this in the state
16 run sheet it gives a pretty good description at the
17 bottom of how he was positioned at the site.
18     Q. The sheets we're looking at on Exhibit 1,
19 would you have gone back to the station and
20 immediately filled these out?
21     A. Yes.
22     Q. Okay. So everything was fresh in your
23 mind?
24     A. Yes. Yes. And I recall in this certain

## Page 38

1 situation the documentation was an important function
2 for me so I know that when I did go back I went to a
3 separate room away from everybody else and made sure
4 and did my documentation.
5     Q. You wanted to get everything right?
6     A. Right.
7     Q. Okay. Let me just read through this real
8 quick, I might not have too many questions. When you
9 examined for -- on the back here under comments it
10 says "examined patient for pulse". Is that right
11 carotid?
12     A. At.
13     Q. At carotid on left side. Where exactly are
14 you feeling on someone else's neck?
15     A. It would be just in the general neck area
16 on the left side, you know, anywhere that you could
17 palpate or feel a -- for a carotid pulse.
18     Q. Okay. "Assessed patient for rigor mortise,
19 left upper and left lower extremities" and it's got
20 in parens C. Elder. So was it Mr. Elder who assessed
21 for rigor mortise?
22     A. Yeah, he is the one that physically touched
23 him. I was in the same room with him when he was
24 performing the assessment.

## Page 39

1     Q. Okay. Then we move on, it says "contacted
2 Logan via phone and offices." What is Logan?
3     A. Logan would be Logan campus or Provena
4 United Samaritans Medical Center.
5     Q. Okay.
6     A. It used to be referred to as Sager campus
7 and Logan campus and a lot of us kind of forget that
8 it's Provena United Samaritans Medical Center instead
9 of Logan campus.
10     Q. Again I think you told me that the purpose
11 of contacting them is part of your protocol?
12     A. Yes, part of protocol that you have to
13 contact medical direction any time that there's an
14 obvious death, that you are going to confirm obvious
15 death.
16     Q. When you first got to the cell do you know
17 how many people were in there?
18     A. I couldn't tell you exact numbers, no.
19     Q. Were there -- Kevin was there, yourself,
20 Mr. Elder. Were there more than five other people in
21 there, less than five?
22     A. Honestly I really don't recall.
23     Q. Okay. Was there anyone else in there?
24     A. Yes. Yeah, there was -- there was maybe

## Page 40

1 two or three other corrections officers, but
2 that's -- again, I don't remember an exact number of
3 how many was there.
4     Q. Was there an investigation going on or were
5 they just standing around?
6     A. When we got there I believe that they
7 were -- they were quick to point us in the direction
8 of where he was at and once we were there they kind
9 of stayed in the area and asked if there was anything
10 they could do to help.
11     Q. Did anyone -- did you ever observe anyone
12 providing CPR or any other life-saving techniques to
13 Kevin in your presence?
14     A. No.
15     Q. Did anyone ever tell you that they had done
16 that?
17     A. No.
18     Q. Was there any evidence that anybody tried
19 to do anything to Kevin before you arrived?
20     A. No.
21     Q. I'm going to -- I have moved on to the
22 state sheet, I want to read that narrative and see if
23 there is anything on there I want to ask you. So
24 when you arrived according to this narrative you

## Page 41

1 found Kevin face down, rolled on to right side in
2 holding cell?
3     A. Yes.
4     Q. And can you just -- as I read that I was a
5 little bit confused. So he is face down, would that
6 be he's laying on his chest?
7     A. If you go down towards the bottom here, at
8 the very bottom of the report it says "noted
9 patient's right upper extremity to be underneath
10 body. Left upper extremity extended slightly away
11 from the body and left lower extremity crossed over
12 right lower extremity." So it's almost like he was
13 kind of on his face with his head, you know, on his
14 arm and his legged crossed.
15     Q. So when you say rolled on to his right
16 side, is that what you guys did, you would look at
17 him, you had to roll him up or he was --
18     A. No, he was somewhat rolled on to his right.
19 He wasn't exactly face down with his face planted
20 into a mat is what I was trying to depict. He was on
21 his --
22     Q. More in a prone position but on his right
23 side?
24     A. Yes.

Page 42

1    Q. And he was unresponsive to anything you
2  attempted to do to him?
3    A. Yes.
4    Q. And we talked about rigor mortise. Is
5  there -- assuming the longer someone is dead, the
6  more rigor mortise sets in?
7    A. You know, from previous experience rigor
8  mortise is something that usually sets in over time,
9  but after a certain amount of time tends to start to
10  fade away. So it's very hard to tell time frames.
11    Q. Sure. And I think you said Cole did all
12  the touching of Kevin.
13    A. Right. He did the touching, the actual
14  physical touching of it; but like I said, I was right
15  in the room with him and observed the same thing that
16  he was observing.
17    Q. Right. So I guess are there varying
18  degrees -- maybe he might be the person to ask, if
19  there are -- I am assuming that the longer -- within
20  the first 72 hours or so the longer you are dead the
21  more rigor mortise or stiffness there is, so would
22  you be able to tell me was he extremely stiff or
23  somewhat stiff, do you know what I mean?
24    A. Yeah, when he went to move the extremity,

Page 43

1  you know, it wasn't like moving a normal person's
2  extremity, the whole extremity was stiff in the same
3  position and -- and it was almost as if the whole
4  body would move when he moved that extremity.
5    Q. Was he able to straighten out the
6  extremity?
7    A. No.
8    Q. Is that typical that you cannot straighten
9  the extremity with rigor mortise?
10    A. With rigor mortise, yes.
11    Q. And at that point there was -- you noted
12  there was no obvious trauma, correct? Do you see
13  that on the fourth line there in the middle?
14    A. Yeah.
15    Q. And no lividity. So there were no areas on
16  his body or anywhere on his body where blood had
17  settled at that point?
18    A. Not that was obvious. We obviously because
19  of his position and being -- not wanting to disturb
20  the scene, noting that it was an obvious rigor
21  mortise, there was nothing we were going to do, we
22  didn't remove his clothing to check under that area;
23  but from what we could see and what was apparent with
24  being able to lift certain areas of the clothing up

Page 44

1  we didn't notice any lividity.
2    Q. Do you recall what he was wearing when you
3  got there?
4    A. No. I don't. No.
5    Q. Is lividity more difficult to observe in a
6  black individual?
7    A. Yes, absolutely, and that was the point
8  that I wanted to make is lividity is definitely more
9  difficult to assess in somebody who is
10  African-American.
11    Q. You mentioned something, you didn't want to
12  disturb the scene. Is that something the officers
13  asked you to be careful with, not move him too much?
14    A. No, that's something that we have as part
15  of our training, it's protocol that if you are
16  involved with a crime scene that you try to -- or a
17  possible crime scene, then you try to preserve as
18  much evidence as possible.
19    Q. Was there -- what led you to believe that
20  this might be a crime scene?
21    A. Just I guess not so much a crime scene, but
22  as a police involvement, something that there's going
23  to be an investigation, just through previous
24  experience, you know, this was something that was

Page 45

1  going to be investigated and that it was going to be
2  something that was -- was going to be looked at and
3  wanted to preserve as much of the scene as possible.
4    Q. Do you remember where you put the
5  monitoring -- what do we call the little --
6    A. The patches?
7    Q. The patches. Do you know where you put
8  them on him to get these strips?
9    A. I don't believe that it says exactly where
10  we placed them, but the leads that you would attach
11  to them has specific places that they have to go in
12  order to pick up. And that would have been both the
13  upper areas of the chest and one in the lower area on
14  the left side.
15    Q. Do you ever do it on someone's back?
16    A. Yeah, there are some occasions where you
17  can apply it to their back and get a good reading
18  through the back, especially if they are in a face
19  down position.
20    Q. Do you get a better reading from the front
21  as opposed to the back or it doesn't matter?
22    A. From experience it really generally doesn't
23  make a difference.
24    Q. After no lividity it's got "note, two small

## Page 46

1  packets of white substance rolled in plastic wrap at
2  patient's feet."
3         Tell me about those. When did you first
4  see the two packets of white substance?
5         A. As soon as we walked into the room.
6         Q. Okay. So they were how close to his feet?
7         A. You know, within maybe one to two feet of
8  his feet.
9         Q. Okay. Did anyone in the room tell you
10 whether they -- the significance of those? Had they
11 fallen out of an officer's pockets, do we believe
12 they are Kevin's?
13        A. Nobody mentioned anything about it, it was
14 an observation that we -- that I had seen that I
15 noted.
16        Q. Were they two -- it says wrapped in plastic
17 wrap, like a plastic baggy that you put a sandwich
18 in?
19        A. Yeah, from what I remember, from after
20 reading this, it was almost like a baggy, like a
21 plastic baggy, like a sandwich baggy.
22        Q. A small or -- was it small?
23        A. I believe that it was not -- not large at
24 all, it was fairly small.

## Page 47

1         Q. And there were two next to each other?
2         A. Yeah.
3         Q. Did those remain at his feet the entire
4  time you were there?
5         A. Yes. We didn't move them, we didn't touch
6  them. As far as I know they were there when we
7  turned the patient over to the coroner.
8         Q. Did anyone ever give you any indication as
9  to what they thought the cause of death was?
10        A. No.
11        Q. And that's nothing you really -- that's not
12 part of your duties to determine that?
13        A. No.
14        Q. If you had to estimate, could you say how
15 big each baggy was?
16        A. I don't know. Maybe three inches long,
17 half an inch, quarter inch thick, something like
18 that.
19        Q. Do you know how they were closed? Were
20 they tied in a knot, was there a twist tie?
21        A. I believe that they were just wrapped up,
22 rolled on top of one another.
23        Q. So they were on top of each other as
24 opposed to laying next to each other?

## Page 48

1         A. No, I mean they were rolled -- the plastic
2  was rolled on top of itself to close it, not that it
3  was twisted or tied in a knot.
4         Q. I see. Then there was one and how far
5  would you say the other one was away from it?
6         A. They were pretty close together.
7         Q. Within inches?
8         A. Sure.
9         Q. And then one of the officers gave you a
10 history of the patient somewhat, it says VCCO,
11 Vermilion county correctional officer?
12        A. Yes.
13        Q. "Stated patient was brought in around 6:30
14 hours and he was combative and doped up or
15 something." Are those -- it looks like there's quote
16 marks.
17        A. Yes.
18        Q. Is that exactly what somebody told you?
19        A. Yes.
20        Q. "Correctional officer stated patient was
21 placed in isolated cell due to being combative.
22 Correctional officer stated patient was placed in his
23 cell around 6:45" and you corrected that from 7:30?
24        A. Yes.

## Page 49

1         Q. "And patient was last spoken to around 700
2  hours." Let me just ask you about the writing down
3  6:30 and then putting 0645. Since you wrote these at
4  the station, is that something that you corrected on
5  your own reading it over or, you know, can you just
6  explain the correction?
7         A. The line through the 0730, is that what
8  you're asking?
9         Q. Yeah.
10        A. The line through 0730 was because you can
11 tell that there was -- it wasn't crammed back in
12 there, the 0645, usually if you would continue on
13 with the sentence, so the hours would have been after
14 that. It was something that I must have wrote and
15 realized that it was an error right away, put a line
16 through it and corrected it.
17        Q. Okay. Then we talked about the asthma.
18 And you talked about his upper extremity underneath
19 his body. And then the last -- the very last word in
20 that narrative is confirmation?
21        A. Uh-huh.
22        Q. Yes?
23        A. Yes.
24        Q. And before it is something circled. What

Page 50

1  is that?
2      A. I'm sorry? Before where?
3      Q. Before the word confirmation there's --
4      A. P. That's a P with a circle around it.
5      Q. What does that mean?
6      A. We use a -- at least I use a standard
7  format to write things in and it is SOAP. S is here
8  at the very beginning which stands for subjective,
9  that would be anything that the patient tells you.
10  It says under subjective that he was unable to voice
11  a complaint. O is objective. Those are all
12  observations or anything that anyone other than the
13  patient would tell you. And then P would be your
14  plan of action.
15      Q. Okay. And the time of death you have here
16  under treatment on this page is 1133. Is that when
17  the coroner pronounced him dead?
18      A. No, the time of death would have came from
19  a physician at Provena United Samaritans Hospital
20  after we contacted him via phone.
21      Q. So I mean in reality you knew much -- 10
22  minutes earlier, say, that he was dead, it was just
23  you needed confirmation from a doctor --
24      A. Yes.

Page 51

1      Q. -- telling him he's three zeros and the
2  doctor says we're going to pronounce him dead?
3      A. Yes. Yes. Because we can't determine a
4  time of death or pronounce anyone dead. It has to
5  come through the physician.
6      Q. Okay. If we look at the next sheet, the
7  EMS system run record, what we just talked about is
8  pretty much confirmed in these times in the upper
9  right-hand corner, it looks like you called the
10  hospital around 11:31 and the conversation was over
11  at 11:33 and at that point the doctor had pronounced
12  him dead?
13      A. Yes.
14      Q. So from -- and at that point you're still
15  at the Public Safety Building, correct?
16      A. Yes.
17      Q. Okay. And you also saw mucus coming from
18  Kevin's mouth?
19      A. Yeah, I documented in my report, note some
20  type of fluid to be coming from patient's mouth.
21      Q. Do you know just by calling it mucus,
22  though, was it a white substance or dark substance?
23      A. From what I remember of it actually I
24  believe that it was a white frothy type of substance.

Page 52

1      Q. Okay. And then if we are looking still at
2  the EMS run record under meds, there's inhaler. Did
3  you observe Kevin with an inhaler there at the Public
4  Safety Building?
5      A. I'm sorry, I'm not seeing that.
6      Q. I'm sorry.
7      A. Oh.
8      Q. On this sheet here, meds. Inhaler. I know
9  you didn't prepare this, but you said this is
10  information you gave Miss Decker so I'm wondering --
11      A. Without -- you know, without listening to
12  the report because those -- those reports are
13  recorded, that's the reason that we call it in, it's
14  on a recorded line. Without -- I may have said that
15  there was an inhaler. I don't remember there being
16  an inhaler there and I didn't document it on any of
17  my other run sheets, but she must have gotten it
18  somewhere from me, so I may have said something in
19  the report about there being an inhaler there, but I
20  don't specifically remember it being there.
21      Q. Okay. Let's look at the monitor strips and
22  they're -- all three monitor strips, they are all
23  flat. And I just want to ask you about the time,
24  11:27. And I know from your report there was a

Page 53

1  problem sending the strips through your radio because
2  of the cement in the basement there?
3      A. Yeah.
4      Q. Okay. So the 11:27, is that when you were
5  actually monitoring him or is that when it sent?
6      A. No, that's when you actually hit the button
7  to record the strip and that puts a time stamp on it.
8      Q. Okay. So let's -- if you could quickly
9  just take me through when you got into the padded
10  cell what you did, when you get there until --
11  until -- well, why don't you just take me through
12  what you did when you got there until you leave.
13      A. Okay. What I -- what we did, Cole and I
14  both went in at the same time with our equipment, we
15  both walked in to the cell together. As I stated
16  there was some other correctional officers that was
17  there. I would have began asking them questions to
18  establish time lines, what had happened, such as the
19  information that I documented in my report. Cole
20  then began the physical assessment by assessing for
21  the carotid pulse and then also assessing the
22  extremities for the rigor mortise.
23          After we determined that he did not have a
24  pulse and that he had rigor mortise, he met the

Page 54

1  criteria of the protocol for the triple zero. We
2  would have then applied the cardiac monitor, recorded
3  the strips, gained as much information about the
4  individual as possible, write all of it down and then
5  contact the hospital for the confirmation of death.
6       Q. Okay. And this was pretty standard
7  protocol. The only thing that was sort of out of the
8  ordinary was you had to give a statement afterwards
9  because of the situation?
10      A. Yes. Yes.
11      Q. So what happens is you do everything you
12  just told us about, you give the statement to the --
13  an investigating officer I am assuming and then you
14  go back to the station and do this -- these reports?
15      A. Yes.
16      Q. The statements that you gave to the
17  officer, the statement you gave, was the officer
18  writing down as you spoke or was it tape recorded or
19  was he just listening to you?
20      A. Actually after starting to recall some
21  events I believe that the Vermilion county sheriff,
22  Pat Hartshorn, was there and I actually have it
23  documented on the back of here who -- I usually
24  document who the officers are on the scene or at

Page 55

1  least the most senior officer. And with Sheriff
2  Hartshorn being there, he would have been the most
3  senior person, that's why I placed him on the report.
4  But as I recall when I gave my report they were
5  taking notes and writing things down as I was
6  speaking.
7       Q. Okay. And I am looking at your report and
8  because you didn't really prepare it I don't think
9  I'm going to show it to you, but there's a few things
10 I'm going to ask you about. There's reference in
11 here to a Deputy Bill Hurt. Does that ring a bell?
12      A. I just know that he's a sheriff.
13      Q. Do you know, do you remember him being down
14 there?
15      A. I really don't remember who all was there.
16 About the only person that I really remember that was
17 there was -- was Sheriff Hartshorn.
18      Q. Where in the Public Safety Building did you
19 talk to the investigating officer?
20      A. It was, if I remember right, it was as I
21 had said in the report I left Cole with -- with the
22 patient while I went to a place where I could call
23 from a phone and after the coroner got there we -- it
24 was -- it was in an office area, I went back, turned

Page 56

1  the patient over to the coroner after they got there
2  and then we went down and I believe it was in that
3  same area.
4       Q. The same book-in area, on the same floor?
5       A. I don't know if it was book-in, but, yeah,
6  it was on the same floor. It was the same place that
7  I called from to make the report to the hospital.
8       Q. Okay. So if there was some discrepancy or
9  anything like that about what you were telling this
10 officer from what he actually observed, you guys
11 could just walk over there and take a look and
12 straighten it out?
13      A. Yes. Yes.
14      Q. Do you have any experience with responding
15 to someone who has had a drug overdose?
16      A. Yes.
17      Q. How about specifically a cocaine overdose?
18      A. We obviously can't tell what the medication
19 is that they are taking, we can only rely on the
20 patients, what they are telling us. And I have been
21 on calls where patients have said that they have
22 taken cocaine, yes.
23      Q. How did those patients, where they have
24 told you they have taken cocaine and you have

Page 57

1  responded to a call, how did they present to you,
2  like their behaviors?
3       A. The patient that stands out in my mind that
4  I supposedly dealt with was a -- he ended up having a
5  cocaine induced heart attack and that patient was
6  anxious, but was very willing to cooperate to relay
7  the information because he understood that he was in
8  distress and that was why he had called.
9       Q. Was he -- when you say anxious, was he
10 agitated, jittery?
11      A. This particular person wasn't. But I mean
12 there are other cases where, yeah, I mean each
13 individual is different, you know, it's hard to base
14 what each person will -- how they will react to a
15 certain substance.
16      Q. Did that man survive?
17      A. Yes.
18      Q. Okay. What was your treatment for him once
19 you learned he was on cocaine?
20      A. The treatment that we performed for him in
21 recollection was we had followed a protocol of a
22 possible drug overdose which calls for administering
23 a certain medication called sodium bicarbonate. And
24 sodium bicarbonate helps to counteract the effects of

## Page 58

1  cocaine on the myocardial muscles in the heart.

2  Q. I'm going to show you what has previously

3  been marked as O'Brien Group Exhibit No. 4. These

4  are a group of photographs, if you want to take a

5  look, I am going to come over there and just -- a

6  group of photographs which we've been told are Kevin

7  Lucas in the padded cell and these are actually here,

8  you can look through these. And I have shown you the

9  first photograph where he is in a prone position with

10  the leads on his shoulders and one on his side. Does

11  that photograph accurately show the position of Kevin

12  Lucas when you entered the padded cell?

13  A. Yes.

14  Q. And to your recollection is that where you

15  put the leads on him?

16  A. Yes.

17  Q. Your recollection, is that what he was

18  wearing when you entered the padded cell?

19  A. Yes.

20  MR. ROSE: Counsel, do we want to mark --

21  if he is looking at a specific photo maybe we should

22  mark that as -- this as part of Exhibit 4, you could

23  mark it 4A and 4B.

24  MR. DE CARO: We'll mark this as 4A.

## Page 59

1  MR. ROSE: That way you can give it to the

2  reporter and it will make sense in the transcript.

3  (Whereupon Exhibit No. 4A and 4B were

4  marked for identification.)

5  Q. I will show you what we will mark as

6  O'Brien 4B. You can see around Kevin's mouth, it

7  looks like there's a white dried substance. Is that

8  the mucus you talked about?

9  A. That was the fluid that I had documented

10  coming from the patient's mouth.

11  Q. Okay.

12  A. And a lot of times when I call the report

13  they may not be specifically documenting every single

14  word that I say, so...

15  Q. Sure. When you were in the padded cell at

16  any time did you see anybody taking these photographs

17  that we are looking at?

18  A. I believe that they were -- they were

19  taking them after we had already called the hospital.

20  I think it was -- it was on the return from -- my

21  return from the -- from the office area where I

22  contacted the hospital back to the cell.

23  Q. And I'll show you what we have marked as

24  O'Brien 4C.

## Page 60

1  (Whereupon Exhibit No. 4C was marked for

2  identification.)

3  Q. It shows a little blood in Kevin's nose

4  area. Is that not significant enough to document?

5  A. It may have been something that we -- we

6  didn't initially notice or something that we really

7  didn't document. Or that I did not document.

8  Q. Let's go back and look at 4A. Is that the

9  position that Kevin remained in during the entire

10  time you took his vitals and monitored him or did you

11  attempt to move him in any way?

12  A. No, the only thing we attempted to do was,

13  like I say, we grabbed this extremity and that

14  extremity to attempt --

15  Q. Which extremity?

16  A. It would be his left extremity, correct?

17  Yeah, it would be the left extremity.

18  Q. Left arm?

19  A. Upper extremity.

20  MR. ROSE: When you are referring to

21  extremity, I assume you are talking upper arm.

22  A. Yes, left upper extremity and left lower

23  extremity.

24  Q. And that was just to see if rigor mortise

## Page 61

1  had set in?

2  A. Yes.

3  Q. Then you put him back to where he was?

4  A. Yes. We didn't roll him or anything.

5  Q. Have we talked about all the conversations

6  you've had with anyone regarding this case?

7  A. I believe so, yes.

8  Q. Okay.

9  MR. DE CARO: I don't have anything else.

10  EXAMINATION CONDUCTED:

11  BY: MR. JASON W. ROSE:

12  Q. Since we're starting with the pictures we

13  might as well -- since we ended with the pictures we

14  might as well continue. Do we have the black and

15  white of this one?

16  MR. DE CARO: That's A.

17  Q. Okay. And you can see in 4A there does

18  appear to be some sort of white package or something

19  which can be seen in photo 4A, correct?

20  A. Yes.

21  Q. And is this what you observed, is this what

22  you recall observing?

23  A. Yeah.

24  Q. And do you see that on the picture there

Page 62

1  appears to be a white bag and then right next to it
2  there's a white something, but you can't really -- it
3  looks much smaller?
4      A. Yeah. Yeah. Seeing it now, that's -- I
5  believe that both of those were white packages and I
6  just believe that one was larger than the other.
7      Q. Okay. But this is -- this picture, 4A,
8  fairly and accurately depicts what you observed when
9  you were in the cell on the morning in question?
10     A. Yes.
11     Q. Okay.  To become a paramedic you have to
12 take a test; is that correct?
13     A. Yes. You have to take a test and you also
14 have to go through a course and meet the objectives
15 for the course and the standards that are set forth
16 through the agency that's administering the course
17 along with the Illinois Department of Public Health.
18     Q. How many hours of instruction do you need
19 to pass for the paramedic test?
20     A. I believe that including classroom time,
21 with -- because you have to sit through a classroom
22 portion, then you also have to go out into the field
23 and do what they call, what they refer to as
24 clinicals, which would be riding along with the

Page 63

1  ambulance, observing certain patients, that it's
2  somewhere over 1000, maybe 2000 hours.
3      Q. So is it correct to say that all paramedics
4  are EMTs but not all EMTs are paramedics?
5      A. Yes.
6      Q. And is the test a one day test?
7      A. Yeah. Well, the state test that I took,
8  yes, was a one day test, one day written test. But
9  there was other tests for the class, that was part of
10 the classroom that they would have to provide to
11 validate for the state.
12     Q. Okay. At some point during the deposition
13 you talked about triple zero protocol.
14     A. Uh-huh.
15     Q. The triple zero refers to no heart rate, no
16 blood pressure, no pulse?
17     A. Yes.
18     Q. And in this case when you got to the scene
19 you tested all three of those things, right?
20     A. He did not have a heart rate, which we
21 verified through checking for the carotid pulse, he
22 did not -- no heart rate -- no heart rate, no
23 respirations rate and no blood pressure. That's what
24 I stated, right?

Page 64

1      Q. Yes.
2      A. Okay.
3      Q. Yes.
4      A. Okay. So the -- we checked for the -- the
5  physical sign of -- through the -- checking for the
6  carotid pulse to make sure he did not have a pulse.
7  We would have checked for respirations by watching
8  for chest rise and fall. It was documented in my
9  report that he was apneic, which means he was not
10 breathing. And then blood pressure, generally we do
11 not check for blood pressure on somebody who has the
12 other two clinical findings, especially in
13 conjunction with somebody who has no electrical
14 activity on the heart monitor because if they don't
15 have a pulse, then they can't have a blood pressure.
16     Q. So let's take a case where you have no
17 heart rate, no blood pressure, no pulse. At that
18 point can you make a decision --
19     A. I'm sorry. I think I misspoke. Heart rate
20 and pulse are the same thing. It's no heart rate, no
21 respirations and no blood pressure.
22     Q. Okay. So the heart rate is checked through
23 the carotid pulse?
24     A. Yes.

Page 65

1      Q. And the respiration rate is checked how?
2      A. Through visual observation, by watching
3  chest rise and fall, you can also auscultate or
4  listen for lung sounds. But in this case it was very
5  apparent that there was no chest rise and fall.
6      Q. Okay. So in a case where you have an
7  individual with no heart rate, no blood pressure and
8  no respiration rate, can you then make a decision
9  that we are not going to make an attempt to
10 resuscitate the patient?
11     A. Yes, but we have to call medical direction
12 to confirm that.
13     Q. Okay. Did you indicate, though, that in
14 addition to no heart rate, no blood pressure and no
15 respiration that you need something in addition to
16 those three things?
17     A. Yes.
18     Q. Is that where the decapitation, rigor
19 mortise, lividity come in?
20     A. Yes.
21     Q. So let's say the case where you have no
22 heart rate, no blood pressure, no respiration rate,
23 but you don't have any of these other factors?
24     A. Then we would probably attempt

Page 66

1  resuscitation. Not probably. If we don't have any
2  of the others we would attempt resuscitation efforts.
3      Q. And how do you resuscitate? What do you do
4  specifically?
5      A. By performing CPR, you know,
6  cardiopulmonary resuscitation where you begin
7  ventilating the patient with a bag valve mask or you
8  perform an intubation where you place a tube in their
9  throat and breathe for them, you have somebody who
10  would start chest compressions, place them on the
11  heart monitor if they are in a -- if their heart was
12  in some type of rhythm where you could shock it, you
13  would defibrillate. Those are the key steps to early
14  access and patient care for somebody who is in a --
15  in a situation where they possibly could be
16  resuscitated.
17      Q. Okay. I spoke to Mr. Elder briefly
18  yesterday and I believe he told me that there were
19  five cases where you don't have to resuscitate and he
20  mentioned decapitation, rigor mortise. Are there
21  four or five?
22      A. Decapitation, rigor mortise, lividity,
23  coroner's on the scene or the doctor is on the scene,
24  so that would be five.

Page 67

1      Q. Coroner or doctor, is that four and five?
2      A. I believe that's four and five, yeah.
3      Q. Okay. But in this -- and any one of those,
4  they don't all have to be present, you just need one
5  of those in addition to the triple O and at that
6  point you don't need to make an attempt to
7  resuscitate, correct?
8      A. Yes.
9      Q. And in this case you had no heart rate, no
10  blood pressure, no respiration and on top of those
11  three things you had rigor mortise?
12      A. Yes.
13      Q. And Mr. De Caro was asking you and I'm
14  going to ask you a few more questions about trying to
15  measure rigor mortise. Would you ever classify rigor
16  mortise in terms of mild rigor mortise, substantial
17  rigor mortise and then high rigor mortise?
18      A. No. I mean there's no real classification
19  as far as the -- the depth or the -- the
20  criticalness, I guess, of rigor mortise. It's
21  generally just defined as rigor mortise.
22      Q. In this case would it be fair to say you
23  and Mr. Elder observed a significant amount of rigor
24  mortise?

Page 68

1      A. Yes, obviously there was enough rigor
2  mortise to -- any rigor mortise is part of that
3  criteria, but it was very observable in this specific
4  patient.
5      Q. And specifically when you -- when Mr. Elder
6  went to move his -- his extremity, the body went with
7  it?
8      A. Not to the point of moving the body from
9  its original position, but, yes, you could tell that
10  the body would move with the extremity, whether it
11  was the upper extremity or the lower extremity when
12  it was moved.
13      Q. Okay. Based on your training and your
14  observation of the body which began at 11:22 AM on
15  the day in question, do you have an opinion as to
16  whether Kevin Lucas was dead at 11:05, which is 17
17  minutes earlier.
18      A. I really can't say whether he was dead at
19  that time or not. The only thing I can say is that
20  when I got there I found that he met the criteria for
21  this triple zero protocol and we confirmed the death
22  at 11:33.
23      Q. Okay. And tell me again in terms of your
24  rigor mortise what you've studied. You said you did

Page 69

1  a little bit of research this morning about rigor
2  mortise?
3      A. Yeah.
4      Q. And what did you get, read a text from a
5  textbook or one of your training books?
6      A. Yeah, I read it from a textbook. As I
7  said, I'm an instructor, I am right in the middle
8  of -- I've actually got two weeks left for my EMT
9  basic students to graduate from my class, so I went
10  to my book and referenced it and, you know, it's --
11  rigor mortise is something that is really dependent
12  on each individual. You may have a different display
13  of rigor mortise as opposed to Mr. De Caro or myself.
14  So rigor mortise is very specific to each individual
15  and, you know, the time of onset can be 10 minutes to
16  24 hours to 72 hours. It's very -- it's very varying
17  in degree.
18      Q. Have you read anything in terms of trying
19  to get a normal how long -- I understand that there
20  can be extreme cases where rigor mortise can set in
21  right away and then based on what you've just said at
22  times rigor mortise can take a long time. Do you
23  know anything about what's typical in terms of how
24  long does it typically take between when a body dies

Page 70

1  and when rigor mortise sets in?
2      A. Like I said it can be any time from 10
3  minutes to three days, so it's varying, really it
4  depends on each individual person.
5      Q. And do you recall what textbook you were
6  looking at or what --
7      A. It's -- I believe it's the Brady
8  Prehospital Emergency Care 7E, seventh edition.
9      Q. And I assume that's an authoritative book
10 that paramedics would frequently use?
11     A. It's used to -- it's used to teach EMT
12 basics. Like I said basics are the very minimal
13 training of emergency medical technicians and it
14 would have been in that book there.
15     Q. Okay. So I think I know your answer, but
16 I'm going to ask the questions anyway. I assume
17 based on your testimony that you do not have any
18 opinion as to when Kevin Lucas may have died on the
19 morning of May 10th?
20     A. No, I have no opinion as to the absolute
21 time.
22     Q. The way you answered it makes me -- do you
23 have any general idea as to the time of death?
24     A. There's no way of telling for sure, at

Page 71

1  least from my perspective without being trained at a
2  paramedic level.
3      Q. Let me ask you this. Do you have an
4  opinion as to whether Kevin Lucas would have been
5  dead an hour earlier?
6      A. I'm sure that it could have been possible.
7  You know --
8      Q. I understand it's possible, but you don't
9  have an opinion one way or the other?
10     A. No.
11     Q. And do you have any opinion as to the cause
12 of death?
13     A. No.
14     Q. And am I correct that you never at any time
15 while you were tending to Kevin Lucas, you never
16 observed any sign that would suggest to you that
17 Kevin Lucas had been beaten or abused at any time; is
18 that correct?
19     A. No, there was -- according to the report
20 there was no obvious signs of trauma to the patient.
21     Q. And is that something that is part of your
22 training you would look for?
23     A. Yes.
24     Q. And give me an example of how you determine

Page 72

1  whether there's an obvious sign of trauma.
2      A. You know, you could see something -- it's
3  part of the assessment pattern that you learn through
4  nationally recognized courses such as basic trauma
5  life support or BTLS courses where you're looking for
6  specific injuries such as deformities, contusions,
7  abrasions, punctures, penetrations, burns,
8  tenderness, lacerations, swelling. You know, things
9  along those lines.
10     Q. And you did not observe any of those
11 things?
12     A. No.
13     Q. And if you had observed any of those things
14 you would have documented them in your report?
15     A. Yes.
16     Q. And as you sit here -- you did not note any
17 bleeding anywhere, correct?
18     A. Not that I -- not that I noted in my
19 report, no.
20     Q. You testified about information that you
21 were given about Mr. Lucas from another correctional
22 officer. As you sit here today do you recall the
23 names of any of the correctional officers that you
24 may have spoken with?

Page 73

1      A. No. I sure don't.
2      Q. As you sit here today can you give a
3  description of any of the correctional officers that
4  you spoke with or any of the correctional officers
5  that were in the cell when you were there?
6      A. No. I sure can't.
7      Q. Okay. Turning your attention back to
8  Exhibit No. 1, what doctor pronounced Kevin Lucas
9  dead?
10     A. If you go to the EMS system run record, the
11 doctor that -- the doctor that would have been on
12 duty when I called would have been Dr. Sally Sidman
13 and you can tell that by the bottom of the page where
14 it says MD.
15     Q. And would you have been the individual that
16 would have spoken to Dr. Sidman?
17     A. No, I would have called the hospital,
18 spoken with the ECRN or the nurse, which would have
19 been the Jamie Decker, very rare is it a doctor gets
20 on the radio and speaks because they have so many
21 patients to see. A lot of times the nurse will go to
22 them, present what I have presented to that nurse and
23 then get the confirmation.
24     Q. What did you tell Nurse Decker?

Page 74

1    A. What I would have told her is simply what
2 she would have documented here. Without actually
3 having the tape from that day, you know, it's very
4 hard for me to say exactly what you said on the
5 radio.
6    Q. Do you recall how long would a typical
7 conversation be with the nurse where you're going
8 through the steps or the protocol to have a patient
9 pronounced dead?
10    A. You know, typically it's because of the
11 hospital is so busy and the time that you take for a
12 nurse to answer the radio is time that's taken away
13 from providing care for a patient. It's usually
14 limited to pertinent information. So, you know, one
15 to two minutes is very common.
16    Q. As you sit here today, though, you don't
17 have an independent recollection of your
18 conversation, you can only presume what you would
19 have told her based on the EMS system run record,
20 correct?
21    A. Yes.
22    MR. ROSE: I'm just going over my notes.
23 Do you have any follow-up?
24    MR. DE CARO: Yeah, I have a couple.

Page 75

1 RE-EXAMINATION,
2 BY: MR. DENNIS DE CARO:
3    Q. In the emergency medical services report,
4 is that what we are calling the state report?
5    A. Sure, I guess. We've always -- I've always
6 just called it state run sheet.
7    Q. Okay. Let's call it that, the state run
8 sheet, it has a history of what the correctional
9 officers told you occurred prior to your arriving?
10    A. Sure.
11    Q. Is that accurate?
12    A. It states pertinent information that I felt
13 was important to document. I mean it's obviously not
14 everything that they told me, but it was something
15 that what they told me was pertinent that I felt
16 needed to be in the report.
17    Q. So anything -- they told you a little more
18 but it was stuff that wasn't critical to his history?
19    A. Sure.
20    Q. Okay. So what you thought was relevant you
21 put down in this narrative?
22    A. Yes.
23    Q. Okay. We talked a little bit about things
24 you would have done with a defibrillator. Back in

Page 76

1 May of '03 were there any defibrillators located in
2 the Public Safety Building?
3    A. Not to my knowledge. I'm not sure that
4 there was.
5    Q. Okay. And I'm a little bit confused as to
6 this decapitation, rigor mortise, lividity, coroner
7 and doctor. Even though you're a trained paramedic,
8 you are instructing an EMT, but yet even if you find
9 triple zeros and rigor mortise you still have to call
10 a doctor or a coroner has to tell you this person is
11 dead?
12    A. Yes.
13    Q. You cannot with your training still can't
14 come to that decision on your own?
15    A. You're absolutely correct.
16    Q. Okay. And prior to taking EMS training or
17 paramedic training, I mean, did you know about these
18 three zeros and decapitation, rigor mortise and
19 lividity and all of that when you were in high school
20 without taking any training?
21    A. No.
22    Q. And you did some research today still at
23 your level of expertise on rigor mortise because
24 that's just not common knowledge even if you're

Page 77

1 training this stuff.
2    A. Yes.
3    Q. And CPR, what does that stand for?
4    A. Cardiopulmonary resuscitation.
5    Q. So -- say the first word.
6    A. Cardio.
7    Q. Cardio. So cardiopulmonary leads me to
8 believe that you use CPR when someone is not
9 breathing or they don't have a heart rate.
10    A. Yes.
11    Q. So there are instances where you might go
12 feel the carotid artery, there's nothing there, that
13 is an instance where you would start CPR?
14    A. If they didn't meet some of the other
15 criteria in that triple zero protocol.
16    Q. If they didn't --
17    A. Yeah, if they didn't have the rigor
18 mortise, they didn't have the lividity, they didn't
19 have, you know, decapitation or the coroner or the
20 doctor on the scene and they didn't meet that certain
21 criteria then, yes.
22    Q. I guess what I'm saying, if I am a layman
23 and I come across somebody who is laying on the
24 sidewalk and they're not breathing and they don't

## Page 78

1  have a heart rate, as an instructor would you
2  instruct me to begin CPR or should I -- should I feel
3  if there's rigor mortise and make a decision not to
4  do CPR?
5      A. Say that one more time.
6      Q. Have you ever taken CPR training? I am
7  assuming you have.
8      A. Yes, I am a CPR instructor.
9      Q. Do you ever train non-EMTs or
10  nonparamedics, do you ever go out to train residents
11  of a certain village?
12      A. Yes.
13      Q. Okay. What do you train them on about the
14  decapitation, rigor mortise, lividity, coroner,
15  doctor or you don't train them on that?
16      A. It's not mentioned in it.
17      Q. So I am assuming that you train them that
18  if a member of their family or they're somewhere
19  where a person is lying and they don't have a pulse
20  and you don't see that they are breathing that they
21  should start CPR?
22      A. Yes. But we also try to teach a little bit
23  of common sense also, you know, if it's -- if they
24  feel that they're in danger or they don't feel

## Page 79

1  comfortable performing it or, you know, if they're
2  not sure when to start it -- I'm sorry, strike that.
3  That's not -- you roll a guy over and his arms stay
4  up in the air.
5      Q. Right. Right. Sure, then you wouldn't do
6  it. If he's decapitated, he doesn't have a head,
7  you're not going to start CPR.
8      A. Yeah, it's common sense. So we don't tell
9  them there is criteria they have to meet but we try
10  to teach a little bit of common sense because it is
11  the lay public.
12      Q. Sure. Sure. So in part of your training
13  is any of it with smelling salts, ammonia is it that
14  they use?
15      A. Ammonia inhaler.
16      Q. So same thing would go with that, if some
17  guy's arm is in the air or he has rigor mortise it
18  would be pointless to use the ammonia?
19      A. Sure.
20      MR. ROSE: I am going to show the deponent
21  the investigative reports.
22      MR. DE CARO: Sure.
23      MR. ROSE: Want me to do that now or did
24  I --

## Page 80

1      MR. DE CARO: I have one more question and
2  I may not. Let me just look. That's all we have.
3      (Whereupon Exhibit No. Allison 2 was marked
4  for identification.)
5  RE-EXAMINATION CONDUCTED:
6      BY: MR. JASON ROSE:
7      Q. I have asked the court reporter to mark the
8  following investigative report as Allison Exhibit 2.
9  This is not a document you prepared, but this is a
10  report that was prepared by a Deputy Damilano
11  regarding his conversations with you. I'd ask you to
12  review it and then I'll ask you a few quick questions
13  about it. What does M/B stand for here in the second
14  paragraph?
15      A. Male black.
16      Q. I just need you to read this part because
17  the rest of it has to do with the conversation that
18  officer -- that Deputy Damilano had with paramedic
19  Elder.
20      A. So just up to this point?
21      Q. Yes. Exactly. And this report reflects
22  that you spoke to Deputy Damilano shortly after the
23  events in question, correct?
24      A. Yes.

## Page 81

1      Q. And is there anything in Deputy Damilano's
2  report that you believe to be inaccurate or that you
3  disagree with?
4      A. I don't know that I said that there -- I
5  saw no blood in the cell. I think it was I may have
6  said that I didn't notice any blood in the area, but
7  I didn't say it was an absolute no.
8      Q. Okay. Is there anything else?
9      A. No, I don't think so.
10      Q. So otherwise generally speaking the
11  investigative report correctly memorializes what you
12  said to Deputy Damilano, correct?
13      A. Sure.
14      MR. ROSE: Nothing further.
15  FURTHER RE-EXAMINATION,
16      BY: MR. DENNIS DE CARO:
17      Q. This report, though, isn't the one you gave
18  to an officer that morning right after you went in
19  there because this one says it was given at 3:30 PM
20  that day. So now there were two conversations with
21  two officers?
22      A. Evidently, yes. There was -- there was
23  initially the conversation in the cell -- I'm sorry,
24  not in the cell but at the PSB that we gave a report

## Page 82

1  there, and then like I said there was a phone call

2  later on while I was at the station asking some more

3  follow-up questions.

4      Q. Would it be around this time that you got

5  the phone call, 3:30?

6      A. Yeah, because it was -- it was definitely

7  in the afternoon by that time.

8      Q. I think what you told me was the guy you

9  talked to at the PSB right after was taking notes?

10     A. Yes.

11     MR. DE CARO: Nothing else.

12  FURTHER RE-EXAMINATION,

13     BY: MR. JASON W. ROSE:

14     Q. Do you know if the person you spoke to at

15  the PSB was the same person you spoke to on the phone

16  or was it two different people or you're not sure?

17     A. I'm not sure.

18     MR. ROSE: Okay. Nothing else. That's it.

19  Signature?

20     MR. DE CARO: What we're going to do is get

21  this typed up. The court reporter is taking this

22  down as we're speaking. What you -- there's two

23  things, but you have to tell us what you want to do,

24  you can either reserve your signature or waive your

## Page 83

1  signature. If you reserve your signature and we

2  order this, either you'll go to a prearranged area to

3  review it or we'll send it to you most likely and

4  you'll look it over and you can change names that are

5  misspelled or typos, but you can't change your

6  testimony. That's reserving it. If you waive it

7  you'll assume that the court reporter has taken

8  things down accurately and you won't have an

9  opportunity to review it for those type of

10  corrections before we get it. But you have to let us

11  know.

12     A. That's fine.

13     Q. You'll waive it?

14     A. Yeah.

15        (Concluding at 12:48 PM)

16  AND FURTHER THE DEPONENT SAITH NOT

    (Signature Waived)

17  _____

18        RYAN ALLISON

19

20

21

22

23

24

## Page 84

1  STATE OF ILLINOIS       )
                            )
2  COUNTY OF VERMILION)

3

        I, Amy L. Prillaman, a Certified Shorthand
4  Reporter, in and for the County of Vermilion, State
   of Illinois, do hereby certify that RYAN ALLISON, the
5  deponent herein, was by me first duly sworn to tell
   the truth, the whole truth and nothing but the truth,
6  in the aforementioned cause of action.
        That the foregoing deposition was taken on
7  behalf of the Defendant, at the Vermilion County
   Courthouse, 7 north Vermilion, Danville, Illinois, on
8  the 26th of August, 2005;
        That said deposition is a true record of the
9  testimony given by the deponent and was taken down in
   stenograph notes and afterwards reduced to
10 typewriting under my instruction; and that it was
   agreed by and between the witness and attorneys that
11 said signature on said deposition would be waived.
        I do hereby certify that I am a disinterested
12 person in this cause of action; that I am not a
   relative of any party or any attorney of record in
13 this cause, or an attorney for any party herein, or
   otherwise interested in the event of this action, and
14 am not in the employ of the attorneys for either
   party.
15     IN WITNESS WHEREOF, I have hereunto set my hand
   this 19th day of September, 2005.

16

17     _____
       AMY L. PRILLAMAN, CSR

18

19

20

21

22

23

24